# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JANA JANSEN,** | Case: 1:25−cv−02961<br>Assigned To : Unassigned<br>Assign. Date : 9/2/2025<br>Description: TRO/Prelim. Inj. (D−DECK) |

**Plaintiff,**

**v.**

**DONALD J. TRUMP, in his official capacity as President of the United States;**

**UNITED STATES DEPARTMENT OF STATE;**

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY;**

**SOCIAL SECURITY ADMINISTRATION;**

**UNITED STATES ATTORNEY GENERAL;**

**SECRETARY OF HEALTH AND HUMAN SERVICES;**

**DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT,**

**Defendants.**

**CIVIL ACTION NO.:**



RECEIVED
SEP -2 2025
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

1

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I. INTRODUCTION

1. This is an action for declaratory and injunctive relief challenging the Executive Order titled "DEFENDING WOMEN FROM GENDER IDEOLOGY EXTREMISM AND RESTORING BIOLOGICAL TRUTH TO THE FEDERAL GOVERNMENT" ("the Executive Order" or "EO"), issued by President Donald J. Trump on January 20, 2025.

2. The Executive Order and subsequent federal agency policies unlawfully and unconstitutionally roll back established rights and recognition for individuals who have undergone surgical sex reassignment and have lived as their affirmed and legally recognized sex for decades.

3. The United States legal system has a documented history of expanding, not contracting, civil rights and liberties, as shown in landmark Supreme Court decisions such as *Marbury v. Madison* (1803), *Brown v. Board of Education* (1954), *Loving v. Virginia (1967)*, *Lawrence v. Texas* (2003)*, Obergefell v. Hodges* (2015), and *Bostock v. Clayton County* (2020)*.

4. The Executive Order's attempt to redefine "sex" and reverse established federal policies regarding identity documents represents a stark departure from this historical commitment to rights expansion.

5. Plaintiff Jana Jansen is a post-operative intersex/transgender woman who has lived exclusively as a woman for over 30 years, with all government documentation

consistently reflecting her female sex.

6.  Ms. Jansen is a mother of minor children and fully participates in life as a woman; her identity is *deeply* ingrained in her personal, familial, and public life.

7.  The Executive Order's impact on Ms. Jansen is not a mere administrative inconvenience; it is an existential threat to her established identity, safety, and ability to navigate daily life without fear of discrimination or harassment.

8.  Such a reversal of long-standing, legally recognized identity constitutes irreparable harm, warranting immediate judicial intervention.

9.  Plaintiff seeks immediate preliminary injunctive relief to prevent irreparable constitutional harm while this litigation proceeds, as she faces imminent document renewal requirements on September 23, 2025, through an appointment for a new social security number due to documented safety risks already supported by the Social Security Administration's policies, and safety risks that cannot be remedied through monetary damages.

10. This lawsuit seeks to affirm the legal system's inherent history of expanding civil rights and to prevent the government from arbitrarily redefining fundamental aspects of identity for a class of individuals whose sex has been legally and medically affirmed for a significant period.

11. The Plaintiff's claim focuses not on theoretical identity constructs but on surgically affirmed, biologically integrated, and legally established sex, as recognized and ratified by decades of federal policy.

12. The Executive Order and related policies unlawfully and retroactively erase Plaintiff's legally established identity, inflicting daily harm.

13. This case presents a clear, narrow question of constitutional and administrative overreach against a verifiable, identifiable class of individuals.

14. Plaintiff respectfully invokes the Court's authority to enjoin and invalidate a federal directive that imposes forced reclassification, undermines agency reliance principles, and threatens the safety and liberty of affected individuals.

## II. JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory judgments), and 2202 (further relief).

16. Plaintiff seeks declaratory and injunctive relief to redress violations of her rights under the First and Fifth Amendments to the United States Constitution, as well as the Administrative Procedure Act, 5 U.S.C. § 701 et seq. and sovereign immunity is waived for this non-monetary relief by 5 U.S.C. § 702

17. Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) because the Executive Order was issued in this District, one or more Defendants reside here, and a substantial part of the events or omissions giving rise to the claims occurred here.

## III. PARTIES

18. Plaintiff Jana Jansen is an adult citizen of the United States and a US resident.

19. Ms. Jansen is a post-operative intersex/transgender woman, having undergone medically necessary surgical procedures over 30 years ago to align her physical sex characteristics with her female gender identity.

20. For over three decades, Ms. Jansen has lived exclusively as a woman, and all her legal and personal documentation, including Social Security records, passport, driver's license, and birth certificate, has consistently reflected her female sex.

21. Ms. Jansen is a mother to minor children, and her identity as a woman is deeply ingrained in her personal, familial, and public life.

22. Donald J. Trump is sued in his official capacity as President of the United States for declaratory relief only. He is responsible for the Executive Order at issue.

23. The United States Department of State is responsible for issuing passports and other travel documents and is directly impacted by the EO's directives.

24. The United States Department of Homeland Security is responsible for issuing various forms of identification and is implicated in the EO's directives.

25. The Social Security Administration is responsible for maintaining Social Security records and has changed its sex designation policy in response to the EO.

26. The United States Attorney General is responsible for issuing legal guidance and revising policies concerning detention and medical care as mandated by the EO.

27. The Secretary of Health and Human Services is mandated by the EO to provide guidance expanding on sex-based definitions.

28. The Director of the Office of Personnel Management is directed to implement changes regarding government-issued identification documents.

29. Due to multiple documented threats to her safety (Plaintiff will submit affidavits or declarations detailing specific risks and EO's exacerbation of these risks) on an unrelated matter, Plaintiff is currently enrolled in her state's Address Confidentiality Program. Plaintiff has been advised that a change in her Social Security number is necessary to

protect her and her children from credible threats of violence. The Executive Order and
its implementation create a credible and imminent fear that obtaining a new Social
Security number will potentially revert her sex designation so that it does not accurately
reflect her affirmed sex which has been her designated sex for over 30 years. This poses
an imminent and irreparable harm to Plaintiff's physical safety, her legal identity, and her
ability to protect her children. As a result, Plaintiff has standing to pursue declaratory and
injunctive relief, and she faces a concrete and particularized injury that is traceable to the
Executive Order and redressable by this Court.

30. Additionally, while Plaintiff's current passport does not expire until December 5, 2032, if
she were to lose it, she would need to renew earlier. While there is currently an
injunction, any renewal would require attestation that she belongs to the "class" in Orr
which gives rise to a credible concern that this could be used for future revocation.
Plaintiff requires renewal to maintain her ability to travel internationally as a dual
national, who by law, cannot re-enter the United States on a foreign passport. Under the
Executive Order's implementation, any renewal without attestation, would revert her sex
designation to male, creating immediate and concrete harm.

31. Plaintiff's Global Entry expires in 2026 with renewal available one year in advance of
expiration, which is imminent and would default her sex designation to male, creating
immediate concrete harm. Plaintiff has never been designated male on her Global Entry.

## IV. FACTUAL ALLEGATIONS

## A. The Medical and Social Reality of Sex, Gender, and Disorders of Sexual Differentiation (DSDs)

32. Sex and gender are complex, multifaceted aspects of human identity, often conflated but distinct.

33. Gender identity refers to an individual's internal sense of being male, female, both, neither, or somewhere else along the gender spectrum.

34. Sex, traditionally assigned at birth, encompasses a combination of chromosomes, gonads, hormones, and internal and external anatomy.

35. The Executive Order purports to restore "biological truth" by defining sex as an immutable biological characteristic determined at conception.

36. This rigid, binary definition is scientifically flawed and ignores the complex realities of human biology.

37. Disorders of Sexual Differentiation (DSDs) are recognized medical conditions involving atypical chromosomal, gonadal, or phenotypic sex.

38. DSDs demonstrate that "biological sex" is not always a simple, immutable binary at conception, but rather a spectrum.

39. Examples of DSDs include 46 XX DSD (such as Congenital Adrenal Hyperplasia where a chromosomally female human has partial or full phenotypic characteristics of a male human and whose brain may be fully or partially virilized), 46 XY DSD (such as Androgen Insensitivity Syndrome can be complete or partial and is a chromosomally typical male human whose body partially or fully fails to react to testosterone creating a fully or partially female phenotypic human), 5-alpha-Reductase Deficiency occurs when a human born phenotypically female appears to become a phenotypically male human at puberty, and a myriad of over forty other recognized disorders of sexual differentiation including sex chromosome DSDs (such as Turner syndrome XO or Klinefelter syndrome

7

XXY and Mosaicism XXXY, XXYY), which defy binary by any biological or scientific standard

40. For individuals with DSDs, medical intervention, including surgery, is often undertaken to align their physical presentation with their affirmed sex. Being intersex does not preclude you from being classified as transgender as by nature many intersex conditions necessitate the same surgeries and consist of changing physical sex to align with psychological gender and often to facilitate life as a human where binary is expected-notably, not all intersex people choose to align with either sex thereby creating a third sex based on their biological reality.

41. The existence and medical recognition of these conditions directly contradict the Executive Order's narrow and ideologically driven definition of "biological sex."

42. If the Executive Order's true aim were to align policy with comprehensive scientific understanding, it would acknowledge the spectrum of sex development.

43. The failure to account for intersex individuals and DSDs reveals that the EO's "biological truth" is a pretext for exclusion and discrimination not based on any "biological truth."

44. Professional medical organizations, such as the World Professional Association for Transgender Health (WPATH), recognize gender-affirming surgeries as medically necessary treatments for gender dysphoria.

45. Major medical organizations beyond WPATH support the medical necessity of gender-affirming care, including the American Medical Association, the Endocrine Society, the American Psychological Association, and the American Academy of Pediatrics, all of which recognize such care as evidence-based treatment for gender dysphoria

46. These surgeries involve significant, irreversible physical changes that align an individual's body with their lived gender identity.

47. For transgender women and some intersex transgender women, common procedures include vaginoplasty, vulvoplasty, and breast augmentation.

48. These procedures fundamentally alter an individual's physical sex characteristics to align with their affirmed female identity. Importantly, these are not cosmetic changes but functionally alter the sexual organs of the individuals who undergo these procedures creating an immutable biological reality functionally and phenotypically.

49. This physical transformation, combined with decades of lived experience and legal recognition, establishes a distinct class of individuals, like Plaintiff, whose "biological sex" can no longer be accurately described solely by their birth assignment—and certainly not by "at conception."

**B. Plaintiff Jana Jansen's Established Identity and Prior Legal Recognition**

50. Plaintiff has lived exclusively as a woman for over three decades.

51. Plaintiff underwent medically affirmed sex reassignment surgery more than 30 years ago.

52. Consistent with her lived experience and surgical correction, Plaintiff updated all government-issued identification documents to reflect her female sex.

53.  Prior to the Executive Order, federal agencies, for well over 30 years, maintained policies that facilitated such updates.

54. The Department of State previously permitted individuals to obtain passports with sex designations reflecting their lived sex.

55. Plaintiff's passport has long reflected her female sex.

56. The Social Security Administration allowed individuals to change their sex designation on records to M or F.

57. Plaintiff's Social Security records have long reflected her female sex.

58. This long-standing recognition created a settled expectation of identity and a deeply integrated legal status for Plaintiff.

59. The Executive Order's abrupt and arbitrary reversal of these policies constitutes a severe disruption of settled expectations and a retroactive undermining of a long-established liberty interest.

60. If Plaintiff's documents are forced to revert to a male designation, she would be forcibly outed every time she used her passport or other identification.

61. This forced outing creates potential harm to Plaintiff's safety and her family's safety.

62. Mismatched identification extends beyond passports to other government interactions, creating significant vulnerabilities.

63. Some state government agencies match sex data with Social Security records, potentially leading to "mismatch" alerts.

64. Such discrepancies can impact health insurance coverage, potentially resulting in denials for gender-specific services.

65. The harm is not merely administrative but poses direct threats to personal safety, privacy, and the ability to navigate daily life without discrimination or harassment.

## C. The Executive Order and Its Provisions

66. On January 20, 2025, President Trump issued the Executive Order titled "DEFENDING WOMEN FROM GENDER IDEOLOGY EXTREMISM AND RESTORING BIOLOGICAL TRUTH TO THE FEDERAL GOVERNMENT."

67. The EO establishes "policy protections that define sex-based rights in accordance with biological distinctions."

68. The EO redefines "sex" as only "male" or "female," based on an "immutable biological classification" at conception.

69. The EO mandates that federal agencies use "sex" instead of "gender" in official capacities, including all identification documents.

70. The EO directs the Departments of State and Homeland Security to require identification documents to reflect sex "at conception."

71. The State Department has suspended policies allowing transgender, intersex, and nonbinary people to update sex designations.

72. The Social Security Administration has issued guidance prohibiting changes to sex on Social Security records.

73. The EO prohibits federal funds from being used to "promote gender ideology."

74. The EO mandates that *individuals designated male at birth are not housed in women's prisons or detention centers.* Interestingly, it *does not* similarly mandate that transgender female to male prisoners be housed in female prisons.

75. The EO nullifies prior guidance documents, including the White House Toolkit on Transgender Equality and 2024 Title IX Regulations.

76. The title and language of the EO are politically charged and inherently discriminatory.

77. The phrase "Gender Ideology Extremism" is inflammatory and prejudicial, designed to vilify transgender, intersex, and non-binary individuals.

78. The EO's emphasis on "Restoring Biological Truth" ignores the complexities of human biology, including DSDs.

79. The EO's framing is inherently sexist and patriarchal, policing identity and excluding a class of individuals long recognized as women.

80. The EO's omission of "men" and "males" as a subject of protection or concern reveals a deeper discriminatory intent.

81. The EO's language specifically targets trans women and intersex people who identify as women, portraying them as a threat to cisgender women and girls harkening back to laws specifically aimed at insinuating a libel against male homosexuals while largely viewing female homosexuality as a benign collateral of the primary purpose of the laws.

82. This framing leverages patriarchal notions of protecting "vulnerable" women from an "extremist ideology," while erasing the existence of trans men and intersex people identifying as male.

83. The EO's selective targeting and linguistic erasure provide further evidence of impermissible animus and a discriminatory purpose.

**E. Harm Caused by the Executive Order and Subsequent Agency Actions**

84. The Executive Order and its implementation cause immediate, direct, and irreparable harm to Plaintiff and similarly situated individuals. Plaintiff will submit affidavits or declarations detailing these risks and how the EO exacerbates the risks.

85. Since the Executive Order's implementation, Plaintiff has experienced concrete harms including travel document concerns, feelings of disenfranchisement from her own country, severe anxiety regarding her children's safety and privacy when her documents may not match her lived identity, and the need to file this lawsuit pro se creating further trauma and fear for her safety and that of her minor children.

86. By requiring Plaintiff's identification documents to reflect a sex inconsistent with her lived reality and surgical correction, the EO forces her to "out" herself every time she uses these documents.

87. This exposure creates risk of discrimination, harassment, and violence, particularly during travel or government interactions.

88. The EO interferes with Plaintiff's fundamental rights to travel, privacy, and liberty in defining her identity.

89. The EO undermines Plaintiff's family unit and ability to function fully in society.

90. The EO's impact extends to Plaintiff's minor children, whose safety and privacy are compromised when their mother is forced to carry identification that could expose her transgender status, potentially subjecting the family, including the school aged children, to discrimination and harassment.

91. Inability to obtain or renew accurate identification documents creates significant practical barriers in daily life.

92. International travel becomes precarious and potentially dangerous for individuals with mismatched documents.

93. Employment and background checks may be affected by "mismatch" alerts.

94. Healthcare coverage may be denied for gender-specific services due to mismatched sex designations.

95. Public benefits may be affected by mismatched records.

96. Post-operative transgender and intersex women forcibly housed with males in prisons or detentions are extremely vulnerable to violence and abuse.

97. For someone like Plaintiff, being forced to revert documents to male creates an irreconcilable conflict between her physical reality, lived identity, and legal documentation.

98. This is not merely a "gender identity" issue but a "sex" issue where the government is forcing a mismatch with the individual's surgically corrected physical sex.

99. The practical consequences of document mismatches are direct results of the EO's policies.

100.    The severe impacts and inflammatory language of the EO suggest a punitive intent rather than a genuine regulatory purpose.

101.    The government's asserted interest in "biological truth" cannot justify such widespread and severe harm to a class of citizens long recognized and integrated into society in their affirmed sex.

102.    The harms described extend to all post-operative individuals who have lived as their affirmed and surgically corrected sex for a significant length of time.

**F. The Executive Order's Paternalistic and Discriminatory Language**

103.    The title of Executive Order 14168 — "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" — reveals the

paternalistic framing underlying the Order. By its terms, the Order depicts cisgender women as vulnerable victims needing government defense against transgender women, who are portrayed as ideological threats.

104.    This rhetoric mirrors discredited notions of "romantic paternalism," in which women were historically excluded from opportunities under the guise of protection. The Supreme Court has recognized such justifications as discriminatory, noting that placing women "not on a pedestal, but in a cage" is constitutionally impermissible. *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973).

105.    The EO further declares that permitting individuals to self-identify as women deprives "women of their dignity, safety, and well-being." Such statements stereotype all cisgender women as helpless and in need of protection, while branding all transgender women as inherent dangers.

106.    EO 14168 also mandates that "women are biologically female, and men are biologically male." By legally defining "woman" exclusively in biological terms defined solely by the order and not biological or physical reality, the EO expressly excludes Plaintiff and other transgender and intersex women from recognition as women, thereby creating a sex-based classification.

107.    The government's stated rationale — to "defend women" — is paternalistic on its face. It relies on the stereotype that cisgender women require government protection from transgender women, an objective the Supreme Court has deemed illegitimate. *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725–26 (1982).

108.     By framing Plaintiff's existence as a threat and cisgender women as wards of state protection, EO 14168 entrenches sex stereotypes and discriminatory distinctions that the Equal Protection Clause forbids

## G. Distinction and Areas of Agreement

109.     Plaintiff acknowledges the government's interest in maintaining accurate and consistent identification records for security and administrative efficiency.

110.     This Complaint specifically focuses on the rights of post-operative intersex and transgender individuals whose sex has been legally and medically affirmed through surgical correction and decades of lived experience.

111.     For this narrowly defined class, the government's definition of "sex at conception" is factually and scientifically inaccurate and constitutionally impermissible.

112.     For Plaintiff and those similarly situated, "biological sex" is defined by her surgically corrected and lived biology, and in some cases actual biology not adhering to a binary definition of sex.

113.     The EO's insistence on "sex at conception" for this group is not a "biological truth" but a denial of their current physical and biological reality and an abject rejection of scientific facts.

114.     This lawsuit does not seek to litigate the rights of individuals who have not undergone sex reassignment surgery or theoretical gender constructs.

115.      By focusing on post-operative individuals with long-established legal identities, this lawsuit presents a clear, definable class whose circumstances are objectively verifiable.

## V. CAUSES OF ACTION

### Count I: Violation of Fifth Amendment Due Process Clause

116.     The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law."

117.     The Executive Order and its implementing policies, particularly regarding passports, directly infringe upon Plaintiff's fundamental right to travel.

118.     The Supreme Court has long recognized these liberty interests. The right to travel abroad is part of the "liberty" protected by the Fifth Amendment. *Kent v. Dulles*, 357 U.S. 116, 125 (1958). The Constitution also protects the privacy of highly personal information, including against government-forced disclosure. *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977). And it safeguards the autonomy to define one's own identity and existence: "At the heart of liberty is the right to define one's own concept of existence." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992). EO 14168 violates all three by arbitrarily redefining Plaintiff as male, outing her at every turn, and stripping her ability to travel and live under her long-established identity. Additionally, EO 14168 violates *Lawrence v. Texas*, 539 U.S. 558 (2003) for personal autonomy in intimate life.

119.     Forcing Plaintiff to carry a passport that misrepresents her identity creates undue burdens, risks, and potential denial of entry or harassment.

120.     The EO compels Plaintiff to disclose private medical information every time she presents her identification, violating her right to privacy and bodily autonomy.

121.     Individuals have a fundamental liberty interest in defining and expressing their personal identity.

122.    The EO's attempt to arbitrarily redefine Plaintiff's sex for government purposes constitutes a deprivation of this liberty interest without due process of law.

### Count II: Violation of Fifth Amendment Equal Protection Clause

123.    The Fifth Amendment's Due Process Clause incorporates the principle of equal protection.

124.    The EO discriminates against Plaintiff and similarly situated individuals on the basis of sex. Under *Bostock v. Clayton County*, 590 U.S. 644 (2020), discrimination against transgender individuals necessarily constitutes sex discrimination, as it is 'impossible to discriminate against a person for being... transgender without discriminating against that individual based on sex.' The Executive Order's targeting of transgender individuals is therefore subject to heightened scrutiny as sex-based discrimination.

125.    By defining "sex" narrowly and rigidly, the EO creates a classification that treats individuals differently based on their sex.

126.    The EO explicitly targets and discriminates against transgender and intersex individuals by attempting to eliminate recognition of their identities.

127.    The language and stated purpose of the EO demonstrate impermissible animus toward transgender and intersex individuals.

128.    Discrimination based on sex, gender identity, or intersex status should be subject to heightened scrutiny.

129.    The EO cannot be justified under any level of judicial scrutiny and fails to serve any legitimate governmental interest.

130.      The Supreme Court has held that laws motivated by a "bare … desire to harm a

politically unpopular group" lack even a rational basis and violate equal

protection. *Romer v. Evans*, 517 U.S. 620, 634–35 (1996). Likewise, in *United States v.*

*Windsor*, 570 U.S. 744, 770 (2013), the Court struck down the Defense of Marriage Act

because its purpose and effect were to impose inequality and stigma. EO 14168's framing

of transgender women as threats to be excluded is the same kind of impermissible

animus: it singles out a vulnerable minority, brands them dangerous, and withdraws

recognition solely to disadvantage them.

### Count III: Violation of First Amendment (Compelled Speech)

131.      The First Amendment protects individuals from compelled speech.

132.      Executive Order 14168, as applied by federal agencies, compels Plaintiff to carry

and present identification documents that falsely identify her sex as male. Each time she

must show such identification, the government forces her to speak a message about

herself that she rejects and that contradicts her lived reality and established legal identity.

133.      The First Amendment protects not only the right to speak, but the right to refrain

from speaking. *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

The government may not compel an individual "to utter what is not in [her] mind." Id.

Similarly, in *Wooley v. Maynard*, 430 U.S. 705, 715 (1977), the Court held that the State

cannot force citizens to display a message on a license plate that they find repugnant.

Forcing Plaintiff to identify herself as male on official documents is indistinguishable in

principle from those unconstitutional compulsion cases.

134.    The compelled speech here is not incidental; it is at the core of Plaintiff's identity. Every time Plaintiff uses her Social Security card, passport, or other federal identification, the government requires her to endorse its contested view of "biological truth" and to publicly represent herself as male. This is unconstitutional compelled speech.

135.    The EO also constitutes unconstitutional viewpoint discrimination. It prohibits federal agencies and grantees from using funds to "promote gender ideology" and mandates recognition only of one perspective—that sex is fixed at conception and immutable. By targeting one side of a public debate for disfavor while privileging the opposing viewpoint, the EO enacts viewpoint discrimination, which is "an egregious form of content discrimination" forbidden by the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541–42 (2001).

136.    Plaintiff is directly harmed by this viewpoint discrimination. Federal agencies and contractors subject to the EO are chilled from recognizing or affirming Plaintiff's female identity, while compelled to adhere to the government's disfavored definition of sex. This distorts public discourse, deprives Plaintiff of equal participation in federally funded services, and violates core First Amendment principles.

137.    Accordingly, EO 14168 and its implementing agency actions violate the First Amendment by (1) compelling Plaintiff to speak and carry government-mandated messages contrary to her beliefs and identity, and (2) enacting viewpoint-based restrictions that single out Plaintiff's perspective for suppression.

138.        This forced misrepresentation constitutes compelled speech, violating Plaintiff's

First Amendment rights.

**Count IV: Violation of Administrative Procedure Act (Arbitrary and Capricious**

**Agency Action)**

139.        The Administrative Procedure Act provides for judicial review of agency actions

that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."

140.        The EO and subsequent directives represent an abrupt and unexplained reversal of

long-standing federal policies.

141.        The EO's reversal of policies without a compelling, fact-based justification

demonstrates a failure of reasoned decision-making.

142.        The EO is based on an unscientific and ideologically driven definition of "sex"

that ignores medical and biological realities.

143.        The EO fails to consider the severe and irreparable harm inflicted upon

individuals like Plaintiff who have established legal identities and undergone irreversible

medical procedures.

144.        The EO is motivated by impermissible animus rather than a reasoned assessment

of public policy.

145.        The implementing agencies failed to conduct impact assessments, ignored

extensive medical literature, provided no transition period for affected individuals with

established legal recognition, and failed to consider less restrictive alternatives, all

demonstrating arbitrary and capricious decision-making under the APA. The agencies'

actions in implementing the EO are therefore unlawful and must be set aside.

146.     Agency action must be set aside if it is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To satisfy

this standard, an agency must "examine the relevant data and articulate a satisfactory

explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983). An unexplained reversal of prior policy is especially suspect:

agencies must provide "a reasoned explanation for disregarding facts and circumstances

that underlay the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–

16 (2009). Most recently, the Court emphasized that failure to consider the reliance

interests of those affected renders a policy change arbitrary.  *Dep't of Homeland Sec. v.*

*Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). Here, the agencies' sudden

abandonment of decades of recognition of Plaintiff's female identity—without analysis,

justification, or acknowledgment of reliance—squarely violates these requirements.

147.     Agencies must consider the "serious reliance interests" that individuals develop

under long-standing policies. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S.

Ct. 1891, 1913 (2020). Plaintiff has lived for over thirty years with government

recognition of her female sex, built her professional and personal life on that settled

status, and is raising children under the protection of her affirmed identity. EO 14168

abruptly strips away that recognition without any acknowledgment of these reliance

interests, let alone a reasoned explanation for disregarding them. Such a wholesale

reversal of policy, without confronting the profound reliance interests of Plaintiff and

others similarly situated, is the definition of arbitrary and capricious action under the APA.

148.    The Executive Order exceeds constitutional limits on presidential power by attempting to redefine fundamental legal concepts without Congressional authorization, violating separation of powers principles and usurping authority reserved to the legislative branch.

### Count V: Violation of Fifth Amendment Equal Protection – Paternalistic Classification Based on Sex

149.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

150.    EO 14168 creates and enforces a sex-based classification by defining "women" as exclusively "biologically female" and excluding transgender women from that legal category.

151.    Under the equal protection component of the Fifth Amendment, sex-based classifications require an "exceedingly persuasive justification." *United States v. Virginia*, 518 U.S. 515, 531 (1996).

152.    The stated purpose of EO 14168 — to "defend women" and protect their "safety and dignity" — is paternalistic and impermissible. Laws cannot rest on overbroad generalizations or stereotypes about the roles and capacities of men and women. *Virginia*, 518 U.S. at 533.

153.        The EO's justification mirrors archaic rationales once used to exclude women

"for their own good." Such paternalistic purposes have been rejected as incompatible

with equal protection. *Frontiero*, 411 U.S. at 684–85; *Hogan*, 458 U.S. at 725–26.

154.        EO 14168's exclusion of transgender women from the legal definition of

"women" is not substantially related to any important governmental objective. Instead, it

is based on stereotypes that transgender women are dangerous and cisgender women are

weak, a rationale that is itself unconstitutional.

155.        Accordingly, EO 14168 violates the equal protection guarantee of the Fifth

Amendment by employing paternalistic classifications based on sex and gender identity.

## VI. JUDICIAL NOTICE OF RELATED AUTHORITY AND RELEVANCE OF *ORR V. TRUMP*

156.        In *Orr v. Trump*, No. 1:25-cv-10313 (D. Mass.), the U.S. District Court for the

District of Massachusetts granted a preliminary injunction enjoining enforcement of

Executive Order 14168's passport policy, which prohibited transgender and nonbinary

individuals from obtaining accurate sex designations on their U.S. passports.

157.        The *Orr* court held that the plaintiffs were likely to succeed on the merits under

both the Equal Protection Clause of the Fifth Amendment and the Administrative

Procedure Act. The court found that the EO exhibited animus, lacked scientific basis, and

represented an abrupt and unexplained reversal of longstanding policy.

158.        The court emphasized the harm inflicted by mismatched documentation, including

risks to safety, denial of services, and psychological injury. These harms mirror those

experienced by Plaintiff in this action.

159.     Like the *Orr* plaintiffs, Plaintiff Jansen is a post-operative individual with decades of legal, medical, and social recognition of her affirmed sex. The reasoning and findings in *Orr* are directly applicable here and reinforce Plaintiff's entitlement to immediate injunctive and declaratory relief.

160.     The *Orr* decision is further persuasive because it reflects judicial skepticism of the EO's stated purpose of restoring "biological truth," and recognizes the broad scope of harm it imposes on law-abiding Americans whose identities had long been settled under federal law.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Jana Jansen respectfully prays for judgment against Defendants and for the following relief:

161.     A declaratory judgment that the Executive Order and any policies, directives, or actions taken pursuant to it that define "sex" solely by birth assignment or "at conception" for government identification documents are unconstitutional, unlawful, arbitrary, and capricious as applied to post-operative intersex/transgender individuals who have lived as their corrected and surgically corrected sex for a significant length of time.

162.     A permanent injunction prohibiting Defendants from enforcing the EO's provisions that require sex designations on government identification documents to revert to or be based solely on sex assigned at birth or "at conception" for post-operative intersex/transgender individuals as described above.

163.    An award of Plaintiff's reasonable fees and costs incurred in this action, pursuant to applicable federal law.

164.    A permanent injunction prohibiting Defendants from reverting, altering, or otherwise changing Plaintiff's sex designation on any and all federal government records or identification documents to Plaintiff's sex assigned at birth or any prior designation inconsistent with her affirmed and lived sex.

165.    A mandatory injunction requiring Defendants to seal, or otherwise make inaccessible any record or notation of Plaintiff's prior sex designation or sex assigned at birth from all government databases, records, and identification documents where Plaintiff's current, affirmed sex is now reflected.

166.    A mandatory injunction ordering the Social Security Administration to issue a new Social Security number to Plaintiff due to the documented credible threats of violence and harassment against her, in accordance with the SSA's own policies for individuals in a situation of life endangerment and to protect her constitutional right to privacy and personal security but unlinked to any prior name or sex designation pending further orders of this court.

167.    A permanent injunction requiring Defendants to maintain Plaintiff's sex designation as female on all current and future government records and identification documents, and to prohibit any reversion to or disclosure of Plaintiff's sex assigned at birth or any prior sex designation except as required by court order.

168.    Order the Department of State to process any passport application or renewal by Plaintiff as a first-time issuance, reflecting only her current name and female sex designation without reference to prior records or need for attestation to any class.

169.    Any other and further relief as this Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

170.    Plaintiff does not demand a jury trial for this action, as it seeks only declaratory

and injunctive relief.

Dated: 2 September 2025

Respectfully submitted,

Jana Jansen (pseudonym)

Pro Se Plaintiff

(Address to be filed under seal with appropriate motion to fully comply with local rules at time

of filing this complaint)

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of September, 2025, a true and correct copy of the foregoing

Complaint for Declaratory and Injunctive Relief was served upon the following in the manner

required by local rules and/or agency specific rules:

1. United States Attorney for the District of Columbia

   United States Attorney's Office

   601 D Street, NW

   Washington, DC 20530

2. Attorney General of the United States

  United States Department of Justice

  950 Pennsylvania Avenue, NW

  Washington, DC 20530-0001


3. United States Department of State

  Office of the Legal Adviser

  Suite 5.600

  600 19th Street, NW

  Washington, DC 20522-0505


4. United States Department of Homeland Security

  Office of General Counsel

  2707 Martin Luther King Jr. Avenue, SE

  Washington, DC 20528


5. Social Security Administration

  Office of General Counsel

  6401 Security Boulevard

  Baltimore, MD 21235

6. United States Department of Health and Human Services

Office of General Counsel

200 Independence Avenue, SW

Washington, DC 20201


7. United States Office of Personnel Management

Office of General Counsel

1900 E Street, NW

Washington, DC 20415

Jana Jansen (pseudonym)

Pro Se Plaintiff

(Address to be filed under seal with appropriate motion to fully comply with local rules at

time of filing this complaint)