**UNITED STATES DISTRICT COURT**

FOR THE DISTRICT OF COLUMBIA

**JANA JANSEN,**

**Plaintiff,**

**v.**

**DONALD J. TRUMP, in his official capacity as President of the United States;**

**UNITED STATES DEPARTMENT OF STATE;**

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY;**

**SOCIAL SECURITY ADMINISTRATION;**

**UNITED STATES ATTORNEY GENERAL;**

**SECRETARY OF HEALTH AND HUMAN SERVICES;**

**DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT,**

**Defendants.**

**CIVIL ACTION NO.: 25-cv-02961**



RECEIVED

SEP 29 2025

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

1

**RENEWED MOTION FOR PRELIMINARY INJUNCTION AGAINST DHS/CBP:
IMMINENT IRREPARABLE HARM VIA GLOBAL ENTRY REVERSION**

## I. INTRODUCTION AND STATEMENT OF THE CASE

**A. The Imminent Harm: Pivot from SSA to DHS/CBP Global Entry**

1. This motion seeks preliminary injunctive relief against the Department of Homeland
   Security (DHS) and U.S. Customs and Border Protection (CBP), predicated on an
   immediate and concrete threat of irreparable harm stemming from the imminent renewal
   of the Plaintiff's Global Entry (GE) membership.

2. The Plaintiff, proceeding under pseudonym Jana Jansen, currently holds over three
   decades of undisputed legal recognition as female in all federal records. This status quo is
   critically threatened by the mandatory application of Executive Order 14168 ("EO
   14168"). *See Ex. A (Executive Order 14168).*

3. The Court previously denied preliminary relief focused on the Social Security
   Administration (SSA) administrative appointment, ruling that the potential harm was
   "conjectural or hypothetical" because the SSA card itself does not bear a sex marker. This
   determination, however, is inapplicable to the DHS Global Entry program. The Global
   Entry card, unlike the SSA card, is a public-facing federal identification document that
   explicitly carries a sex marker, and EO 14168 explicitly directs the Secretaries of State
   and Homeland Security to enforce the restrictive "sex at conception" mandate on Global
   Entry cards and associated identification documents.

4. This motion presents an entirely distinct, concrete, and unavoidable threat of irreparable
   harm tied to the mandatory application of EO 14168 at the impending Global Entry

renewal eligibility date of mid-November (the precise renewal date is set forth in Plaintiff's Sealed Supplemental Declaration filed contemporaneously herewith). The renewal process triggers DHS/CBP's obligation under the Executive Order to revert the Plaintiff's sex marker to "Male," a process that removes all conjecture regarding the nature and timing of the resulting constitutional injury.

## B. Summary of Plaintiff's Unique Position and Relief Requested

5. The Plaintiff is a post-operative intersex and transgender woman who has maintained over 30 years of legal, social, and medical affirmation as female. Her identity is profoundly intertwined with her role as the sole legal and physical parent of two minor children. If the government forcibly reverts her Global Entry sex marker to "Male," this action will constitute a government-mandated erasure of her established identity and create an acute risk to her physical safety and psychological well-being. Appellate precedent has already confirmed that the harms arising from mismatched federal identification documents under this Executive Order constitute irreparable harm.

6. The relief sought is a Preliminary Injunction narrowly tailored to enjoin DHS/CBP and its agents from enforcing EO 14168 to alter her female sex marker ("F") on her GE membership and associated records during the upcoming renewal process. Granting this relief is necessary to preserve the status quo of three decades of consistent federal recognition. *See Ex. B (Plaintiff's Declaration, sealed).*

7. The comprehensive nature of this constitutional challenge against multiple federal defendants reflects the scope of Executive Order 14168's implementation across all federal agencies. Rather than pursuing separate lawsuits against each agency as enforcement mechanism arise, Plaintiff brings this unified action to ensure consistent

judicial oversight and prevent conflicting rulings on the same Executive Order. As different agencies implement EO 14168 in ways that create concrete harm to Plaintiff-first through SSA administrative processes, now through DHS/CBP identification requirements-this Court maintains jurisdiction to address each manifestation of injury as it becomes justiciable. This approach serves judicial economy and ensures comprehensive protection.

## II. JURISDICTION, VENUE, AND GOVERNING LEGAL STANDARD (RULE 65)

### A. Jurisdiction and Venue

8. Jurisdiction over this action is vested in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 2201-02 (declaratory judgments), and 2202 (further relief). The claims arise under the First and Fifth Amendments of the U.S. Constitution and the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq.

9. Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) because the Executive Order was issued here and federal agencies responsible for its implementation, including DHS and CBP, reside within the district.

### B. Legal Standard for Preliminary Injunction

10. A preliminary injunction is an extraordinary remedy requiring the moving party to demonstrate four factors:

    i.    a likelihood of success on the merits;

    ii.    a likelihood of irreparable harm absent relief;

iii.    that the balance of equities tips in her favor; and

iv.    that an injunction is in the public interest.

11. The U.S. Supreme Court requires the moving party to clearly establish that she is likely to suffer irreparable harm. When the government is the opposing party, the latter two factors, the balance of equities and the public interest, merge. The Plaintiff satisfies all four factors with respect to the immediate threat posed by the Global Entry renewal process.

## III. STATEMENT OF MATERIAL FACTS: THE CONCRETE GE THREAT

### A. Plaintiff's Established Identity and Profound Reliance Interests

12. The Plaintiff has lived openly and legally as female since 1993, following medically necessary genital reconstruction surgery in or about December 1994. Due to anatomical complexity, special surgical expertise was required to create a vaginal vault. This history of required medical intervention due to underlying biology aligns with recognized Disorders of Sex Development (DSDs).

13. This medical reality is critical because it demonstrates that EO 14168's definition of "sex at conception" is scientifically flawed and arbitrary, failing to account for the multiple biological variables involved in sex development, including chromosomal, gonadal, and hormonal factors, thereby stripping the policy of any legitimate governmental basis.

14. The Plaintiff's legal female status was confirmed across all major federal records by 1995, including permanent U.S. Passport status and SSA records predicated on submission of surgical records confirming her sex, not gender, was in fact female.

5

15. The issue has therefore previously been adjudicated by the government. This consistent recognition has served as the foundation of her legal identity, travel, employment, and civic life for more than 30 years.

16. Furthermore, she is the mother of two minor children and is integrated into their lives, school, and community solely as their mother. This reliance on a stable legal identity to maintain family integrity constitutes a fundamental liberty interest protected by the Constitution. *See Ex. C (Family Declaration, sealed).*

**B. The Global Entry Card is an Essential Federal ID**

17. The Plaintiff has maintained Global Entry/Trusted Traveler enrollment continuously since the program's inception around 2008, always with the female designation.

18. While the Government may characterize Global Entry as an optional program, the resulting Global Entry card is a DHS Trusted Traveler card is accepted by TSA as a form of compliant primary photo ID for domestic TSA security screening. For a frequent traveler, reliance on the GE card for TSA PreCheck benefits and expedited clearance makes its presentation a frequent requirement in her civil life.

19. The Global Entry card can further be used across many government agencies as a primary identification document.

20. The Global Entry card's function is particularly essential for the Plaintiff because she is a dual national who, by law, cannot re-enter the United States on her foreign passport as per the laws of the United States of America, § 215(b) of the Immigration and Nationality Act (INA) (8 U.S.C. 1185(b)) and 22 CFR § 53, must therefore rely entirely on U.S. documentation.

21. The use of Global Entry facilitates necessary expedited clearance and reduces travel risk, making accurate, consistent identification essential for seamless travel and safety.

22. For more than 15 years, Plaintiff has relied on Global Entry not merely as an optional convenience but as a cornerstone of her travel and family life. She uses her Trusted Traveler card multiple times per month for TSA PreCheck with her children, for international reentry as a dual national, and as a recognized identity document in business and community contexts. This reliance mirrors the reliance interests the Supreme Court deemed dispositive in *DHS v. Regents*, 591 U.S. 1 (2020).

**C. The Mechanism of Imminent Harm: Renewal Mandate**

23. The threat of harm is tied to an imminent and unavoidable administrative deadline. The Plaintiff's Global Entry membership expires in 2026, making her eligible to renew in mid-November 2025 (the precise renewal date is set forth in Plaintiff's Sealed Supplemental Declaration filed contemporaneously herewith).

24. CBP policy advises members to submit a renewal application up to one year prior to expiration to maintain continuous benefits, which Plaintiff has always done, locking the Plaintiff into this timeline to avoid disruption of essential travel benefits.

25. Executive Order 14168 provides the clear mechanism for the forced reversion. Section 3(d) explicitly directs the Secretary of Homeland Security to "implement changes to require that government-issued identification documents, including... Global Entry cards, accurately reflect the holder's sex" as defined by "sex at conception".

26. Given the State Department's parallel actions in halting sex marker changes pursuant to the EO, CBP/DHS must, upon renewal, apply the new EO policy. This mandates that the renewed Global Entry card and the underlying Trusted Traveler Program (TTP)/Advance

Passenger Information System (APIS) record will reflect "Male," directly contradicting her current legal and lived female status. *See Ex. F (CBP Carrier Liaison Program Bulletin, July 7, 2025).*

27. The harm becomes immediate upon submission of the renewal application, which subjects her identity records to mandatory EO vetting, potentially leading to a manual review process that can take 12 to 24 months.

28. Regardless of the physical card issuance date, the intentional initiation of a process designed to impose a false sex marker renders the harm immediate upon submission, eliminating any finding that the threat is conjectural.

## IV. ARGUMENT I: IRREPARABLE HARM IS CONCRETE AND UNCONTROVERTED

### A. Direct Rebuttal to Prior Denial (Global Entry vs. SSA)

29. The previous denial of relief focused on the administrative nature of the SSA record change and the absence of a sex marker on the physical Social Security card. The imminent harm posed by the Global Entry renewal is fundamentally different because it targets a government-issued photo identification document that is designed for public presentation and expressly contains a sex marker.

30. The table below outlines the clear distinctions demonstrating why the Global Entry renewal presents concrete, immediate, and irreparable harm, unlike the conjectural risk identified in the SSA context.

| Harm Factor | SSA Claim (D.D.C. Denial) | Global Entry Claim (Imminent 11/25) | Legal Justification |
|---|---|---|---|
| Justiciability of Harm | Conjectural/Hypothetical (internal record change). | Concrete and Imminent (Fixed | Cures the fundamental defect of the prior ruling. |

| | | date, mandatory agency policy application). | |
|---|---|---|---|
| Document Type | Non-photo ID; No sex marker displayed. | Photo ID; Sex marker displayed on card and in data systems (APIS). | Triggers Compelled Speech and Public Outing injury. |
| Frequency of Presentation | Rare (primarily internal/administrative interactions). | Frequent (TSA PreCheck, Border Crossing, Domestic Travel ID). | Increases likelihood of violence/harassment (Uncontroverted in *Orr*). |
| Reliance Interest | Administrative record; no immediate benefit disruption. | Fee-based, 17-year continuous membership; essential travel function. | Enhances APA/Estoppel claims; loss of travel utility is a severe Due Process violation. |

**B. Binding Precedent on Irreparable Harm: The *Orr v. Trump* Standard**

31. Federal courts have already established that the harms flowing from EO 14168's identification policies are irreparable. The denial of the stay in *Orr v. Trump* by the First Circuit provides controlling and highly persuasive judicial finding directly on point, involving identification policies promulgated under the identical Executive Order.

32. The First Circuit affirmed the district court's reliance on "uncontroverted evidence" demonstrating that mismatched identification documents expose transgender and non-binary individuals to "forced outing, harassment, violence, and denial of services".

33. The court explicitly rejected the government's argument that the institutional harm outweighed the immediate personal harm faced by individuals required to use such documents.

34. The Global Entry context exacerbates this risk. The Global Entry card must be presented for expedited TSA PreCheck and CBP processing—interactions characterized by heightened scrutiny and tension. Forcing the Plaintiff, a post-operative woman, to present

an ID marked "Male" guarantees compelled outing to federal security agents on a recurring basis, resulting in the acute psychological distress and physical safety risks confirmed in *Orr. See Ex. F (CBP Carrier Liaison Program Bulletin, July 7, 2025).*

35. These injuries, which involve the loss of constitutional dignity and physical safety, cannot be remedied by monetary damages.

## C. Irreparable Injury to Fundamental Constitutional Rights

36. The loss of constitutional freedoms, even for minimal periods, constitutes irreparable injury (*Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The forced misidentification through the Global Entry card violates several core constitutional guarantees:

    i. **Compelled Speech:** The act of carrying and presenting a government document bearing a false, state-mandated designation violates the right to refrain from speaking, which is at the heart of the First Amendment protection.

    ii. **Right to Travel:** The right to travel abroad is part of the liberty protected by the Fifth Amendment (*Kent v. Dulles,* 357 U.S. 116, 125–26 (1958)). The threat to seamless and safe entry/exit as a dual national, reliant on this essential federal ID, constitutes an unconstitutional restriction on this right, particularly when the document is guaranteed to create dangerous mismatches.

    iii. **Family Integrity:** The government action destabilizes the Plaintiff's family unit by creating a document that contradicts her legal and social status as "mother". The resulting confusion, shame, and stigma inflicted upon her minor children constitutes irreparable harm to the core parental liberty interest in the care, custody, and control of their children (*Troxel v. Granville,* 530 U.S. 57, 65–66 (2000)). The medical literature corroborates that the lack of accurate legal

documentation exacerbates mental health distress and minority stress. *See Exs. B, C (sealed declarations) and See Ex. D (WPATH SOC-8 excerpts).*

37. Plaintiff satisfies all three elements of Article III standing (*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). First, the harm is concrete and imminent: unless enjoined, Plaintiff's renewal in mid-November 2025 (the precise renewal date is set forth in Plaintiff's Sealed Supplemental Declaration filed contemporaneously herewith) will result in a Global Entry card marked "Male." Second, causation is established because the injury flows directly from EO 14168 and CBP's Carrier Liaison Program Bulletin implementing it. See Ex. F. Third, the requested injunction will fully redress the injury by preserving Plaintiff's female designation.

## V. ARGUMENT II: LIKELIHOOD OF SUCCESS ON THE MERITS (CONSTITUTIONAL & APA CLAIMS)

### A. Administrative Procedure Act (APA) Claims: Arbitrary and Capricious Action

38. The Plaintiff is highly likely to succeed on her APA claims, which challenge the lawfulness of DHS/CBP's implementation of EO 14168.

### Reviewability Affirmed

39. The First Circuit has definitively addressed and rejected the government's central defense that the agencies' implementation of EO 14168 is "compelled by" the President and thus unreviewable under the APA. The court confirmed that agency actions carrying out a presidential directive are ordinarily subject to APA review, especially where the agency made "independent determinations" in formulating the resultant policy. This finding guarantees a strong foundation for judicial scrutiny of CBP's actions.

40. Here, DHS/CBP did not merely transmit the President's directive but independently issued new Carrier Liaison Program guidance revising APIS transmission rules and instructing carriers how to handle sex marker data under EO 14168. See Ex. F (CBP Carrier Liaison Program Bulletin, July 7, 2025). This independent exercise of agency discretion confirms that CBP's implementation is a reviewable final agency action under the APA.

41. Although *Franklin v. Massachusetts*, 505 U.S. 788 (1992), limited APA review of purely presidential action, CBP's Carrier Liaison Program Bulletin independently imposes obligations on carriers and alters Plaintiff's rights. This guidance constitutes final agency action because it is definitive, has legal consequences, and is distinct from the President's directive.

**Failure to Consider Reliance Interests and Equitable Estoppel**

42. DHS/CBP's abrupt reversal of its decades-long policy recognizing the Plaintiff's female Global Entry status fails to provide a reasoned explanation for disregarding the "serious reliance interests" she and thousands of others have built around their established legal identities. *See Ex. C (Family Declaration, sealed).*

43. The Plaintiff's status has been stable for 30 years, and DHS/CBP has accepted fees and maintained her female marker since 2008. The Supreme Court mandates that agency changes of course must take into account reliance interests, and a failure to do so renders the action arbitrary and capricious (*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 1*40 S. Ct. 1891, 1907–08 (2020)*).

44. Furthermore, the government induced reliance by consistently documenting and reaffirming her female identity for decades. The sudden repudiation of this established

status, particularly against a post-operative individual whose transition was recognized with finality in the mid-1990s, aligns with the "affirmative misconduct" required for equitable estoppel against the government (*Watkins v. U.S. Army*).

## B. First Amendment: Unconstitutional Compelled Speech and Viewpoint Discrimination

45. The Global Entry card renewal process threatens two distinct First Amendment violations.

### Compelled Speech

46. When the Plaintiff is forced to carry and present a renewed Global Entry card bearing the designation "Male," the government compels her to speak a message that she rejects and that contradicts her lived reality and established legal identity.

47. The sex marker, dictated by EO 14168, embodies the ideological position that sex is fixed "at conception." Compelling this falsehood is indistinguishable in principle from forcing citizens to display a state motto they find repugnant (*Wooley v. Maynard*, 430 U.S. 705, 715 (1977)) or compelling a flag salute (*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). This compelled expression about personal identity invades the sphere of intellect and spirit the First Amendment protects.

### Viewpoint Discrimination

48. EO 14168, by prohibiting federal agencies and grantees from using funds to "promote gender ideology" while simultaneously mandating recognition only of the binary "biological truth" viewpoint, constitutes viewpoint discrimination.

49.  This suppression of one side of a public debate while privileging the opposing viewpoint is an egregious form of content discrimination forbidden by the First Amendment (*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

50. The EO directly harms the Plaintiff by chilling federal entities from recognizing or affirming her female identity, while compelling adherence to the government's disfavored definition of sex, violating core First Amendment principles.

## C. Fifth Amendment: Substantive Due Process and Equal Protection

### Due Process (Autonomy, Dignity, Privacy)

51. The Due Process Clause safeguards the intimate spheres of decision-making central to personhood and self-definition, recognizing that "at the heart of liberty is the right to define one's own concept of existence" (*Planned Parenthood of Se. Pa. v. Casey*).

52. The EO's reclassification regime arbitrarily nullifies the Plaintiff's established identity and outs her whenever ID is required.

53. This intrusion upon autonomy, bodily integrity, and informational privacy demeans her existence in a manner prohibited by the Supreme Court (*Lawrence v. Texas,* 539 U.S. 558, 567 (2003)).

*54.* Given Plaintiff's post-operative status and history of medical recognition, the government's asserted interests in "biological truth" cannot justify overriding her core self-definition and decades of reliance under the appropriate heightened review. *See Ex. D (WPATH SOC-8 excerpts).*

### Equal Protection (Sex Discrimination and Animus)

55. EO 14168 facially classifies on the basis of sex and transgender status, forcing transgender women like Plaintiff to carry documents inconsistent with their gender while leaving cisgender comparators unaffected. Discrimination against transgender people is discrimination "because of sex" under the Supreme Court's ruling in *Bostock v. Clayton Cnty.,* 140 S. Ct. 1731, 1741–42 (2020) and is therefore subject to heightened scrutiny.

56. The title and stated purpose of EO 14168—"Defending Women from Gender Ideology Extremism"—demonstrates impermissible animus and a lack of legitimate governmental interest, failing even the rational basis test for hostile discrimination (*Romer v. Evans*, 517 U.S. 620, 632 (1996)).

57. The rationale relies on archaic, paternalistic stereotypes that depict cisgender women as vulnerable and transgender women as threats, a justification the Supreme Court has long rejected as illegitimate (*United States v. Virginia*, 518 U.S. 515, 533 (1996)). The *Orr* court's finding of likely success on the animus-based Equal Protection claim directly supports Plaintiff's position. *See Ex. E (Orr v. Trump, slip op. (1st Cir. Sept. 4, 2025)).*

58. Discrimination against transgender persons constitutes sex discrimination under Title VII. See *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741–42 (2020). Although *Bostock* was statutory, its reasoning compels application of heightened scrutiny under the Fifth Amendment's equal protection component. See *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (holding that discrimination against a transgender plaintiff is sex-based and warrants intermediate scrutiny). Accordingly, EO 14168 must at least satisfy intermediate scrutiny, which it cannot, because its justification rests solely on animus and stereotype, not important governmental objectives.

## VI. BALANCE OF EQUITIES AND THE PUBLIC INTEREST

**A. Balance of Equities**

59. The balance of equities overwhelmingly favors Plaintiff. If the injunction is denied, Plaintiff faces catastrophic, irreversible harm: the violation of multiple constitutional rights, the destabilization of her family unit, and documented safety risks confirmed by appellate courts. *See Ex. C (Family Declaration, sealed).*

60. By contrast, DHS/CBP faces no legitimate harm by temporarily preserving one individual's female marker, which it maintained without issue for 17 years since the Global Entry program began.

61. Granting narrowly tailored, as-applied relief imposes no systemic burden on the agency. The need to preserve the status quo until the legal merits can be adjudicated tips the balance decisively in Plaintiff's favor.

**B. The Public Interest**

62. The protection of constitutional rights and the prevention of executive overreach serve the public interest. Enjoining the enforcement of an order found by other federal courts to be arbitrary, capricious, and likely motivated by animus ensures that agencies comply with constitutional guarantees and the APA.

63. Furthermore, preserving the long-standing legal identity, dignity, and safety of a post-operative citizen supports core societal values, reinforcing the public interest in equality and reliance on government pronouncements. *See Ex. D (WPATH SOC-8 excerpts).*

### VII. CONCLUSION AND PRAYER FOR SPECIFIC RELIEF

64. Plaintiff has clearly demonstrated an overwhelming likelihood of success on her claims under the APA, First Amendment, and Fifth Amendment, and has established an

imminent, concrete, and irreparable harm specifically tied to the November 2025 Global
Entry renewal eligibility date.

65.  The distinction between the SSA claim and the GE claim cures the justiciability defect
identified in the prior denial, rendering the extraordinary remedy of a preliminary
injunction against DHS/CBP imperative.

WHEREFORE, Plaintiff Jana Jansen respectfully prays for the Court to enter an Order granting
the following preliminary injunctive relief against Defendants Department of Homeland
Security, U.S. Customs and Border Protection, and their officers, agents, and employees,
pending resolution of this action:

a) **GE Status Maintenance:** Enjoin Defendants DHS/CBP from requiring or effecting
any change to Plaintiff's sex designation, from female ("F") to male ("M") or any other
designation inconsistent with her affirmed sex, on her Global Entry membership,
TTP/APIS data, or associated travel documents, in enforcement of Executive Order
14168 or any related guidance.

b) **Renewal Mandate:** Order Defendants DHS/CBP to immediately process Plaintiff's
Global Entry renewal application upon submission (in November 2025 on renewal date
as filed contemporaneously in Plaintiff's Sealed Declaration) and re-issue her GE card
reflecting her female sex designation ("F"), consistent with the decades of federal
recognition and acceptance of her post-operative status.

c) **Prohibition on Vetting-Related Disclosure:** Prohibit Defendants DHS/CBP from
flagging, noting, or sharing Plaintiff's prior sex marker, birth name, or medical history
(including post-operative status) within the Trusted Traveler Programs vetting or

renewal process, or in any system accessible by frontline staff (TSA/CBP officers), for the purpose of enforcing EO 14168.

d) **No Penalty/Revocation:** Prohibit Defendants from penalizing, suspending, or revoking Plaintiff's Global Entry privileges or TSA PreCheck benefits based solely on her gender identity or the implementation of EO 14168.

e) **Expedited Timeline:** Schedule an expedited hearing and ruling on this motion prior to November 2025 (the precise renewal date is set forth in Plaintiff's Sealed Supplemental Declaration filed contemporaneously herewith).

f) **Bond Waiver:** Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiff respectfully requests that the Court waive any security bond requirement. Courts in this District regularly waive the bond requirement where, as here, the injunction seeks to vindicate constitutional rights, the movant proceeds in forma pauperis, and the government faces no risk of monetary loss. See *Banks v. Booth*, 459 F. Supp. 3d 143, 173 (D.D.C. 2020) (waiving bond requirement in constitutional-rights litigation). Plaintiff has been granted leave to proceed in forma pauperis, and Defendants will suffer no pecuniary harm from the maintenance of the status quo. Accordingly, waiver of security is appropriate.

## VIII. ORAL ARGUMENT REQUESTED (LCvR 7(f))

Pursuant to Local Civil Rule 7(f), Plaintiff respectfully requests oral argument on this motion. Plaintiff believes that oral presentation would materially assist the Court in resolving the complex constitutional and administrative issues raised herein.

## IX. CERTIFICATION OF COMPLIANCE WITH LCvR 7(e)

Pursuant to Local Civil Rule 7(e), Plaintiff certifies that this motion does not exceed the 45-page limitation applicable to motions filed in this Court.

Dated: September 29, 2025

Respectfully submitted,

_Jana Jansen_

Jana Jansen (pseudonym)

Pro Se Plaintiff

c/o Clerk of Court (for public filings)

United States District Court for the District of Columbia

333 Constitution Avenue NW

Washington, DC 20001

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2025, I submitted the foregoing Renewed Motion for Preliminary Injunction, to the Clerk of Court for docketing in Case No. 25-cv-02961. Service on Defendants has not yet been fully effectuated. Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 4(c)(3), Plaintiff proceeds in forma pauperis, and service will be completed by the U.S. Marshals Service following issuance of summons. Defendants will receive notice of filings via the docket once they have appeared.

Respectfully submitted,

Jana Jansen (pseudonym)

Pro Se Plaintiff

c/o Clerk of Court (for public filings)

United States District Court for the District of Columbia

333 Constitution Avenue NW

Washington, DC 20001

**EXHIBIT A**

**EO 14168**

Federal Register / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents    **8615**

## Presidential Documents

Executive Order 14168 of January 20, 2025

### Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

**Section 1**. *Purpose*. Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of "woman" improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

**Sec. 2**. *Policy and Definitions*. It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.

Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

**Sec. 3.** *Recognizing Women Are Biologically Distinct From Men.* (a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms "sex", "male", "female", "men", "women", "boys" and "girls" the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term "sex" and not "gender" in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock* v. *Clayton County* (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

**Sec. 4.** *Privacy in Intimate Spaces.* (a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

Federal Register / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents    **8617**

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled ''Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs'' of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

**Sec. 5.** *Protecting Rights.* The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

**Sec. 6.** *Bill Text.* Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

**Sec. 7.** *Agency Implementation and Reporting.* (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) ''The White House Toolkit on Transgender Equality'';

(ii) the Department of Education's guidance documents including:

(A) ''2024 Title IX Regulations: Pointers for Implementation'' (July 2024);

(B) ''U.S. Department of Education Toolkit: Creating Inclusive and Non-discriminatory School Environments for LGBTQI+ Students'';

(C) ''U.S. Department of Education Supporting LGBTQI+ Youth and Families in School'' (June 21, 2023);

(D) ''Departamento de Educación de EE.UU. Apoyar a los jóvenes y familias LGBTQI+ en la escuela'' (June 21, 2023);

(E) ''Supporting Intersex Students: A Resource for Students, Families, and Educators'' (October 2021);

(F) ''Supporting Transgender Youth in School'' (June 2021);

**8618**    **Federal Register** / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents

(G) "Letter to Educators on Title IX's 49th Anniversary" (June 23, 2021);

(H) "Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families" (June 2021);

(I) "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County" (June 22, 2021);

(J) "Education in a Pandemic: The Disparate Impacts of COVID–19 on America's Students" (June 9, 2021); and

(K) "Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS" (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled "Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972"; and

(iv) the Equal Employment Opportunity Commission's "Enforcement Guidance on Harassment in the Workplace" (April 29, 2024).

**Sec. 8.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02090
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

**EXHIBIT B**

**PLAINTIFF'S PREVIOUSLY FILED PERSONAL DECLARATION IN SUPPORT OF**

**TRO (SEALED)**

**Exhibit B filed under seal pursuant to LCvR 5.1(h) and prior orders of the Court**

**EXHIBIT C**

**PLAINTIFF'S PREVIOUSLY FILED FAMILY DECLARATION IN SUPPORT OF TRO**

**(SEALED)**

**Exhibit C filed under seal pursuant to LCvR 5.1(h) and prior orders of the Court**

**EXHIBIT D**

**(WPATH SOC-8 excerpts)**

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH    S93

## CHAPTER 10 Intersex

The Standards of Care, Version 7 included a chapter on the applicability of the standards to people with physical intersexuality who become gender-dysphoric and/or change their gender because they differ from transgender individuals without intersexuality in phenomenological presentation, life trajectories, prevalence, etiology, and stigma risks. The current chapter provides an update and adds recommendations on the medically necessary clinical approach to the management of individuals with intersexuality in general (see medical necessity statement in Chapter 2—Global Applicability, Statement 2.1). Because a newborn with an atypical sexual differentiation may already present with clinical challenges, including the need for family education and support from early on, the decision-making on gender assignment, subsequent clinical gender management, components of which—especially genital surgery—may be controversial, and a later risk of gender dysphoria development and gender change that is markedly increased (Sandberg & Gardner, 2022).

### Terminology

"Intersex" (from Latin, literal translation "between the sexes") is a term grounded in the binary system of sex underlying mammalian (including human) reproduction. In medicine, the term is colloquially applied to individuals with markedly atypical, congenital variations in the reproductive tract. Some variations, often labeled "genital ambiguity," preclude the simple recognition of somatic sex as male or female and, in resource-rich societies, may require a comprehensive physical, endocrine, and genetic work-up, before a sex/gender is "assigned." In recent years "intersex" has also become an identity label adopted by some individuals with intersex conditions and a subset of (non-intersex) individuals with a non-binary gender identity (Tamar-Mattis et al., 2018).

At a 2005 international consensus conference on intersex management, intersex conditions were subsumed under a new standard medical term, "Disorders of Sex Development" (DSD), defined as "congenital conditions in which development of chromosomal, gonadal, or anatomical sex is atypical" (Hughes et al., 2006). DSD covers a much wider range of conditions than those traditionally included under intersexuality and comprises conditions such as Turner syndrome and Klinefelter syndrome, which are much more prevalent. In addition, many affected individuals dislike the term "disorder," viewing it as inherently stigmatizing (Carpenter, 2018; Griffiths, 2018; Johnson et al., 2017; Lin-Su, et al., 2015; Lundberg et al., 2018; Tiryaki et al., 2018). Health care professionals (HCPs) also vary in their acceptance of the term (Miller et al., 2018). The wide-spread alternative reading of DSD as "Differences in Sex Development" can be seen as less pathologizing, but is semantically unsatisfactory as this term does not distinguish the typical genital differences between males and females from atypical sexual differentiation. Other recent attempts to come up with less obviously stigmatizing terms such as "Conditions Affecting Reproductive Development" (CARD; Delimata et al., 2018) or "Variations of/in Sex Characteristics" (VSC; Crocetti, et al., 2021) are also not specific to intersexuality.

Given these definitional issues, in this chapter we are using the term "intersexuality" (or "intersex") to refer to congenital physical manifestations only. This is done for both descriptive clarity and historical continuity. This choice is not meant to indicate an intention on our part to take sides in the ongoing discussion regarding the concept of sex/gender as a bipolar system or as a continuum, which may vary with considerations of context and utility (Meyer-Bahlburg, 2019). In 21st century societies, the concepts of sex and gender are in a process of evolution.

### Prevalence

The prevalence of intersex conditions depends on the definition used. Obvious genital atypicality ("ambiguous genitalia") occurs with an estimated frequency ranging from approximately 1:2000—1:4500 people (Hughes et al., 2007). The most inclusive definitions of DSD estimate a prevalence of up to 1.7% (Blackless et al., 2000). Although these numbers are high in aggregate, the individual conditions associated with the intersex variations tend to be much rarer. For instance, androgen insensitivity syndrome (AIS) occurs in approximately 1 in 100,000 46,XY births (Mendoza & Motos, 2013), and classic congenital adrenal

hyperplasia (CAH) in approximately 1 in 15,000 46,XX births (Therrell, 2001). Prevalence figures for individual syndromes may vary dramatically between countries and ethnic groups.

### Presentation

The presentation of individuals with intersex traits varies widely. Intersexuality can be recognized during prenatal ultrasound imaging, although most individuals will be identified during genital examinations at birth. In resource-rich societies, such children will undergo extensive medical diagnostic procedures within the first weeks of life. Taking into consideration the specific medical diagnosis, physical and hormonal findings, and information from long-term follow-up studies about gender outcome, joint decision-making between the health-care team and the parents generally leads to the newborn being assigned to the male or female sex/gender. Some individuals with intersexuality come to the attention of specialists only around the age of puberty, for instance, when female-raised adolescents are evaluated for primary amenorrhea.

HCPs assisting individuals with both intersexuality and gender uncertainty need to be aware that the medical context in which such individuals have grown up is typically very different from that of non-intersex TGD people. There are many different syndromes of intersexuality, and each syndrome can vary in its degree of severity. Thus, hormonal and surgical treatment approaches vary accordingly.

Some physical manifestations of intersexuality may require early urgent intervention, as in cases of urinary obstruction or of adrenal crisis in CAH. Most physical variations among individuals with intersexuality neither impair function, at least in the early years, nor risk safety for the individual. Yet, the psychosocial stigma associated with atypical genital appearance often motivates early genital surgery (commonly labeled 'corrective' or 'normalizing') long before the individual reaches the age of consent. This approach is highly controversial because it conflicts with ethical principles supporting a person's autonomy (Carpenter, 2021; Kon, 2015; National Commission for the Protection of Human Subjects of

Biomedical and Behavioral Research, 1979). In addition, among the manifestations without immediate safety concerns, some individuals, when older, may opt for a range of medical interventions to optimize function and appearance. The specifics of medical treatments are far beyond the scope of what can be addressed in this chapter, and the interested reader should consult the respective endocrine and surgical literature.

Some intersex conditions are associated with a greater variability in long-term gender identity outcome than others (Dessens et al., 2005). For instance, the incidence of a non-cisgender gender identity in 46,XX individuals with CAH assigned female may be as high as 5–10% (Furtado et al., 2012). The substantial biological component underlying gender identity is a critical factor that must be considered when offering psychosocial, medical, and surgical interventions for individuals with intersex conditions.

There is also ample evidence people with intersexuality and their families may experience psychosocial distress (de Vries et al., 2019; Rosenwohl-Mack et al., 2020; Wolfe-Christensen et al., 2017), in part related to psychosocial stigma (Meyer-Bahlburg, Khuri et al., 2017; Meyer-Bahlburg, Reyes-Portillo et al., 2017; Meyer-Bahlburg et al., 2018).

### Intersexuality in the psychiatric nomenclature

Since 1980, the American psychiatric nomenclature recognized individuals with intersexuality who meet the criteria for gender identity variants; however, their diagnostic categorization changed with successive DSM editions. For instance, in DSM-III (American Psychiatric Association, 1980), the Axis-I category of "transsexualism" could not be applied to such individuals in adulthood, but such children were labeled "gender identity disorder of childhood," with the medical intersex condition to be specified in Axis III. In DSM-IV-TR (American Psychiatric Association, 2000), individuals with intersexuality were excluded from the Axis-I category of "gender identity disorder" regardless of age and, instead, grouped with other conditions under the category "gender identity disorder not otherwise specified." In DSM-5 (American Psychiatric Association, 2013), which moved away from the multiaxial

---

**Statements of Recommendations**

10.1- We suggest a multidisciplinary team, knowledgeable in diversity of gender identity and expression as well as in intersexuality, provide care to individuals with intersexuality and their families.

10.2- We recommend health care professionals providing care for transgender youth and adults seek training and education in the aspects of intersex care relevant to their professional discipline.

10.3- We suggest health care professionals educate and counsel families of children with intersexuality from the time of diagnosis onward about the child's specific intersex condition and its psychosocial implications.

10.4- We suggest both providers and parents engage children/individuals with intersexuality in ongoing, developmentally appropriate communications about their intersex condition and its psychosocial implications.

10.5- We suggest health care professionals and parents support children/individuals with intersexuality in exploring their gender identity throughout their life.

10.6- We suggest health care professionals promote well-being and minimize the potential stigma of having an intersex condition by working collaboratively with both medical and non-medical individuals/organizations.

10.7- We suggest health care professionals refer children/individuals with intersexuality and their families to mental-health providers as well as peer and other psychosocial supports as indicated.

10.8- We recommend health care professionals counsel individuals with intersexuality and their families about puberty suppression and/or hormonal treatment options within the context of the individual's gender identity, age, and unique medical circumstances.

10.9- We suggest health care professionals counsel parents and children with intersexuality (when cognitively sufficiently developed) to delay gender-affirming genital surgery, gonadal surgery, or both, so as to optimize the children's self-determination and ability to participate in the decision based on informed consent.

10.10- We suggest only surgeons experienced in intersex genital or gonadal surgery operate on individuals with intersexuality.

10.11- We recommend health care professionals who are prescribing or referring for hormonal therapies/surgeries counsel individuals with intersexuality and fertility potential and their families about a) known effects of hormonal therapies/surgery on future fertility; b) potential effects of therapies that are not well studied and are of unknown reversibility; c) fertility preservation options; and d) psychosocial implications of infertility.

10.12- We suggest health care professionals caring for individuals with intersexuality and congenital infertility introduce them and their families, early and gradually, to the various alternative options of parenthood.

---

system, "gender identity disorder" was re-defined as "gender dysphoria" and applied regardless of age and intersex status, but individuals with intersexuality received the added specification "with a disorder of sex development" (Zucker et al., 2013). The just published text revision of DSM-5 (American Psychiatric Association, 2022) keeps the term gender dysphoria. Note, however, the recent revision of the International Classification of Diseases [ICD-11; World Health Organization, 2019a] has moved "gender incongruence" from the chapter "Mental, Behavioral, or Neurodevelopmental Disorders" to a new chapter "Conditions Related to Sexual Health."

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

Statement 10.1

**We suggest a multidisciplinary team, knowledgeable in diversity of gender identity and expression as well as in intersexuality, provide care to individuals with intersexuality and their families.**

Intersexuality, a subcategory of DSD, is a complex congenital condition that requires the involvement of experts from various medical and behavioral disciplines (Hughes et al., 2006). Team composition and function can vary depending on team location, local resources, diagnosis, and the needs of the individual with intersexuality and her/his/their family. The ideal team includes pediatric subspecialists in endocrinology, surgery and/ or urology, psychology/psychiatry, gynecology, genetics, and, if available, personnel trained in social work, nursing, and medical ethics (Lee et al., 2006). The structure of the team can be in line with 1) the traditional multidisciplinary medical model; 2) the interprofessional model; or 3) the transdisciplinary model. Although these structures can appear similar, they are in fact very different and can exert varying influences on how the team functions (Sandberg & Mazur, 2014). The 2006 Consensus Statement makes no decision about which model is best—multidisciplinary, interdisciplinary, or transdisciplinary— and only states the models "imply different degrees of collaboration and professional

S18 E. COLEMAN ET AL.

interventions. In many countries, medically necessary gender-affirming care is documented by the treating health professional as treatment for Gender Incongruence (HA60 in ICD-11; WHO, 2019b) and/or as treatment for Gender Dysphoria (F64.0 in DSM-5-TR; APA, 2022).

There is strong evidence demonstrating the benefits in quality of life and well-being of gender-affirming treatments, including endocrine and surgical procedures, properly indicated and performed as outlined by the Standards of Care (Version 8), in TGD people in need of these treatments (e.g., Ainsworth & Spiegel, 2010; Aires et al., 2020; Aldridge et al., 2020; Almazan & Keuroghlian, 2021; Al-Tamimi et al., 2019; Balakrishnan et al., 2020; Baker et al., 2021; Buncamper et al., 2016; Cardoso da Silva et al., 2016; Eftekhar Ardebili, 2020; Javier et al., 2022; Lindqvist et al., 2017; Mullins et al., 2021; Nobili et al., 2018; Owen-Smith et al., 2018; Özkan et al., 2018; T'Sjoen et al., 2019; van de Grift, Elaut et al., 2018; White Hughto & Reisner, Poteat et al., 2016; Wierckx, van Caenegem et al., 2014; Yang, Zhao et al., 2016). Gender-affirming interventions may also include hair removal/transplant procedures, voice therapy/surgery, counseling, and other medical procedures required to effectively affirm an individual's gender identity and reduce gender incongruence and dysphoria. Additionally, legal name and sex or gender change on identity documents can also be beneficial and, in some jurisdictions, are contingent on medical documentation that patients may call on practitioners to produce.

Gender-affirming interventions are based on decades of clinical experience and research; therefore, they are not considered experimental, cosmetic, or for the mere convenience of a patient. They are safe and effective at reducing gender incongruence and gender dysphoria (e.g., Aires et al., 2020; Aldridge et al., 2020; Al-Tamimi et al., 2019; Balakrishnan et al., 2020; Baker et al., 2021; Bertrand et al., 2017; Buncamper et al., 2016; Claes et al., 2018; Eftekhar Ardebili, 2020; Esmonde et al., 2019; Javier et al., 2022; Lindqvist et al., 2017; Lo Russo et al., 2017; Marinkovic & Newfield, 2017; Mullins et al., 2021; Nobili et al., 2018; Olson-Kennedy, Rosenthal et al., 2018; Özkan et al., 2018; Poudrier et al., 2019; T'Sjoen et al., 2019; van de Grift, Elaut et al., 2018; White Hughto & Reisner,

Poteat et al., 2016; Wierckx, van Caenegem et al., 2014; Wolter et al., 2015; Wolter et al., 2018).

Consequently, WPATH urges health care systems to provide these medically necessary treatments and eliminate any exclusions from their policy documents and medical guidelines that preclude coverage for any medically necessary procedures or treatments for the health and well-being of TGD individuals. In other words, governments should ensure health care services for TGD people are established, extended or enhanced (as appropriate) as elements in any Universal Health Care, public health, government-subsidized systems, or government-regulated private systems that may exist. Health care systems should ensure ongoing health care, both routine and specialized, is readily accessible and affordable to all citizens on an equitable basis.

Medically necessary gender-affirming interventions are discussed in SOC-8. These include but are not limited to hysterectomy +/- bilateral salpingo-oophorectomy; bilateral mastectomy, chest reconstruction or feminizing mammoplasty, nipple resizing or placement of breast prostheses; genital reconstruction, for example, phalloplasty and metoidioplasty, scrotoplasty, and penile and testicular prostheses, penectomy, orchiectomy, vaginoplasty, and vulvoplasty; hair removal from the face, body, and genital areas for gender affirmation or as part of a preoperative preparation process; gender-affirming facial surgery and body contouring; voice therapy and/or surgery; as well as puberty blocking medication and gender-affirming hormones; counseling or psychotherapeutic treatment as appropriate for the patient and based on a review of the patient's individual circumstances and needs.

Statement 2.2

**We recommend health care professionals and other users of the Standards of Care, Version 8 (SOC-8) apply the recommendations in ways that meet the needs of local transgender and gender diverse communities, by providing culturally sensitive care that recognizes the realities of the countries they are practicing in.**

TGD people identify in many different ways worldwide, and those identities exist within a cultural context. In English speaking countries, TGD people variously identify as *transsexual,*

32

being almost always understood in reference to a gender binary (Butler, 1993). Presently, it can be difficult for nonbinary people to be reliably recognized as their gender via visual cues associated with their gender expression (e.g., clothing, hair). However, androgyny or gender nonconformity may be communicated by the mixing or combining of cultural markers with traditionally masculine or feminine connotations. Because there is no commonly recognized "nonbinary category" within most contemporary Western, global north cultural contexts, nonbinary visibility often necessitates explicit sharing of one's gender with others or the use of cues that may be interpreted as gender nonconformity (but not necessarily nonbinary).

For these reasons, framing access to medical care in the context of someone experiencing a "social gender transition" where they are "living in a gender role that is congruent with one's gender identity" is not in line with the way many TGD people understand themselves and their personal transition process. For some, "living in a gender role that is congruent with one's gender identity" does not involve changes in name, pronouns, or gender expression even as medical intervention may be necessary. Even if a person is able to live in ways that are congruent with their gender identity, it may be difficult for an outside observer to assess this without learning directly from that person how they understand their own experience in this regard. Expectation of "social gender transition" may be unhelpful when considering eligibility for gender-affirming care, such as hormones and surgery, and rigid expectations of what a "social gender role transition" "should" look like can be a barrier to care for nonbinary people. There is no logical requirement gender-affirming medical interventions can only be done once a person legally changes their name, changes the gender marker on their identity documents, or wears or refrains from wearing particular items of clothing. Nonbinary people may struggle to access recognition of their genders on formal documentation, which may negatively affect their mental health or well-being (Goetz & Arcomano, 2021). TGD people may benefit from specific support in accessing (or retaining) their gender marker of preference. A requirement that someone disclose their gender identity in all circles of their lives (family, work, school, etc.) in order to access medical care may not be consistent with their goals and can place them at risk if it is not safe to do so.

Statement 8.3

**We recommend health care professionals consider gender-affirming surgical interventions in the absence of hormonal treatment unless hormone therapy is required to achieve the desired surgical result.**

The trajectory of "hormones before surgery" is an option across a range of surgical interventions. Some nonbinary people will seek gender-affirming surgical treatment to alleviate gender incongruence and increase body satisfaction (Beek et al., 2015; Burgwal & Motmans, 2021; Jones et al., 2019; Koehler et al., 2018), but do not want hormonal treatment or are unable to undergo hormonal therapy due to other medical reasons (Nieder, Eyssel et al., 2020). Currently, it is unknown for which proportion of nonbinary people these options apply.

Perhaps the surgery which has some specific association with nonbinary people (rather than sought by transgender men or undergone by some cisgender women) is mastectomy in nonbinary people AFAB who have not taken testosterone—although testosterone is not a requirement for this type of surgery—and some nonbinary people AFAB may need breast reduction (McTernan et al., 2020). An example of a surgery for which at least a period of hormone therapy may be necessary is metoidioplasty that enhances the enlarged clitoris produced by testosterone therapy. See Chapter 13—Surgery and Postoperative Care for more detail on whether hormone therapy is necessary for various surgeries. Procedures addressing the internal reproductive system include hysterectomy, unilateral or bilateral salpingo-oophorectomy, and vaginectomy. Hormone therapy is not required for any of these procedures, but hormone replacement therapy (either with estrogens, testosterone, or both) is advisable in those individuals undergoing a total gonadectomy to prevent adverse effects on their cardiovascular and musculoskeletal systems (Hembree et al., 2017; Seal, 2017). For phalloplasty, while there is no surgical requirement per se for a minimum period of testosterone

therapy for eligible* transgender and gender diverse people who wish this treatment due to demonstrated improvement in psychosocial functioning and quality of life. For supporting text, see Statement 12.21.

### Statement 12.21

**We recommend health care professionals maintain existing hormone therapy if the transgender and gender diverse individual's mental health deteriorates and assess the reason for the deterioration, unless contraindicated.**

Several mental health disparities have been documented in the transgender population including depression, suicidality, anxiety, decreased self-esteem, and post-traumatic stress disorder (Arcelus et al., 2016; Becerra-Culqui et al, 2018; Bouman et al., 2017; Eisenberg et al., 2017; Heylens, Elaut et al., 2014; Witcomb et al., 2018). The gender minority stress model provides evidence of several mediators and moderators of these disparities (Hendricks & Testa, 2012; Meyer, 2003). Mediators and moderators of mental health disparities unique to transgender people include experiences of discrimination, victimization, misgendering, family rejection, and internalized transphobia (Hendricks & Testa, 2012). Factors that have a positive effect on mental health include family acceptance, supportive social and romantic relationships, transgender community connectedness, protection by affirming and inclusive policies, policies of affirmation and inclusion, possession of updated legal name/gender documentation, and achievement of physical gender transition based on individualized embodiment goals (Bauer et al., 2015; Bockting et al., 2013; Bouman et al., 2016; Davey et al., 2014; de Vries et al., 2014; Du Bois et al., 2018; Gower, Rider, Brown et al., 2018; Hendricks & Testa, 2012; Keo-Meier et al., 2015; Meier et al., 2013; Pflum et al., 2015; Ryan et al., 2010; Smith et al., 2018).

Hormone therapy has been found to positively impact the mental health and quality of life of TGD youth and adults who embark on this treatment (Aldridge et al., 2020; Allen et al., 2019; Bauer et al., 2015; Nobili et al., 2018; Russell et al., 2018; Ryan, 2009). In many cases, hormone therapy is considered a lifesaving intervention (Allen et al., 2019; Grossman & D'Augelli, 2006; Moody et al., 2015). Several studies have found associations between the initiation of hormone therapy and improved mental health in youth and adults (Aldridge et al., 2020; Costa et al., 2016; de Vries et al., 2014; Kuper et al., 2020; Nguyen et al., 2018; White Hughto & Reisner, 2016), including improvements in quality of life (Gorin-Lazard et al., 2012; Gorin-Lazard et al., 2013; Murad et al., 2010; Newfield et al., 2006; Nobili et al., 2018; White Hughto & Reisner, 2016), a reduction in anxiety and depression (Aldridge et al., 2020; Colizzi et al., 2014; Davis & Meier, 2014; de Vries, Steensma et al., 2011; Gómez-Gil et al., 2012; Rowniak et al., 2019), decreased stress, and decreased paranoia (Keo-Meier & Fitzgerald, 2017). A prospective, controlled trial using the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) demonstrated significant improvement in multiple domains of psychological functioning in transgender men after only 3 months of testosterone treatment (Keo-Meier et al., 2015). Although there are higher rates of autism symptoms in the transgender population, these symptoms have not been found to increase after the initiation of hormone therapy (Nobili et al., 2020).

As a reduction in depressive symptoms may correlate with a decrease in the risk of suicide, withholding hormone therapy based on the presence of depression or suicidality may cause harm (Keo-Meier et al., 2015; Levy et al., 2003). Turban, King et al. (2020) found a decrease in the odds of lifetime suicidal ideation in adolescents who required pubertal suppression and had access to this treatment compared with those with a similar desire with no such access (Turban, King et al., 2020). A recent systematic review found pubertal suppression in TGD adolescents was associated with an improved social life, decreased suicidality in adulthood, improved psychological functioning and quality of life (Rew et al., 2020). Because evidence suggests hormone therapy is directly linked to decreased symptoms of depression and anxiety, the practice of withholding hormone therapy until these symptoms are treated with traditional psychiatry is considered to have iatrogenic effects

**EXHIBIT E**

**First Circuit Order Denying Stay Pending Appeal, Orr v. Trump, No. 25-1579 (1st Cir.**

**Sept. 4, 2025)**

# United States Court of Appeals

## For the First Circuit

—————————————

No. 25-1579

VIKTOR AGATHA; CHASTAIN ANDERSON; BELLA BOE; DAVID DOE; AC
GOLDBERG; RAY GORLIN; DREW HALL; CHELLE LEBLANC; ASHTON ORR; ZAYA
PERYSIAN; SAWYER SOE; and REID SOLOMON-LANE, on behalf of themselves and others
similarly situated;

Plaintiffs, Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S.
DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and
the UNITED STATES OF AMERICA;

Defendants, Appellants.

—————————————

Before

Montecalvo, Rikelman, and Aframe,
<u>Circuit Judges</u>.

—————————————

**ORDER OF COURT**

Entered:  September 4, 2025

   The government has moved for a stay pending its appeal of several orders entered
by the district court that preliminarily enjoined the U.S. Department of State ("Department") and
its Secretary from enforcing a policy ("Passport Policy"), promulgated by the Department in
connection with an executive order ("Executive Order") issued by President Donald J. Trump, that
would require U.S. passports to state the biological sex of their bearer at birth.  <u>See</u> Mot. for Stay
Pending Appeal, <u>Orr</u> v. <u>Trump</u>, No. 25-1579 (1st Cir. July 18, 2025).  Under the Department's
prior policy, passport applicants could select a sex marker of "M," "F," or "X," which was not
required to correspond with the applicant's biological sex.  In addition to the government's motion,
we have received and considered a response from the plaintiffs, who are transgender or non-binary
Americans representing two certified classes, and a reply from the government.

   As the party seeking a stay pending appeal, the government bears the burden of
justifying the extraordinary relief it requests.  <u>See</u> <u>Nken</u> v. <u>Holder</u>, 556 U.S. 418, 433-34 (2009).

We consider four factors: (1) whether the government has made "a strong showing that [it] is likely to succeed on the merits"; (2) whether the government has shown that it "will be irreparably injured absent a stay"; (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." Does 1-3 v. Mills, 39 F.4th 20, 24 (1st Cir. 2022) (quoting Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos., 996 F.3d 37, 44 (1st Cir. 2021)). The first two factors "are the most critical." Nken, 556 U.S. at 434.

We begin with the likelihood of success on the merits. The district court concluded that the plaintiffs were likely to succeed on their claim that the Department's implementation of its Passport Policy was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"). See Mem. & Order on Pls.' Mot. to Stay Agency Action and for Prelim. Inj., Orr v. Trump, No. 25-cv-10313 (D. Mass. Apr. 18, 2025), ECF No. 74 at 33-43; 7 U.S.C. § 706(2)(A). In its stay papers, the government, relying on Franklin v. Massachusetts, 505 U.S. 788 (1992), and Bradford v. Department of Labor, 101 F.4th 707 (10th Cir. 2024), cert. denied, 145 S. Ct. 1047 (2025), contends that the Passport Policy is not subject to review under the APA because it was "compelled by" the President's Executive Order. But agency action that carries out a presidential directive is ordinarily subject to APA review. See New York v. Trump, 133 F.4th 51, 70 n.17 (1st Cir. 2025); Nebraska v. Su, 121 F.4th 1, 15 (9th Cir. 2024) ("The Supreme Court has never excepted a final rule from APA review because it carried out a presidential directive."); Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1327 (D.C. Cir. 1996). And, unlike in Bradford, the Executive Order at issue here, which instructed the Secretary to "implement changes to require . . . passports" to "accurately reflect the holder's sex," Exec. Order No. 14,168, 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025), did not leave the agency with "no discretion," Bradford, 101 F.4th at 731. Rather, the district court concluded -- and the government does not presently dispute -- that the Department made several "independent determinations in formulating" the Passport Policy. See Mem. & Order on Pls.' Mot. to Stay Agency Action and for Prelim. Inj., Orr v. Trump, No. 25-cv-10313 (D. Mass. Apr. 18, 2025), ECF No. 74 at 35-36.

The government argues that agency action implementing a presidential directive is nevertheless unreviewable when a statute commits the action to the President's sole discretion. And it asserts that title 22, section 211a, which concerns the contents of passports, is one such statute. Even assuming for present purposes that section 211a is such a statute, the government has not substantially developed the point or provided any decision from the U.S. Supreme Court or any federal court of appeals in which Franklin's prohibition of APA review of presidential action was extended to prohibit review of action taken by an agency, otherwise indisputably covered by the APA, see 5 U.S.C. § 701(b)(1), because the action was directed by the President in his sole discretion. Thus, whatever the ultimate merits of the argument, which appears to be a matter of first impression in the federal courts of appeals, we cannot conclude on the present submissions that the government has made a strong showing that the Passport Policy is unreviewable under the APA. And the government's cursory assertion in two sentences that the Passport Policy, if reviewable, passes muster under the APA, is insufficient to meet its burden to demonstrate a strong likelihood of success on the merits of this appeal. See Mot. for Stay Pending Appeal at 19, Orr v. Trump, No. 25-1579 (1st Cir. July 18, 2025).

Given our view that the government has not made a strong showing that it is likely to succeed on the merits of its appeal of the APA claim and given that the district court based its

- 2 -

preliminary injunction on the plaintiffs' APA claim and, independently, on their animus-based Equal Protection Clause claim, we need go no further in considering the likelihood of success on the merits.  That is especially so given that the government has not claimed in its stay papers that the APA claim could not fully support the preliminary relief that the district court granted.

We do note, however, that in regard to the Equal Protection Clause claim premised on "unconstitutional animus toward transgender Americans," the government in its motion fails to engage meaningfully with the district court's analysis.  Rather, the government devotes only two sentences to challenging the district court's assessment of the plaintiffs' animus-based Equal Protection Clause claim.  See Mot. for Stay Pending Appeal at 17, Orr v. Trump, No. 25-1579 (1st Cir. July 18, 2025) ("Moreover, because these are valid reasons for the Passport Policy's prohibition on self-identification, that policy is not inexplicable by anything but animus.  The district court plainly erred in concluding otherwise." (citation modified)).  And before the district court, the government left undeveloped its contentions that the express "purposes" section of the Executive Order justifies the Passport Policy and that the government has an interest in using an "objective" criterion for determining sex.  See, e.g., New Jersey v. Trump, 131 F.4th 27, 41-42 (1st Cir. 2025) (finding waiver under analogous circumstances).  Further, in its written decision, the district court identified four overarching considerations underlying its conclusion that the plaintiffs are likely to succeed on their animus claim.  Mem. & Order on Plfs.' Mot. to Stay Agency Action and for Prelim. Inj., Orr v. Trump, No. 25-cv-10313 (D. Mass. Apr. 18, 2025), ECF No. 74 at 27-30.  The government does not grapple in its motion to stay with the four prongs of the district court's reasoning as to the animus claim, and instead offers only the two sentences we describe above in disputing the district court's ruling on this claim.  As a result, the government has failed to meet its burden to secure a stay.[1]  See, e.g., New Jersey, 131 F.4th at 41 (denying the requested stay and observing that the government "d[id] not address the significant additional burdens that the [d]istrict [c]ourt identified in finding that the [p]laintiff-[s]tates would suffer irreparable harm in the absence of preliminary injunctive relief").

The remaining factors for the requested relief also do not favor the government's stay request.  In its motion papers, the government mostly describes certain long-term institutional interests of the executive branch that may be harmed if the challenged policy is enjoined.  In contrast, based on the named plaintiffs' affidavits and the expert declarations submitted by the plaintiffs, the district court made factual findings that the plaintiffs will suffer a variety of immediate and irreparable harms from the present enforcement of the challenged policy, including "a greater risk of experiencing harassment and violence" while traveling abroad.  Mem. & Order on Pls.' Mot. to Stay Agency Action and for Prelim. Inj., Orr v. Trump, No. 25-cv-10313 (D. Mass. Apr. 18, 2025), ECF No. 74 at 50.  Relatedly, in granting class-wide injunctive relief, the district court pointed to immediate and irreparable harms on a class-wide basis, explaining that the

---

[1]  The government's motion to stay focuses on a different claim by the plaintiffs, a sex discrimination claim, and the impact on that claim of the decision in United States v. Skrmetti, 145 S. Ct. 1816 (2025).  But the district court carefully explained in its order denying the government's previous motion to dissolve the preliminary injunction that its rulings as to the likelihood of success on the APA claim and the animus-based Equal Protection Clause claim stand as independent bases for its grant of injunctive relief.  See Order, Orr v. Trump, No. 25-cv-10313 (D. Mass. July 11, 2025), ECF No. 130.

- 3 -

plaintiffs had offered "uncontroverted evidence of the harms that transgender and non-binary people face" if required to use such passports.  Mem. & Order on Pls.' Mot. for Class Certification and Mot. to Apply the Prelim. Inj. to the Classes, <u>Orr</u> v. <u>Trump</u>, No. 25-cv-10313 (D. Mass. June 17, 2025), ECF No. 115 at 24.  In light of the district court's factual findings on irreparable harm, and the government's failure to contest the plaintiffs' evidence before the district court, the government "has not sufficiently demonstrated that the balance of harms and equities" favors upending the status quo and subjecting the plaintiffs to the immediate harms identified by the district court.  <u>See</u> <u>NetChoice, LLC</u> v. <u>Fitch</u>, No. 25A97, 2025 WL 2350189, at *1 (U.S. Aug. 14, 2025) (Kavanaugh, J., concurring).

   For all these reasons, the motion for a stay pending appeal is <u>DENIED</u>.

   So ordered.

        By the Court:

        Anastasia Dubrovsky, Clerk

cc:  Hon. Julia Eleanor Kobick, Robert Farrell, Clerk, United States District Court for the District of Massachusetts, James D. Esseks, Jon Warren Davidson, Jessie J. Rossman, Jennifer Herrmann, Aditi Fruitwala, Zoe Kreitenberg, Isaac D. Chaput, Li Nowlin-Sohl, Robert Gianchetti, Sruti J. Swaminathan, Lewis Yelin, Donald Campbell Lockhart, Rayford A. Farquhar, Charles W. Scarborough, Abraham R. George, M. Jared Littman, Joshua Harrell

- 4 -

**EXHIBIT F**

**(CBP CARRIER LIAISON PROGRAM BULLETIN, JULY 7, 2025)**



**Carrier Liaison Program**

July 07, 2025                                      CLP@cbp.dhs.gov

## Sex Codes "M" or "F" in Systems

- On January 20, 2025, the U.S. President issued Executive Order 14168, *"Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"* (EO).  In compliance with the EO, U.S. Customs and Border Protection (CBP) is updating guidance for Advance Passenger Information System (APIS) transmissions to CBP.

- Carriers are reminded that they are responsible for comparing the travel document presented by the travelers with the travel document information transmitted to CBP to ensure that information is correct, the document appears to be valid for travel to the United States, and the traveler is the person to whom the travel document was issued.[1]  Commercial air carriers' submission of APIS data requires carriers to submit traveler information, including the traveler's sex, as part of the pre-departure transmission.

- Existing APIS regulatory language provides that "M" or "F" (M=Male; F=Female) sex markers are to be accepted in the transmission. However, CBP systems had previously accepted characters other than "M" or "F" without returning an error response or requiring resubmission.

- Effective July 14, 2025, air carriers will have an informed compliance period of 90-days where values other than "M" or "F" in the sex field will not require resubmission. After the compliance period, APIS will begin returning a resubmit or "X response" which indicates insufficient information requiring resubmission, when values other than "M" or "F" are submitted in the sex field.

- If the travel document presented by a traveler for an international flight to or from the United States has a sex indicator other than "M" or "F" or does not otherwise indicate the sex of the traveler, the carrier or the traveler should select either "M" or "F".  Submitting "M" or "F" in the sex field, in place of the value reflected on the travel document, will not subject the carrier to penalty.

- Any questions regarding the authorization for any alien to travel to the United States to seek admission, should be directed to their appropriate Regional Carrier Liaison Group (RCLG) or other designated CBP official for adjudication prior to aircraft departure.

| RCLG | SERVICE AREA | PHONE NUMBER |
| --- | --- | --- |
| Honolulu | Asia, Pacific Rim | 808-237-4632 |
| Miami | Latin America, Caribbean | 305-874-5444 |
| New York | Europe, Africa, Middle East | 718-487-5321 |

---

[1] 19 C.F.R. § 122.49a(d).

Publication No. 5061-0625