# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JANA JANSEN**

                *Plaintiff,*

  v.

**DONALD J. TRUMP**, *in his official capacity as*
*President of the United States*
    1600 Pennsylvania Avenue NW
    Washington, DC 20500;

**U.S. DEPARTMENT OF STATE**
    2201 C Street NW
    Washington, DC 20451;

**MARCO RUBIO**, *in his official capacity as*
*Secretary of the U.S. Department of State*
    2201 C Street NW
    Washington, DC 20451;

**U.S. DEPARTMENT OF HOMELAND
SECURITY**
    2707 Martin Luther King Junior Avenue SE
    Washington, DC 20528-0525;

**KRISTI NOEM**, *in her official capacity as*
*Secretary of Homeland Security*
    2707 Martin Luther King Junior Avenue SE
    Washington, DC 20528-0525;

**U.S. CUSTOMS AND BORDER
PROTECTION**
    1300 Pennsylvania Avenue
    Washington, DC 20229;

**RODNEY S. SCOTT**, *in his official capacity as*
*Commissioner of Customs and Border Protection*
    1300 Pennsylvania Avenue

Civil Action No. 1:25-cv-02961-LLA

Washington, DC 20229;

**UNITED STATES OF AMERICA**,
950 Pennsylvania Avenue NW
Washington, D.C. 20530

*Defendants*.

## AMENDED COMPLAINT

1.    Pseudonymous Plaintiff Jana Jansen files this action for declaratory and injunctive relief to prevent the United States from unlawfully changing the sex designation from "female" to "male" on her U.S. passport and Global Entry card.

2.    Ms. Jansen is an intersex, post-operative transgender woman and mother who has lived exclusively as a woman for over thirty years and whose federal and state identification documents have reflected her female sex for over thirty years—including her U.S. passport, birth certificate, state driver's license, and (since her entry into the program in 2009) Global Entry card.

3.    On January 20, 2025, however, President Donald Trump issued Executive Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Executive Order"), which eschews well-established science to erase the existence of intersex, transgender people like Ms. Jansen.

4.    As relevant here, the Executive Order directs the U.S. Department of State ("State Department") and the U.S. Department of Homeland Security ("DHS") to apply an unscientific view of "sex" as a binary concept that is fixed "at conception."  But intersex people are born with physiological characteristics—including chromosomes, reproductive glands, and/or reproductive anatomy—that do not fit the typical binary definitions of "male" and "female," and they are thus

2

often assigned the wrong sex at birth. The Executive Order chooses to ignore this reality, and in doing so, overturns longstanding policy allowing transgender people—including intersex, post-operative transgender people like Ms. Jansen—to accurately designate their sex for their U.S. passports and Global Entry participation.

5.      Pursuant to the Executive Order's direction, the State Department immediately implemented a new policy preventing passport applicants (including renewal applicants) from selecting a sex designation that differs from the applicant's sex assigned at birth. And DHS and DHS's Customs and Border Protection ("CBP") have similarly implemented the Executive Order by directing that applicants for Global Entry (including renewal applicants) must use the sex designation that was assigned to them at birth. Neither policy has any exemption for intersex, post-operative transgender people like Ms. Jansen.

6.      This abrupt reversal of policy is not only unscientific, unreasonable, and intended to inflict profound shame and embarrassment; it also risks grave harm to Ms. Jansen. It means she will be "outed" as transgender whenever she uses those travel documents, which in turn risks the violence, harassment, and discrimination that is endemic against transgender people within the United States and around the world. It risks subjecting her to invasive, degrading searches by male officers, despite her female anatomy. It will force her to express the counterfactual and ideologically infused message that her sex, and sex in general, is what the Executive Order defines it to be—a message with which Ms. Jansen fundamentally disagrees. It will also require her to travel with mismatched identification documents, given that her state identification documents, including driver's license and birth certificate, accurately reflect her female sex. Traveling with mismatched documents carries its own weighty risks, including the risk of being detained or denied the ability to enter or leave a country.

7.    The Executive Order as applied to passports and Global Entry, the State Department's implementation of the Executive Order as applied to passports ("Passport Policy"), and DHS and CBP's implementation of the Executive Order as applied to Global Entry ("Global Entry Policy") (collectively, the "Travel Document Policies"), therefore violate Ms. Jansen's constitutional rights to equal protection, privacy, and free speech, and violate the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq*.

8.    Accordingly, this suit seeks a declaration that the Travel Document Policies are unconstitutional; a declaration that the Passport Policy and the Global Entry Policy violate the APA; preliminary and permanent injunctive relief prohibiting implementation of these unlawful policies; and an order setting aside the Passport Policy and the Global Entry Policy.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346.

10.    Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities, and Defendants reside in this District.  A substantial part of the events or omissions giving rise to this Complaint occurred in the District of Columbia.

## PARTIES

11.    Plaintiff Ms. Jansen is a United States citizen and resident.

12.    Defendant Donald Trump, sued in his official capacity as President of the United States, has statutory authority to prescribe certain rules for the issuance of passports. *See* 22 U.S.C. § 211a.

13.    Defendant the State Department is a federal executive agency responsible for implementing the Executive Order.

4

14.    Defendant Marco Rubio, sued in his official capacity as the Secretary of State, is responsible for supervising and directing the State Department.  The Secretary of State has exclusive statutory authority to issue passports under rules prescribed by the President.  *See* 22 U.S.C. § 211a.  The President has delegated the authority to prescribe those rules for passport issuance to the Secretary of State.  *See* Exec. Order No. 11295, *Rules Governing the Granting, Issuing, and Verifying of United States Passports*, 31 Fed. Reg. 10,603 (Aug. 5, 1966).

15.    Defendant DHS is a federal executive agency responsible for implementing the Executive Order.

16.    Defendant Kristi Noem, sued in her official capacity as the Secretary of Homeland Security, is responsible for supervising and directing DHS.  The Secretary of Homeland Security is responsible for implementing and maintaining a program for expedited travel of previously screened and known travelers across the borders of the United States.  *See* 8 U.S.C. § 1365b(k).

17.    Defendant CBP is a federal executive agency within DHS responsible for implementing and maintaining Global Entry, a DHS Trusted Traveler Program implemented pursuant to 8 U.S.C. § 1365b(k).  CBP is responsible for processing applications and renewal requests for Global Entry participants, issuing Global Entry cards, and screening Global Entry participants at certain airports and ports of entry.  *See* 8 C.F.R. § 235.12.

18.    Defendant Rodney S. Scott, sued in his official capacity as the Commissioner of CBP, is responsible for supervising and directing CBP.

19.    Defendant the United States of America is the government of the United States and includes all government agencies and officials responsible for implementing the Travel Document Policies.

## BACKGROUND

**I.     The Travel Document Policies Ignore the Reality of Intersex People.**

**A.  President Trump Issues the Executive Order.**

20.     On January 20, 2025—the first day of his second term of office—President Trump issued Executive Order No. 14168, titled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*.

21.     The Executive Order purports to rely exclusively on 5 U.S.C. § 7301, which generally permits the President to issue regulations for employee conduct in the Executive Branch.

22.     The Executive Order's stated "[p]urpose" is to "defend women's rights and protect freedom of conscience by using clear and accurate language and policies."  Exec. Order § 1.

23.     The Executive Order neither protects the rights of women, nor does it use "accurate" biological language.  Instead, it baselessly declares that "ideologues who deny the biological reality of sex" are "depriving" women "of their dignity, safety, and well-being" by "permit[ting] men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women."  *Id*.

24.     The Executive Order asserts that this "unhealthy," "corrosive" "erasure of sex" is an "attack" on "the ordinary and longstanding use and understanding of biological and scientific terms," and that it "replac[es] the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts."  Exec. Order § 1.  The Executive Order cites no scientific authority for its assertions.

25.     To effectuate this purported "defen[se]" of women, the Executive Order states that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality."  Exec. Order § 2.  It

declares that the "Executive Branch will enforce all sex-protective laws to promote this reality," and provides a list of definitions to "govern all Executive interpretation of and application of Federal law and administration policy." *Id.*; *see also id.* § 3(b)–(c). Among the definitions are:

a. "Sex" shall refer to an individual's immutable biological classification as either male or female.

b. "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

c. "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

*Id.* § 2(a)–(c).

26.    The Executive Order further decries the concept of "[g]ender ideology," which it deems an "internally inconsistent" principle that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true," and which "diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f).

27.    As relevant here, the Executive Order directs the Secretary of State and the Secretary of Homeland Security to "implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order." *Id.* § 3(d).

28.    The Executive Order also directs the Secretary of Health and Human Services ("HHS") to provide "clear guidance expanding on the sex-based definitions set forth in this order."

*Id.* § 3(a).  HHS did so on February 19, 2025, defining "[f]emale" as "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)," and defining "[m]ale" as "a person of the sex characterized by a reproductive system with the biological function of producing sperm."  HHS's policy further states: "Rare disorders of sexual development do not constitute a third sex because these disorders do not lead to the production of a third gamete.  That is, the reproductive system of a person with such a disorder does not produce gametes other than eggs or sperm."[1]

29.    The Executive Order imposes various other rules related to sex, including with respect to federal employees' records, interpretation of certain federal laws, rescission of certain agency policies, and proposals for legislation on the topic.  *See* Exec. Order §§ 3–7.

**B.  The Executive Order Reflects Longstanding Animus.**

30.    On its face, the Executive Order reflects President Trump and his Administration's animus towards people who do not conform to their unscientific view of "sex."

31.    This is consistent with President Trump and his Administration's longstanding and explicit animus towards people who do not conform to their unscientific view of "sex."

---

[1] U.S. Dep't of Health & Hum. Servs., *Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Feb. 19, 2025), https://perma.cc/4J3A-TBU5; Press Release, U.S. Dep't of Health & Hum. Servs., *HHS Takes Action on President Trump's Executive Orders Defending Women and Children* (Feb. 19, 2025), https://perma.cc/2M4H-J8FX; *see also* OASH Office on Women's Health, *Sex-Based Definitions*, https://perma.cc/D8KA-FR4D (last updated Nov. 14, 2025).

32.     President Trump repeatedly uses terms like "transgender insanity"[2] and "the transgender cult,"[3] and he refers to transgender people as "deranged," "sick," and drug users.[4]

33.     Secretary Rubio has referred to the existence of transgender people as "a harmful ideology" and stated that being transgender is "not real."[5]

34.     To inflame public opinion, President Trump has repeatedly peddled false accusations that schools are facilitating gender-reassignment surgery for children without parental consent.[6]

35.     Following in this tradition of animus, President Trump issued a barrage of executive orders targeting transgender people mere days into office.[7]  One executive order, for example,

_____

[2] Bill Barrow, *Trump and Vance Make Anti-Transgender Attacks Central to Their Closing Argument Before Election Day*, PBS (Nov. 1, 2024), https://perma.cc/5APK-TPCP (last visited Jan. 30, 2026).

[3] *See Fact Sheet: Donald Trump on LGTBQ Issues: Transgender Americans*, GLAAD (Aug. 20, 2024), https://perma.cc/5CR4-LGTY (last visited Jan. 30, 2026).

[4] *See id.*

[5] Ken Scheck, *JD Vance Adds to Anti-LGBTQ+ Track Record with Census Letter*, Buckeye Flame (Nov. 13, 2023), https://perma.cc/BEG3-DANS (last visited Jan. 30, 2026) (letter co-written by then-Senator JD Vance and then-Senator Rubio)

[6] Matt Lavietes, *Trump repeats false claims that children are undergoing transgender surgery during the school day*, NBC News (Sept. 9, 2024), https://perma.cc/E9M2-8VY8.

[7] These include: Exec. Order No. 14148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025) (rescinding Biden Administration executive orders protecting transgender people); Exec. Order No. 14170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025) (prohibiting governmental employers from considering gender identity in hiring); Exec. Order No. 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, title and § 1 (Jan. 28, 2025); Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) (prohibiting teaching of transgender-related topics in schools); Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) (barring transgender girls from playing school sports).

banned transgender people from serving in the military and stated that being transgender "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life," and "is not consistent with the humility and selflessness required of a service member."[8]

36.     Pursuant to and in addition to these executive orders, President Trump and his Administration have sought to eliminate or restrict existing protections for transgender people; to erase any mention or recognition of transgender people from and by any part of the federal government, including federal contractors and grantees; and to enact affirmative policies to discriminate against transgender people in all aspects of public life, including education, employment, health care, and housing, to name a few.

**C. The Executive Order Ignores the Reality of Intersex People.**

37.     "Intersex," also known in the medical community as "disorders of sex development" or "differences of sex development" ("DSDs"), refers to a broad spectrum of conditions in which a person is born with physiological characteristics—including chromosomes, reproductive glands, and/or reproductive anatomy—that do not fit the typical binary definitions of "male" and "female."

38.     There are many different types of DSDs. The medical community divides DSDs into three classifications based on chromosomal structure,[9] with many further subclassifications: (1) 46,XX DSD, which includes individuals with typical female sex chromosomes (XX) but certain

---

[8] Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025).

[9] Normal human cells have 23 pairs of chromosomes, for a total of 46 chromosomes. The 23rd pair of chromosomes are sex chromosomes, meaning they carry the genes that determine an individual's sex. A typical female sex chromosome is XX; a typical male sex chromosome is XY.

male physiological characteristics; (2) 46,XY DSD, which includes individuals with typical male sex chromosomes (XY) but certain female or incompletely developed physiological characteristics; and (3) complex or undetermined DSD, which includes atypical chromosomal structures such as only a single sex chromosome or an extra pair of sex chromosomes.

39.    DSDs can present in many different forms, ranging from mild to more significant. Physical differences are often not apparent until puberty.

40.    For example, some individuals have typical female sex chromosomes (XX) and gonads (ovaries) but external reproductive organs that appear male; or, conversely, typical male sex chromosomes (XY) and gonads (testes) but external reproductive organs that appear female. Other individuals may present with external reproductive organs that are ambiguous (*i.e.*, not clearly male or female) and/or gonads that are both male and female (*i.e.*, both testicular and ovarian tissue).  Other variations of DSDs can result in hormonal imbalances that affect sex development and puberty.

41.    According to estimates by the United Nations, between 0.05% and 1.7% of the population is born with intersex traits—meaning there are potentially as many as 5.6 million intersex people in the United States.[10]

42.    Some intersex people are transgender.  A person is "transgender" if they live in a sex different from the sex they were assigned at birth.  Not all intersex people are transgender, as some intersex people were assigned a sex at birth that they have continued to live in.

43.    To use the Executive Order's own language, the Order's definitions "eras[e]" the "biological reality" of intersex people. Exec. Order § 1.  For example, under the Executive Order's

---

[10] United Nations Free & Equal, *Intersex People*, Office of the United Nations High Commissioner for Human Rights 1 (2024), https://perma.cc/26P9-J3VK (last visited Jan. 30, 2026)

definitions, some individuals with DSDs have the capacity (after puberty) to "produce" "the large reproductive cell" (*i.e.*, egg cell) but were assigned male at birth due to the appearance of their external genitalia; or, conversely, some individuals have the capacity (after puberty) to "produce" "the small reproductive cell" (*i.e.*, sperm cell) but were assigned female at birth due to the appearance of their external genitalia. The Executive Order does not account for how such individuals fit within its unscientific, binary system in which "sexes are not changeable."

44.    Similarly, some individuals with DSDs may have the capacity to "produce" neither "the large reproductive cell" (*i.e.*, egg cell) nor "the small reproductive cell" (*i.e.*, sperm cell)—in other words, they are born infertile. The Executive Order does not purport to explain how to categorize such individuals.

### D. The State Department Implements the Unlawful Executive Order as to Passports.

45.    To travel out of or into the United States, a U.S. citizen must carry a U.S. passport. *See* 8 U.S.C. § 1185; 22 C.F.R. § 53.1(a). A U.S. passport is a travel document issued under the authority of the State Department "attesting to the identity and nationality of the bearer." 22 C.F.R. § 51.1. It has also recently become a critical document for proving U.S. citizenship even for those not traveling outside of the United States.[11]

46.    Before a U.S. passport can be issued, the applicant must submit a written application providing "a true recital of each and every matter of fact" required and must sign the application under penalty of perjury. 22 U.S.C. § 213. In applying for a new or renewed passport, the applicant has the burden of establishing her identity by submitting a previous passport, other

---

[11] *See* Suzanne Gamboa, et al., *Immigration officers around Minneapolis are approaching people and demanding proof that they're U.S. citizens*, NBC News (Jan. 16, 2026), https://perma.cc/MSU5-CDXT; Staff, *'It's sad we have to do this': the US citizens carrying passports out of fear*, Guardian (Dec. 23, 2025), https://perma.cc/6RN7-N8P2.

government-issued photograph identification, or other identifying evidence such as an affidavit of an identifying witness. *See* 22 C.F.R. § 51.23. An applicant also has the burden of proving nationality, which can be established by a birth certificate. *See id.* § 51.42(a).

47.    Along with the written application, an applicant must submit a photograph that is "a good likeness" and "satisfactorily identif[ies] the applicant" at the time of application. *Id.* § 51.26. The State Department has detailed regulations on photograph requirements to ensure they are sufficiently identifying. For example, a photograph that shows a "change in hairstyle or facial hair" is acceptable only if it remains "a good likeness of the applicant." 8 FAM 402.1-2. The "[b]rightness and contrast" of the photograph must "accurately reproduce [the applicant's] natural skin tones" and must not "obscure unique facial features." *Id.* at 402.1-3(a). Applicants may not use "[d]igital manipulation" or "retouching," *id.* at 402.1-3(g), "[h]air accessories" that "obscure any part of the face, hairline," or background, *id.* at 402.1-4(b), or "[h]ats or other head coverings" (unless worn for medical or religious purposes), *id.* at 402.1-4(c).

48.    It is a criminal offense to willfully and knowingly make false statements in a passport application with intent to induce or secure issuance of a passport. *See* 18 U.S.C. § 1542; 22 C.F.R. § 51.20(b).

49.    The State Department first introduced sex as a required identity attribute on passport application forms in 1976, in conformity with a new international standard.

50.    That requirement has remained through present day. The forms required for a new passport (DS-11)[12] and for renewing an existing passport (DS-82)[13] each contain a field for "Sex."

---

[12] U.S. Dep't of State, *Application for a U.S. Passport* (Apr. 2025), https://perma.cc/K9TQ-QNQ6.

[13] U.S. Dep't of State, U.*S. Passport Renewal Application for Eligible Individuals* (Apr. 2025), https://perma.cc/4NHA-LQHX.

51.    For the majority of the time since introducing the sex-designation requirement in 1976, the State Department has allowed transgender individuals—including intersex, post-operative transgender individuals like Ms. Jansen—to change the sex designation on their passports.

52.    Since at least 1992, the State Department has allowed applicants to select a sex designation on their passport that differed from that assigned at birth. The policy required individuals to submit medical documentation establishing that they had undergone or would soon undergo what the policy referred to as "sexual reassignment surgery."

53.    In 2010, the State Department eliminated the requirement for surgical "reassignment" and instead allowed individuals to change the sex listed on their passport by submitting a certification from a physician that they were being treated for sex transition.

54.    Starting in 2021, the State Department permitted individuals to change the sex designation on their passports based on their own affirmation, without a physician's certification.

55.    Within days after President Trump issued the Executive Order, however, the State Department reversed this thirty-year history. By January 23, 2025, Secretary Rubio had already issued an internal State Department cable directing that "[t]he policy of the United States is that an individual's sex is not changeable."[14]

56.    As of the date of this filing, the State Department's website states that, "[u]nder the executive order," the State Department will "only issue a passport with an M or F sex marker that

---

[14] *See* Joseph Gedeon, *Rubio Instructs Staff To Freeze Passport Applications with 'X' Sex Markers*, Guardian (Jan. 23, 2025), https://perma.cc/ENQ9-B4C4 (last visited Jan. 30, 2026).

matches the customer's biological sex at birth" and "will not honor attestations requesting a preferred sex marker."[15]

57.     The website explains that all currently valid passports remain "valid for travel until they expire, are replaced by the applicant, or are invalidated pursuant to federal regulations."[16] But if an applicant submits a passport application "requesting a sex marker that differs from the sex marker at [their] birth, [they] may experience delays" and "may receive a letter or email requesting more information," and the State Department will ultimately issue "a new passport that matches [their] biological sex at birth, based on [the] supporting documents and [the State Department's] records about [their] previous passports."[17]

58.     The White House has confirmed that renewed passports will be issued with an applicant's sex as "decided at birth."[18]

**E. DHS and CBP Implement the Unlawful Executive Order as to Global Entry.**

59.     Global Entry is a CBP international trusted traveler program that facilitates the entry into the United States of pre-approved, low-risk air travelers by providing dedicated CBP processing at certain airports.  *See* 8 C.F.R. § 235.12(a).

60.     Global Entry is open to eligible U.S. citizens, U.S. nationals, U.S. lawful permanent residents, and citizens of certain countries that have entered into agreements with CBP.  *See id.*

---

[15] U.S. Dep't of State, *Sex Marker in Passports*, https://perma.cc/VC9E-BQ5T (last updated Nov. 18, 2025).

[16] *Id.* (select "Is my passport still valid if . . . it lists a sex other than my sex at birth?").

[17] *Id.*

[18] Oriana González, *Trump's Gender Order Won't Affect Existing Passports — Unless They're Renewed*, NOTUS (Jan. 21, 2025), https://perma.cc/A8DH-DD3Q.

§ 235.12(b)(1).  A U.S. citizen is eligible to participate in Global Entry if she has a valid U.S. passport.  *See id*. §§ 235.12(b)(1), (f).

61.    To apply to participate in Global Entry, an applicant must submit an online application, pay a fee, and attend an in-person interview.  *See id*. § 235.12(d)–(e).  During the in-person interview, CBP collects fingerprints and digital photographs.  *See id.* § 235.12(e)(2).

62.    CBP's website states that 80% of applications for Global Entry are approved within two weeks after completing the in-person interview, while some applications can take up to 12 months or longer for processing.[19]

63.    An individual is ineligible to participate in Global Entry if CBP determines that the individual presents a potential risk for terrorism or criminality, or is otherwise not a "low-risk" traveler.  *See id.* § 235.12(b)(2).  Providing "false or incomplete information on the application" is grounds for CBP to deny an application or remove a participant from the program.  *See id.* §§ 235.12(b)(2)(i), (j)(2).

64.    Applicants accepted for participation in Global Entry are accepted for a period of five years, unless CBP terminates participation sooner.  *See id.* §§ 235.12(d)(3), (j).  Participants are eligible to renew participation up to one year prior to the close of the participation period.  *See id*. § 235.12(d)(3).  The renewal process may require an interview.[20]

65.    Once enrolled, participants may use the separate Global Entry processing lines at certain airports when re-entering the country following international travel.  *See id.* § 235.12(g).

---

[19] U.S. Customs & Border Prot., *How to Apply for Global Entry* (last modified Nov. 27, 2024), https://perma.cc/5DY2-SD49.

[20] U.S. Customs & Border Prot., *Global Entry Frequently Asked Questions* (last modified Mar. 13, 2025), https://perma.cc/7FJM-AULQ ("An interview for program membership renewal may not be necessary.")

Participants may be subject to additional CBP examination and inspection at any time during the arrival process.  *See id.* § 235.12(h).

66.    Participants who are U.S. citizens are issued a Global Entry card.  Global Entry cards include a sex designation.

67.    Global Entry cards can be used for U.S. entry at land and sea ports of entry—although not at airports, at which only a U.S. passport is accepted for U.S. citizen Global Entry participants.[21]

68.    Global Entry cards can also be used for a variety of other identification purposes, as they serve as lawful federal identification.  For example, they can be used as lawful identification during Transportation Security Administration ("TSA") processing.

69.    Prior to 2025, CBP allowed intersex, transgender individuals to choose their correct sex and to change their sex designation for their Global Entry participation.

70.    While neither DHS nor CBP has issued any public guidance, DHS and CBP have implemented the Executive Order as applied to Global Entry.  The Executive Order was issued over a year ago, and there is no reason to believe that DHS and CBP have ignored the Executive Order's explicit instruction to implement its directives with regard to Global Entry.

71.    CBP now uses the same or similar definitions of "male" and "female" as provided in the Executive Order to determine the sex designation of Global Entry participants: defining "[f]emale" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and defining "[m]ale" as "a person belonging, at conception, to the sex that produces the small reproductive cell."  Exec. Order § 2(d)–(e).  Alternatively, CBP uses the same or similar

---

[21] U.S. Customs & Border Prot., *Global Entry Card* (last modified Aug. 20, 2025), https://perma.cc/R4VW-PH67.

definitions of "male" and "female" as does the State Department's implementation of the Executive Order: "the customer's biological sex at birth."[22]

## II.    The Travel Document Policies Harm Ms. Jansen.

### A.  Ms. Jansen is an Intersex, Post-Operative Transgender Woman Who Frequently Uses Her Passport and Global Entry Card.

72.    Ms. Jansen is an intersex, post-operative transgender woman in her 50s.  She is a mother of two minor children.  She has lived as a woman for over thirty years, and her female identity is deeply ingrained in her personal, familial, and public life.[23]

73.    Ms. Jansen has sex chromosome mosaicism, a DSD meaning that each of her cells has a different combination of sex chromosomes: some are XX, some are XY, and some are XXXY (*i.e.*, an extra pair of chromosomes).

74.    When Ms. Jansen was born in the 1970s, her sex was assigned as male on her birth certificate despite the fact that she was born with underdeveloped external, male reproductive organs and testes later found to have "non-obstructive azoospermia," *i.e.*, testes that did not produce sperm.  In other words, Ms. Jansen was born infertile.

75.    Ms. Jansen discovered that she had mosaicism in the 1990s after seeing an endocrinologist for hormonal abnormalities as a teenager—in particular, high estrogen levels and low testosterone levels, which resulted in premature bone plate closure.  Ms. Jansen has always felt that she was female, and after learning of her mosaicism, she began living all aspects of her life as a woman.  She has continued to live her life as a woman for over thirty years since then.

---

[22] *Sex Marker in Passports*, *supra* note 15.

[23] Because Ms. Jansen is proceeding pseudonymously in this litigation, some of the information herein has been generalized to protect her identity and the identities of her minor children.

76.     In the 1990s, Ms. Jansen successfully petitioned to change the sex on her birth certificate and in her Social Security records.  Also in the 1990s, the state's department of motor vehicles changed her state driver's license from male to female in the belief that the male designation was a clerical error.

77.     Ms. Jansen underwent surgery in the 1990s to conform her physical sexual anatomy to her lived female identity.  She had to travel to the United Kingdom to find a specialist who could perform that surgery, as standard methods would not suffice given her DSD.  She also began hormone therapy around the same time, which she continues to this day.

78.     Ms. Jansen is 5'1" and approximately 110 pounds.  She is perceived as female in her daily life.  While people close to Ms. Jansen are aware that she is intersex and transgender, people in her community are not.

79.     Ms. Jansen has a U.S. passport, which expires in December 2032.

80.     Ms. Jansen first obtained a U.S. passport as a minor, which carried a male sex designation.  She successfully petitioned the State Department to change the sex designation on her U.S. passport from male to female in the 1990s, after her surgery.  Pursuant to the policy at that time, the State Department issued her a provisional passport with a female sex designation, and Ms. Jansen subsequently submitted a letter to the State Department from the surgeon who performed her surgery.  The State Department responded with a permanent passport bearing a female sex designation and a letter confirming that her sex designation had officially been changed for purposes of her passport.  Her passport has been renewed several times since then.

81.     Ms. Jansen is a Global Entry participant, and she has been since approximately 2009.  Her participation expires in November 2026 and she is eligible for renewal as of November 2025.  Her Global Entry card carries and has always carried a female sex designation.

19

82.     Accordingly, all of Ms. Jansen's federal and state identification documents have reflected her female sex for over thirty years—including her U.S. passport, birth certificate, state driver's license, Global Entry card, and Social Security Administration records.

83.     Ms. Jansen uses both her U.S. passport and her Global Entry card frequently, including both within the United States and when traveling abroad.

84.     Ms. Jansen's career background is in international economic development, travel, and tourism, as she is able to learn languages quickly and is fluent in over 10 languages. She has traveled to over 70 countries, including Saudi Arabia, Thailand, the United Arab Emirates, Colombia, Russia, Venezuela, Malaysia, Egypt, and China, primarily for work.

85.     Ms. Jansen has resided in the United States for the past 10 years, but prior to that she lived abroad for approximately 20 years.

86.     Although she no longer works in the international travel and tourism industry, Ms. Jansen travels abroad frequently for personal reasons, including to visit friends and for specialized medical care. Until the Executive Order was issued in January 2025, she traveled abroad approximately 5 times per year (and previously she traveled abroad at least once per month). She uses her U.S. passport every time she exits or re-enters the United States. She also often uses her U.S. passport to enter or exit foreign countries.

87.     Ms. Jansen is frequently required to use her U.S. passport as identification when traveling abroad, outside the context of border crossings. A U.S. passport (and sometimes a Global Entry card) is often the only form of identification carried by a U.S. citizen that is recognized or acknowledged by foreign authorities or private citizens abroad. Ms. Jansen is thus often required to use her U.S. passport when traveling internationally to check into hotels and to use banks or ATMs. If an emergency were to occur when Ms. Jansen is traveling abroad, her U.S. passport

would be the primary and quickest way for her to identify herself to officials, including U.S. officials at an embassy or consulate.

88.     Ms. Jansen uses her U.S. passport and her Global Entry card in a wide variety of identification contexts within the United States.  For example, she has recently used both her U.S. passport and Global Entry card to verify her identification for a notary; for banking purposes; and at a Social Security Administration field office.

89.     Ms. Jansen also frequently uses her Global Entry card.  She uses it any time she enters the United States by land—which she does when she drives from Mexico or Canada back into the United States.  She almost always uses her Global Entry card as her official government identification for TSA when traveling by air domestically (a Global Entry card is one of the few alternative forms of identification accepted by TSA).  She also always carries her Global Entry card in her wallet and often uses it as her primary identification instead of her state driver's license—especially in situations where she does want to share her residential address, which is listed on her driver's license.  For example, she recently used her Global Entry card at her local post office to pick up a package.

**B. The Travel Document Policies Harm Ms. Jansen.**

90.     The Travel Document Policies presently harm and risk future harm to Ms. Jansen.

91.     Ms. Jansen faces numerous risks from having her U.S. passport and/or Global Entry card changed to include a male designation.  Using or carrying travel documents with a male sex designation would "out" her as intersex and/or transgender to officials and private citizens, both because she is perceived as female and because her other identification documents—such as her driver's license—have a female sex designation.  Ms. Jansen would be outed upon using her travel documents to enter or exit the United States, at other international border crossings, or at any of

21

the many other instances that Ms. Jansen is required to use or uses her travel documents, both domestically and internationally.  Ms. Jansen would also be outed if she were arrested or stopped by officials in public, within the United States or abroad, and asked to provide identification or proof of citizenship.  In some countries, officials commonly stop people in public to require identification documents.

92.    Being outed as intersex and/or transgender could be incredibly dangerous.  It would subject Ms. Jansen to significant risk of harassment, discrimination, and even violence, both in the United States and while traveling abroad.  Harassment and discrimination of intersex and transgender people is common, accepted, and even explicitly lawful in some countries, including at the hands of government officials.  Intersex and transgender people are already more likely to suffer harassment, discrimination, and violence than the population at large—and this policy only makes identification and targeting easier and more likely.

93.    According to reports, hundreds of transgender people were killed around the world in 2023, and similar figures exist for prior years.[24]  In the United States, there have been at least 316 documented homicides of transgender people since January 2017.[25]  Ms. Jansen could also face imprisonment merely for existing as a transgender person in some countries—including countries to which Ms. Jansen has traveled, such as Malaysia and the United Arab Emirates.

94.    Ms. Jansen faces significant risk using travel documents with a male sex designation even apart from "outing" her.  Because her state driver's license and other

---

[24] *See* Jamie Wareham, *Beaten, Stabbed and Shot: 320 Trans People Killed in 2023 – New Monitoring Report*, Forbes (Nov. 13, 2023), https://tinyurl.com/mh3j87mt (last visited Jan. 30, 2026).

[25] EveryStat (last visited Jan. 30, 2026), https://perma.cc/2QT6-VXGT?type=image.

identification documents have a female sex designation, and because she is perceived as female, Ms. Jansen would risk being accused of using falsified or inaccurate identification.  She would risk being denied entry or exit from a foreign country, being detained at border crossings, or even being arrested and imprisoned.  Traveling with falsified identification is a crime in the United States and in many other countries.

95.    Even applying to renew her passport or Global Entry—with either her accurate female sex or an inaccurate male sex—could come at risk of perjury.

96.    Traveling with a passport or Global Entry card listing her sex as male would also create serious risk for Ms. Jansen and her minor children when they travel together.  Ms. Jansen used assisted reproduction to create her family and is listed as the mother and sole parent to her children on their birth certificates.  Many countries require evidence of legal relationship when traveling with minor children.  Indeed, the State Department's website advises to "[a]lways bring a copy of each child's birth certificate or other evidence of your legal relationship to each child" when traveling internationally with minor children. [26]  In the event that Ms. Jansen's legal relationship to her children were ever to be questioned while traveling, and if she were required to present her U.S. passport to prove her identity and relationship—especially if she were also required to present her children's birth certificates—Ms. Jansen would not only be outed and risk all the concomitant harms, but would also risk being separated from her children for prolonged periods of time and even being accused of child abduction.

97.    Were Ms. Jansen forced to use travel documents with a male designation, she would risk being subjected to searches by male officers during border screening, rather than female

---

[26] U.S. Dep't of State, *Travel with Minors* (last updated Aug. 11, 2025), https://perma.cc/E72G-YXHP.

officers—both in the United States and while traveling abroad.  This could include invasive, degrading pat-downs of the groin and chest area by male officers, or even cavity searches.  Many countries have strict rules requiring that travelers be searched by an officer of the same sex. Indeed, Ms. Jansen has in the past been subject to, and frequently is subject to, invasive pat-downs by female officers, both in the United States and when traveling abroad, while using identification documents with a female designation.  She has never been subject to invasive searches by a male officer while traveling with identification documents with a female designation.

98.     If Ms. Jansen were detained while carrying a passport or Global Entry card with a male designation, either in the United States or abroad, she would risk detention in a male population and the harassment, violence, and discrimination that would attend such detention. This is no speculative risk: intersex and transgender people face extreme levels of violence and harassment in prisons, especially when they are detained with a population that is a different sex than the sex they live in.

99.     Ms. Jansen's risk in such a situation is particularly acute: following her surgery, she is anatomically female and is able to have normal sexual relations.  As noted, she is also 5'1" and approximately 110 pounds, and she is perceived as female.  Detention with a male population would risk sexual assault and rape.  Ms. Jansen is distinctly aware of this risk, as she is a rape survivor.

100.    The psychological fear from each of these risks is itself a significant harm.  Ms. Jansen has lived in fear for the past year, anticipating these many different harms that could befall her or her children due to the Travel Document Policies.  Indeed, Ms. Jansen has cancelled two international trips that she had planned to take in 2026 due to fear of using her passport and Global Entry card in the current climate.  The first trip was to the United Kingdom in March 2026 to visit

a friend.  The second trip was to Israel in the spring of 2026 for her oldest child's Bar Mitzvah and birthday—a once-in-a-lifetime opportunity that she and her children now cannot experience together.

101.    Ms. Jansen has postponed applying to renew her Global Entry participation (which expires in 2026) out of fear that she will be required to use a male sex designation.

## CLAIMS FOR RELIEF

### COUNT I
### The Fifth Amendment Due Process Clause
### Against All Defendants

102.    Ms. Jansen realleges and incorporates by reference the allegations in each of the preceding paragraphs of this Complaint.

103.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Inherent within the Fifth Amendment's Due Process Clause is a guarantee of equal protection of the laws applicable to the federal government.

104.    The Travel Document Policies—both in combination and independently—violate the Fifth Amendment's equal protection guarantee as applied to Ms. Jansen by discriminating based on sex; intersex status; transgender status; and intersex, transgender status.

**Discrimination Based on Sex**

105.    The Travel Document Policies facially classify based on sex, which is not justifiable under the requisite heightened scrutiny or under any standard of constitutional review.

106.    The Executive Order defines "[f]emale" as a "person belonging, at conception, to the sex that produces the large reproductive cell" and "[m]ale" as a "person belonging, at conception, to the sex that produces the small reproductive cell," and then restricts sex designations

25

on passports and Global Entry cards to those definitions of "male" and "female."  Exec. Order § 2(d)–(e).

107.    The Passport Policy classifies based on "the customer's biological sex at birth," and then restricts sex designations on passports to those definitions of "male" and "female."

108.    The Global Entry Policy uses the same or similar definitions as the Executive Order or the Passport Policy.

109.    The Travel Document Policies, both individually and collectively, treat one sex of people differently: intersex people, who fit into neither of the traditional notions of "male" nor "female."  The Travel Document Policies prevent intersex people from obtaining U.S. passports or Global Entry participation consistent with their lived sex.  The Travel Document Policies are therefore sex-based classifications in the truest sense of the term.

110.    These sex-based classifications are subject to heightened scrutiny, under which they fail.

111.    The Travel Document Policies are not substantially related to any important government purpose.  No important government purposes are furthered by forcing intersex people to use U.S. passports or Global Entry cards identifying them as a sex that they are not.

112.    As applied here, no important government purposes are furthered by forcing Ms. Jansen to use a U.S. passport or a Global Entry card identifying her as a sex that she is clearly not, by biology or anatomy or perception, merely because it was the sex incorrectly assigned to her at birth—a sex that is contrary to the sex she has lived in for over three decades, contrary to decades of federal identification documents, and contrary to her local and state identification documents, including her state driver's license and her birth certificate.

26

113.   The Travel Document Policies are impermissibly premised on incorrect assumptions, expectations, stereotypes, or norms about the nature of sex, including that there is no such thing as intersex people and that all people are born either exclusively "male" or exclusively "female."

114.   The Travel Document Policies were motivated by animus.  They were adopted and implemented because of, and not simply in spite of, their adverse effects on people who depart from the Travel Document Policies' binary definitions of sex, including to humiliate, shame, and out.

**Discrimination Based on Intersex Status**

115.   The Travel Document Policies discriminate based on intersex status.

116.   Intersex people are a quasi-suspect class because they comprise a discrete group defined by immutable characteristics, and these characteristics bear no relation to their abilities to perform in or contribute to society.  The defining feature of intersex people is that they were born with physiological characteristics—including chromosomes, reproductive glands, and/or reproductive anatomy—that do not fit the typical binary definitions of "male" and "female."

117.   Intersex people are also politically powerless and have historically suffered discriminatory treatment.  Although there may be as many as 5.6 million intersex people in the United States, they comprise only between 0.05% to 1.7% of the population.  They lack the political power to protect themselves through the political process.

118.   Classifications based on a quasi-suspect class, like the Travel Document Policies, are subject to heightened scrutiny.

119.    The Travel Document Policies treat intersex people differently than people who fit the typical binary definitions of "male" and "female" by prohibiting intersex people from obtaining U.S. passports or Global Entry participation under the sex they live in.

120.    Treating intersex people differently than people who fit the typical binary definitions of "male" and "female" does not substantially advance any important government interest.  No important government purposes are furthered by forcing intersex people to use U.S. passports or Global Entry cards identifying them as a sex that they are not.

121.    As applied here, no important government purposes are furthered by forcing Ms. Jansen to use a U.S. passport or a Global Entry card identifying her as a sex that she is clearly not, by biology or anatomy or perception, merely because it was the sex incorrectly assigned to her at birth—a sex that is contrary to the sex she has lived in for over three decades, contrary to decades of federal identification documents, and contrary to her local and state identification documents, including her state driver's license and her birth certificate.

122.    The Travel Document Policies were motivated by animus.  They were adopted and implemented because of, and not simply in spite of, their adverse effects on people who depart from the Travel Document Policies' binary definitions of sex, including to humiliate, shame, and out.

**Discrimination Based on Transgender Status**

123.    The Travel Document Policies discriminate based on transgender status.

124.    As many courts have held, transgender people are a quasi-suspect class because they comprise a discrete group defined by immutable characteristics that bear no relation to their abilities to perform in or contribute to society.  Sex is an immutable trait based on a host of characteristics—and for transgender individuals, that sex is wrongly assigned at birth.

28

125.    Transgender people are politically powerless and have historically suffered discriminatory treatment.[27]  For nearly two centuries of American history, transgender people have been prosecuted through cross-dressing and fraud charges and have been disproportionate targets of policing related to public decency and vagrancy.  They have been excluded from legal deterrents and protections against violence.  Until recently in American history, being transgender was pathologized and treated as a mental illness, and transgender people have historically been subject to involuntary institutionalization and high-risk incarceration.  Transgender immigrants have historically even been denied entry into, or deported from, the United States based on their transgender status.

126.    Because the Travel Document Policies use classifications based on a quasi-suspect class, they are subject to heightened scrutiny.

127.    The Travel Document Policies treat transgender people differently than people who fit the typical binary definitions of "male" and "female" by preventing them from obtaining a U.S. passport or participating in Global Entry under the sex they live in.

128.    No important government purposes are furthered by forcing transgender people to use U.S. passports or Global Entry cards identifying them as a sex that they are not.

129.    As applied here, no important government purposes are furthered by forcing Ms. Jansen to use a U.S. passport or a Global Entry card identifying her as a sex that she is clearly not, by biology or anatomy or perception, merely because it was the sex incorrectly assigned to her at birth—a sex that is contrary to the sex she has lived in for over three decades, contrary to decades

---

[27] *See* Brief of Law and History Scholars as *Amici Curiae* in Support of Respondents, *Little v. Hecox*, Nos. 24-38, 24-43 (Nov. 17, 2025), https://perma.cc/3VYE-DG4Q.

of federal identification documents, and contrary to her local and state identification documents, including her state driver's license and her birth certificate.

130.    The Travel Document Policies were motivated by animus.  They were adopted and implemented because of, and not simply in spite of, their adverse effects on people who depart from the Travel Document Policies' binary definitions of sex, including to humiliate, shame, and out.

**Discrimination Based on Intersex, Transgender Status**

131.    The Travel Document Policies discriminate based on intersex, transgender status.

132.    Intersex, transgender people are a quasi-suspect class because they comprise a discrete group defined by immutable characteristics that bear no relation to their abilities to perform in or contribute to society.  The defining feature of intersex, transgender people is that they were born with physiological characteristics—including chromosomes, reproductive glands, and/or reproductive anatomy—that do not fit the typical binary definitions of "male" and "female," and they were therefore assigned the wrong sex at birth.

133.    Intersex, transgender people are also politically powerless and have historically suffered discriminatory treatment.  Although there may be as many as 5.6 million intersex people in the United States, they comprise only between 0.05% to 1.7% of the population.  And for nearly two centuries of American history, transgender people have been disproportionately targeted for violence, prosecution, policing tactics, involuntary institutionalization, high-risk incarceration, and more.  They lack the political power to protect themselves through the political process.[28]

134.    Because the Travel Document Policies use classifications based on a quasi-suspect

---

[28] *See id.*

class, they are subject to heightened scrutiny.

135.    The Travel Document Policies treat intersex, transgender people differently than people who fit the typical binary definitions of "male" and "female" by preventing them from obtaining a U.S. passport or participating in Global Entry under the sex they live in.

136.    No important government purposes are furthered by forcing intersex, transgender people to use U.S. passports or Global Entry cards identifying them as a sex that they are not.

137.    As applied here, no important government purposes are furthered by forcing Ms. Jansen to use a U.S. passport or a Global Entry card identifying her as a sex that she is clearly not, by biology or anatomy or perception, merely because it was the sex incorrectly assigned to her at birth—a sex that is contrary to the sex she has lived in for over three decades, contrary to decades of federal identification documents, and contrary to her local and state identification documents, including her state driver's license and birth certificate.

138.    The Travel Document Policies were motivated by animus.  They were adopted and implemented because of, and not simply in spite of, their adverse effects on people who depart from the Travel Document Policies' binary definitions of sex, including to humiliate, shame, and out.

## COUNT II
### The Fifth Amendment Equal Protection Clause
### Against All Defendants

139.    Ms. Jansen realleges and incorporates by reference the allegations in each of the preceding paragraphs of this Complaint.

140.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Supreme Court has

held that the liberties protected by the Due Process Clause include avoiding forced disclosure of private and intimate information.

141.    The Travel Document Policies infringe Ms. Jansen's constitutional liberty interest in the right to maintain intimate information as private.

142.    Whether "at conception" Ms. Jansen "belong[ed] to" "the sex that produces the large reproductive cell" or "the small reproductive cell," or what sex was assigned to her at birth, is highly sensitive and personal medical information.    Indeed, Ms. Jansen is proceeding pseudonymously in this case precisely because of the highly sensitive and personal nature of her intersex, post-operative transgender status.

143.    Forcing Ms. Jansen to travel with documents designating her as male would necessarily reveal to anyone who sees both her and that designation that she is transgender and/or intersex.    Such forced disclosure of personal information, without Ms. Jansen's consent, is not only deeply invasive—it also risks her safety and well-being.    Transgender and intersex people are often subject to violence, harassment, and discrimination.

144.    Because the Travel Document Policies infringe a fundamental right, they are subject to strict scrutiny.    They fail that scrutiny because they are not narrowly tailored to advance any compelling government interest.

145.    The Travel Document Policies would fail even rational basis review, as they do not rationally advance any legitimate government objective.    The conclusory government interests identified in the text of the Executive Order are inaccurate and motivated by animus.    In any event, denying intersex, transgender people accurate passport sex designations is not rationally related to achieving even the illegitimate interests identified by the Executive Order.

## COUNT III
## The First Amendment
## Against All Defendants

146.    Ms. Jansen realleges and incorporates by reference the allegations in each of the preceding paragraphs of this Complaint.

147.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.

148.    The Travel Document Policies violate Ms. Jansen's First Amendment right to free speech and expression.

149.    A U.S. passport and a Global Entry card are items associated with a specific individual, and the government cannot use either to force someone to convey the government's ideologically infused speech with which they disagree.

150.    The Travel Document Policies will force Ms. Jansen to either (a) forgo having a U.S. passport or Global Entry when her current U.S. passport and Global Entry expire or (b) express the government's counterfactual and ideologically infused message, each time she uses or applies to renew her U.S. passport or Global Entry, that her sex, and sex in general, is what the Executive Order defines it to be.  Ms. Jansen strongly and fundamentally disagrees with this message.  The Travel Document Policies therefore impermissibly require compelled speech.

151.    Indeed, Ms. Jansen reasonably fears that the State Department or CBP may seek to prosecute her, or at the very least may reject her renewal applications for her U.S. passport or Global Entry, if she were to accurately fill out the sex designation on the application forms to reflect her female sex.

152.    Because the Travel Document Policies force individuals to communicate an ideological message with which they disagree, they are subject to strict scrutiny.  The Travel

33

Document Policies engage in this First Amendment infringement without any meaningful justification, let alone the requisite compelling government interest.  There is no compelling government interest furthered by forcing intersex, transgender people like Ms. Jansen to express that she is a sex that she is not, nor—more broadly—to express a definition of sex contrary to that of scientific consensus.  Even if there were a compelling government interest here, which there is not, the Travel Document Policies could not possibly be narrowly tailored to achieve any such interest.

153.    And even if a lower level of heightened scrutiny applied, the Travel Document Policies would still fail because they lack an important governmental objective, and the means the Defendants employ are not substantially related to achieving any legitimate objective.

## COUNT IV
## APA, 5 U.S.C. § 706 – Contrary to Constitutional Right, Power, Privilege or Immunity Against the State Department, DHS, and CBP

154.    Ms. Jansen realleges and incorporates by reference the allegations in each of the preceding paragraphs of this Complaint.

155.    The APA provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity . . . ."  5 U.S.C. § 706(2).

156.    The Executive Order is binding on the State Department and DHS, including CBP, who have taken concrete steps to implement the Executive Order by issuing the Passport Policy and the Global Entry Policy, respectively.  The Passport Policy and the Global Entry Policy constitute final agency action under the APA.

157.    As a result of these agency actions, Ms. Jansen will be denied a renewed U.S. passport or Global Entry with her correct, female sex, leaving her with inaccurate travel documents

that subject her to risk of significant harm.  Further, because of these agency actions, Ms. Jansen fears that if she attempts to renew her U.S. passport or Global Entry with her correct, female sex, the State Department will deny her passport renewal, confiscate her passport, and/or suspend her passport processing, and CBP will deny her Global Entry participation and/or suspend her Global Entry processing.

158.    For the reasons described in the preceding claims, and incorporated here, the Passport Policy and the Global Entry Policy are "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), and therefore must be held unlawful and set aside.  In particular, as described above, those actions violate Ms. Jansen's constitutional rights to equal protection and privacy under the Fifth Amendment and free speech under the First Amendment.

**COUNT V**
**APA, 5 U.S.C. § 706 – Arbitrary, Capricious, and Abuse of Discretion**
**Against the State Department, DHS, and CBP**

159.    Ms. Jansen realleges and incorporates by reference the allegations in each of the preceding paragraphs of this Complaint.

160.    The APA provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ."  5 U.S.C. § 706(2).

161.    The Executive Order is binding on the State Department and DHS, including CBP, who have taken concrete steps to implement the Executive Order by issuing the Passport Policy and the Global Entry Policy, respectively.  The Passport Policy and the Global Entry Policy constitute final agency action under the APA.

162.    As a result of these agency actions, Ms. Jansen will be denied a renewed U.S. passport and Global Entry card with her correct, female sex, leaving her with inaccurate travel

documents that subject her to risk of significant harm.  Further, because of these agency actions, Ms. Jansen fears that if she attempts to renew her U.S. passport or Global Entry with her correct, female sex, the State Department will deny her passport renewal, confiscate her passport, and/or suspend her passport processing, and CBP will deny her Global Entry participation and/or suspend her Global Entry processing.

163.    The Passport Policy and the Global Entry Policy are arbitrary and capricious because they are neither reasonable nor reasonably explained.

164.    The Passport Policy and the Global Entry Policy are contrary to well-established science on the existence and physiology of intersex people, despite purporting to rely on "biological truth."  Intersex people have chromosomes, reproductive glands, and/or reproductive anatomy that do not fit the typical binary definitions of "male" and "female."  They are often assigned an incorrect sex at birth due to these abnormalities.  The Passport Policy and the Global Entry Policy simply ignore the reality of intersex people because they do not fit into the Executive Order's unscientific, animus-laden view of sex.

165.    Neither the State Department nor DHS and CBP made any factual findings in effectuating the Passport Policy and the Global Entry Policy or took *any* data into account between the issuance of the Executive Order and the issuance of the respective agency actions—much less factual findings or data specific to intersex people.  To the contrary, the Passport Policy and the Global Entry Policy are based on animus towards people who do not conform to the Executive Order's unscientific view of sex.

166.    Neither the State Department nor CBP examined important aspects of the issues, including the severe harms that intersex, transgender people face when carrying and using travel documents that bear the wrong sex designation.

36

167.    The State Department and CBP failed entirely to consider any reliance interests engendered by the longstanding preexisting policies.  Ms. Jansen, for example, has had all her federal and state identification documentation consistently reflect her female sex for over thirty years.  She successfully petitioned the State Department to change her sex from male to female in the 1990s.  Suddenly forcing her to use travel documents proclaiming her to be male is illogical, unscientific, and animus-laden.

168.    The Passport Policy and the CBP Policy undermine the government's ability to accurately identify intersex, transgender people.

169.    Neither the State Department nor CBP considered any alternatives to the implemented policies, nor did they provide the requisite detailed justification for their sudden reversals of longstanding policies that had been in place in similar form for years with no problems—in the State Department's case, over three decades.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Jansen respectfully requests that this Court enter judgment in her favor and grant the following relief:

A.    Issue a declaratory judgment that (i) the Travel Document Policies violate Ms. Jansen's constitutional rights; and (ii) the Passport Policy and the Global Entry Policy are arbitrary and capricious, an abuse of discretion, and otherwise contrary to law in violation of the APA;

B.    Issue preliminary and permanent injunctive relief enjoining the State Department, DHS, CBP, and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing the Travel Document Policies against Ms. Jansen;

C.    Hold unlawful and set aside the Passport Policy and the Global Entry Policy;

D.     Award reasonable attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E.     Grant all such other and further relief as the Court may deem just and proper.

Dated: January 30, 2026

Respectfully submitted,

*/s/  Jaime A. Santos*
Jaime A. Santos (#1047905)
Cassandra M. Snyder (#1671667) (admission
pending)
Kylie E. Burke (#90040140) (application for
admission forthcoming)
GOODWIN PROCTER, LLP
1900 N Street, N.W. Washington, DC 20036
Tel.: (202) 346-4000
Fax: (202) 246-4444
JSantos@goodwinlaw.com
CassandraSnyder@goodwinlaw.com
KylieBurke@goodwinlaw.com

Louis Lobel (*pro hac vice* pending)
Andrea S. Goodman (admission for *pro hac
vice* forthcoming)
GOODWIN PROCTER, LLP
100 Northern Avenue
Boston, MA 02210
Tel.:  (617) 570-1000
Fax:  (617) 523-1231
LLobel@goodwinlaw.com
AndiGoodman@goodwinlaw.com

Timothy James Beavers (admission for *pro
hac vice* forthcoming)
GOODWIN PROCTER, LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.:  (212) 459-7208
Fax:  (212) 355-3333
TBeavers@goodwinlaw.com

*Counsel for Plaintiff*

39