# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANA JANSEN<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD TRUMP, *in his official capacity as President of the United States;* U.S. DEPARTMENT OF STATE; MARCO RUBIO, *in his official capacity as Secretary of the U.S. Department of State*, U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of Customs and Border Protection*; UNITED STATES OF AMERICA,<br><br>*Defendants*. | Civil Action No. 1:25-cv-02961-LLA |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

I.      The Experience of Intersex People Demonstrate that Sex Is Not Black-and-White ........ 3

II.     Ms. Jansen's Medical History and Identification Documents........................................... 4

III.    Since the Early 1990s, the U.S. Government Has Permitted Changes to Sex
Designations on U.S. Passports................................................................................... 6

IV.     Executive Order 14168 Dramatically Changed the U.S. Government's Policies
Regarding Federal Identification Documents ............................................................... 7

V.      Procedural History............................................................................................................ 15

LEGAL STANDARD ....................................................................................................... 15

ARGUMENT..................................................................................................................... 16

I.      MS. JANSEN IS LIKELY TO SUCCEED ON THE MERITS....................................... 16

        A. The Passport Policy and the Global Entry Policy violate the APA. ........................... 16

            i. The Policies are final agency actions....................................................................... 16

            ii. The Policies are arbitrary and capricious. ............................................................. 18

                1. The Passport Policy is neither reasonable nor reasonably explained. ............... 18

                2. The Global Entry Policy is neither reasonable nor reasonably explained......... 21

                3. The Agencies cannot rely on the Executive Order to justify their unexplained
                actions.................................................................................................................... 21

            iii. The Passport Policy and the Global Entry Policy are contrary to Ms. Jansen's
            constitutional rights. .................................................................................................. 24

        B. The Travel Document Policies violate Ms. Jansen's Fifth Amendment right to equal
        protection........................................................................................................................ 24

            i. The Travel Document Policies are fundamentally irrational.................................... 25

            ii. The Travel Document Policies unconstitutionally discriminate based on sex. ....... 27

iii.  The Travel Document Policies unconstitutionally discriminate based on sex based on intersex status. ............................................................................................ 28

C.  The Travel Document Policies violate Ms. Jansen's First Amendment Right to Freedom of Speech. ............................................................................................... 32

D.  The Travel Document Policies violate Ms. Jansen's Fifth Amendment right to substantive due process. ............................................................................................ 35

II.    MS. JANSEN WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ..................................................................................................................... 38

III.    BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION ..................................................................................................................... 43

CONCLUSION................................................................................................................................ 44

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
   495 F.3d 695 (D.C. Cir. 2007)..................................................................................43

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995)..................................................................................................32

*Advance Am. v. FDIC*,
   2017 WL 2672741 (D.D.C. Feb. 23, 2017) ..............................................................51

*Am. Fed'n of Gov't Emps., AFL-CIO v. Dep't of Hous. & Urb. Dev.*,
   118 F.3d 786 (D.C. Cir. 1997)...........................................................................44, 45

*Am. Foreign Serv. Ass'n v. Trump*,
   783 F. Supp. 3d 248 (D.D.C. 2025)..........................................................................23

*American Meat Inst. v. U.S. Dept. of Ag.*,
   968 F. Supp. 2d. 38 (D.D.C. 2013)...........................................................................42

*Arroyo Gonzalez v. Rossello Nevares*,
   305 F. Supp. 3d 327 (D.P.R. 2018)...........................................................................45

*Bennett v. Spear*,
   520 U.S. 154 (1997)..................................................................................................24

*Bloch v. Ribar*,
   156 F.3d 673 (6th Cir. 1998) ....................................................................................44

*Bowen v. Gilliard*,
   483 U.S. 587 (1987)............................................................................................36, 37

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974)..................................................................................................31

*Building Trades Unions v. Dep't of Def.*,
   783 F. Supp. 3d 290 (D.D.C. 2025)..........................................................................52

*Burns v. Warden, USP Beaumont*,
   482 F. App'x 414 (11th Cir. 2012) ...........................................................................44

*Chamber of Com. of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)..................................................................................25

*Chamber of Com. of the U.S. v. SEC*,
    412 F.3d 133 (D.C. Cir. 2005) ...................................................................................26

*City of Brookings Mun. Tel. Co. v. FCC*,
    822 F.2d 1153 (D.C. Cir. 1987) .................................................................................29

*Costa v. Bazron*,
    456 F. Supp. 3d 126 (D.D.C. 2020) ...........................................................................51

*Cressman v. Thompson*,
    798 F.3d 938 (10th Cir. 2015) ...................................................................................41

*Defending Ed. v. Olentangy Local School Dis. Bd. of Ed.*,
    158 F.4th 732 (6th Cir. 2025) ....................................................................................41

*DHS v. Regents of the Univ. of California*,
    591 U.S. 1 (2020) .......................................................................................................28

*Doe v. City of N.Y.*,
    15 F.3d 264 (2d Cir. 1994) ........................................................................................44

*Doe v. Marshall*,
    367 F. Supp. 3d 1310 (M.D. Ala. 2019) ..............................................................41, 42

*Eastwood v. Dep't of Corr. of Okla.*,
    846 F.2d 627 (10th Cir. 1988) ...................................................................................44

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ...................................................................................................28

*F.V. v. Barron*,
    286 F. Supp. 3d 1131 (D. Idaho 2018) ......................................................................45

*Farrell v. Tillerson*,
    315 F. Supp. 3d 47 (D.D.C. 2018) .............................................................................32

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ...................................................................................................26

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ..............................................................................................25, 26

*Fraternal Order of Police, Lodge No. 5 v. Philadelphia*,
    812 F.2d 105 (3d Cir. 1987) .......................................................................................44

*Gomez v. Trump*,
485 F. Supp. 3d 145 (D.D.C.), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and amended in part sub nom. Gomez v. Biden*, 2021 WL 1037866 (D.D.C. Feb. 19, 2021) ......................................................................................................30

*Gore v. Lee*,
107 F.4th 548 (6th Cir. 2024) (White, J., dissenting) ...............................................32

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024), *cert. denied sub nom. Harper v. Faulkender*, 145 S. Ct. 2867 (2025)...............................................................................................44

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*,
515 U.S. 557 (1995)...................................................................................................41

*Idaho Org. of Res. Councils v. Labrador*,
780 F. Supp. 3d 1013 (D. Idaho 2025) ......................................................................47

*Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*,
626 F.3d 84 (D.C. Cir. 2010)......................................................................................28

*Intersex Legislation and Regulation*,
https://perma.cc/S5QG-8QGH....................................................................................39

*Johnson v. California*,
543 U.S. 499 (2005)....................................................................................................46

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)....................................................................................51

*Klayman v. Obama*,
142 F. Supp. 3d. 172 (D.D.C. 2015)...........................................................................51

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)........................................................................................52

*Little v. Hecox*,
Nos. 24-38, 24-43 (U.S. Nov. 17, 2025), https://perma.cc/3VYE-DG4Q...............39

*Love v. Johnson*,
146 F. Supp. 3d 848 (E.D. Mich. 2015)......................................................................45

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....................................................................................................51

*Manin v. Nat'l Transp. Safety Bd.*,
627 F.3d 1239 (D.C. Cir. 2011)..................................................................................31

vi

*Moshea v. Nat'l Transp. Safety Bd.*,
570 F.3d 349 (D.D.C. 2009) ........................................................................28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...............................................................................26, 27

*NASA v. Nelson*,
562 U.S. 134 (2011) ..........................................................................43, 44, 45

*Nixon v. Adm'r of Gen. Servs.*,
433 U.S. 425 (1977) ..........................................................................43, 44, 45

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................................................................51

*Orr v. Trump*,
778 F. Supp. 3d 394 (D. Mass. 2025) ............................................................20

*Padula v. Webster*,
822 F.2d 97 (D.C. Cir. 1987) .......................................................................37

*Payne v. Taslimi*,
998 F.3d 648 (4th Cir. 2021) ........................................................................44

*Physicians for Soc. Resp. v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) .....................................................................28

*Planned Parenthood of Greater New York v. HHS*,
2025 WL 2840318 (D.D.C. Oct. 7, 2025) .....................................................29

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999)..........................................................................45

*Public Citizen v. United States Trade Representative*,
5 F.3d 549 (D.C. Cir. 1993), *cert. denied*, 510 U.S. 1041 (1994) .................25

*Ray v. McCloud*,
507 F. Supp. 3d 925 (S.D. Ohio 2020) ..........................................................45

*Romer v. Evans*,
517 U.S. 620 (1996).....................................................................................33

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)......................................................................................26

*Sorenson Commc'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014) .....................................................................30

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) .......................................................................................25, 30

*Thorne v. City of El Segundo*,
    726 F.2d 459 (9th Cir. 1983) ...............................................................................................44

*Turner v. U.S. Agency for Glob. Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020)......................................................................................51

*In re U.S. OPM Data Sec. Breach Litig.*,
    928 F.3d 42 (D.C. Cir. 2019)...........................................................................................44, 45

*United States v. Skrmetti*,
    605 U.S. 495 (2025).........................................................................................................35, 40

*United States v. Virginia*,
    518 U.S. 515 (1996).........................................................................................................35, 36

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)..............................................................................................................40

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)........................................................................................................43, 46

*Whalen v. Roe*,
    429 U.S. 589 (1977)..................................................................................................43, 44, 45

*Widakuswara v. Lake*,
    779 F. Supp. 3d 10 (D.D.C. 2025) ........................................................................................29

*Wolfe v. Schaefer*,
    619 F.3d 782 (7th Cir. 2010) ...............................................................................................44

*Woodland v. Houston*,
    940 F.2d 134 (5th Cir. 1991) (per curiam)............................................................................44

*Wooley v. Maynard*,
    430 U.S. 705 (1977)..................................................................................................40, 41, 42

*Zzyym v. Pompeo*,
    958 F.3d 1014 (10th Cir. 2020) ...........................................................................................37

**INTRODUCTION**

Jana Jansen was born with sex chromosome mosaicism, an intersex condition meaning that each of her cells has a different combination of sex chromosomes: some are XX, some are XY, and some are XXXY (*i.e.*, an extra pair of chromosomes).  Because of atypical sex characteristics resulting from her mosaicism, Ms. Jansen was incorrectly identified as male at birth.  But her federal and state identification documents have reflected her female sex for over three decades— including her U.S. passport, birth certificate, state driver's license, and (since 2009) Global Entry card.  She has lived, worked, and traveled internationally using these documents without incident.

On January 20, 2025, however, President Donald Trump issued Executive Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Executive Order").  Pursuant to the Executive Order, new policies now require that passports and Global Entry cards reflect a person's sex assigned at birth—with no exceptions.  For Ms. Jansen, enforcement of these policies would strip her of federal documents that have accurately reflected her sex for over 30 years.  She would be forced to travel with a passport marked with a male sex designation while every other identification document she has—including her driver's license and birth certificate—carries a female sex designation.  That mismatch is not a technicality.  It necessarily "outs" her to anyone who views her passport or Global Entry card, exposing her to discrimination and harassment.  It also exposes her to the serious safety risks that come with presenting contradictory documents at borders, including denial of entry and detention.

Ms. Jansen seeks a preliminary injunction to prevent Defendants from enforcing this dramatic change against her.  Ms. Jansen is likely to succeed on the merits of her claims.  First, the challenged agency actions violate the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*.  The

policies are arbitrary and capricious because they entirely fail to consider intersex people, fail to provide any justification for departing from longstanding prior policy, and fail to consider the harm the policy changes would cause or any less restrictive alternatives. Second, the Executive Order and the agency policies violate Ms. Jansen's constitutional rights to equal protection, free speech, and privacy. They infringe upon her Fifth Amendment right to equal protection because they lack any rational relationship to a legitimate state interest, and because they separately discriminate against her based on her sex and intersex status. They violate her First Amendment right to free speech because they force her to communicate an unscientific, unsupported, and false message about her body with which she fundamentally disagrees. And they violate her Fifth Amendment due process right against unwarranted disclosure of intimate, private information because they force her to disclose that she is intersex and/or transgender *every time* she uses her passport or her Global Entry card—which, under the Executive Order, will no longer match her appearance, state identification documents, or birth certificate.

In the absence of a preliminary injunction, Ms. Jansen will suffer irreparable physical, psychological, and constitutional harm. If she renews her passport or Global Entry participation under the current policies, she will be "outed" as intersex and/or transgender any time she uses her passport or Global Entry card, which in turn risks violence, harassment, and discrimination. Forcing Ms. Jansen to have a male sex designation on her passport or Global Entry card will also require her to travel with mismatched identification documents, given that her driver's license and other state identification documents accurately reflect her female sex. Traveling with mismatched documents carries weighty risks, including the risk of being detained or denied the ability to enter or leave a country. And the balance of the equities and the public interest favor an injunction, as

2

an injunction would merely return circumstances to the status quo that existed for over three decades prior to the implementation of the Travel Document Policies.

## BACKGROUND

### I.   The Experience of Intersex People Demonstrate that Sex Is Not Black-and-White

Sex is often presented as a black-and-white binary.  Intersex people, however, do not fall neatly within that framework.  "Intersex"—also known as "differences of sex development" or "sex chromosome abnormalities"—refers to a broad spectrum of conditions involving atypical biological sex development.  Decl. of Dr. Michelle Kaufman ¶¶ 16–20.  Intersex people have variations in chromosomes, external genitals, internal reproductive organs, and/or hormone production that do not meet the typical definitions of "male" and "female."  *Id.* ¶ 20.

Intersex characteristics are often the result of chromosomal abnormalities.  *Id.* ¶¶ 16–20. Humans typically have 23 pairs of chromosomes, for a total of 46 chromosomes.  *Id.* ¶ 15.  The 23rd pair of chromosomes are the "sex chromosomes," meaning they carry the genetic information commonly associated with the physiological and anatomical features of sex.  *Id.*  A typical female sex chromosome is XX; a typical male sex chromosome is XY.  *Id.* ¶ 16.  An individual's chromosomal composition is determined at conception.  *Id.* ¶ 15.

Variations in sex chromosomes can result in a wide variety of intersex conditions.  *Id.* ¶¶ 16–20.  For example, some people have only a single functional sex chromosome while others have additional sex chromosomes.  *Id.* ¶ 16.  Adding to this complexity, some people have "genetic mosaicism": a genetic condition where the individual has two or more sets of cells that differ genetically from one another.  *Id.* ¶ 17.  For example, a person with sex-chromosome mosaicism may have some cells with XX sex chromosomes, some cells with XY sex chromosomes, some

3

cells that contain more than two sex chromosomes, and/or some cells that only have one functional sex chromosome. *Id.*

Unlike a person's chromosomal composition, physiological and anatomical features associated with sex do not develop until after conception, and often not until puberty. *Id.* ¶¶ 15, 18. Many physiological characteristics are undifferentiated until the initial gestational period, after which they may differentiate for people who have a Y sex chromosome. *Id.* ¶ 18. Intersex conditions can affect the physiological and anatomical features of an individual as they develop. *Id.* ¶¶ 19–20. People with an atypical number of sex chromosomes often have variations in genitalia and other physiological and anatomical features—such as underdeveloped genitalia or both types of genitalia. *Id.* Other people with intersex conditions have typical male sex chromosomes (XY) but female-associated genitals. *Id.* And some have typical female sex chromosomes (XX), male-associated external genitals, and a uterus and ovaries. *Id.*

## II.    Ms. Jansen's Medical History and Identification Documents

Ms. Jansen is an intersex, post-operative transgender woman. *See* Decl. of Jana Jansen ¶¶ 4–6. She is a mother of two minor children. *Id.* She has lived as a woman for over thirty years, and her female identity is deeply ingrained in her personal, familial, and public life. *Id.*

Ms. Jansen's birth certificate was marked "male" at birth, despite the fact that she was born with underdeveloped external reproductive organs. As a teenager in the 1990s, Ms. Jansen learned that she had high estrogen levels and low testosterone levels, which had resulted in premature bone plate closure. She sought treatment from an endocrinologist for these hormonal irregularities, and subsequent testing revealed her genetic mosaicism intersex condition: her cells carry XX, XY, and XXXY sex chromosomes, and she produced no sperm. Taken together, the medical record that emerged from that evaluation was unambiguous: the assignment of male at birth had been a

mistake. It had been the result of an incomplete picture of her biology at a time when her intersex condition had not yet been identified.

Ms. Jansen had always known that she was female, and after learning of her mosaicism, she began living all aspects of her life as a woman. Ms. Jansen underwent surgery in the 1990s to align her physical anatomy with her correct sex. She also began female hormone therapy at that time, which she continues to this day. These medical interventions were undertaken in consultation with and under the supervision of her physicians.

Ms. Jansen then sought to correct her legal documents to reflect what her medical record had established. The State Department updated her passport from male to female after reviewing documentation of her surgery. Her birth certificate and Social Security records were also corrected. The department of motor vehicles in her state of residence updated her driver's license—not based on her request but rather on the assumption, upon seeing her in person, that the original male designation had been a clerical error. These federal and state agencies all recognized, implicitly or explicitly, what had occurred: a child had been assigned the wrong sex at birth because a congenital condition had gone unrecognized.

Thus, since the 1990s, every federal and state government document issued to or created for Ms. Jansen has identified her as female. That includes her passport, her birth certificate, her state driver's license, her Social Security records, and her Global Entry card (which she obtained in approximately 2009). *See* Ex. A (passport) (submitted under seal); Ex. B. (birth certificate) (submitted under seal); Ex. C (driver's license) (submitted under seal); Ex. D (Global Entry Card) (submitted under seal). These designations have not been questioned or challenged by any government authority in over thirty years.

Ms. Jansen is now in her 50s. She is 5'1" and approximately 110 pounds. Many people in

5

her community are not aware that she was incorrectly assigned male at birth.

### III. Since the Early 1990s, the U.S. Government Has Permitted Changes to Sex Designations on U.S. Passports

A U.S. passport, which is necessary to travel out of or into the United States, 8 U.S.C. § 1185; 22 C.F.R. § 53.1(a), is a travel document that "attest[s] to the identity and nationality of the bearer," 22 C.F.R. § 51.1. The Secretary of State has exclusive statutory authority to issue passports and has been delegated rulemaking authority by the President for the issuance of passports. 22 U.S.C. § 211a; Exec. Order No. 11295, *Rules Governing the Granting, Issuing, and Verifying of United States Passports*, 31 Fed. Reg. 10,603 (Aug. 5, 1966).

The process of applying for a renewed passport involves proving one's identity and likeness, including by submitting a current photograph. The applicant must submit a written application providing "a true recital of each and every matter of fact," signed under penalty of perjury. 22 U.S.C. § 213. The applicant must prove her identity by submitting a previous passport, other government-issued photograph identification, or other identifying evidence such as an affidavit of an identifying witness. *See* 22 C.F.R. § 51.23. An applicant must also submit a photograph that is "a good likeness" and "satisfactorily identif[ies] the applicant" at the time of application. *Id.* § 51.26. The State Department has detailed regulations to ensure that photographs resemble the applicant. *See* 8 FAM 402.1. It is a criminal offense to willfully and knowingly make false statements in a passport application with intent to induce or secure issuance of a passport. *See* 18 U.S.C. § 1542; 22 C.F.R. § 51.20(b).

The State Department has allowed people to change the sex marker on their passport for over three decades. The State Department first introduced sex as a required identity attribute on passport application forms in 1976 to conform with the International Civil Aviation Organization ("ICAO"). Kaufman Decl. ¶ 66. The ICAO adopted this requirement as a means of distinguishing

men and women who were dressed androgynously. *Id.*  While the ICAO has updated its policy to allow for additional sex designation markers, the requirement of listing a sex designation has remained through present day.[1]  Beginning in at least 1992, the State Department allowed applicants to select a sex designation on their passport that differed from that assigned at birth by submitting medical documentation establishing that they had undergone or would soon undergo what the policy referred to as "sexual reassignment surgery."  Passport Bulletin 92-22, *Procedures for Handling Requests for a Change in Gender in Passports* (Oct. 1, 1992), https://perma.cc/NJN7-G4CU (Attachment G of California Transgender Law 101 (Apr. 2006)).  In 2010, the State Department eliminated the requirement for surgical "reassignment" and instead allowed individuals to change the sex listed on their passport by submitting a certification from a physician that they were being treated for "gender transition."  *See* 7 FAM 1300 app. M (2010), https://perma.cc/4XTC-6GXG; *New Policy on Gender Change in Passports Announced*, State Dep't (Jun. 9, 2010), https://perma.cc/Z54T-BKYZ.  Starting in 2021, the State Department permitted individuals to change the sex designation on their passports based on their own affirmation, without a physician's certification.  Press Release, U.S. Dep't of State, *Proposing Changes to the Department's Policies on Gender on* U.S. Passports and Consular Reports of Birth Abroad (Jun. 30, 2021), https://perma.cc/96V2-N9A9.

## IV. Executive Order 14168 Dramatically Changed the U.S. Government's Policies Regarding Federal Identification Documents

In early 2025, the federal government's policies regarding federal identification documents reversed 30 years of consistent practice.

---

[1] The forms required for a new passport (DS-11) and for renewing an existing passport (DS-82) each contain a field for "Sex."  *See* State Dep't, *Application for a U.S. Passport* (Apr. 2025), https://perma.cc/K9TQ-QNQ6 (DS-11); State Dep't, *U.S. Passport Renewal Application for Eligible Individuals* (Apr. 2025), https://perma.cc/4NHA-LQHX (DS-82).

**A.** On President Trump's first day of his second term of office, he issued the Executive Order 14168, purportedly to "defend women's rights and protect freedom of conscience by using clear and accurate language and policies." Exec. Order § 1. But the Executive Order neither protects the rights of women, nor does it use "accurate" scientific language. Instead, it declares that "ideologues" are "attack[ing] women by depriving them of their dignity, safety, and well-being" and "permit[ting] men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women," such as "women's domestic abuse shelters." *Id*. The Order asserts that this is an "unhealthy," "corrosive" "erasure of sex," which "replac[es] the immutable biological reality of sex" with a "subjective sense of self unmoored from biological facts." *Id*. The Order decries "the false claim that males can identify as and thus become women and vice versa" and that "it is possible for a person to be born in the wrong sexed body." *Id*. § 2(f). The Order cites no factual support or scientific authority for its assertions.

To effectuate this purported "defen[se]" of "women," the Executive Order states that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable." *Id*. § 2. It declares that the "Executive Branch will enforce all sex-protective laws to promote this reality," and provides a list of definitions to "govern all Executive interpretation of and application of Federal law and administration policy." *Id.*; *see also id.* § 3(b)–(c). Among the definitions are:

> "Sex" shall refer to an individual's immutable biological classification as either male or female.
>
> "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.
>
> "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

*Id*. § 2(a)–(e). The Executive Order does not discuss or even acknowledge intersex people.

8

As relevant here, the Executive Order directs the Secretary of State and the Secretary of Homeland Security to "implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order." *Id.* § 3(d).  The Executive Order also directs the Secretary of Health and Human Services ("HHS") to provide "clear guidance expanding on the sex-based definitions set forth in this order."  *Id.* § 3(a).  HHS did so on February 19, 2025, defining "[f]emale" as "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)," and defining "[m]ale" as "a person of the sex characterized by a reproductive system with the biological function of producing sperm."  HHS, *Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168* at 2 (Feb. 19, 2025), https://perma.cc/4J3A-TBU5 (hereinafter HHS, *Defining Sex*).  HHS's policy further states: "Rare disorders of sexual development do not constitute a third sex because these disorders do not lead to the production of a third gamete.  That is, the reproductive system of a person with such a disorder does not produce gametes other than eggs or sperm."  *Id.* at 1 That policy likewise includes no supporting authority, nor does it suggest how to determine the sex of someone whose genetic makeup permits either or both gametes, especially those with mosaicism.  Kaufman Decl. ¶ 78.

The Executive Order reflects President Trump and his Administration's longstanding animus towards people who do not conform to their unscientific view of "sex."  President Trump uses terms like "transgender insanity" and "the transgender cult," and he frequently refers to transgender people as "deranged" and "sick."  Kaufman Decl. ¶ 45.  Secretary Rubio has similarly referred to the existence of transgender people as "a harmful ideology" and stated that being transgender is "contrary to 'objective reality'"  *Id*. ¶ 48.  To inflame public opinion, President

9

Trump has repeatedly peddled false accusations that schools are facilitating gender-reassignment surgery for children without parental consent. *See* Matt Lavietes, *Trump repeats false claims that children are undergoing transgender surgery during the school day*, NBC News (Sept. 9, 2024), https://perma.cc/E9M2-8VY8. As Dr. Kaufman explains, the President's rhetoric is consistent with other rhetoric espoused by certain political groups who have sought to dehumanize transgender and intersex individuals. Kaufman Decl. ¶¶ 44–53.

Following in this tradition of animus, President Trump issued a barrage of executive orders targeting transgender people mere days into office.[2] One executive order, for example, banned transgender people from serving in the military, and states that being transgender "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life," and "is not consistent with the humility and selflessness required of a service member." Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025); *see also* Kaufman Decl. ¶ 47.

Pursuant to and in addition to these executive orders, President Trump and his Administration have sought to eliminate or restrict existing protections for transgender people; to erase any mention or recognition of transgender people from and by any part of the federal government, including federal contractors and grantees; and to enact affirmative policies to

---

[2] These include: Exec. Order No. 14148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025) (rescinding Biden Administration executive orders protecting transgender people); Exec. Order No. 14170, *Reforming the Federal Hiring Process and Restoring Merit to Government Service*, 90 Fed. Reg. 8621 (Jan. 20, 2025) (prohibiting governmental employers from considering gender identity in hiring); Exec. Order No. 14187, *Protecting Children from Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, title and § 1 (Jan. 28, 2025); Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) (prohibiting teaching of transgender-related topics in schools); Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) (barring transgender girls from playing school sports).

discriminate against transgender people in all aspects of public life, including education, employment, health care, and housing, to name a few. *See supra* note 2; Kaufman Decl. ¶ 47 (noting that the Trump Administration scrubbed all references to transgender individuals on the website for New York's Stonewall National Monument).

**B.** Almost immediately after Executive Order 14168 was issued and without undergoing any fact-finding, the State Department implemented a sudden and unexplained change to its longstanding policy related to passports (the "Passport Policy").

Days after President Trump issued the Executive Order, the State Department reversed this thirty-year history. By January 22, 2025, the State Department issued an internal memorandum directing that "[t]he policy of the United States is that an individual's sex is not changeable" and requiring the suspension of any passport application "seeking to change their sex marker from that defined in the executive order," "pending further guidance." Memorandum to the Passport Services Directorate (Jan. 22, 2025) (attached as Exhibit E); Memorandum to All Diplomatic and Consular Posts (Jan. 23, 2025) (attached as Exhibit F).

Further guidance came almost immediately thereafter. Only two weeks later, Senior Bureau Official of the Bureau of the Consular Affairs Julie M. Stufft issued an internal recommendation to the Secretary of State. *See* Action Memo for the Secretary (Feb. 6, 2025) (hereinafter "Stufft Recommendation") (attached as Exhibit G). That recommendation repeated the Executive Order's "recogni[tion of] two sexes, male and female" that "are not changeable." *Id.* at 1. Notably, it changed the Executive Order's definition of "male" and "female":

> Although the executive order defines "male" and "female" at the point of conception, it will be advantageous for [the Bureau of Consular Affairs] to adjudicate applications based on an applicant's biological sex at birth given that applicants provide vital records such as birth certificates, and because translating "sex at birth," rather than, "sex at conception," will decrease the incidences of an applicant's misunderstanding.

11

*Id.* at 1–2. As since clarified in related litigation, the State Department "relies on HHS's definitions of 'male' and 'female,' rather than the Executive Order's definitions of these terms" because it "does not have the capacity to adjudicate 'sex at conception.'" *Orr v. Trump*, 778 F. Supp. 3d 394, 404 (D. Mass. 2025) (citation omitted); *see* HHS, *Defining Sex*, *supra*. The Stufft Recommendation also suggested how to determine "sex at birth": by using "a preponderance of evidence standard" based on "[d]ocumentation issued closest to an individual's birth." Stufft Rec. at 2. Although it referenced the State Department's prior, longstanding policy permitting applicants "to apply for a passport changing from one sex to another," the Stufft Recommendation did not explain the departure from that prior policy except to cite the Executive Order. *Id.* at 1–2.

Two days later, Ms. Stufft issued substantively the same memorandum to the Bureau of Consular Affairs, *see* Memorandum (Feb. 8, 2025) (hereinafter "Stufft PPT Memo") (attached as Exhibit H), and to all diplomatic and consular posts, *see* Memorandum (Feb. 8, 2025) (hereinafter "Stufft ALDAC Memo") (attached as Exhibit I). These three memoranda—the Stufft Recommendation, the Stufft PPT Memo, and the Stufft ALDAC Memo—collectively comprise the Passport Policy. The Stufft PPT Memo provided further detail on how the State Department would determine "sex at birth." In particular, "[i]ssuance dates of vital records and/or amendments are important indicators to consider," and "documentation issued closest to an individual's birth should be used to establish the biological sex at birth." Stufft PPT Memo 2–3. Moreover, the State Department would suspend any application and request additional information if the "evidence submitted with the application does not sufficiently establish the applicant's biological sex at birth," including if it "does not indicate their binary biological sex at birth, … or there is conflicting information regarding their biological sex at birth." *Id.* at 3. Notably, however, the Passport Policy gives little clarification on what "conflicting information" means. *Id.*

12

Consistent with the Passport Policy, the State Department's website currently states that the State Department will "only issue a passport with an M or F sex marker that matches the customer's biological sex at birth" and "will not honor attestations requesting a preferred sex marker." State Dep't, *Sex Marker in Passports* (last updated Nov. 18, 2025), https://perma.cc/VC9E-BQ5T. The website explains that all valid passports remain "valid for travel until they expire, are replaced by the applicant, or are invalidated pursuant to federal regulations." *Id.* But if an applicant submits a passport application "requesting a sex marker that differs from the sex marker at [their] birth, [they] may experience delays" and "may receive a letter or email requesting more information," and the State Department will ultimately issue "a new passport that matches [their] biological sex at birth, based on [the] supporting documents and [the State Department's] records about [their] previous passports." *Id.* The White House has confirmed that renewed passports will be issued with an applicant's sex as "decided at birth." Oriana González, *Trump's Gender Order Won't Affect Existing Passports — Unless They're Renewed*, NOTUS (Jan. 21, 2025), https://perma.cc/A8DH-DD3Q.

**C.** DHS and CBP have also implemented the Executive Order as to Global Entry (the "Global Entry Policy"). Global Entry is a CBP international trusted traveler program that facilitates the entry into the United States of pre-approved, low-risk air travelers by providing dedicated CBP processing at certain airports. *See* 8 C.F.R. § 235.12(a). Once admitted, participants may use the separate Global Entry processing lines at certain airports when re-entering the country following international travel—although participants may be subject to additional CBP examination and inspection at any time during the arrival process. *See id.* § 235.12(g), (h).

The program is open to eligible U.S. citizens who have a valid U.S. passport. *See* 8 C.F.R.

13

§ 235.12(b)(1), (f).[3] To apply, an applicant must submit an online application, pay a fee, and attend an in-person interview. *See id*. § 235.12(d)–(e). During the in-person interview, CBP collects fingerprints and digital photographs. *See id.* § 235.12(e)(2). Providing "false or incomplete information on the application" is grounds for CBP to deny an application or remove a participant from the program. *See id.* §§ 235.12(b)(2)(i), (j)(2). Applicants accepted for participation in Global Entry are accepted for a period of five years, subject to early termination. *See id.* §§ 235.12(d)(3), (j). Participants are eligible to renew participation up to one year prior to the close of the participation period. *See id*. § 235.12(d)(3). The renewal process may require an interview. CBP, *Global Entry Frequently Asked Questions* (last modified Mar. 13, 2025), https://perma.cc/7FJM-AULQ.

Participants who are U.S. citizens are issued a Global Entry card, which includes a sex designation. Global Entry cards can be used as identification for U.S. entry at land and sea ports of entry (although not at airports). CBP, *Global Entry Card* (last modified Aug. 20, 2025), https://perma.cc/R4VW-PH67. Global Entry cards can also be used for a variety of other identification purposes, as they serve as lawful federal identification. For example, they can be used as lawful identification during Transportation Security Administration ("TSA") processing. *See* TSA, *Acceptable Identification at the TSA Checkpoint*, https://perma.cc/BF7G-9L3R.

Prior to 2025, CBP allowed intersex, transgender individuals to choose their correct sex for their Global Entry participation. *See* Jansen Decl. ¶¶ 17, 21. CBP changed this policy following the Executive Order. The new Global Entry Policy now uses the same or similar definitions of "male" and "female" as provided in the Executive Order to determine the sex designation of Global

---

[3] An individual is ineligible to participate in Global Entry if CBP ultimately determines that the individual presents a potential risk for terrorism or criminality, or is otherwise not a "low-risk" traveler. *See id.* § 235.12(b)(2).

Entry participants: defining "[f]emale" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and defining "[m]ale" as "a person belonging, at conception, to the sex that produces the small reproductive cell." *Id.* § 2(d)–(e). Alternatively, CBP uses the same or similar definitions of "male" and "female" as does the Passport Policy: "the customer's biological sex at birth."

## V.    Procedural History

Ms. Jansen filed this lawsuit on September 2, 2025. Compl., ECF No. 1. Following appointment of pro bono counsel, Ms. Jansen filed an amended complaint on January 30, 2026. Am. Compl., ECF No. 53. Ms. Jansen's amended complaint brings claims challenging the Executive Order, the Passport Policy, and the Global Entry Policy (collectively, the "Travel Document Policies") under the Fifth Amendment's Due Process Clause for violation of her right to equal protection of the laws; under the Fifth Amendment's Due Process Clause for violation of her fundamental right against the disclosure of intimate, private information about her body; under the First Amendment; and under the Administrative Procedure Act.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff need only demonstrate a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d 248, 261 (D.D.C. 2025) (quoting *Archdiocese of Washington v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018)).

15

## ARGUMENT

## I.    MS. JANSEN IS LIKELY TO SUCCEED ON THE MERITS.

### A.  The Passport Policy and the Global Entry Policy violate the APA.

The APA instructs courts to "set aside" any agency action that is "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). The Passport Policy and the Global Entry Policy (collectively, the "Policies") are final agency actions subject to review under the APA. The Policies violate the APA because (i) they are arbitrary and capricious; (ii) they violate Ms. Jansen's constitutional right to equal protection; (iii) they violate her constitutional right against forced disclosure of private, intimate details about her body; and (iv) they violate her constitutional right against compelled speech.

### i.    The Policies are final agency actions.

The Policies are textbook examples of "final agency action[s]." 5 U.S.C. § 704. They are each "agency action" because they are agency "rule[s]," 5 U.S.C. § 551(13)—*i.e.*, "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). And they are "final" agency action because they each (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) are actions 'by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). The Passport Policy is the consummation of the State Department's decisionmaking processes with respect to how to define sex designations on passports and is therefore "final." Likewise, the Global Entry Policy is "final" because it is the consummation of DHS's and CBP's decisionmaking process with respect to how to define sex designations for Global Entry.

The fact that the Policies each implement an executive order does not insulate them from review under the APA. The plain text of the APA authorizes review of all final "agency action,"

16

and there is no carveout for agency action pursuant to an executive order.  5 U.S.C. § 704.

Consistent with that principle, courts have "never excepted a final rule from APA review because

it carried out a presidential directive." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024).  While the APA

does not provide for review of *presidential* action, *see Franklin v. Massachusetts*, 505 U.S. 788,

800–01 (1992), Ms. Jansen's APA claims challenge only the agency Policies, not the Executive

Order itself.  *Franklin* cannot bar APA review of the Policies because, as the D.C. Circuit has

repeatedly explained, "*Franklin* is limited to those cases in which the President has final

constitutional or statutory responsibility for the *final step* necessary for the agency action directly

to affect the parties." *Public Citizen v. United States Trade Representative*, 5 F.3d 549, 552 (D.C.

Cir. 1993), *cert. denied*, 510 U.S. 1041 (1994) (emphasis added); *see also Chamber of Com. of

U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based

on the President's Executive Order hardly seems to insulate them from judicial review under the

APA, even if the validity of the Order were thereby drawn into question.").

There can be no real dispute here that the agencies, not the President, have authority over

the "final step necessary for the agency action[s] to directly affect the parties." *Public Citizen*, 5

F.3d at 552.  The express terms of the Executive Order recognize as such by directing "[t]he

Secretaries of State and Homeland Security" to "implement changes to require that government-

issued identification documents, including passports … and Global Entry cards, accurately reflect

the holder's sex, as defined" by the Executive Order.  Exec. Order § 3(d).  The Executive Order

even acknowledges that it does not supersede but rather is subject to existing authorities:  It states

that it "shall [not] be construed to impair or otherwise affect … the authority granted by law to an

executive department or agency, or the head thereof," and it "shall be implemented consistent with

applicable law and subject to the availability of appropriations."  *Id.* § 8(a)(i), (b).

17

In other words, "the target stop[ped] moving" with the agencies, not the President. *Franklin*, 505 U.S. at 798. Indeed, the State Department necessarily made multiple independent determinations in implementing the Passport Policy: (1) it chose to depart from the Executive Order's definitions of "male" and "female"—the key terms of that Order—and instead defer to HHS on the meaning of those terms; (2) it determined what sources of evidence to consult in order to assess a person's "sex at birth"; and (3) it determined how to adjudicate a person's "sex at birth" where there may be "conflicting" information. *See* Stufft Rec. 1–2; Stufft PPT Memo 2–3. DHS and CBP had the same level of discretion in implementing the Global Entry Policy.

### ii. The Policies are arbitrary and capricious.

The Policies violate the APA's fundamental rule that agency action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). In reviewing agency action under the arbitrary-and-capricious standard, courts must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted); *accord Chamber of Com. of the U.S. v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005). In doing so, courts are limited to reviewing the reasonableness of the agency's own explanation. Thus, the court may not "substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, nor may it affirm on a ground not relied upon by the agency, *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). Here, the Passport Policy and the Global Entry Policy each fail the APA's arbitrary-and-capricious standard.

### 1. The Passport Policy is neither reasonable nor reasonably explained.

The State Department's Passport Policy is unreasonable because the Department entirely

ignored intersex people, provided no justification for departing from longstanding prior policy, and failed to consider any less restrictive alternatives. Any one of these failures is fatal.

Most fundamentally, the Passport Policy "entirely failed to consider an important aspect of the problem": intersex people. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The Policy's "recogni[tion of] two sexes, male and female," which it says "are not changeable," ignores that intersex people have biological characteristics that do not fit the typical binary definitions of "male and female"—that is what makes them intersex. *Id.* at 1. The State Department made no factual findings about intersex people, collected no information about intersex people, and offered no explanation for how their definitions apply to someone like Ms. Jansen, whose cells carry XX, XY, and XXXY chromosomes and who was incorrectly assigned male at birth as a direct result of her intersex condition. The sole indication that the State Department was even aware that intersex people exist itself proves that the State Department seeks to ignore them: the Policy explains that "a designation of intersex" on an applicant's birth certificate or other documentation "will" result in "suspens[ion of] the application" while the State Department investigates "whether the applicant is male or female." Stufft PPT Memo 2.

An agency that fails to consider an entire category of people affected by its policy has failed the most basic requirement of reasoned decisionmaking. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. That result is not only inexplicable, but also dangerous. As detailed further below, *see infra* pp. 38–43, forcing intersex, post-operative transgender people like Ms. Jansen to use a sex designation that does not reflect her lived sex risks her safety and well-being. The Passport Policy did not even attempt to rationalize this irrational, dangerous result.[4]

---

[4] HHS's guidance does not bridge this gap, as it similarly provides no explanation for ignoring intersex people. That guidance summarily concludes that intersex people "do not constitute a third sex" because they "do[] not produce gametes other than eggs or sperm." HHS, *Defining Sex*,

That failure is particularly egregious given that the Passport Policy is a sudden departure from over three decades of prior practice. While agencies are allowed to change policies, they "must 'offer a reason to distinguish [the prior policy] or explain its apparent rejection of [the prior] approach.'" *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (quoting *Southwest Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)). And they must "take[] into account" the "serious reliance interests" that the prior "polic[y] may have engendered." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (citation omitted).

The Passport Policy acknowledged the prior policy but, again, made no attempt to explain the change. *See, e.g.*, *Moshea v. Nat'l Transp. Safety Bd.*, 570 F.3d 349, 352 (D.D.C. 2009) ("The Board's analysis suffers from a separate flaw that also requires vacatur… [b]y departing from the [prior] precedent without explanation, the Board here acted in an arbitrary and capricious manner."). Nor did the State Department consider the "serious reliance interests" implicated by its sudden and extreme policy reversal. *Id.* For over thirty years, Ms. Jansen has "legitimate[ly] reli[ed]" on the ability to obtain a passport with a sex designation consistent not only with her lived sex, but also with all of her other state and federal identification documents. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020). Indeed, she was listed as the mother on her children's birth certificates in reliance on her ability to correctly and consistently identify herself as female. Jansen Decl. ¶¶ 5–7. Suddenly forcing her to use a passport with an inconsistent male sex designation upends that reliance and risks serious harm to her. *See infra* pp. 38–43. The State Department provided no consideration to those, like Ms. Jansen, who have for decades relied on

*supra*, at 1. But the guidance has no justification for requiring that intersex people nevertheless cannot *change* their sex designation in light of an inaccurate sex assignment at birth. "Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of [APA] review." *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010).

their ability to ensure that their passport matches their lived sex and other identification documents.

The Passport Policy also failed to consider less restrictive alternatives.  Nowhere, for example, did the State Department consider an exception for intersex people whose sex assigned at birth was demonstrably incorrect.  Nor did it consider an exception for people who had undergone gender reassignment surgery—as was the State Department's practice since the 1990s. Failure to consider obvious alternatives "has led uniformly to reversal."  *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (citation omitted).

> **2. The Global Entry Policy is neither reasonable nor reasonably explained.**

DHS and CBP fare even worse than the State Department.  They complied with the Executive Order without providing *any* public information, much less any explanation for the change in longstanding policy.  That is facially insufficient.  *See, e.g.*, *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 33 (D.D.C. 2025) ("Not only is there an absence of 'reasoned analysis' from the defendants; there is an absence of any analysis whatsoever.").  DHS and CBP's complete failure to offer any explanation is fatal to the Global Entry Policy.

> **3. The Agencies cannot rely on the Executive Order to justify their unexplained actions.**

The defendant agencies may try to use the Executive Order as a substitute for the reasoned decisionmaking required by the APA.  That reliance would be misplaced.  The law is clear that the mere fact that an agency action implements an executive order does not absolve the agency from engaging in reasoned decisionmaking.  Rather, "[e]ven when 'implement[ing] an executive order,' agencies are bound by their APA obligations to 'analyz[e] the impacts, costs, and benefits of alternative policy options.'" *Drs. for Am.*, 793 F. Supp. 3d at 145 (quoting *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024)); *see also Planned Parenthood of Greater New York v. HHS*, 2025 WL 2840318, at *28 (D.D.C. Oct. 7, 2025) ("The invocation of an [executive order] is an insufficient

21

justification for any policy change….”); *Gomez v. Trump*, 485 F. Supp. 3d 145, 177–78 (D.D.C.), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and amended in part sub nom. Gomez v. Biden*, 2021 WL 1037866 (D.D.C. Feb. 19, 2021) (“APA review of an Executive Branch official's actions is … not precluded merely because the official is carrying out an executive order.”). Indeed, the purpose of requiring agencies to engage in reasoned decisionmaking—“to encourage reasoned and informed policymaking”—is no less salient when agency action is taken pursuant to a politically charged executive directive. *Su*, 121 F.4th at 16.

Moreover, the Executive Order is itself irrational. The Order purports to “defend” women by preserving “intimate single-sex spaces and activities designed for women,” such as “women's domestic abuse shelters.” Exec. Order § 1. But the Order fails to explain or provide any support for its assertion that people like Ms. Jansen are “attack[ing] women” and “depriving them of their dignity, safety, and well-being” by simply existing in those spaces. *Id.* Nor does the Order explain how people like Ms. Jansen are “undermin[ing]” “laws and policies designed to protect” women. *Id.* Nor does the Order explain why forcing people like Ms. Jansen to use a male sex designation on her travel documents—after thirty years of consistent identification documentation reflecting her female sex—has any bearing on that issue. It is not sufficient to merely assert an unsupported, irrational justification: the agency must assert a *reasonable* and *reasonably explained* justification. *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014) (rejecting agency's explanation that challenged rule “will deter fraud[]” because “the agency offers no evidence suggesting there is fraud to deter,” “[n]or is there anything in the record demonstrating how [the rule] would deter fraud even if it existed”).

The Executive Order's unexplained references to other broad concepts do not bridge this gap. The Executive Order cannot justify the agencies' actions by citing “scientific inquiry” and

22

"biological reality," Exec. Order § 1, given that, as explained, the Executive Order's definitions are untethered from well-established science on intersex people, *see supra* p. 19. And the Order's vague references to "morale" and "trust in government" and "freedom of conscience," Exec. Order ¶ 2(f), are poorly veiled animus against people who do not comport with the Executive Order's narrow definitions of sex, *see* Kaufman Decl. ¶¶ 44–53; *supra* pp. 9–11 (cataloguing President Trump's Administration's animus towards people who do not conform to the Executive Order's narrow definitions of sex), which does not support reasoned decisionmaking.

Aside from the purported "defe[nse]" of women and these unexplained references to "biolog[y]" and "morale," the Executive Order proffers no other rationales. The Court's inquiry thus ends here, as courts may not "affirm" agency action "on a ground other than that relied upon by the agency," *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011), nor "supply a reasoned basis for [an] agency's action that the agency itself has not given," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (citation omitted). For example, none of the Travel Document Policies offer any rationale related to identification needs in the context of national security or federal record-keeping. In any event, the Travel Document Policies would not further any such interest in identification. Forcing people to identify using a sex that they do not live in and are not perceived as would only undermine any governmental interest in accurate and consistent identification. Kaufman Decl. ¶ 72 (explaining how the State Department articulated the need for accurate identification photographs reflecting the applicant's current appearance when it first permitted individuals to change their sex designations). That is especially true given that many people who are intersex and/or transgender have state identification consistent with their lived sex, including birth certificates and driver's

23

licenses.[5]  Indeed, Ms. Jansen herself has had a birth certificate with a female sex designation for over thirty years.  Prohibiting people who were assigned an incorrect sex at birth from using sex designations consistent with their lived sex in federal identification documents would only create greater inconsistency.

Accordingly, if agencies could rely generally on executive orders to justify their own actions, *but see* pp. 21–22, the Executive Order here is unreasonable on its face.  The sole cited rationales related to protecting women, "scientific inquiry," and "trust in government" are illusory and unexplained, and Defendants cannot rely on *post hoc* rationalizations about accurate or consistent identification that the Order only undermines.

### iii.  The Passport Policy and the Global Entry Policy are contrary to Ms. Jansen's constitutional rights.

The APA provides that courts must "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  Thus, the APA provides a vehicle for courts to consider whether agency action has violated a constitutional right.  *See, e.g.*, *Farrell v. Tillerson*, 315 F. Supp. 3d 47, 70 (D.D.C. 2018).  As explained below, the Policies violate Ms. Jansen's constitutional rights to equal protection, free speech, and privacy.  *See infra* pp. 24–38.  For this reason, too, the Policies must be set aside.

### B.  The Travel Document Policies violate Ms. Jansen's Fifth Amendment right to equal protection.

The Fifth Amendment ensures that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  It also imposes upon the federal government the "obligation to respect the personal right to equal protection of the laws."  *Adarand*

---

[5] Approximately forty-three jurisdictions allow changes to the sex designation on birth certificates under certain circumstances.  *See Gore v. Lee*, 107 F.4th 548, 569 (6th Cir. 2024) (White, J., dissenting).

*Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 231–32 (1995).  The Travel Document Policies fail under the Fifth Amendment because they lack any rational relationship to legitimate state interests as applied to Ms. Jansen, and because they unconstitutionally discriminate based on her sex and intersex status.

### i.    The Travel Document Policies are fundamentally irrational.

The Travel Document Policies cannot survive rational-basis review because they "lack[] a rational relationship to legitimate state interests" as applied to Ms. Jansen.  *Romer v. Evans*, 517 U.S. 620, 632 (1996).  A law that is otherwise valid[6] may still be unconstitutional in its application to a particular plaintiff where the government's proffered justifications, examined against the specific facts of that plaintiff's circumstances, provide no rational basis for the differential treatment.  *See Cleburne*, 473 U.S. at 448–50 (invalidating zoning ordinance as applied where the city's proffered justifications provided no rational basis for treating a group home for persons with intellectual disabilities differently from other permitted uses in the same zone).

The Travel Document Policies rest on a single stated premise: that "biological reality" defines sex as a binary, black-and-white biological characteristic.  The Policies insist that a person's sex is determined by whether they "belong, at conception, to the sex that produces the large reproductive cell" or "the small reproductive cell," Exec. Order § 2(d)–(e), or whether they belonged, "at birth," Stufft PPT Memo 1–2, to "the sex characterized by a reproductive system with the biological function of producing eggs (ova)" or "of producing sperm," HHS, *Defining Sex*, *supra*, at 2.  But, whatever the merit of this premise as applied to people whose biology fits neatly within that black-and-white binary, it has no rational application to Ms. Jansen.  Ms. Jansen was born with sex chromosomal mosaicism, meaning that her cells had sex chromosomes

---

[6] Ms. Jansen seeks injunctive relief only for herself, but Ms. Jansen does not concede the validity of the Travel Document Policies as to others.

belonging to both sexes and her reproductive anatomy was under-developed and nonfunctioning. *See supra* pp. 4–5. She was born, in other words, with neither the chromosomal composition nor the reproductive function that the government's own framework associates with being male. Her birth record designation of "male" was not a scientific determination that she met any biological definition of male. It was an administrative assignment: the kind of assignment that, as Dr. Kaufman explains, was routinely made for intersex infants based on the appearance of external genitalia rather than any comprehensive assessment of chromosomal or reproductive biology. Kaufman Decl. ¶¶ 21, 23, 81. Thus, to the extent the Travel Document Policies purportedly rest on "biological reality," "biological reality" does not compel Ms. Jansen to use a male sex designation on her travel documents. The government cannot rationally claim that its policy serves the interest of accurately reflecting biological sex on government documents while simultaneously compelling a person with XX, XY, and XXXY cells and azoospermic testes to carry a document designating her as male.

Nor can the Travel Document Policies be explained with reference to any government interest in accurate identification, or consistent identification across records—the apparent purpose of including sex designations on travel documents. *See supra* pp. 6–7; Kaufman Decl. ¶ 66. As explained, the Travel Document Policies *undermine* the government's ability to consistently and accurately identify Ms. Jansen. *See supra* pp. 23–24. It is certainly not an accurate physical identifier: Ms. Jansen has lived as a women for over thirty years; she is perceived as female; and her anatomy reflects her female sex. Nor is it an accurate or helpful identifier for records purposes. Ms. Jansen's federal and state identification documents have accurately reflected her female sex for over 30 years—including her birth certificate and her driver's license. Forcing her to suddenly use a male sex designation for her passport and Global Entry card would force a conflict with her

26

state identification documents, with her biology, and with the reality of her daily life.  There is simply no rational basis to compel Ms. Jansen to use an incorrect, male sex designation on her travel documents.

### ii. The Travel Document Policies unconstitutionally discriminate based on sex.

The Fifth Amendment prohibits "artificial constraints" on individuals based on a sex classification.  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  At the outset, whether the Travel Document Policies classify based on sex is a straightforward inquiry.  The Policies restrict who may obtain a male or female sex designation on their travel documents to people who meet the Policies' definitions of "male" and "female," respectively.  That is a sex-based classification, and the Policies are therefore subject to heightened scrutiny.  *Id.* at 555.

Of course, not all sex-based classifications are constitutionally suspect.  Sex is a quasi-suspect class, rather than a proscribed classification like race or national origin, because there are indisputably "[p]hysical differences" between men and women.  *Id*. at 533, 555.  Those physical differences can justify, for example, maintaining single-sex schools or sports teams.  But where the government distinguishes the sexes based on physical differences, it must do so based on distinctions that "are substantially related to the achievement of" "important governmental objectives."  *Id* at 533.  This is a "demanding" standard: the burden "rests entirely on the State" to demonstrate an "exceedingly persuasive" justification for its differential treatment, and the justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation."  *Id*.  Sex-based classifications may not be premised on "stereotypes or overbroad generalizations about the differences between men and women."  *United States v. Skrmetti*, 605 U.S. 495, 510 (2025) (quoting *Sessions v. Morales-Santana*, 582 U.S. 47, 62 (2017)).  They may not be premised on "estimates of what is appropriate for *most women*" or *most men*, while ignoring people who fall

27

"outside the average description." *Virginia*, 518 U.S. at 550. And they certainly may not be premised on characteristics that do not reflect actual biological differences.

But that is exactly what the Travel Document Policies do—particularly with respect to intersex people like Ms. Jansen. They rest on the unscientific assumption that all people fit neatly within their narrow definitions of "male" and "female." Ms. Jansen does not. She did not "belong, at conception, to the sex that produces the large reproductive cell" or "the small reproductive cell," Exec. Order § 2(d)–(e), nor was she, "at birth," Stufft PPT Memo at 1–2, just "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)" or "sperm," HHS, *Defining Sex*, *supra*, at 1–2. She is living proof that these definitions are overbroad generalizations about the sexes—generalizations that operate to the discriminatory exclusion of intersex women like her. *See Virginia*, 518 U.S. at 549 (applying heightened scrutiny where university argued that educational "differences are 'justified pedagogically,' based on 'important differences between men and women in learning and developmental needs,' [and] 'psychological and sociological differences'" (citation omitted)). Under these Policies, Ms. Jansen is precluded from obtaining an accurate, female sex designation—even though she *also* does not meet the Policies' definition of "male."

These overbroad generalizations fail heightened scrutiny. For all the same reasons that the Travel Document Policies are irrational, *see supra* pp. 18–24, 25–26, compelling Ms. Jansen to use an inaccurate male sex designation on her travel documents is not "substantially related" to the achievement of any "important governmental objectives."

### iii. The Travel Document Policies unconstitutionally discriminate based on sex based on intersex status.

The Travel Document Policies discriminate based on intersex status, which is a quasi-suspect class. The test for identifying a quasi-suspect class is well established. *See Bowen v.*

28

*Gilliard*, 483 U.S. 587, 602 (1987); *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987). Quasi-suspect classes have historically been subject to discrimination, *Cleburne*, 473 U.S. at 440–41; they have a defining characteristic that bears no relation to their ability to contribute to society, *id.*; they comprise a discrete group characterized by obvious, immutable, or distinguishing characteristics, *Bowen*, 483 U.S. at 602; and they lack political power, *id.*

The defining feature of intersex people is that they were born with immutable physiological characteristics—including chromosomes, reproductive glands, and/or reproductive anatomy—that do not fit the typical binary definitions of "male" and "female." *See* Kaufman Decl. ¶¶ 16–20; *see also Zzyym v. Pompeo*, 958 F.3d 1014, 1028 & n.8 (10th Cir. 2020) (collecting academic literature defining intersexuality); U.N. Office of the High Commissioner for Human Rights, *Intersex People: OHCHR and the Human Rights of LGBTI People*, https://tinyurl.com/54wp6pax; HHS, *Advancing Health Equity for Intersex Individuals* 3 (Jan. 2025), https://perma.cc/CY85-68RM (hereinafter *HHS Report*); *see also supra* pp. 3–4. As HHS has recognized, intersex also comprises "an identity and community." *HHS Report*, *supra*, at 3. Those immutable physiological characteristics bear no relation to their ability to contribute to society. *See* Kaufman Decl. ¶ 22. Just as sex "generally provides no sensible ground for differential treatment," neither does being intersex. *Cleburne*, 473 U.S. at 440–41 (citing *Frontiero*, 411 U.S. at 686)); *cf.* Am. Psychiatric Ass'n, Position Statement on Discrimination Against Transgender and Gender Non-Conforming Individuals 1 (2024), https://perma.cc/PH6X-WAKD (seventeen of the foremost medical, mental health, and public health organizations agreeing that being transgender or gender-non-conforming "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities").

Intersex people have historically suffered, and continue to suffer, discriminatory treatment.

*See* Kaufman Decl. ¶¶ 25–43.   Beginning in the 1950s, the medical community began to "eliminate" intersex traits in early childhood by "choosing" a particular sex through surgery, endocrinology, and psychology—without the child's informed choice.  *Id*. ¶ 21.  Intersex people are still often subject to nonconsensual, medically unnecessary interventions early in life to attempt to conform their physiology with binary sex stereotypes.  *Id.*  These interventions have high complication rates, including infertility, reduced sexual function, and other physical and mental health disparities.  *Id.*  As HHS recently acknowledged, studies have "associated these interventions with relatively high rates of dissatisfaction and health challenges later in life." *HHS Report*, *supra*, at 5; *see also* U.N. Office of the High Commissioner for Human Rights, *Discriminatory Laws and Policies, Acts of Violence and Harmful Practices Against Intersex Persons* ¶¶ 10–14 (Aug. 8, 2025), https://tinyurl.com/2wb46jna.

Intersex people also frequently face discrimination in their daily lives—much of which stems from mismatched identity documents.   *See* Kaufman Decl. ¶¶ 35–36,  38–39,  57–62. According to a 2024 survey, 65% of intersex people in the United States experienced some form of discrimination in the workplace, at school, in accessing housing, in public spaces, and when seeking government-funded services. *Id*. ¶ 27.  Intersex people face hardship accessing healthcare, as many medical providers are not sufficiently trained on intersex issues.  *Id.*  According to one survey, 88% of intersex people in the United States reported experiencing some form of discrimination from a health care provider in the preceding year.  *Id*. ¶ 55.  And the current Administration has made clear its animus towards people who do not conform to its narrow definition of sex.  *See* Kaufman Decl. ¶¶ 44–53; *supra* pp. 9–11.

Intersex people also experience many of the same harms that LGBTQ+ people experience. *Id*. ¶¶ 25–43.  And when intersex people are assigned the wrong sex at birth, as commonly happens,

30

they often experience all the same harms that other transgender people experience. *See id.* There is broad consensus that people who were assigned the wrong sex at birth have historically been subject to *de jure* discrimination. *See Cleburne*, 473 U.S. at 440–41. For nearly two centuries of American history, transgender people have been disproportionate targets of policing, prosecution, and incarceration. *See* Br. of Law and History Scholars as *Amici Curiae* in Supp. of Resp'ts, *Little v. Hecox*, Nos. 24-38, 24-43 (U.S. Nov. 17, 2025), https://perma.cc/3VYE-DG4Q. They have been prosecuted under cross-dressing laws, and for fraud. *See* Kaufman Decl. ¶ 43. And they have been disproportionately targeted for public indecency and vagrancy. *Id*. As multiple Courts of Appeals have recognized, "[t]here is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." *Whitaker*, 858 F.3d at 1051; *see also Grimm*, 972 F.3d at 610–11 ("one would be hard-pressed to identify a class of people more discriminated against historically or … singled out for adverse treatment, than transgender people" (citation omitted)); Kaufman Decl. ¶ 43.

Intersex people lack the political power to protect themselves through the political process. Although there may be as many as 5.6 million intersex people in the United States, just 0.05% to 1.7% of the population is intersex. *See* Kaufman Decl. ¶ 24. Intersex people are often forgotten even in broader discussions of the LGBTQ+ population. *Id*. ¶ 28. For example, the federal government only acknowledged the existence of intersex people for the first time in 2016, *see* interACT, *Intersex Legislation and Regulation*, https://perma.cc/S5QG-8QGH, and only first sought to understand inequalities faced by intersex people for the first time in January 2025, *see HHS Report*, *supra*, at 1 (noting "first of its kind report" on health equity for intersex people).

The Travel Document Policies discriminate against this quasi-suspect class of intersex people. Unlike people who fit within their narrow definitions of "male" and "female," the Travel

31

Document Policies bar many intersex people from obtaining a sex designation consistent with their lived sex—simply because their atypical physiological traits resulted in an incorrect sex assignment at birth. That includes Ms. Jansen, who will be required to use a passport and a Global Entry card with a male sex designation, despite the fact that she has lived as female for over thirty years, her state and federal identification documents have included a female sex designation for the same amount of time, and she has cells with XX sex chromosomes.

The Travel Document Policies stand in stark contrast to the challenged statutes in *Skrmetti*, which explicitly exempted intersex people. *See Skrmetti*, 605 U.S. at 507 (noting that "SB1 does not ban fully the administration of [gender-affirming care] to minors" because "[a] healthcare provider may administer puberty blockers or hormones to treat a minor's congenital defect [or] precocious (or early) puberty," where "[c]ongenital defect" is defined as an "abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex"). Because the Travel Document Policies discriminate against intersex people by barring many intersex people from obtaining a sex designation consistent with their lived sex, this Court should subject the Policies to heightened scrutiny. And for the same reasons as described above, they fail heightened scrutiny. *See supra* pp. 21–24, 27–28.

C. **The Travel Document Policies violate Ms. Jansen's First Amendment Right to Freedom of Speech.**

The First Amendment prohibits the government from compelling a private citizen to speak a message to which she objects. *Wooley v. Maynard*, 430 U.S. 705, 717 (1977). This principle is as old as the Republic: "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). And that prohibition applies "not only to expressions of value, opinion, or endorsement, but equally to statements of

32

fact the speaker would rather avoid." *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995).

Through the Travel Document Policies, however, the government not only communicates its view on the proper definitions of sex—it also forces citizens to be the messengers of that view. That it cannot do. The elements of a compelled speech claim are straightforward: the plaintiff must identify (1) speech; (2) to which she objects; (3) that is compelled; and (4) that is readily associated with her. *See, e.g.*, *Cressman v. Thompson*, 798 F.3d 938, 949–51 (10th Cir. 2015). Each element is satisfied here.

First, the sex designations on Ms. Jansen's travel documents are speech. *See, e.g.*, *Defending Ed. v. Olentangy Local School Dis. Bd. of Ed.*, 158 F.4th 732, 754–55 (6th Cir. 2025) (recognizing biological and preferred pronouns as speech); *Doe v. Marshall*, 367 F. Supp. 3d 1310, 1326 (M.D. Ala. 2019) (finding statement on state ID card is speech). Through these Policies, the government "communicate[s] to others an official view as to [the] proper" definition of "sex." *Wooley*, 430 U.S. at 717 (license plate motto is speech). In doing so, the government "take[s] a side" in "the broader debate over transgender rights," which "has stirred a passionate political and social debate in our society." *Olentangy*, 158 F.4th at 753–55.

Second, as evident by this lawsuit, Ms. Jansen objects to the government's message. The Travel Document Policies require her documents to state that she is male. That statement is false. Ms. Jansen is an intersex woman whose biology does not fit the government's own definition of male. She has lived as a woman for over thirty years, and every government-issued identification document reflects her female sex—until now. Ms. Jansen does not believe that she is male, and she objects to being forced to serve as "the courier" for a message that denies her existence as an intersex, transgender woman. *Wooley*, 430 U.S. at 717.

33

Third, the speech is compelled. The Travel Document Policies would require Ms. Jansen to carry identification documents stating that she is male—a statement that is false and that she does not believe—as a condition of exercising her right to travel and her ability to participate in ordinary civic life. She will be forced to communicate that message every time she shares her travel documents with airline personnel, border officials, or other authorities. And these Policies provide no options for her to renew her documents without the new sex designations. Absent an injunction, she will be required to identify as "male" on her Global Entry card before the end of this year. She also will be required to identify as "male" when she renews her passport. By requiring Ms. Jansen to adopt the government's viewpoint to retain her ability to travel abroad, the government is compelling her to speak in a certain way, and to give up other freedoms, including her privacy. *See infra* pp. 35–38. "[N]o matter how acceptable to some" the government's definition of "sex" may be, such interest "cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 717.

Fourth, the sex designation is readily associated with Ms. Jansen. Her passport and Global Entry card contain her personal information. *See, e.g.*, *Marshall*, 367 F. Supp. at 1326. When she presents these documents, the sex designation is understood by anyone who sees it as a statement about who she is. *See id.* The government understands this significance; after all, the government permits individuals who "dislike" their passport photos to pay to change those photos. *See Change or Correct a Passport*, State Dep't (last updated Sept. 4, 2025), https://perma.cc/E5ML-46HY.

Where, as here, the government seeks to compel a private citizen to speak, the government must show that its actions satisfy strict scrutiny. *American Meat Inst. v. U.S. Dept. of Ag.*, 968 F. Supp. 2d. 38, 47 (D.D.C. 2013). The government cannot meet this burden for all the same reasons as explained above—indeed, the government cannot meet even rational basis or heightened

34

scrutiny. *See supra* pp. 21–24, 25–26. It cannot identify any compelling interest in forcing Ms. Jansen to carry a document stating she is male when she is not. And no interest in doing so could be narrowly tailored because there is no governmental purpose served by compelling a person whose biology does not fit the government's own definition of male, *see supra* pp. 21–24, 25–26, to identify as male on her travel documents.

### D. The Travel Document Policies violate Ms. Jansen's Fifth Amendment right to substantive due process.

The Due Process Clause of the Fifth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). A right is "fundamental" if it is "'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty.'" *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 715 (D.C. Cir. 2007) (quoting *Glucksberg*, 521 U.S. at 721). Ms. Jansen has a fundamental right to privacy, which protects against the unwarranted disclosure of her personal, intimate information.

The Supreme Court has repeatedly assumed, without deciding, the existence of a fundamental right to informational privacy. *See Whalen v. Roe*, 429 U.S. 589, 599–600 (1977) (describing a line of cases rooted in the "interest in avoiding disclosure of personal matters"); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977) (acknowledging that public officials "may" have "constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity"); *NASA v. Nelson*, 562 U.S. 134, 138, 145–47 (2011) ("assum[ing], without deciding, that the Constitution protects a privacy right of the sort mentioned in *Whalen* and *Nixon*"). In each of these cases, the Court held that the particular facts did not establish a violation of that right to informational privacy because they involved "only the Government's *collection* of information," which was "shielded by statute from 'unwarranted

35

disclosur[e].'"  *Id.* at 156 (citation omitted).

In the wake of this guidance, nearly every federal court of appeals has explicitly recognized a fundamental interest in informational privacy, and none has affirmatively rejected such a right.[7] The D.C. Circuit has not answered the question but has noted the "ambiguity" of the "precise contours of" the fundamental right to informational privacy, and has repeatedly "assum[ed] (without deciding) the existence of a constitutional right to informational privacy."  *See In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d 42, 72, 74 (D.C. Cir. 2019) ("*In re OPM Litig.*").

Neither the Supreme Court nor the D.C. Circuit has ever considered the kind of extraordinary privacy intrusion at issue here.  At the outset, information about Ms. Jansen's sexual anatomy and sexual identification is as intimate as it gets.  *See, e.g.*, *Lawrence*, 539 U.S. at 572 ("liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex"); *Obergefell*, 576 U.S. at 663 ("[The Due Process Clause] extend[s] to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs.").  This case is about more than "birth dates, Social Security numbers, addresses, and … fingerprint records," *In re OPM Litig.*, 928 F.3d at 49, "private communications," *Nixon*, 433 U.S. at 459, drug prescriptions, *see Whalen*, 429 U.S. at 591, or even use of illicit drugs and other potentially "adverse information," *NASA*, 562 U.S. at 151–55; *Am. Fed'n of Gov't Emps., AFL-CIO v. Dep't of Hous. & Urb. Dev.*, 118 F.3d 786, 794 (D.C. Cir. 1997).

---

[7] *Harper v. Werfel*, 118 F.4th 100, 113 (1st Cir. 2024) ("the substantive component of the Due Process Clause protects a limited liberty interest in the confidentiality of certain intimate information"), *cert. denied sub nom. Harper v. Faulkender*, 145 S. Ct. 2867 (2025); *Doe v. City of N.Y.*, 15 F.3d 264, 267 (2d Cir. 1994); *Fraternal Order of Police, Lodge No. 5 v. Philadelphia*, 812 F.2d 105, 110 (3d Cir. 1987); *Payne v. Taslimi*, 998 F.3d 648, 655 (4th Cir. 2021); *Woodland v. Houston*, 940 F.2d 134, 138 (5th Cir. 1991) (per curiam); *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998); *Wolfe v. Schaefer*, 619 F.3d 782, 785 (7th Cir. 2010); *Thorne v. City of El Segundo*, 726 F.2d 459, 468 (9th Cir. 1983); *Eastwood v. Dep't of Corr. of Okla.*, 846 F.2d 627, 631 (10th Cir. 1988); *Burns v. Warden, USP Beaumont*, 482 F. App'x 414, 417 (11th Cir. 2012).

This case is about deeply intimate information about Ms. Jansen's bodily and sexual autonomy that she is constitutionally entitled to share only when and with whom she chooses. *See Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) ("The excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate."). Consistent with this caselaw, many courts have held that due process protects against the disclosure of information that would reveal transgender status.[8]

Moreover, the government is not merely collecting and retaining Ms. Jansen's intimate information for internal governmental use. Each of *Whalen*, *Nixon*, *NASA*, *AFL-CIO*, and *In re OPM Litigation* focused on the fact that the plaintiffs challenged "only the Government's *collection* of information." *NASA*, 562 U.S. at 156; *see also AFL-CIO*, 118 F.3d at 793 ("the individual interest in protecting the privacy of the information sought by the government is significantly less important where the information is collected by the government but not disseminated publicly"). Ms. Jansen, in contrast, does not have "unsubstantiated fear of public disclosure." *AFL-CIO*, 118 F.3d at 793. There are no regulatory and statutory "protections against" dissemination of her information. *In re OPM Litig.*, 928 F.3d at 73; *accord NASA*, 562 U.S. at 155; *AFL-CIO*, 118 F.3d at 794. The Travel Document Policies will force her to disclose her intimate information *every time* she uses her passport or her Global Entry card because the sex

---

[8] *See Powell*, 175 F.3d at 111 (recognizing a privacy right in maintaining the confidentiality of one's transgender identity in challenge to prison guard's disclosure of plaintiff's identity); *Ray v. McCloud*, 507 F. Supp. 3d 925, 932, 939–40 (S.D. Ohio 2020) ("forced disclosure of a transgender individual's status as transgender [on birth certificate] was highly personal sexual information that [i]s protected by the due process clause's informational right to privacy"); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) ("By permitting plaintiffs to change the name on their birth certificate, while prohibiting the change to their gender markers, the Commonwealth forces them to disclose their transgender status in violation of their constitutional right to informational privacy."); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1142 (D. Idaho 2018) (same); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015) (same regarding state-issued driver's licenses and state identification cards).

marker required on these documents will clearly not match her physical appearance, how she has been perceived by the public for decades, or her state identification documents. Disclosure is a feature of the Travel Document Policies, not a bug. And as explained, *see infra* pp. 38–43, the disclosure of this information is both embarrassing and places Ms. Jansen at direct risk of bodily harm.

Because the Travel Document Policies violate Ms. Jansen's fundamental right to informational privacy, the Fifth Amendment requires that it satisfy strict scrutiny review. *See Glucksberg*, 521 U.S. at 720. Under that standard, Defendants must demonstrate that the Travel Document Policies are narrowly tailored to achieve a compelling government interest and that they have attempted to use less intrusive alternatives to achieve those interests. *See Johnson v. California*, 543 U.S. 499, 505 (2005). Defendants cannot do so, for all the same reasons already explained. *See supra* pp. 21–24, 25–26. The sole identified interest in "defend[ing] women's rights" is illusory and unsupported, as are the vague references to "biological reality" and "morale." *See supra* pp. 21–24, 25–26. And Defendants cannot rely on a post-hoc rationalization not actually identified in any of the Travel Document Policies. Even if they could rely on uncited rationales related to identification needs, such as in the national security or federal record-keeping contexts, the Policies are not narrowly tailored to serve any such interest for the same reasons explained above. *See supra* pp. 21–24, 25–26. Indeed, the Travel Document Policies fail even rational basis review because they are premised on animus, not any rational government interest. *See supra* pp. 21–24, 25–26. If anything, they *expressly work against* the governmental interest in ensuring that passports capture a consistent and accurate likeness of the passport holder.

## II.    MS. JANSEN WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

The Travel Document Policies threaten physical, psychological, and constitutional harm to

Ms. Jansen. Absent an injunction, these Policies will require Ms. Jansen to carry identification documents that do not match her lived sex, appearance, or other documentation. That, in turn, risks not only "outing" Ms. Jansen as intersex and/or transgender, which in turn exposes her to discrimination and harassment—it also exposes her to the risks of traveling with mismatched identification.

Ms. Jansen's Global Entry card is currently eligible for renewal and will expire before the end of this year. She has yet to renew it out of fear that she will be required to inaccurately identify as male. Jansen Decl. ¶ 38. Her fear is well founded, as the government has already denied other individuals the dignity to carry a sex designation that is consistent with their lived sex.[9] Absent an injunction, Ms. Jansen will be forced to carry a card that is inconsistent not only with her physical appearance but with all her other identification, increasing the scrutiny that she will likely receive. Kaufman Decl. ¶¶ 36, 85, 92, 96. Indeed, even the act of renewing her Global Entry card exposes her to serious legal risks, as she could be accused of committing perjury regardless of how she completes her application. *See Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1045 (D. Idaho 2025) ("Because Plaintiffs are at risk of being subject to criminal penalties allegedly preempted by federal law, the Court finds that they are likely to suffer irreparable injury and that this factor weighs in favor of granting injunctive relief."). If Ms. Jansen were to accurately identify as female, she risks being accused of perjury because it is inconsistent with the Global Entry Policy. But to instead identify as "male" would in fact be perjury, as she would be knowingly submitting false information—indeed, false information that is contradictory to her current birth

---

[9] *See, e.g.*, Decl. of Zaya Perysian ¶ 11, *Orr v. Trump*, 1:25-cv-10313 (D. Mass. Feb. 18, 2025), ECF No. 30-3 (describing how Defendant State Department refused to update an individual's sex designation); Decl. of Ashton Orr ¶ 12, *Orr v. Trump*, 1:25-cv-10313 (D. Mass. Feb. 18, 2025), ECF No. 30-4 (describing how Defendant State Department placed a passport application on hold given the sex designation).

certificate.  Even aside from this perjury trap, renewing her Global Entry participation with a male sex designation could risk suspension or revocation of her Global Entry card and her passport, should her documents be flagged as "erroneous" due to the mismatch.  *See, e.g.*, 22 C.F.R. § 51.62(a)(2) (providing that the State Department can revoke or limit a passport if "the passport was illegally, fraudulently or erroneously obtained from the Department").

Furthermore, should Ms. Jansen be forced to carry travel documents with a male sex designation, Ms. Jansen fears that she will be subjected to verbal and physical harassment as well as other indignities, including pat-downs and more invasive searches, when she travels.  Jansen Decl. ¶ 36.  Ms. Jansen is a frequent traveler who commonly uses her Global Entry card to travel between the U.S., Canada, and Mexico.  Jansen Decl. ¶ 30.  It is well documented that travelers who present with identity documents that do not match their sex identity are more likely to be verbally and physically harassed during security screenings and document inspections.  Kaufman Decl. ¶ 85; Decl. of Zaya Perysian ¶ 8, *Orr v. Trump*, 1:25-cv-10313 (D. Mass. Feb. 18, 2025), ECF No. 30-3 (describing how TSA agents referred to her as the "'prettiest boy' they have ever seen").  Transgender travelers have reported being groped and subjected to scrutiny by police and even bomb squads due to unexpected "anomalies."  Kaufman Decl. ¶¶ 36, 59, 85; Decl. of Chastain Anderson ¶ 13, *Orr v. Trump*, 1:25-cv-10313 (D. Mass. Feb. 18, 2025), ECF No. 30-6 (describing how she was strip searched by TSA due to her identification document not matching her sex presentation).  Ms. Jansen has exclusively experienced invasive pat-down searches by female officers, both domestically and while traveling abroad, while traveling with documents correctly reflecting a female sex designation.  Jansen Decl. ¶ 36.  By requiring her to identify as male, the Travel Document Policies will subject Ms. Jansen—who is anatomically female—to invasive searches by male officers.

40

Ms. Jansen also fears the harm that these Policies will cause by outing her as intersex and/or transgender, especially when she travels abroad. Jansen Decl. ¶¶ 32–37. These Policies place Ms. Jansen at a greater risk of harassment, discrimination, and violence when travelling internationally. Kaufman Decl. ¶¶ 94–97. And in many countries, including several countries that Ms. Jansen has traveled to before with some frequency, like the United Arab Emirates, she could be subject to criminal liability, including imprisonment, because of these documents marking her as male. Kaufman Decl. ¶ 95. Were Ms. Jansen to be incarcerated, her "male" sex marker would likely result in her incarceration with males, which subjects her to a higher risk of physical and sexual assault. Kaufman Decl. ¶ 95. These risks—and the fear of them—would interfere with Ms. Jansen's ability to obtain the specialized medical care that she has received abroad for years now. Jansen Decl. ¶ 13.

Traveling with mismatched identity documents also exposes Ms. Jansen to the risk of being detained, accused of fraud, having her passport revoked, or being denied entry or exit from the United States or a foreign country. There are numerous documented instances where transgender and intersex individuals with mismatched documents have been accused of lying about their identity or forging documents. *See, e.g.*, Kaufman Decl. ¶ 36; Decl. of Ashton Orr ¶ 10, *Orr v. Trump*, 1:25-cv-10313 (D. Mass. Feb. 18, 2025), ECF No. 30-4 (describing how TSA accused an individual of presenting a fake identification document due to incongruent sex designations). This risk is particularly acute when she travels with her children, as she is listed as the mother and sole parent on her children's birth certificates. Many countries require evidence of legal relationship when traveling with minor children. Indeed, the State Department's website advises to "[a]lways bring a copy of each child's birth certificate or other evidence of your legal relationship to each child" when traveling internationally with minor children. U.S. Dep't of State, *Travel with Minors*

41

(last updated Aug. 11, 2025), https://perma.cc/E72G-YXHP.  In the event that Ms. Jansen's legal relationship to her children were ever to be questioned while traveling, and if she were required to present her passport to prove her identity and relationship—especially if she were also required to present her children's birth certificates—Ms. Jansen would not only be outed and risk all the concomitant harms, but would also risk being separated from her children for prolonged periods of time and even being accused of child abduction.

Not only would the Travel Document Policies subject her to greater risks while traveling, they will also force her to disclose an intimate, private detail about her body dozens of times each year—any time she uses her travel documents, which she does not only any time she travels but also often in her daily life.  People in her community do not know that she was designated male at birth.  Jansen Decl. ¶ 16.  And by outing her to friends, neighbors, acquaintances, and strangers, the Travel Document Policies place her at a greater risk of harassment, discrimination, and violence.  Kaufman Decl. ¶¶ 25–62, 92 (describing how transgender and intersex individuals report higher levels of harassment, discrimination, and even violence in numerous social settings when people become aware that an individual is transgender or intersex).

The real risks of harassment, discrimination, and violence—and the anticipation of them— have wrought and will continue to inflict psychological distress on Ms. Jansen.  Jansen Decl. ¶¶ 32–40.  Since the Travel Document Policies were implemented, she has lost sleep, suffered from anxiety, and had trouble concentrating and focusing in her daily life due to fear for herself and her children.  *Id.* ¶ 40.  Her anxiety and emotional anguish are shared by many transgender and intersex individuals who are forced to use incongruent identity documents.  Kaufman Decl. ¶¶90–98.

Finally, any violation of Ms. Jansen's constitutional rights is irreparable.  A "'prospective violation of a constitutional right constitutes irreparable injury for … purposes' of 'seeking

42

equitable relief.'" *Karem v. Trump,* 960 F.3d 656, 667–68 (D.C. Cir. 2020) (finding irreparable harm for violation of Fifth Amendment due process rights) (citation omitted); *see also Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (internal quotations omitted)); *Advance Am. v. FDIC*, 2017 WL 2672741, at *10 (D.D.C. Feb. 23, 2017) ("Plaintiffs have alleged that they will suffer a violation of their right to due process.  The violation of such a personal constitutional right is *per se* irreparable.").  Absent injunctive relief, Ms. Jansen will continue to suffer irreparable harm from the government's violation of her First and Fifth Amendment rights.

## III.  BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION

When "the Government is the opposing party," the determination of the third and fourth factors regarding "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Under any of the numerous ways in which the government violates Ms. Jansen's constitutional rights and disregards established law, this balancing test weighs in favor of an injunction.  Ms. Jansen seeks only to maintain the status quo of the last three decades while the Court considers her claims.

An injunction benefits both Ms. Jansen and the public.  The Travel Document Policies offend Ms. Jansen's First and Fifth Amendment constitutional rights.  As the Constitution is "the ultimate expression of the public interest," "government actions in contravention of the Constitution are 'always contrary to the public interest.'"  *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385–86 (D.D.C. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)); *see also Klayman v. Obama*, 142 F. Supp. 3d. 172, 196–97 (D.D.C. 2015) ("This Court simply cannot, and will not, allow the Government to trump the Constitution" where government action violated constitutionally-protected privacy rights); *Costa v. Bazron*, 456 F. Supp. 3d 126, 137–38 (D.D.C. 2020) (recognizing that the public interest weighed in favor of the health and

43

safety of individuals who would be harmed by the government's policies). The Travel Document Policies also violate the APA, *supra* pp. 21–24, and "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted).

There is no harm to Defendants in requiring that they continue following the same policies that they have followed for over 30 years. That is especially true here given that the government has not articulated any legitimate reason to suddenly require Ms. Jansen to identify by a sex that is inconsistent with 30 years of federal and state documentation, with her body, and with her life.[10]

### CONCLUSION

Ms. Jansen respectfully requests that the Court grant her request for a preliminary injunction.

---

[10] For these same reasons, Ms. Jansen requests that this Court not impose a security bond. *See N. Am.'s Building Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (declining to "require bonds in public interest litigation").

Dated: February 27, 2026

Respectfully submitted,


/s/ Jaime A. Santos
Jaime A. Santos (#1047905)
Cassandra M. Snyder (#1671667) (admission pending)
Kylie E. Burke (#90040140) (application for admission forthcoming)
GOODWIN PROCTER, LLP
1900 N Street, N.W. Washington, DC 20036
Tel.: (202) 346-4000
Fax: (202) 246-4444
JSantos@goodwinlaw.com
CassandraSnyder@goodwinlaw.com
KylieBurke@goodwinlaw.com

Louis Lobel (admitted *pro hac vice*)
Andrea S. Goodman (admitted *pro hac vice*)
GOODWIN PROCTER, LLP
100 Northern Avenue
Boston, MA 02210
Tel.:  (617) 570-1000
Fax:  (617) 523-1231
LLobel@goodwinlaw.com
AndiGoodman@goodwinlaw.com

Timothy James Beavers (admitted *pro hac vice*)
GOODWIN PROCTER, LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.:  (212) 459-7208
Fax:  (212) 355-3333
TBeavers@goodwinlaw.com

*Counsel for Plaintiff*

45