## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANA JANSEN<br><br>*Plaintiff*,<br><br>v.<br><br>DONALD TRUMP, *in his official capacity as President of the United States;* U.S. DEPARTMENT OF STATE; MARCO RUBIO, *in his official capacity as Secretary of the U.S. Department of State*, U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of Customs and Border Protection*; UNITED STATES OF AMERICA,<br><br>*Defendants*. | Civil Action No. 1:25-cv-02961-LLA |

## REPLY IN SUPPORT OF
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

ARGUMENT .............................................................................................................................. 2

    I.    Ms. Jansen Is Likely to Succeed on the Merits. ..................................................... 2

        A.    The Passport Policy and the Global Entry Policy violate the APA. ............................ 2

            i.    The narrow reviewability exception for presidential action does not apply. ................ 2

            ii.    The Policies are arbitrary and capricious. ................................................................. 5

        B.    The Travel Document Policies violate Ms. Jansen's Fifth Amendment right to equal protection. ................................................................................................................ 7

            i.    The Travel Document Policies are fundamentally irrational. .................................... 7

            ii.    The Travel Document Policies unconstitutionally discriminate based on sex. ............ 9

            iii.    The Travel Document Policies unconstitutionally discriminate based on intersex status. ...................................................................................................................... 10

        C.    The Government Fails to Rebut Ms. Jansen's Compelled Speech Challenge. ............ 12

        D.    The Travel Document Policies violate Ms. Jansen's Fifth Amendment right to substantive due process. ........................................................................................... 15

    II.    Absent an Injunction, Ms. Jansen Will Suffer Imminent Irreparable Harm. ................ 17

    III.    The Government Exaggerates Its Potential Harms. ...................................................... 20

CONCLUSION .......................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advance Am. v. FDIC*,
2017 WL 2672741 (D.D.C. Feb. 23, 2017) ..................................................................20

*Aid for Women v. Foulston*,
441 F.3d 1101 (10th Cir. 2006) .....................................................................................16

*Ashtari v. Pompeo*,
496 F. Supp. 3d 462 (D.D.C. 2020) ................................................................................5

*Autor v. Pritzker*,
740 F.3d 176 (D.C. Cir. 2014) .......................................................................................17

*Bennett v. Spear*,
520 U.S. 154 (1997) .........................................................................................................4

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .......................................................................................................10

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ......................................................................................20

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985) .......................................................................................................12

*Cressman v. Thompson*,
798 F.3d 938 (10th Cir. 2015) .......................................................................................13

*Detroit Int'l Bridge Co. v. Gov. of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ..................................................................................4

*Doe 1 v. Marshall*,
367 F. Supp. 3d 1310 (M.D. Ala. 2019) .......................................................................14

*Doe 1 v. Trump*,
275 F. Supp. 3d 167 (D.D.C. 2017) ..........................................................................11–12

*Does v. District of Columbia*,
374 F. Supp. 2d 107 (D.D.C. 2005) ...............................................................................20

*Drs. for Am. v. Off. of Personnel Mgmt.*,
793 F. Supp. 3d 112 (D.D.C. 2025) .............................................................................3, 5

*DynaLantic Corp. v. U.S. Dep't of Defense*,
  885 F. Supp. 2d 237 (D.D.C. 2012)....................................................................................19

*\*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)..............................................................................................................2

*Fowler v. Stitt*,
  676 F. Supp. 3d 1094 (N.D. Okla. 2023)............................................................................15

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020)..................................................................................3–5

*Gore v. Lee*,
  107 F.4th 548 (6th Cir. 2024) ............................................................................................16

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020)..............................................................................................6

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ..............................................................................................11

*Griswold v. Connecticut*,
  381 U.S. 479 (1965)............................................................................................................16

*Haig v. Agee*,
  453 U.S. 280 (1981)............................................................................................................14

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022).............................................................................................20

*\*Hurley v. Irish-Am. Gay, Lesbian, Bisexual Group*,
  515 U.S. 557 (1995)............................................................................................................15

*Idaho Org. of Res. Councils v. Labrador*,
  780 F. Supp. 3d 1013 (D. Idaho 2025) ...............................................................................19

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994)............................................................................................................10

*\*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020)............................................................................................20

*Kelly v. Hegseth*,
  2026 WL 391777 (D.D.C. Feb. 12, 2026) ..........................................................................20

*Kingdom v. Trump*,
  2025 WL 1568238 (D.D.C. June 3, 2025)........................................................................3, 5

*Lyng v. Castillo*,
477 U.S. 635 (1986) ............................................................................................ 11–12

*Matal v. Tam*,
582 U.S. 218 (2017) ................................................................................................. 13

*McLaughlin v. Florida*,
379 U.S. 184 (1964) ................................................................................................. 10

*MediNatura, Inc. v. FDA*,
2021 WL 1025835 (D.D.C. Mar. 16, 2021) ............................................................. 19

*Milligan v. Pompeo*,
502 F. Supp. 3d 302 (D.D.C. 2020) ......................................................................... 4–5

*Minnesota Voters Alliance v. City of Saint Paul*,
442 F. Supp. 3d 1109 (D. Minn. 2020) .................................................................... 14

*Nat'l Ass'n of Manufacturers v. SEC*,
800 F.3d 518 (D.C. Cir. 2015) .................................................................................. 15

*NE Fla. Chapter v. City of Jacksonville*,
896 F.2d 1283 (11th Cir. 1990) ................................................................................ 19

*Nelson v. Landry*,
714 F. Supp. 3d 790 (M.D. La. 2024) ....................................................................... 15

*NRDC v. Dep't of State*,
658 F. Supp. 2d 105 (D.D.C. 2009) ............................................................................ 4

*O.A. v. Trump*,
404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................................ 5

*Olmstead v. United States*,
277 U.S. 438 (1928) ................................................................................................. 16

*Padula v. Webster*,
822 F.2d 97 (D.C. Cir. 1987) .................................................................................... 12

*Public Citizen v. U.S. Trade Representative*,
5 F.3d 549 (D.C. Cir. 1993) ..................................................................................... 3–4

*Riley v. Nat'l Fed'n of the Blind*,
487 U.S. 781 (1988) ................................................................................................. 15

*R.J. Reynolds Tobacco Co. v. FDA*,
823 F. Supp. 2d 36 (D.D.C. 2011) ............................................................................ 19

iv

*Ruhumuriza v. Higgins*,
  2026 WL 587636 (D.D.C. Mar. 3, 2026).................................................................................5

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
  411 U.S. 1 (1973)...................................................................................................................12

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017)...................................................................................................................9

*\*Shurtleff v. City of Boston*,
  596 U.S. 243 (2022)...............................................................................................................13

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022)..................................................................................................17

*Susman Godfrey LLP v. Exec. Office of the President*,
  789 F. Supp. 3d 15 (D.D.C. 2025)...................................................................................19–20

*Talbott v. United States*,
  775 F. Supp. 3d 283 (D.D.C. 2025)..................................................................................11–12

*Tate v. Pompeo*,
  513 F. Supp. 3d 132 (D.D.C. 2021)....................................................................................4–5

*Trump v. Orr*,
  146 S. Ct. 44 (2025)............................................................................................................2, 5

*Tulare Cnty. v. Bush*,
  185 F. Supp. 2d 18 (D.D.C. 2001)..........................................................................................4

*United States v. Skrmetti*,
  605 U.S. 495 (2025)...........................................................................................................9–12

*\*Va. State Conf. NAACP v. Shenandoah Cnty.*,
  799 F. Supp. 3d 515 (W.D. Va. 2025).............................................................................12–13

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015)...............................................................................................................13

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)...............................................................................................................16

*Whalen v. Roe*,
  429 U.S. 589 (1977)...............................................................................................................16

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012)...................................................................................................11

*Wooley v. Maynard*,
  430 U.S. 705 (1977)...........................................................................................13–14, 19

**INTRODUCTION**

The government's opposition is infected with three pervasive errors. *First*, the government misses the very premise of Ms. Jansen's claims: she is intersex. Intersex people are born with immutable physiological characteristics that do not fit binary definitions of "male" and "female." The Travel Document Policies discriminate against intersex people by denying their existence, and they violate the APA by using arbitrary classifications that fail to consider an entire category of people. The government does not dispute the science. Indeed, nowhere does the government engage with the biology of intersex people. Instead, it insists it was not arbitrary to rely on binary definitions of biological sex because the government believes it can divide biological sex into binary definitions. Ms. Jansen, says the government, must be male because she was born with reproductive organs that *look* male and must therefore *be* male.

That is circular logic at its worst. And it has no coherent application to intersex people. Many intersex people have *both* male and female reproductive organs. And even for those who do not, the government's definitions arbitrarily elevate one physiological trait above all others, ignoring the full biological picture. An intersex person might, for example, have male-associated external genitalia but female-associated chromosomes, ovaries, and a uterus. For Ms. Jansen, as a direct result of her sex-chromosome mosaicism, she was born with biological traits typical of both men and women—including that her reproductive organs never fully differentiated between typical male and typical female anatomy, resulting in underdeveloped male reproductive organs. The government's attempt to categorize her as male because she was born with *some* male biological characteristics, despite the fact that she was *also* born with female biological characteristics, is irrational and unreasonable. The government cannot ignore its constitutional and APA obligations by simply assuming away science and, with it, the existence of an entire class of Americans.

1

*Second*, the government repeatedly mischaracterizes Ms. Jansen's claims. In the hopes of latching onto an emergency-docket stay order issued in a different case brought by different plaintiffs asserting different claims on a different record, the government mischaracterizes this case as one about the desire to "self-select" a sex designation based on "gender identity." *See Trump v. Orr*, 146 S. Ct. 44 (2025). But the Supreme Court did not consider claims about intersex people, so its stay order has no bearing on Ms. Jansen's distinct claims and arguments.

*Third*, the government mischaracterizes and downplays the harmful impact of the Travel Document Policies. The government does not dispute that Ms. Jansen risks severe harm if she uses federal identification documents with an inaccurate sex designation. Nor does it dispute that Ms. Jansen risks perjury if she truthfully identifies herself as female on her passport and Global Entry forms, rather than perjuring herself. Instead, the government takes the incredible position that any harm is self-imposed—that if Ms. Jansen does not want to find herself in danger, she can simply not use her Global Entry card, and that if she wants to avoid a perjury prosecution, she can simply accede to the government's speech compulsion. That startling and unprecedented view of irreparable harm arising from unconstitutional and unlawful government action would foreclose injunctive relief in most cases. And unsurprisingly, it is not the law. The government cannot demand that Ms. Jansen change her behavior to avoid its discriminatory conduct.

## ARGUMENT

### I.    Ms. Jansen Is Likely to Succeed on the Merits.

#### A.    The Passport Policy and the Global Entry Policy violate the APA.

##### i.    *The narrow reviewability exception for presidential action does not apply.*

The government invokes *Franklin v. Massachusetts*, 505 U.S. 788 (1992), in an attempt to skirt judicial review. Opp. 11. To be clear, this argument (even if accepted) would apply *only* to

Ms. Jansen's APA claims and not to her constitutional claims.  But either way, it is misguided. *Franklin* applies only to presidential action—and not to an agency's independent, discretionary decisions in implementing presidential action, which the government concedes occurred here.

The D.C. Circuit has "soundly rejected" the argument that a challenge to a regulation implementing an executive order is an unreviewable challenge to the executive order itself.  *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020) (citation omitted), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and* 2021 WL 1037866 (D.D.C. Feb. 19, 2021).  Instead, *Franklin* shields presidential action from review only when "the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties."  *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993); *see* Mot. 17.

That is not the case here.  The government concedes (at 13) that the State Department exercised "independent discretion" in implementing Executive Order 14168.  That independent discretion included departing from the Executive Order's definitions of male and female, determining what sources of evidence are relevant to assessing "sex at birth," and determining how to adjudicate "sex at birth" in light of "conflicting" information.  Mot. 18.  That independent discretion forecloses any argument that the President alone took the relevant "final step" of the agency action.  *Pub. Citizen*, 5 F.3d at 552.  Ms. Jansen's APA claims are based on the *agencies'* "independent" and "discretion[ary]" choices.  Opp. 13; *see* Mot. 18.  This District has twice held as much when reviewing the same Executive Order at issue here.  *See Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 138 (D.D.C. 2025); *Kingdom v. Trump*, 2025 WL 1568238, at *1 (D.D.C. June 3, 2025).  Indeed, the agencies' choice to move from "sex at conception" to "sex at birth" is the only way the government can now argue that Ms. Jansen falls within *either* definition of male or female—since she was born with both male and female sex chromosomes and therefore

3

did not "belong[], at conception, to the sex that produces" either "the small reproductive cell" *or* "the large reproductive cell." Exec. Order § 2. That is not ministerial agency action.

The government's reliance on *Detroit Int'l Bridge Co. v. Gov. of Canada*, 189 F. Supp. 3d 85, 102 (D.D.C. 2016), *aff'd on other grounds*, 875 F.3d 1132 (D.C. Cir. 2017), and its predecessor cases is misplaced. These cases at most hold that purely "ministerial implementation of presidential action" is unreviewable. *Gomez*, 485 F. Supp. 3d at 178 (discussing *Detroit Int'l Bridge Co.*); *see also Milligan v. Pompeo*, 502 F. Supp. 3d 302, 314 (D.D.C. 2020) (same); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143 (D.D.C. 2021) (same).[1] Here, the Policies "are in no sense a ministerial implementation of presidential action." *Gomez*, 485 F. Supp. 3d at 178. The agencies had discretion and exercised that discretion. *See* Mot. 17–18; *supra* pp. 3–4.

That the President may have exercised discretionary authority under the Passport Act or Article II in issuing the Executive Order does not shield the agencies' subsequent actions from APA review. *See* Opp. 13.[2] The question is not the source of the President's authority to direct the agency, but rather the scope of the *agency's* discretionary authority. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (*Franklin* was "premised on the observation that the [challenged agency] report [to the President] carried 'no direct consequences' and served 'more like a tentative recommendation than a final and binding determination'" (citation omitted)). In other words, the question is whether (a) the President retains control over the "final step," *Pub. Citizen*, 5 F.3d at 552, or (b) that control has been "delegated to an agency head but directed by the President." Elena

---

[1] *Detroit* relied on and echoed the same reasoning in the government's two other cited cases. *See* Opp. 12 (citing *NRDC v. Dep't of State*, 658 F. Supp. 2d 105 (D.D.C. 2009), and *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18 (D.D.C. 2001), *aff'd on other grounds*, 306 F.3d 1138 (D.C. Cir. 2002)).

[2] The Executive Order does not even mention the Passport Act or Article II; it relies only on 5 U.S.C. § 7301, which grants the President authority to "prescribe regulations for the conduct of employees in the executive branch." Exec. Order. Regardless, as explained, the State Department has its own discretionary authority to promulgate rules for the issuance of passports. *See* Mot. 6.

Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001).  If the latter, then "the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern."  *Id*.  Here, the President has indeed "stepped into the shoes" of the agencies by directing them to "implement changes" to government identification documents to "accurately reflect the holder's sex," as defined in the Executive Order.  Exec. Order § 3(d).  That left the agencies with "independent discretion" in choosing *how* to implement—as the government concedes.  Opp. 13.  Indeed, courts have regularly found agency action reviewable despite the fact that it implements a presidential directive—including presidential directives issued pursuant to *presidential* statutory and constitutional authority.[3]

### ii.  The Policies are arbitrary and capricious.

When an agency exercises discretion, it must comply with the APA.  *See* Mot. 21.  The State Department and CBP failed so spectacularly in adhering to their APA obligations that the government's defense on this point is largely to parrot their APA reviewability arguments.  Those arguments fare no better the second time around.

First, the President's rulemaking authority under the Passport Act does not absolve the agencies of their APA obligations.  *Cf.* Opp. 14.  As explained, the State Department concededly exercised "independent discretion" in implementing the Executive Order, including in how it chose to define "male" and "female."  *Id.* at 13.  It is those discretionary decisions Ms. Jansen challenges.

Second, the Supreme Court's emergency-docket order in *Orr*, 146 S. Ct. 44, is inapposite for the same reason.  Ms. Jansen does not challenge the State Department's choice not to "depart

---

[3] *See Tate*, 513 F. Supp. 3d at 143; *Milligan*, 502 F. Supp. 3d at 312–14; *Gomez*, 485 F. Supp. 3d at 177; *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 468–69 (D.D.C. 2020); *Ruhumuriza v. Higgins*, 2026 WL 587636, at *9 (D.D.C. Mar. 3, 2026); *O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019); *Kingdom*, 2025 WL 1568238, at *10; *Drs. for Am.*, 793 F. Supp. 3d at 138.

from Presidential rules that Congress expressly required it to follow." *Id.* at 46 (citation omitted). Rather, she challenges the independent, discretionary choices related to intersex people that the agencies made in implementing those rules. Those choices were not "obvious" or "mandatory." Opp. 15. In any event, the *Orr* plaintiffs did not present claims that the government "entirely failed to consider" intersex people or the reliance interests of intersex people (Mot. 18–21) because the plaintiffs there did not allege they were intersex. The Supreme Court's preliminary assessment of claims focused solely on gender identity—distinct from Ms. Jansen's claims here.

Finally, the government asserts (at 16) that the APA is satisfied because the Executive Order is rational. But the APA imposes specific obligations distinct from mere rationality. *See* Mot. 18. In any event, the government does not even attempt to dispute that both the Executive Order *and* the agencies ignored intersex people entirely, *id*. at 19, 22–24, failed to consider the longstanding reliance interests of intersex people, *id.* at 20, and failed to consider less restrictive alternatives, such as an exception for intersex people, *id.* at 21. These failures cannot now be rectified through post hoc rationalizations. *See Grace v. Barr*, 965 F.3d 883, 903 (D.C. Cir. 2020).

The failure to consider reliance interests is particularly problematic given the sudden change to over thirty years of agency policy and practice. The government addresses reliance interest only in a footnote, claiming (at 15) that Ms. Jansen failed to "adequately articulate any." That is nonsense. Ms. Jansen's motion and declaration addressed *at length* her reliance interests from an uninterrupted thirty-year history of maintaining federal identification documents that reflect her accurate sex designation, including that these documents are consistent with her state identification documents, that she is listed as the "mother" on her children's birth certificates, and that she has traveled internationally freely and without fear of persecution because those federal travel documents match her appearance and identity. *See* Mot. 20–21. It is hard to fathom a case

with stronger reliance interests on the government's *decades* of consistent policy and practice. *See*

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

    **B.**    **The Travel Document Policies violate Ms. Jansen's Fifth Amendment right to equal protection.**

    *i.*    *The Travel Document Policies are fundamentally irrational.*

The government's primary equal protection argument is to distort Ms. Jansen's claim—to suggest that she is merely challenging the government's use of "biological sex" markers over an applicant's "self-select[ed]" "gender identity." Opp. 22–23. That may have been the *Orr* plaintiffs' challenge, but it is not Ms. Jansen's. Instead, her Complaint and motion confirm that she challenges the Policies as discriminating against intersex people. *See* Mot. 25–27. Those claims are subject to heightened scrutiny, as explained below, but even if rational-basis review applied, the Travel Document Policies are fundamentally irrational with respect to intersex people.

At the outset, the government's insistence (at 24) that Ms. Jansen is male because she was born with "a male reproductive system," *id*., is circular. Latching onto HHS guidance, the government defines a "male reproductive system" as a system with the "function of producing" sperm. *Id*. at 23 (citing HHS, *Defining Sex* (Feb. 19, 2025), https://perma.cc/4J3A-TBU5). The government does not explain what it means to have the "function of producing" sperm, except that it does *not* require the literal ability to produce sperm. *See id.* But if "function" does not require literal ability, then the operative criterion has shifted from "function of producing . . . sperm" to "outwardly resembles the structures associated with male." And a physical-resemblance criterion has zero scientific application to intersex people. *See* Mot. 25–26.

As explained, intersex people can present with a variety of atypical biological traits. That includes sex chromosomes typically associated as male but genitals associated as female, *see* Kaufman Decl. ¶ 20; sex chromosomes typically associated as female, and a uterus and ovaries,

but external genitals associated as male, *id.*; sex chromosomes that are *both* male and female, along with *both* ovarian and testicular tissue, *id.* ¶ 78; or, as in Ms. Jansen's case, sex chromosomes that are *both* male and female, along with *underdeveloped* male reproductive organs (*i.e.*, organs that never fully differentiated between male and female and thus have biological characteristics of both), *see id.* ¶¶ 18–20, 78; Jansen Decl. ¶ 8.  Defining "biological sex" with reference to one trait in isolation (the outward physical appearance of reproductive organs), while ignoring the overall picture of one's biological, genetic makeup, is quintessentially irrational.  And it has absurd results for intersex people.  *See* Kaufman Decl. ¶¶ 77–79 (HHS guidance necessarily classifies some intersex people as both sexes or neither sex).

The government's "place of birth" analogy (at 19, 22–23) again responds to an argument Ms. Jansen does not make.  The government compares sex to "immutable facts" like "a person's date or place of birth," which cannot be "self-select[ed]."  *Id.*  But Ms. Jansen does not dispute that sex is immutable: she has always had mosaicism, she has always had both male and female sex chromosomes, and she always will.  She was, however, incorrectly assigned as male at birth due to that mosaicism.  *See* Mot. 29–30; Kaufman Decl. ¶ 21.  Properly applying the government's "place of birth" analogy here, it would be as if Ms. Jansen were born in Richmond, and her birth certificate mistakenly indicated that she was born in Raleigh but was later corrected to say Richmond.  Certainly, it would be a "historical fact" that her birth certificate once said Raleigh.  Opp. 17.  But that "historical fact" would be inaccurate.  And it cannot be true that the government has any rational interest in displaying inaccurate information on identification documents.[4]

Finally, the government suggests (at 22–23) that the Policies further a vague "interest in

---

[4] The "place of birth" analogy is also inapposite because no evidence suggests that a birthplace designation leads to increased harm.  *See* Kaufman Decl. ¶¶ 67–71.

8

uniformity" in defining sex across the federal government. The government's insistence that Ms. Jansen may retain her current passport (which correctly identifies her as a woman) for the next six years, but must use a Global Entry card that would incorrectly identify her as a male, makes this justification nonsensical. In any event, refusing to provide an exemption for intersex people *undermines* uniformity. It means that sex designations for intersex people are based on whether their intersex condition was caught at birth and how medical professionals and parents reacted at that time. *See* Kaufman Decl. ¶ 21. That is not "[b]iological [t]ruth"; it is chance. Exec. Order. And forcing Ms. Jansen to use a male sex designation on her passport and Global Entry card will render them inconsistent with her state identification documents, which carry a female sex designation. *See* Mot. 5. Even assuming the government has an unexplained interest in "uniformity," the Policies' erasure of intersex people has no rational connection to that interest. Notably, the government does not argue that the Policies are rationally connected to any interest in identifying people based on physical appearance, nor could it. As Ms. Jansen lives as a woman, *see* Mot. 5–6, the Policies directly undermine any interest in appearance-based identification.

### ii. The Travel Document Policies unconstitutionally discriminate based on sex.

The Policies discriminate based on sex because they define women with reference to "overbroad generalizations about the differences between men and women." *United States v. Skrmetti*, 605 U.S. 495, 510 (2025) (citing *Sessions v. Morales-Santana*, 582 U.S. 47, 62 (2017)). They are premised on the unscientific notion that all women "belong[], at conception, to the sex that produces the large reproductive cell," Exec. Order § 2(d), or are, "at birth," Stufft PPT Memo at 1–2, ECF No. 66-9, "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)," HHS, *Defining Sex*, *supra*, at 7.

The government brushes past this argument (at 18–19), arguing that the Policies are saved

9

because they "appl[y] equally to each sex" by "defining sex for everyone in terms of biology over identity." But Ms. Jansen does not seek to "self-select" a sex designation based on her "gender identity": she merely seeks recognition of her biology. The government ignores that the Policies' various definitions of "female" are unscientific, "overbroad generalizations" that wield "sex" as a weapon to exclude women like Ms. Jansen. *Skrmetti*, 605 U.S. at 510 (citing *Morales-Santana*, 582 U.S. at 62). Those definitions are no less discriminatory simply because the Policies' definitions of "male" are also exclusionary to men. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 131, 146 (1994) (equal protection violation where challenged practice applied equally to both sexes); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020) ("Nor is it a defense [under Title VII] for an employer to say it discriminates against both men and women because of sex.").[5]

### iii. The Travel Document Policies unconstitutionally discriminate based on intersex status.

Had Ms. Jansen not been born with mosaicism—had she been born with only typical female biological characteristics—she would be able to obtain federal identification documents reflecting her correct, lived sex. That is undisputed. Yet the government, once again, simply ignores that intersex people like Ms. Jansen have atypical biology. Instead, it accuses Ms. Jansen of seeking "preferential treatment" for her "gender identity." Opp. 19–20. But Ms. Jansen seeks only the same treatment she would be given if she had not been born with mosaicism. That is not "preferential treatment"—it is equal treatment.

Although the Policies fail any level of scrutiny, intersex people are a quasi-suspect class and thus are entitled to heightened scrutiny. *See* Mot. 28–31. Contrary to the government's

---

[5] *See also Loving v. Virginia*, 388 U.S. 1, 8 (1967) ("reject[ing] the notion that the mere 'equal application' of a statute containing racial classifications is enough"); *McLaughlin v. Florida*, 379 U.S. 184, 191 (1964) (review "does not end with a showing of equal application," but requires inquiry into "whether the classifications drawn in a statute are reasonable in light of its purpose").

dramatic pronouncement (at 20), the Supreme Court has not discredited the test for quasi-suspect classes. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (applying the test); *cf. Skrmetti*, 605 U.S. at 517 (declining to apply test solely because the case did "not raise that question"). And courts of appeals have recognized new suspect classes where appropriate—as is the case here.[6]

The government can defend against that well-established test only by ignoring basic science and history. First, the government's suggestion (at 20) that intersex people are not a discrete group defined by immutable characteristics is contrary to the defining feature of intersex people: people *who are born with* biological characteristics that do not fit the typical binary definitions of "male" and "female." *See* Mot. 29. The mere fact that some intersex conditions are not always medically recognized at the moment of birth does not make them any less immutable. *Cf.* Opp. 20. Indeed, contrary to the government's suggestion (at 20), Ms. Jansen's mosaicism is a chromosomal condition that has defined her biology since the moment of her conception. The government cannot change her biology simply by parroting the phrase "gender identity." Similarly, variations in intersex conditions do not make the fundamental shared characteristics of intersex people any less distinct or consistent. *Cf. id*. at 20–21.

The government rightfully does not argue that intersex people have not suffered discrimination generally. *See* Mot. 29–31. And the government's suggestion (at 21) that intersex people have not suffered *de jure* discrimination ignores the lengthy evidence Ms. Jansen provided on that exact point. *See* Mot. 30–31. In any event, courts in this District considering the existence of a quasi-suspect class do not limit the inquiry to *de jure* discrimination.[7] Even the Solicitor

---

[6] *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 613 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013).

[7] *See, e.g., Doe 1 v. Trump*, 275 F. Supp. 3d 167, 208–09 (D.D.C. 2017), *vacated on other grounds*, 755 F. App'x 19 (D.C. Cir. 2019); *Talbott v. United States*, 775 F. Supp. 3d 283, 319–20 (D.D.C.

General in *Skrmetti* conceded that this prong does "not turn on 'discrimination . . . reflected in the laws.'" 605 U.S. at 553–54 (Barrett, J., concurring) (citation omitted).

The same is true of the government's argument regarding political power: courts do not limit that inquiry to the historical ability to vote, and the government cites no binding law supporting their narrow view. *See, e.g.*, *Doe 1*, 275 F. Supp. 3d at 209; *Talbott*, 775 F. Supp. 3d at 321–22. Indeed, limiting the inquiry to historical voting power would be redundant of the discrimination prong and inconsistent with the Supreme Court's guidance that "political[] powerless[ness]" refers to the "ability to attract the attention of the lawmakers." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445 (1985); *see also Lyng*, 477 U.S. at 638 ("a minority or politically powerless"); *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987) ("relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process" (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973))).

## C.    The Government Fails to Rebut Ms. Jansen's Compelled Speech Challenge.

The government-speech doctrine is not a defense to compelled speech, and the government does not otherwise substantively address Ms. Jansen's compelled-speech argument. The government does not dispute three of the four elements of a compelled-speech claim: the Policies are (1) speech (2) to which Ms. Jansen objects (3) that is compelled. And while it raises objections that go to the fourth element—whether the travel documents are readily associated with Ms. Jansen—those objections are baseless and misapply the law.

First, the Supreme Court "has never held that government speech is a defense to a compelled speech claim." *Va. State Conf. NAACP v. Cnty. Sch. Bd. of Shenandoah Cnty.*, 799 F. Supp. 3d 515, 533 (W.D. Va. 2025). In fact, "the Supreme Court has expressly stated that

2025), *stayed on other grounds*, 2025 WL 3533344 (D.C. Cir. Dec. 9, 2025).

12

compelled speech is a limit on government speech doctrine"—and in contrast, "no decision holds the reverse to be true." *Id.* at 536. The government's own cited cases recognize this principle: "the Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015); *see also Shurtleff v. City of Bos.*, 596 U.S. 243, 269 (2022) (Alito, J., concurring) ("[G]overnment speech in the literal sense is not exempt from First Amendment attack if it uses a means that restricts private expression in a way that 'abridges' the freedom of speech, as is the case with compelled speech.").

The government thus cannot justify compelling Ms. Jansen to convey a message through her identification documents simply because they may also be government speech. Just as the government could not force its citizens to display license plates with an ideological state motto in *Wooley v. Maynard*, the government cannot force Ms. Jansen to carry identification documents with an ideological message denying her existence. 430 U.S. 705, 707, 717 (1977); *see also Cressman v. Thompson*, 798 F.3d 938, 948 (10th Cir. 2015) ("[r]egardless of whether [it] is the government's message, private First Amendment rights can still be significantly implicated because state-issued standard license plates are 'readily associated' with vehicle owners").

Indeed, "the fact that the government is the ultimate source of any speech at issue helps rather than hinders [Ms. Jansen's] First Amendment claim." *Va. State Conf.*, 799 F. Supp. 3d. at 533. Otherwise, "the government [could] select[] a message that its citizens must affirm." *Id.* at 535; *see also Matal v. Tam*, 582 U.S. 218, 235 (2017) ("the government-speech doctrine . . . is susceptible to dangerous misuse"); *Shurtleff*, 596 U.S. at 269 (Alito, J., concurring). If that were the case, the government could compel an individual to carry any controversial message under the guise of government speech—for example, by adding partisanship designations to IDs, the

13

government could brand its critics as "communists," "fascists," "lunatics," or the like, and there would be no recourse for holders under the First Amendment. But that is not the law. *See, e.g., Minnesota Voters All. v. City of Saint Paul*, 442 F. Supp. 3d 1109, 1116–17 (D. Minn. 2020).

Second, the sex designations on Ms. Jansen's passport and Global Entry card are readily associated with her. *See* Mot. 34. The mere fact that a passport is a "political document" issued and owned by the federal government, Opp. 24, has no bearing on whether the document is readily associated with its holder, *see Wooley*, 430 U.S. at 707, 717, and again conflates the compelled-speech and government-speech doctrines.[8] Identification documents "are meant to convey substantive personal information about their holders." *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1326 (M.D. Ala. 2019). Because they are "chock-full" of personal information, people associate their contents with the holder. *Id.* That personal information is compiled and provided *by the holder* through their application forms. When the holder presents their identification card, the public understands the holder to be representing that the information is accurate. *See Cressman*, 798 F.3d at 949 (license plate is "closely linked" with holder). Where there is a mismatch between the identification and the holder, the public's suspicions are directed at the holder—not the government. That is especially true for intersex and transgender individuals, who face heightened scrutiny (even from the government) when their documents do not match their sex presentation. *See* Kaufman Decl. ¶ 85. Even the holders themselves perceive the documents as being a statement of self—not just one government talking to another. *See id.* ¶¶ 54, 89 (individuals endure psychological harm from incongruent documents). Thus, when the government compels holders to self-identify a certain way on applications (on penalty of perjury), and subsequently bear that

---

[8] Like the other Supreme Court cases cited by the government, *Haig v. Agee*, 453 U.S. 280, 283 (1981), did not address compelled speech; it concerned the Executive's authority to revoke a passport where a former CIA operative exposed CIA officers and agents abroad.

14

compelled self-identification on identification cards, the government compels holders to speak.

The government fails to identify any controlling precedent to support its position. It instead turns to *Fowler v. Stitt*, 676 F. Supp. 3d 1094, 1105–08 (N.D. Okla. 2023), *aff'd in part on other grounds, rev'd in part on other grounds*, 104 F.4th 770 (10th Cir. 2024), *vacated on other grounds*, 145 S. Ct. 2840 (2025) and dictum from *Doe v. Kerry*, 2016 WL 5339804 (N.D. Cal. Sept. 23, 2016) (dismissing for lack of standing and ripeness). But the reasoning of both cases—that a statement of fact cannot be compelled speech—has already been rejected by the Supreme Court and the D.C. Circuit. *See Hurley v. Irish-Am. Gay, Lesbian, Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (First Amendment protections apply "equally to statements of fact the speaker would rather avoid"); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 782 (1988) ("a distinction cannot be drawn between compelled statements of opinion and . . . of 'fact'"); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 554 (D.C. Cir. 2015) ("That a disclosure is factual, standing alone, does not immunize it from scrutiny[.]"); *see also Nelson v. Landry*, 714 F. Supp. 3d 790, 803–04 (M.D. La. 2024) (rejecting *Doe*'s reasoning based on *Riley*); *Cressman*, 798 F.3d at 964 (the "disagreement . . . need not be ideological"). Even if the reasoning were applicable, the government fails to engage with the evidence that the sex designation on Ms. Jansen's documents is ideological speech. *See, e.g.*, Kaufman Decl. ¶¶ 44–53. Nor could it dispute that evidence. *See* Mot. 33–34. The record establishes compelled speech, and so strict scrutiny applies. *See id.* at 34–35. The government does not even try to argue the Policies satisfy that high bar.

### D.       The Travel Document Policies violate Ms. Jansen's Fifth Amendment right to substantive due process.

The government does not dispute that, should this Court recognize a fundamental right to informational privacy, the Policies violate that right. Instead, the government attempts (at 27) to sanitize the question down to whether there is a fundamental right to "self-select a sex marker."

But that writes out the very information that Ms. Jansen seeks to keep private. Ms. Jansen's due process claim does not concern her sex marker in isolation. Rather, it concerns the intimate personal information about her body and sex that the sex marker necessarily discloses. That disclosure could be catastrophic for Ms. Jansen: discrimination and sexual assault in the United States, and persecution and even death in other countries. *See* Mot. 40–42. The Travel Document Policies thus do not violate Ms. Jansen's right to "self-select a sex marker"—they violate her right to keep intimate, stigmatic details about her body to herself.

The government's sanitization attempt also defies courts' treatment of the right to informational privacy as a right in and of itself. *See* Mot. 36 n.7. As multiple courts have held, a government policy forcing the disclosure of transgender status violates this fundamental right. *See id.* at 37 n.8. The government primarily relies (at 26–27) on the Sixth Circuit's decision in *Gore v. Lee*, yet *Gore* placed the Sixth Circuit in the significant minority of circuits in holding that "the Constitution does not create a general right of privacy." 107 F.4th 548, 563 (2024).

The government's focus on *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), is similarly misplaced. Ms. Jansen does not seek recognition of a *new* right "to self-select a sex marker," Opp. 27, but only the well-recognized right to informational privacy. That right is fundamental for all the same reasons that nearly every other court of appeals has recognized it (many of which long predated *Glucksberg* itself). *See, e.g.*, Mot. 36 n.7. Indeed, "for nearly 100 years," the Supreme Court has suggested that the Constitution protects some form of informational privacy. *Aid for Women v. Foulston*, 441 F.3d 1101, 1116 (10th Cir. 2006); *see Whalen v. Roe*, 429 U.S. 589, 599 n.25 (1977) (collecting cases); *Griswold v. Connecticut*, 381 U.S. 479, 483 (1965) ("[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion."); *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting) ("the

16

right to be let alone" is "the most comprehensive of rights and the right most valued by civilized men"). Especially given the nature of the information at stake—information about Ms. Jansen's body and sex—the Policies violate Ms. Jansen's fundamental right to informational privacy.

## II.    Absent an Injunction, Ms. Jansen Will Suffer Imminent Irreparable Harm.

The government does not dispute that, should Ms. Jansen be forced to carry identification documents with male sex designations, she would be subject to severe and irreparable physical and psychological harm. *See* Mot. 38–42. The government simply argues that these harms are not sufficiently imminent, but it is wrong.

First, the government contends (at 8) that Ms. Jansen is at no imminent risk of harm from the Global Entry Policy simply because the program is voluntary and she need only carry the card for certain participation purposes. In other words, Ms. Jansen can give up the card, or her dignity and constitutional rights. This reasoning misses the mark in a number of ways. The Global Entry card itself is a benefit. It is intended to be used as a benefit. *See, e.g.*, TSA, *Acceptable Identification at the TSA Checkpoint*, https://perma.cc/BF7G-9L3R; Mot. 14. And it is undisputed that Ms. Jansen frequently uses it as her primary form of identification (in part due to safety and privacy concerns) and almost always for TSA identification purposes. *See* Jansen Decl. ¶ 31; *see also* Suppl. Jansen Decl. ¶¶ 4–5. The government cannot deny a benefit on a discriminatory basis—even if Ms. Jansen has no inherent "right" to the benefit. *See Autor v. Pritzker*, 740 F.3d 176, 181–83 (D.C. Cir. 2014). Moreover, this puts Ms. Jansen to a Hobson's choice: suffer the indignity of losing access to this benefit because she refused to be labeled as something she is not, or the indignity of being outed and branded as male, and the undisputed physical and psychological harms associated with incongruent identification documents. *See* Kaufman Decl. ¶¶ 12–13, 25–43, 53–62, 83–98; Jansen Decl. ¶¶ 30–31; *Singh v. Berger*, 56 F.4th 88, 110 (D.C. Cir. 2022)

17

(irreparable harm where plaintiffs forced to choose between religious beliefs and military service).

Second, the government's own actions confirm that Ms. Jansen faces irreparable harm related to her passport. The government does not dispute that, were her passport to be replaced, it would bear a male sex designation. And the risk that the government will suspend or revoke Ms. Jansen's passport for having "a sex other than [her] sex at birth" is not speculative. State Dep't, *Sex Marker in Passports*, https://perma.cc/VC9E-BQ5T ("All passports are valid for travel until they expire, are replaced by the applicant, or are *invalidated* pursuant to federal regulations." (emphasis added)); 22 C.F.R. § 51.62(a)(2) (government "may revoke or limit a passport when" it was "illegally, fraudulently or erroneously obtained"); *see also* Mot. 40. Despite the government's passing suggestion that Ms. Jansen's "passport will 'remain valid until [its] date of expiration,'" Opp. 9 (citing Stufft Rec. at 2, ECF No. 66-8), it has made contrary statements in *Orr v. Trump* indicating intent to revoke passports issued pursuant to the preliminary injunction in that case.[9]

Third, the government's response to Ms. Jansen's stated risk of perjury only reinforces her concern. *See* Mot. 39–40. The government suggests that Ms. Jansen will not be prosecuted for perjury only so long as she "provides information consistent with the Executive Order's definition of sex in an application to renew Global Entry membership." Opp. 9. It is silent as to what would happen if Ms. Jansen submits a truthful application affirming that she is female. *See* Mot. 39. In an age where the government has targeted college students, comedians, law firms, and former military officers for their speech, the government's reassurance is cold comfort—particularly because it applies only if she lies on a government form. *See* Mot. 31 (citing historical over-

---

[9] *See, e.g.*, Appellants' Br. at 24, *Orr v. Trump*, No. 25-1579 (1st Cir. July 18, 2025); *id.*, Ex. 9 ¶ 12; *see also, e.g.*, Matthew Lee, *AP Report: Americans Who Owe Significant Child Support Will Have Their U.S. Passports Revoked*, PBS News (May 7, 2026), https://perma.cc/5MYQ-KVHU (State Department will enforce 1996 law to revoke passports for parents delinquent in child support payments).

18

policing and over-prosecution of transgender people); *id.* at 41 (citing examples of transgender people accused of fraud because identification documents did not match sex presentation). Because Ms. Jansen is "at risk of being subject to criminal penalties" under the challenged actions, she is "likely to suffer irreparable injury and [] this factor weighs in favor of granting injunctive relief." *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1045 (D. Idaho 2025).

Finally, the government's argument that Ms. Jansen will not suffer constitutional harm ignores the fundamental facts of this case. *See* Mot. 42–43. Her First Amendment harm manifests as soon as the government compels her to convey the government's message by using identification documents with an incorrect sex designation. *See R.J. Reynolds Tobacco Co. v. FDA*, 823 F. Supp. 2d 36, 51 (D.D.C. 2011) (finding irreparable harm in "residual effect of unconstitutionally compelled commercial speech"), *vacated on other grounds*, 696 F.3d 1205 (D.C. Cir. 2012); *see also MediNatura, Inc. v. FDA*, 2021 WL 1025835, at *6 (D.D.C. Mar. 16, 2021); *Wooley*, 430 U.S. at 709, 717 (affirming injunction for compelled speech claim). Similarly, she suffers harm to her Fifth Amendment right to equal protection as soon as she is irrationally and discriminatorily forced to assume identification documents with an incorrect sex designation. *See DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 292 (D.D.C. 2012) (finding deprivation of equal protection constitutes irreparable harm). And her Fifth Amendment right to due process is harmed as soon as she is forced to disclose intimate secrets about her body and her sex by using those identification documents. *See NE Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (just like "chilled free speech," "invasions of privacy, because of their intangible nature" are irreparable). These harms are imminent and irreparable. "It is well established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Susman Godfrey LLP v.*

19

*Exec. Off. of President*, 789 F. Supp. 3d 15, 56 (D.D.C. 2025) (citation and internal quotations omitted), *appeal docketed*, No. 25-5310 (D.C. Cir. Aug. 26, 2025).

These harms are also entirely consistent with *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006). Ms. Jansen must show only that her "First Amendment interests are either threatened or in fact being impaired," *id.* at 301, which she has done. *See* Mot. 38–42; *supra* pp. 12–15. The government's argument that *Chaplaincy* or *Ayele v. District of Columbia*, 704 F. Supp. 3d 231 (D.D.C. 2023), dictates a different outcome, is contrary to binding D.C. Circuit authority, *see, e.g.*, Mot. 42–43 (quoting *Karem v. Trump*, 960 F.3d 656, 667–68 (D.C. Cir. 2020)), and has already been rejected by other courts in this District. *See, e.g.*, *Advance Am. v. FDIC*, 2017 WL 2672741, at *10 (D.D.C. Feb. 23, 2017); *Kelly v. Hegseth*, 2026 WL 391777, at *12 (D.D.C. Feb. 12, 2026), *appeal docketed*, No. 26-5070 (D.C. Cir. Feb. 27, 2026).

### III.    The Government Exaggerates Its Potential Harms.

The government emphasizes potential harms from a "class-wide preliminary injunction." Opp. 27. But Ms. Jansen is not seeking class-wide relief. She asks only that her personal sex designation remain as it has been for the last three decades while this litigation unfolds. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (injunctions are meant to preserve "last *uncontested* status"). In any event, "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Susman Godfrey*, 789 F. Supp. 3d at 57 (citation omitted). Ms. Jansen's request, at most, presents "'[m]ere administrative inconvenience,'" which "'can never justify denial' of a constitutional or civil right." *Does v. Dist. of Columbia*, 374 F. Supp. 2d 107, 118 (D.D.C. 2005).

### CONCLUSION

Ms. Jansen respectfully requests that the Court grant her request for a preliminary injunction.

20

Dated: May 22, 2026

Respectfully submitted,


*/s/  Jaime A. Santos*
Jaime A. Santos (#1047905)
Cassandra M. Snyder (#1671667)
Kylie E. Burke (#90040140)
GOODWIN PROCTER, LLP
1900 N Street, N.W. Washington, DC 20036
Tel.: (202) 346-4000
Fax: (202) 246-4444
JSantos@goodwinlaw.com
CassandraSnyder@goodwinlaw.com
KylieBurke@goodwinlaw.com

Louis Lobel (*pro hac vice*)
Andrea S. Goodman (*pro hac vice*)
GOODWIN PROCTER, LLP
100 Northern Avenue
Boston, MA 02210
Tel.:  (617) 570-1000
Fax:  (617) 523-1231
LLobel@goodwinlaw.com
AndiGoodman@goodwinlaw.com

Timothy James Beavers (*pro hac vice*)
GOODWIN PROCTER, LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.:  (212) 459-7208
Fax:  (212) 355-3333
TBeavers@goodwinlaw.com

*Counsel for Plaintiff*

21