UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANA JANSEN,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP,<br>President of the United States, et al.<br><br>Defendants. | Civil Action No. 1:25-cv-2961-LLA |

**DEFENDANTS' MOTION TO DISMISS
AND MEMORANDUM IN SUPPORT THEREOF**

## TABLE OF CONTENTS

Page

Table of Authorities ..... ii

Background ..... 2

A. Legal Background ..... 2

B. Plaintiff's Allegations and Procedural History ..... 5

Legal Standard ..... 8

Argument ..... 9

I. Plaintiff's APA claim fails both because it challenges a nonreviewable presidential action and because the Executive Order is not arbitrary and capricious. ..... 9

A. The Executive Order is not reviewable under the APA. ..... 9

B. The Executive Order's biological-sex requirement is not arbitrary and capricious. ..... 13

II. The constitutional claims fail because strict scrutiny is not triggered, and the Executive Order passes any required rational-basis review. ..... 17

A. The Executive Order complies with equal protection ..... 17

B. The Executive Order does not compel private speech, only government speech ..... 22

C. The Executive Order does not violate any fundamental constitutional right. ..... 23

III. The Court should excuse the need to file an administrative record. ..... 25

Conclusion ..... 25

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Albright v. Oliver*,
510 U.S. 266 (1994) ........ 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 8

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322–27 (D.C. Cir. 1996) ........ 12, 13

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
473 U.S. 432 (1985) ........ 22

*Collins v. City of Harker Heights*,
503 U.S. 115 (1992) ........ 24

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ........ 12

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ........ 24

*Doe v. Kerry,*
No. 16- 0654-PJH, 2016 WL 5339804 (N.D. Cal. Sept. 23, 2016) ........ 23

*Drs. for Am. v. Off. of Pers. Mgmt.*,
793 F. Supp. 3d 112 (D.D.C. 2025) ........ 11

*Executive Order. Heller v. Doe ex rel. Doe*,
509 U.S. 312 (1993) ........ 22

*Executive Order. Nat. Res. Def. Council, Inc. v. Dep't of State*,
658 F. Supp. 2d 105 (D.D.C. 2009) ........ 10-11, 12

*Fowler v. Stitt*,
676 F. Supp. 3d 1094–08 (N.D. Okla. 2023) ........ 23

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........ 9, 10, 13

*Gomez v. Trump*,
485 F. Supp. 3d 145 (D.D.C. 2020) ........ 10, 11-12

*Gore v. Lee*,
107 F.4th 548 (6th Cir. 2024) ........ 24

*Haig v. Agee*,
453 U.S. 280 (1981) ........ 2, 3, 12, 23

*Hettinga v. United States*,
677 F.3d 471 (D.C. Cir. 2012) ........ 8

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
928 F.3d 42 (D.C. Cir. 2019) ........ 24

*Michael M. v. Superior Court*,
450 U.S. 464 (1981) ........ 17, 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 14

*Nguyen v. INS*,
533 U.S. 53 (2001) ........ 17, 18

*Papasan v. Allain*,
478 U.S. 265 (1986) ........ 8, 9

*Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs., No. 25-cv-2453*
No. 25-cv-2453 (BAH), 2025 WL 2840318 (D.D.C. Oct. 7, 2025) ........ 11

*Pleasant Grove City v. Summum*,
555 U.S. 460–68 (2009) ........ 22

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) ........ 23

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ........ 8

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) ........ 13

*Trump v. Orr*,
146 S. Ct. 44 (2025) ........ 1, 2, 13, 14, 17, 18, 19

*Tulare Cnty. v. Bush*,
185 F. Supp. 2d 18–29 (D.D.C. 2001) ........ 11, 12

*United States v. Carolene Products Co.*,
304 U.S. 144 (1938) ........ 21, 22

*United States v. Laub*,
385 U.S. 475 (1967) ........ 2

*United States v. Skrmetti*,
605 U.S. 495 (2025) ........ 15, 17, 18, 20, 21, 22

*United States v. Virginia*,
518 U.S. 515 (1996) .......... 21

*Urtetiqui v. D'Arcy*,
34 U.S. (9 Pet.) 692 (1835) .......... 2

*US Inventor, Inc. v. U.S. Pat. & Trademark Off., No. CV 22-2218*
No. 22-cv-2218 (JDB), 2023 WL 4488913 (D.D.C. July 12, 2023) .......... 25

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) .......... 22

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .......... 23-24, 24

*West Virginia v. B. P. J.*,
146 S. Ct. 2356 (2026) .......... 19. 20

**Statutes**

5 U.S.C. § 701(b)(1) .......... 9
5 U.S.C. § 704 .......... 9
5 U.S.C. § 706(2) .......... 9, 13
8 U.S.C. § 1185(b) .......... 2
8 U.S.C. § 1365b(k)(2) .......... 3
18 U.S.C. § 1543 .......... 23
22 U.S.C. § 211a .......... 2, 12, 13, 14

**Other**

8 C.F.R. § 235.12(a) .......... 3
22 C.F.R. § 51.7(a) .......... 3, 23
90 Fed. Reg. 8615 (Jan. 30, 2025) .......... 3, 4, 5, 6, 7, 8, 10, 11, 14, 15, 16, 18, 19, 22

*President." Elena Kagan, Presidential Administration*,
114 Harv. L. Rev. 2245 (2001) .......... 12

On Inauguration Day in 2025, the President issued an Executive Order requiring all federal identification documents to display the holder's biological sex as defined by certain immutable sexual characteristics. Plaintiff Jana Jansen's biological sex, as defined by the Order, is apparently male, but Jansen identifies as transgender and intersex and prefers to use a female sex marker on federal identification documents. Jansen claims that the Order's requirement to use biological sex on identification documents is arbitrary and capricious under the Administrative Procedure Act ("APA") and in violation of the Equal Protection Clause, Free Speech Clause, and Due Process Clause of the United States Constitution. Jansen seeks an order declaring the Executive Order's biological-sex requirement unlawful and enjoining the U.S. Department of State and U.S. Customs and Border Protection ("CBP") from using biological sex as defined by the Order to determine the sex marker on Jansen's passport and Global Entry card.

This action should be dismissed. The APA claims fail because that Act does not allow challenges to presidential actions like the biological-sex requirement set forth in the Executive Order. And agencies do not act arbitrarily when they simply follow the mandatory directives of an order by the President, which is what Jansen seeks to stop the Department of State and CBP from doing. The Supreme Court has endorsed this reasoning. In an analogous case challenging the biological-sex requirement for passports, the Court opined that the plaintiffs there were not likely to prevail in arguing that the State Department acted arbitrarily and capriciously by "declining to depart from Presidential rules that Congress expressly required it to follow." *Trump v. Orr*, 146 S. Ct. 44, 46 (2025). In any event, the Executive Order's biological-sex requirement is not arbitrary and capricious because it sensibly favors an immutable, biological definition of sex over more fluid concepts of gender identity for purposes of identification. And contrary to Jansen's

contentions, the government's biological-sex definitions duly account for persons who experience rare disorders of sexual development.

Plaintiff's constitutional claims also fail. Strict scrutiny is not triggered because the Executive Order's biological-sex requirement neither discriminates based on a suspect class (or any class), nor compels private speech (only the government's speech), nor implicates any fundamental constitutional right. The Supreme Court's decision in *Orr* is again instructive. The Court there explained that "[d]isplaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely attesting to a historical fact without subjecting anyone to differential treatment." *Id*. The Court also found that "the Government's choice to display biological sex" was not based on animus. *Id.* And the Executive Order easily passes any required rational-basis review for the same reason that it survives arbitrary-and-capricious review.

The Court should therefore grant this motion and dismiss the case.

## BACKGROUND

### A. Legal Background

#### 1. Passports

United States citizens generally require a United States passport to travel abroad. 8 U.S.C. § 1185(b). The Secretary of State issues passports "under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a; *see* Act of July 3, 1926, ch. 772, § 1, 44 Stat. 887, 887. A passport is a "political document" issued by the federal government and "addressed to foreign powers." *Haig v. Agee*, 453 U.S. 280, 292 (1981) (quoting *Urtetiqui v. D'Arcy*, 34 U.S. (9 Pet.) 692, 699 (1835)). Its purpose is to identify its bearer as a U.S. citizen and to "request foreign powers to allow the bearer to enter and to pass freely and safely." *United States v. Laub*, 385 U.S. 475, 481 (1967) (citation modified). A passport is thus an official

communication "by which the Government vouches for the bearer and for his conduct." *Agee*, 453 U.S. at 293. "A passport at all times remains the property of the United States." 22 C.F.R. § 51.7(a).

2. Global Entry

Global Entry is a "registered traveler program" administered by CBP, a subcomponent of the Department of Homeland Security. It is "designed to expedite the travel of previously screened and known travelers across the borders of the United States." 8 U.S.C. § 1365b(k)(2). The program uses "approved technology" including "biometrics" to "validate identity" and "perform enforcement queries" in order to process pre-approved travelers. 8 C.F.R. § 235.12(a).

Those enrolled in Global Entry may—but are not required to—obtain a Global Entry card. A Global Entry card "is not necessary . . . to continue using Global Entry [at] an airport." *Global Entry FAQ*, https://perma.cc/32PN-7D7L. In fact, Global Entry cards "are not accepted at Global Entry kiosks, which require passports or U.S. lawful permanent resident cards." *Id.* The Global Entry card is used only for expedited entry through dedicated express lanes coming into the United States from Canada and Mexico by land and for expedited entry at seaports. *Id.*

3. Executive Order 14168

On his Inauguration Day in 2025, President Donald Trump issued an executive order declaring it "the policy of the United States to recognize two sexes, male and female." Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism & Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), 90 Fed. Reg. 8615 (Jan. 30, 2025). The Order defines "'[s]ex'" as "an individual's immutable biological classification as either male or female." *Id.* at 8615. Thus, a "male" is someone "belonging, at conception, to the sex that produces the small reproductive cell." *Id.* And a "female" is someone "belonging, at conception, to the sex that produces the large reproductive cell." *Id.*

The Executive Order directs the Secretary of Health and Human Services to provide "clear guidance expanding on" these sex-based definitions. 90 Fed. Reg. at 8616. In response, the Department of Health and Human Services has published guidance specifying that a person is "either female or male based on whether the person is of the sex characterized by a reproductive system with the biological function of producing eggs (ova) or sperm." *Sex-Based Definitions*, https://perma.cc/JPB9-TJT9. The guidance provides that a "male" "is a person of the sex characterized by a reproductive system with the biological function of (at maturity, absent disruption or congenital anomaly) producing sperm" and a "female" "is a person of the sex characterized by a reproductive system with the biological function of (at maturity, absent disruption or congenital anomaly) producing eggs (ova)." *Id.*

The guidance acknowledges that having "the biological function" to produce eggs or sperm "does not require that eggs or sperm are ever produced" and that "[s]ome females or males may not or may no longer produce eggs or sperm due to factors such as age, congenital disorders or other developmental conditions, injury, or medical conditions that cause infertility." *Sex-Based Definitions*, https://perma.cc/JPB9-TJT9. It also notes that "disorders of sexual development do not constitute a third sex because these disorders do not lead to the production of a third gamete" other than eggs or sperm. *Id.* It likewise notes that "use of hormones or surgical interventions do not change a person's sex because such actions do not change the type of gamete that the person's reproductive system has the biological function to produce." *Id.*

The Executive Order distinguishes the "immutable biological reality of sex" from "the concept of 'gender identity.'" It describes the latter as reflecting "an internal, fluid, and subjective sense of self unmoored from biological facts." 90 Fed. Reg. at 8615. The Executive Order explains that because "'[g]ender identity' reflects a fully internal and subjective sense of self, disconnected

from biological reality and sex and existing on an infinite continuum," it "does not provide a meaningful basis for identification." *Id.* at 8616. The Order therefore directs the Secretary of State and the Secretary of Homeland Security to "implement changes to require that government-issued identification documents, including passports, . . . and Global Entry cards, accurately reflect the holder's sex, as defined" by the Executive Order. *Id.*

In accordance with the Executive Order, the Department of State now only issues passports "with an M or F sex marker that matches [the applicant's] sex at birth." U.S. Dep't of State, *Sex Markers in Passports*, https://perma.cc/VC9E-BQ5T.

**B. Plaintiff's Allegations and Procedural History**

Plaintiff Jana Jansen (who is using a pseudonym in this case) identifies as "an intersex, post-operative transgender woman." Am. Compl. ¶ 72 (ECF No. 53). Jansen has sex chromosome mosaicism, meaning some unspecified portion of her cells have a different combination of sex chromosomes. *Id.* ¶ 73. Jansen was born with male reproductive organs and was assigned the sex "male" at birth in the 1970s. *Id.* ¶ 74. In the 1990s, Jansen discovered the mosaicism, underwent surgery "to conform her physical sexual anatomy to her lived female identity," and began at that point to identify as a woman on identification documents. *Id.* ¶¶ 75–77, 80. Jansen's passport and Global Entry card currently identify Jansen's sex as "female." *Id.* ¶¶ 80–81. Jansen claims that, if identified as "male" on those documents, Jansen would be "outed" as intersex and transgender and would be subject to harassment and violence. *Id.* ¶¶ 91–92.

On September 2, 2025, Jansen brought this civil action pro se, challenging the biological-sex requirement of the Executive Order. The complaint asserted claims under the Fifth Amendment's Due Process Clause, *id.* ¶¶ 116–22, the Equal Protection Clause, *id.* ¶¶ 123–30; 149–55, the First Amendment, *id.* ¶¶ 131–38, and the Administrative Procedure Act, *id.* ¶¶ 139–48, and sought an order enjoining the government from enforcing certain aspects of the Executive

Order against "post-operative intersex/transgender individuals," *id.* ¶ 161, and from "changing Plaintiff's sex designation on any and all federal government records or identification documents," *id.* ¶ 164, among other relief.

Along with the complaint, Jansen filed a motion for a preliminary injunction (ECF No. 5) and a motion for appointment of counsel (ECF No. 6). Shortly thereafter, Jansen also moved for a temporary protective order (ECF No. 13). The Court granted the motion to appoint counsel (ECF No. 20) and sua sponte denied the motion for a preliminary injunction and the motion for a temporary restraining order. Mem. Op. & Order (ECF No. 36). The motions for preliminary relief primarily asked that the Social Security Administration be immediately prevented from changing the sex in Jansen's records from "female" to "male," but the Court concluded that Jansen had not shown a cognizable injury in part because Social Security cards do not identify the holder's sex. *Id.* at 2, 5, 6 n.3. The Court also noted that Jansen had "expresse[d] concerns" about Jansen's sex marker being changed to "male" "when she seeks to renew her Global Entry membership, which expires in 2026, . . . or her passport, which expires in 2032." *Id.* at 8 n.4. The Court concluded that "these harms are too conjectural to support injunctive relief at this time." *Id.*

After the Court's decision, Jansen, still pro se, filed another motion for a preliminary injunction, again asserting harm from an alleged imminent change to the sex designation on Jansen's Global Entry card. Mot. (ECF No. 38) ¶ 3. After counsel for the government entered an appearance, the parties jointly sought and obtained a stay of all proceedings, including on the motion for a preliminary injunction, pending the appointment of counsel for Jansen. (ECF No. 43); Min Order (Oct. 10, 2025). Once appointed, Jansen's new counsel filed an amended complaint (ECF No. 53) and a renewed motion for a preliminary injunction (ECF No. 66, 66-1).

The amended complaint and renewed motion for a preliminary injunction argued that biological-sex requirement in the Executive Order: (1) is arbitrary and capricious and contrary to constitutional right in violation of the Administrative Procedure Act, Am. Compl. ¶¶ 154–69 (ECF No. 53); Mot. for Prelim. Inj. at 16–24 (ECF No. 66-1), (2) violates Plaintiff's Fifth Amendment right to equal protection, Am. Compl. ¶¶ 129–45; Mot. for Prelim. Inj. at 24–32, (3) violates Plaintiff's First Amendment right to freedom of speech, Am. Compl. ¶¶ 146–53; Mot. for Prelim. Inj. at 32–35, and (4) violates Plaintiff's Fifth Amendment right to substantive due process, Am. Compl. ¶¶ 102–38; Mot. for Prelim. Inj. at 35–38. The motion for preliminary injunction contended that the biological-sex requirement would cause Jansen irreparable harm because it would require Jansen to "carry identification documents that do not match her lived sex, appearance, or other documentation," which would "out" Jansen as intersex and transgender and expose Jansen to "discrimination and harassment." Mot. for Prelim. Inj. at 38–43. Jansen asked the Court to preliminarily enjoin the government from enforcing the Executive Order with respect to Jansen's passport and Global Entry card. Mot. for Prelim. Inj., Proposed Order (ECF No. 66-14).

The Court denied the motion for a preliminary injunction because it found that Jansen failed to show imminent irreparable harm. Mem. Op. & Order at 12 (ECF No. 80). With respect to Jansen's passport, the Court noted that Jansen's current passport has a female sex marker and will remain valid until it expires in 2032. *Id.* at 14. Jansen was therefore at no imminent risk of any alleged harms caused by using a passport with a male sex marker. *Id.* As for the Global Entry card, while Jansen's Global Entry membership requires renewal by November 2026, the Court concluded that Jansen faces no imminent harm because Jansen need not use the card to enter the United States and could use other forms of identification for purposes such as passing through

airport security screening. *Id.* at 15–16. Because the lack of irreparable harm was sufficient to deny the motion for a preliminary injunction, the Court did not significantly address the merits, except to note that it was "somewhat skeptical" that Jansen's intersex and transgender status distinguished Jansen in any relevant respect from the plaintiffs in *Orr*, where the Supreme Court found that arbitrary-and-capricious and Equal Protection challenges to the biological-sex requirement for passports were unlikely to succeed. *Id.* at 18–19 n.8.

The parties previously requested, and the Court granted, a proposed schedule that extended the government's time to respond to the amended complaint until after the Court ruled on the renewed motion for a preliminary injunction. With that motion resolved, the government now responds to the amended complaint with this motion to dismiss.

**LEGAL STANDARD**

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When deciding a Rule 12(b)(6) motion, well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). But the Court need not accept "a legal conclusion couched as a factual allegation" nor an inference unsupported by the facts alleged in the pleadings. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Ultimately, "[d]etermining whether

a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## ARGUMENT

### I. Plaintiff's APA claim fails both because it challenges a nonreviewable presidential action and because the Executive Order is not arbitrary and capricious.

Jansen contends that the requirement to use biological sex on federal identification documents is arbitrary and capricious (Count V). This claim suffers two flaws that each independently require dismissal. First, Jansen's APA claims challenge the Executive Order's requirement to use biological sex on identification documents, but presidential actions like the Executive Order are not reviewable under the APA. Second, even if the Executive Order's directive to use biological sex were reviewable, it is not arbitrary and capricious. It is reasonable for the government to prefer a sex marker based on immutable biological characteristics over one based on subjective concepts of self-identity.[1]

#### A. The Executive Order is not reviewable under the APA.

Jansen cannot attack the Executive Order's biological-sex requirement through the APA. The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The President, however, is not an "agency" under the APA. 5 U.S.C. § 701(b)(1); *Franklin* v. *Massachusetts*, 505 U.S. 788, 800–01 (1992). The President's actions—like the Executive Order's requirement to use biological sex on federal identification

[1] Jansen also claims that the Executive Order's definition of biological sex violates the APA's prohibition against agency actions that are "contrary to constitutional right, power, privilege, or immunity" (Count IV). Am. Compl. ¶ 155 (quoting 5 U.S.C. § 706(2)). The arguments against that claim overlap with the arguments in response to Jansen's separate constitutional claims and are addressed in Part II below. *Infra* 17–24.

documents containing sex markers—are therefore "not reviewable" under the APA. *Franklin*, 505 U.S. at 801.

To get around this problem, Jansen purports to challenge what the amended complaint refers to as the "Passport Policy" of the Department of State and the "Global Entry Policy" of CBP, insofar as they would require Jansen's passport and Global Entry card to refer to Jansen's biological sex using the definitions in the Executive Order. Am. Compl. ¶¶ 5, 7 (ECF No. 53). But those definitions do not come from any separate policy of the Department of State or CBP. They come directly from the Executive Order itself. It is the President—not the Department of State or CBP—who has declared it to be "the policy of the United States to recognize two sexes, male and female"; instructed that "'[g]ender identity'" "does not provide a meaningful basis for identification"; provided that "[a]gency forms that require an individual's sex shall list male or female, and shall not request gender identity"; and directed "that government-issued identification documents, including passports . . . and Global Entry cards, accurately reflect the holder's sex, as defined under" the Executive Order. 90 Fed. Reg. at 8616. Jansen's challenge to the so-called "Passport Policy" and "Global Entry Policy" is only a disguised challenge to the biological-sex requirement in the Executive Order. And because the Executive Order is a presidential action that is "not reviewable" under the APA, *Franklin*, 505 U.S. at 801, Jansen may not challenge the biological-sex requirement under the APA.

It is true that courts sometimes permit APA challenges to agency actions that "expand[] the scope" of an Executive Order in their implementation of it. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 178 (D.D.C. 2020). But that is not the case here. Instead, the Department of State and CBP, insofar as Jansen challenges their actions, are "acting solely on behalf of the President" to implement the "purely presidential prerogatives" in the Executive Order. *Nat. Res. Def. Council,*

*Inc. v. Dep't of State* ("*NRDC*"), 658 F. Supp. 2d 105, 109 (D.D.C. 2009). The mere fact that the Executive Order directs agencies to carry out its biological-sex requirement does allow that requirement to be subject to APA review. *See Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001) (rejecting "the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action"), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002).

Indeed, the only agency action specific to the Department of State that Jansen challenges in the amended complaint is the Department's ministerial implementation of the Executive Order's biological-sex requirement. *See* Am. Compl. ¶¶ 55–57 (ECF No. 53). As Jansen notes, *id.* ¶ 56, the Department of State has updated its website to note that, "[u]nder the executive order," it will "only issue a passport with an M or F sex marker that matches the [applicant's] biological sex at birth," *Sex Marker in Passports*, https://perma.cc/VC9E-BQ5T. But that is merely a restatement of the Executive Order's policy "to recognize two sexes, male and female"; its definition of sex in terms of an "immutable biological classification" that a person belongs to "at conception"; and its directive that "government-issued identification documents, including passports," must reflect the holder's sex using that definition. 90 Fed. Reg. at 8615. This is therefore not a case in which the agency "went well beyond" the provisions of the Executive Order in implementing it. *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 145 (D.D.C. 2025) (concluding that agencies had not reasonably explained implementation decisions beyond the terms of the relevant executive order, including timelines for compliance and directive to completely take down, rather than modify, websites with offending language); *see also Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-2453 (BAH), 2025 WL 2840318, at *28 (D.D.C. Oct. 7, 2025) (challenge to policy notice adding to terms of executive order); *Gomez v. Trump*, 485 F. Supp. 3d

145, 178 (D.D.C.) (reviewing claim that the Secretary of State "expanded the scope" of presidential proclamation). Instead, the challenged actions by the Department of State do nothing but ministerially implement "purely presidential prerogatives," *NRDC*, 658 F. Supp. 2d at 109, so Jansen cannot use those actions to circumvent the "deference Congress has chosen to give to presidential action," *Tulare Cnty.*, 185 F. Supp. 2d at 28–29.

Moreover, with respect to passports, this is not a case where the challenged agency action is the exercise of discretion "delegated to an agency head but directed by the President." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001). Rather, this the exercise of discretion here is "committed to . . . the President" himself. *Id.* The Passport Act provides that the Secretary of State may issue passports "under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a. The statute thus supplements the President's inherent Article II authority to prescribe rules for the issuance of passports. *Agee*, 453 U.S. 293–94. And the President exercised this statutory and constitutional power in the Executive Order. Because the State Department's Passport Policy is implementing "discretionary authority vested in the President," the Court cannot "review an APA challenge . . . regardless of whether the President or the agency takes the final action." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 104 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017).

With respect to Global Entry cards, there is an even starker absence of reviewable agency action apart from the Executive Order. Jansen has identified no independent regulation, guidance, or action by CBP—or any other agency—to "implement" or "flesh out" the Executive Order's requirements with respect to Global Entry cards. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326–27 (D.C. Cir. 1996). To the contrary, Jansen acknowledges that neither CBP nor DHS have "issued any public guidance" and merely assumes that DHS and CBP would not ignore "the

Executive Order's explicit instruction" to use its definition of biological sex "with regard to Global Entry." Am. Compl. ¶ 70 (ECF No. 53). Because the only legal authority governing the challenged aspects of CBP's anticipated action on Jansen's Global Entry membership is the Executive Order itself, Jansen "[can] not possibly [rely] on the APA for a cause of action." *Chamber of Com.*, 74 F.3d at 1327 (concluding that the plaintiff may not bring an APA action where the agency had not promulgated regulations implementing the requirements of an executive order).

**B. The Executive Order's biological-sex requirement is not arbitrary and capricious.**

Even if Jansen could proceed with an APA claim, that claim would fail insofar as Jansen has not identified any "agency action" that was "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). As to the Department of State, the Supreme Court has held that other plaintiffs are "[not] likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." *Orr*, 146 S. Ct. at 46 (citing 22 U.S.C. § 211a). That determination may not be binding on the merits, *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025), but its reasoning is persuasive and correct. The Passport Act directs "[t]he Secretary of State [to] grant and issue passports . . . under such rules as the President shall designate and prescribe." 22 U.S.C. § 211a. Thus, the statute itself requires the Department to follow the President's "rules," *id.*, and the President need not provide a reasoned explanation for those rules because he is not subject to the APA, *see Franklin*, 505 U.S. at 801. Nor, as Jansen acknowledges, is the Secretary of Homeland Security or CBP at liberty to disregard an "explicit instruction" from the President mandating the biological sex, as defined by the order, on Global Entry cards. *See* Am. Compl. ¶ 70 (ECF No. 53).

Jansen contends that the Department of State and CBP have not "reasonably explained" why they will follow the Executive Order's biological-sex requirement. Am. Compl. ¶ 163 (ECF

No. 53). But, for the Department of State, the Passport Act specifically requires the agency "grant and issue passports . . . under such rules as the President shall designate and prescribe." 22 U.S.C. § 211a. "[T]he agency's path" was therefore not just "reasonably . . . discern[ible]"; it was obvious—and mandatory. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). Far from "entirely fail[ing] to consider an important aspect of the problem," *id.*, the Department considered the only aspect relevant here: that the Passport Act required it to follow the President's rules. That requirement rendered irrelevant any other consideration in following those rules. In short, because Congress instructed the Department to follow the President's rules, which are not themselves subject to APA review, it could not have been arbitrary or capricious for the Department to have followed the President's rules here by making the changes dictated by the Executive Order. *See Orr*, 146 S. Ct. at 46.

Nor can Jansen fault CBP for failure to offer a reasoned explanation for agency action, as Jansen has identified no action whatsoever on the part of CBP other than its anticipated future compliance with the "explicit instruction" in the Executive Order. Am. Compl. ¶ 70 (ECF No. 53). Jansen cannot fault CBP for failing to explain something it has not done. And to the extent CBP later employs the Executive Order's biological-sex requirement on Jansen's Global Entry cards, its reasons for doing so would be readily "discern[ible]," *State Farm*, 463 U.S. at 43: it is mandated by the Executive Order, *see Orr*, 146 S. Ct. at 46.

Finally, even if the Executive Order were subject to APA review, its biological-sex requirement is not arbitrary or capricious. It is entirely rational for the President to decide that "'[g]ender identity'" "does not provide a meaningful basis for identification" on passports, while biological sex does. 90 Fed. Reg. at 8616. As the Executive Order explains, "'[g]ender identity' reflects a fully internal and subjective sense of self," "exist[s] on an infinite continuum," and may

shift over time. *Id.*; *see id.* at 8615 (describing the "concept of self-assessed gender identity" as "fluid" and "ever-shifting"). For example, Jansen was "assigned as male" at birth and did not begin "living all aspects of her life as a woman" until a teenager. Am. Compl. ¶¶ 74–75 (ECF No. 53). And a person who identifies as "transgender now may not be transgender later." *Skrmetti*, 605 U.S. at 576 (Alito, J., concurring in part and concurring in the judgment). "[S]ome transgender individuals 'detransition' later in life—in other words, they begin to identify again with the gender that corresponds to their biological sex." *Id.* at 551 (Barrett, J., concurring). Given the "internal, fluid, and subjective" nature of "gender identity," the President rationally rejected it as a "basis for identification" in favor of a "biological" definition of sex—one grounded in facts that are "immutable." 90 Fed. Reg. at 8615–16.

Other designations on U.S. passports, such as a person's date or place of birth, similarly reflect immutable facts. A person cannot self-identify as having been born on December 31, 1969, in Richmond, if she was in fact born on January 1, 1970, in Raleigh, let alone on July 1, 1980, in New York. The President rationally decided that, just as a person may not self-select a date or place of birth, so too a person may not self-select a sex marker. And in the interest of uniformity, the President rationally decided to apply the same biology-based definition of sex throughout the federal government, making no exception for passports or Global Entry cards. *Id.* at 8616.

Jansen contends that the Executive Order's definition of "sex" contradicts "well-established science on the existence and physiology of intersex people" like Jansen, Am. Compl. ¶ 164 (ECF No. 53), who have a "different combination of sex chromosomes," *id.* ¶ 73. But the Order's definition of biological sex has nothing to do with chromosomes. It recognizes biological sex as tied to the function of producing reproductive cells. 90 Fed. Reg. at 8615. Jansen was born with "male reproductive organs and testes," Am. Compl. ¶ 74, which is the reproductive system

"that produces the small reproductive cell," 90 Fed. Reg. at 8615. The Executive Order rationally designates persons with that reproductive system at birth as "male," *id.*, which is indeed the sex that Jansen was "assigned" at birth, Am. Compl. ¶ 74.

The Order also is not made irrational by the fact that some people, like Jansen, were "born infertile." *Id.* The government recognizes that some females and males "may not . . . produce eggs or sperm" due to factors including "congenital disorders or other developmental conditions." *Sex-Based Definitions*, https://perma.cc/JPB9-TJT9. The relevant factor, however, is the "biological function" of the reproductive system, which does not "require that eggs or sperm are ever produced." *Id.* Because the biological function of male reproductive organs is to produce sperm, persons born with that reproductive system are "male" under the Executive Order, whether or not they actually produce sperm. *Id.*

On the other hand, Jansen identifies no "biological" reason why the government may only rationally designate Jansen's sex as "female" as opposed to "male." Jansen claims to have chromosomes associated with both the male and female sex in some unspecified proportion, but Jansen was born with only a male reproductive system. Am. Comp. ¶ 74 (ECF No. 53). Designating Jansen's sex as female would therefore elevate "gender identity" over the "biological category of sex," which the Executive Order rationally concludes "does not provide a meaningful basis for identification." 90 Fed. Reg. at 8616.

Finally, Jansen faults the government for not mentioning the "reliance interests" of people who have historically used a sex other than their biological sex on federal identification documents. Am. Compl. ¶ 167 (ECF No. 53). But Jansen fails to set forth any nonconclusory "reliance interest" that the government should have considered. For these reasons, Jansen fails to adequately plead a claim that the Executive Order's biological-sex requirement is arbitrary and capricious.

## II. The constitutional claims fail because strict scrutiny is not triggered, and the Executive Order passes any required rational-basis review.

### A. The Executive Order complies with equal protection.

Equal protection generally demands only rational-basis review, unless a policy discriminates against a suspect or quasi-suspect class. *See United States v. Skrmetti*, 605 U.S. 495, 509 (2025). Jansen contends that the biological-sex requirement discriminates based on sex, Am. Compl. ¶ 105 (ECF No. 53), intersex status, *id.* ¶ 115, and transgender status, *id.* ¶ 123. It does no such thing. The Executive Order's biological-sex requirement does not discriminate based on any class. As the Supreme Court opined in *Orr*, "[d]isplaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely attesting to a historical fact without subjecting anyone to differential treatment." 146 S. Ct. at 46. That conclusion follows from well-settled precedent. Equal protection does not demand that a policy "necessarily apply equally to all persons or require things which are different in fact . . . to be treated in law as though they were the same." *Michael M. v. Superior Court*, 450 U.S. 464, 469 (1981) (plurality opinion) (alteration in original) (quotation marks omitted); *see Skrmetti*, 605 U.S. at 515 (holding that law that applies equally to each sex without treating any member of one sex differently from a similarly situated member of the opposite sex does not discriminate based on sex); *Nguyen v. INS*, 533 U.S. 53, 63-64 (2001) (explaining that equal protection is not violated by classifications that treat men and women differently where the two sexes "are not similarly situated," such as measures that "take[] into account a biological difference"). Jansen does not challenge the inclusion of a sex designation on passports or Global Entry cards generally and thereby accepts that there are "differen[ces] in fact" that justify distinguishing people based on sex on those documents. *Michael M.*, 450 U.S. at 469 (plurality opinion) (quotation marks omitted). What Jansen challenges is the Executive Order's directive that

each person's sex be determined according to that person's historical "immutable biological" characteristics and not self-selected based on "gender identity." 90 Fed. Reg. at 8615–16. But because the order requires the same kind of historical information from all identification holders, it does not subject "anyone to differential treatment. *Orr*, 146 S. Ct. at 46.

Jansen is wrong that the biological-sex requirement "facially clissifies based on sex." Am. Compl. ¶ 105. To the contrary, the sex marker on government-issued identification documents must reflect the holder's "immutable biological classification as either male or female," rather than "self-assessed gender identity." 90 Fed. Reg. at 8615. In defining sex based on biology rather than self-identification, the challenged policy does not discriminate based on sex, because every government-issued identification document, for every individual, must reflect the same immutable biological characteristics, not purported "gender identity." *Id.* The Supreme Court has long recognized that sex discrimination requires treating members of one sex differently from "similarly situated" members of the opposite sex. *Nguyen*, 533 U.S. at 63; *see Michael M.*, 450 U.S. at 469 (plurality opinion). The Court reaffirmed that principle in *Skrmetti*. There, the Court rejected the suggestion that "mere reference to sex is sufficient to trigger heightened scrutiny." *Skrmetti*, 605 U.S. at 512. And the Court held that a law does not discriminate based on sex if it applies equally to each sex without treating any member of one sex differently from a similarly situated member of the opposite sex. *See id.* at 515 (emphasizing that under the challenged statute, "no minor may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence; minors of any sex may be administered puberty blockers or hormones for other purposes" (emphases omitted)). That is precisely the case here. Under the challenged policy, no one may self-select a sex marker based on "gender identity"; every sex marker, for any individual, must instead reflect immutable biological characteristics. The challenged policy thus

applies equally to members of each sex—defining sex for everyone in terms of biology over identity.

By analogy, it would not be discrimination based on national origin to define a person's national origin as the country in which the person was born (say, India), rather than the country with which the person self-identifies (say, Pakistan for an Indian born in Kashmir). As the Supreme Court explained in *Orr*, it is similarly not discrimination based on sex for the challenged policy to determine a person's sex according to the person's "immutable biological" characteristics, rather than the person's "self-assessed gender identity." 90 Fed. Reg. at 8615; *see Orr*, 146 S. Ct. at 46 Jansen may prefer an identity-based definition of sex over a biology-based one, but the government's use of the latter is not sex discrimination.

Nor does the Executive Order discriminate based on intersex or transgender status. *See West Virginia v. B. P. J.*, 146 S. Ct. 2356, 2378 (2026) (noting lack of "distinct transgender classification" in law determining eligibility for female sport based on biological sex). As noted, the Executive Order applies equally to all people. Both intersex and non-intersex, transgender and non-transgender persons may obtain a passport or Global Entry card, provided that they meet the relevant criteria, and all groups are required to use sex markers corresponding to biological sex based on the same definitions. It is Jansen who seeks differential treatment—namely, a special accommodation that would allow Jansen to use a sex marker that corresponds to gender identity rather than the biological characteristics set forth in the Executive Order. The government's decision not to afford such preferential treatment to members of a particular group cannot plausibly be characterized as "discrimination" based on intersex status.

Even if the Executive Order discriminated based on intersex or transgender status, heightened scrutiny would still be inappropriate because neither intersex nor transgender people

form a suspect or quasi-suspect class. Jansen alleges that intersex and transgender people form quasi-suspect classes because each group is discreet and characterized by immutable characteristics, historically subject to discrimination, and politically powerless. Am. Compl. ¶¶ 116–17, 124–25. But that test has no basis in the text or original understanding of the Constitution, and the Supreme Court has "never embraced" a new suspect or quasi-suspect class under it. *Skrmetti*, 605 U.S. at 550 (Barrett, J., concurring) (emphasis omitted); *see id.* at 573–76 (Alito, J., concurring in part and concurring in the judgment) (observing that the Court has previously declined to recognize the poor, the elderly, illegal aliens, close relatives, and people with disabilities as suspect or quasi-suspect classes).

In any event, neither intersex nor transgender people satisfy Jansen's preferred test. *Cf. B.P.J.*, 146 S. Ct. at 2379 ("Several Members of this Court, moreover, have concluded that classifications based on transgender status or gender identity should receive only deferential rational basis review and not intermediate or other heightened scrutiny."). First, neither group is marked by the "obvious, immutable, or distinguishing characteristics" of a "discrete group." *Skrmetti*, 605 U.S. at 549–50 (Barrett, J., concurring) (citations omitted); *see id.* at 574–76 (Alito, J., concurring in part and concurring in the judgment). Jansen acknowledges that the term "intersex" refers to a "broad spectrum of conditions" that "present in many different forms, ranging from mild to more significant." Am. Compl. ¶¶ 37, 39 (ECF No. 53). The term "transgender" likewise is an "umbrella term" that describes "varied groups" with "many diverse gender experiences." *Skrmetti*, 605 U.S. at 549–50 (Barrett, J., concurring) (citations omitted). Nor are intersex or transgender persons "defined by a trait that is definitively ascertainable at the moment of birth." *Id.* at 550 (Barrett, J., concurring) (citations omitted). Jansen admits that intersex conditions are "often not apparent until puberty," and Jansen did not learn of Jansen's own

"difference of sex development" until Jansen was a teenager and only began "living as a woman" at that point. Jansen Decl. ¶¶ 8–11 (ECF No. 66-11). "The boundaries of the group, in other words, are not defined by an easily ascertainable characteristic that is fixed and consistent across the group." *Skrmetti*, 605 U.S. at 549–50 (Barrett, J., concurring).

Second, intersex and transgender people have not "suffered a history of *de jure* discrimination." *Skrmetti*, 605 U.S. at 549–50 (Barrett, J., concurring); *see id.* at 574-76 (Alito, J., concurring in part and concurring in the judgment). On this issue, "the relevant question is whether the group has been subject to a longstanding pattern of discrimination *in the law*," not "a history of private discrimination." *Skrmetti*, 605 U.S. at 554–55 (Barrett, J., concurring) (emphasis in original). For example, discrimination based on sex triggers heightened scrutiny in part because women were historically deprived of the right to vote and legally excluded from certain opportunities accorded to men. *Id.* (citing *United States v. Virginia*, 518 U.S. 515, 531 (1996)). Jansen's allegations do not identify any similar de jure discrimination against intersex or transgender persons. *See* Am. Compl. ¶¶ 117, 125 (ECF No. 53).

Third, neither group is politically powerless. *Skrmetti*, 605 U.S. at 576 (Alito, J., concurring in part and concurring in the judgment); *see id.* at 555-56 (Barrett, J., concurring) (noting that *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938), "equates political powerlessness with laws burdening those who lacked a vote"). Jansen notes that intersex people make up a relatively small percentage of the voting population. Am. Compl. ¶¶ 117 (ECF No. 53). But there is no evidence that intersex individuals, "like racial minorities and women, have been excluded from participation in the political process." *Id.* at 576 (Alito, J., concurring in part and concurring in the judgment).

And finally, treating intersex and transgender people as a quasi-suspect class "would require courts to oversee all manner of policy choices normally committed to legislative discretion." *Id.* at 551 (Barrett, J., concurring); *see City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 445 (1985) (holding that individuals with mental disabilities are not a quasi-suspect class because governments must have "flexibility and freedom from judicial oversight in shaping and limiting their remedial efforts").

Because the Executive Order does not discriminate based on sex or any other suspect or quasi-suspect characteristic, the only standard (if any) that could apply is rational-basis review. Under that standard, the government "has no obligation to produce evidence to sustain the rationality of" the Executive Order. *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993). Instead, the policy "is presumed constitutional," and the burden is on the challengers "'to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Id.* at 320–21 (citation omitted). "Where there exist 'plausible reasons' for the relevant government action, '[the Court's] inquiry is at an end.'" S*krmetti*, 605 U.S. at 522. The challenged policy easily satisfies this undemanding standard because, as discussed above, *supra* 13–16, it is entirely reasonable for the President to decide that the "internal, fluid, and subjective" nature of "gender identity" makes it a less-favorable "basis for identification" compared to the order's "biological" definition of sex grounded in "immutable" facts. 90 Fed. Reg. at 8615–16.

**B. The Executive Order does not compel private speech, only government speech.**

Jansen's First Amendment speech rights are not implicated because factual information on passports and Global Entry cards is government speech that is not attributable to the identification holder. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009)). Passports

and Global Entry cards are government speech, given "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022).

A United States passport is a "political document" issued by the federal government and "addressed to foreign powers" to "vouch[] for the bearer and for his conduct," *Agee*, 453 U.S. at 292, and it "at all times remains the property of the United States," 22 C.F.R. § 51.7(a). Similarly, Global Entry cards are issued by the United States government to convey to border officials that the holder is enrolled in a trusted traveler program and may obtain expedited entry over a land border or at a seaport. *Global Entry FAQ*, https://perma.cc/32PN-7D7L. The government also retains control over the content of these documents. Indeed, "alter[ing]" a passport could result in criminal charges. *See* 18 U.S.C. § 1543. Given that passports and Global Entry cards are government-crafted communications about the holder, the content of those documents is government speech attributable only to the government. *See Doe v. Kerry*, No. 16- 0654-PJH, 2016 WL 5339804, at *16 (N.D. Cal. Sept. 23, 2016) ("The information contained in a passport is unquestionably government speech."); *Fowler v. Stitt*, 676 F. Supp. 3d 1094, 1105–08 (N.D. Okla. 2023) (sex marker on birth certificate is government speech), *aff'd in part, rev'd in part on other grounds*, 104 F.4th 770 (10th Cir. 2024), *cert. granted, judgment vacated*, 145 S. Ct. 2840 (2025).

**C. The Executive Order does not violate any fundamental constitutional right.**

Jansen claims that the Executive Order offends a "fundamental right to privacy" against the "disclosure of private and intimate information." Am. Comp. ¶ 140 (ECF No. 53). The Fifth Amendment to the Constitution protects certain fundamental rights, such as "the rights to marry; to have children; to direct the education and upbringing of one's children; to marital privacy; to use contraception; to bodily integrity; and to abortion." *Washington v. Glucksberg*, 521 U.S. 702,

720 (1997). But "the [Supreme] Court has always been reluctant to expand the concept of substantive due process" because "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). "To that end, *Glucksberg*'s two-step inquiry disciplines the substantive due process analysis." *Id.* "First, it insists on a 'careful description of the asserted fundamental liberty interest.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 721). "Second, it stresses that 'the Due Process Clause specially protects' only 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 720–21). Accordingly, as discussed above, "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994)).

There is no fundamental right to information privacy. Neither the Supreme Court nor the D.C. Circuit has "ever held that this interest is a constitutional right," and "[b]oth courts have, so far, steadfastly rejected all information privacy claims purporting to rest on the Constitution[.]" *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 72 (D.C. Cir. 2019). And there is no basis to newly establish an information-privacy right when it comes to displaying sex markers because self-selecting a sex marker is neither "deeply rooted in our history and tradition" nor "essential to our Nation's scheme or ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 237 (2022). Instead, history shows that, "however important individuals may perceive the designation of their sex" on government-issued identification, "it is only recently" that some laws have permitted sex designations to conform to gender identity. *Gore v. Lee*, 107 F.4th 548, 562 (6th Cir. 2024).

## III. <u>The Court should excuse the need to file an administrative record.</u>

By default, the local rules of this Court require service of an administrative record "simultaneously with the filing of a dispositive motion." D.D.C. LCvR 7(n)(1). Courts in this District "routinely" excuse the government from complying with this provision when "the administrative record is not necessary for the court's decision." *US Inventor, Inc. v. U.S. Pat. & Trademark Off.*, No. CV 22-2218 (JDB), 2023 WL 4488913, at *9 (D.D.C. July 12, 2023), *aff'd*, 156 F.4th 1306 (Fed. Cir. 2025). This motion to dismiss presents only pure questions of law and does not make reference to materials that would be part of an administrative record other than the Executive Order, which is publicly available. Defendants therefore respectfully request that the Court excuse the government from the need to serve an administrative record until further order of the Court.

## CONCLUSION

For these reasons, this motion should be granted, and the case should be dismissed.

Dated: September 18, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: *\/s/ Johnny Walker*
JOHNNY H. WALKER, III, D.C. Bar #991324
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2511

*Attorneys for the United States of America*