**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JANA JANSEN

*Plaintiff*,

v.

DONALD TRUMP, *in his official capacity as President of the United States*; U.S. DEPARTMENT OF STATE; MARCO RUBIO, *in his official capacity as Secretary of the U.S. Department of State*; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of Customs and Border Protection*; UNITED STATES OF AMERICA,

*Defendants*.

Civil Action No. 1:25-cv-02961-LLA

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

BACKGROUND .......... 3

I. Ms. Jansen's Medical History and Identification Documents .......... 3

II. The U.S. Government Has Long Permitted Changes to Sex Markers on U.S. Passports and Global Entry Cards .......... 4

III. Executive Order 14168 Dramatically Changed the U.S. Government's Policies Regarding Federal Identification Documents .......... 6

IV. Procedural History .......... 9

LEGAL STANDARD .......... 10

ARGUMENT .......... 10

I. MS. JANSEN SUFFICIENTLY ALLEGES HER CLAIMS. .......... 10

A. The Passport Policy and the Global Entry Policy violate the APA. .......... 10

i. The narrow reviewability exception for presidential action does not apply. .......... 10

ii. The Policies are arbitrary and capricious. .......... 16

1. The Passport Policy is neither reasonable nor reasonably explained. .......... 17

2. The Global Entry Policy is neither reasonable nor reasonably explained. .......... 21

3. The emergency stay order in Orr does not excuse the agencies from complying with the APA. .......... 22

B. The Executive Order and the Policies violate Ms. Jansen's Fifth Amendment right to equal protection. .......... 23

i. The Executive Order and the Policies are fundamentally irrational. .......... 23

ii. The Executive Order and the Policies unconstitutionally discriminate based on intersex status. .......... 29

C. The Executive Order and the Policies violate Ms. Jansen's First Amendment Right to Freedom of Speech. .......... 33

i. The government-speech doctrine does not supersede the compelled-speech doctrine. .......... 33

ii. The Executive Order and the Policies unconstitutionally compel Ms. Jansen's speech. 36

iii. Shurtleff confirms that the Executive Order and the Policies violate Ms. Jansen's First Amendment rights 39

D. The Executive Order and the Policies violate Ms. Jansen's Fifth Amendment right to substantive due process. 41

II. MS. JANSEN INTENDS TO SEEK EXPEDITED PRODUCTION OF THE ADMINISTRATIVE RECORD FOR THE GLOBAL ENTRY POLICY. 45

CONCLUSION 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) ....................23

*Advance Colorado v. Griswold*,
99 F.4th 1234 (10th Cir. 2024) ....................36

*Aid for Women v. Foulston*,
441 F.3d 1101 (10th Cir. 2006) ....................42

*Am. Fed'n of Gov't Emps., AFL-CIO v. Dep't of Hous. & Urb. Dev.*,
118 F.3d 786 (D.C. Cir. 1997) ....................43, 44

*Arroyo Gonzalez v. Rossello Nevares*,
305 F. Supp. 3d 327 (D.P.R. 2018) ....................44

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................10

*Ashtari v. Pompeo*,
496 F. Supp. 3d 462 (D.D.C. 2020) ....................11, 15

**Bennett v. Spear*,
520 U.S. 154 (1997) ....................11, 15

*Bloch v. Ribar*,
156 F.3d 673 (6th Cir. 1998) ....................42

*Bowen v. Gilliard*,
483 U.S. 587 (1987) ....................30

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974) ....................21

*Brown v. Yost*,
133 F.4th 725 (6th Cir. 2025) ....................36

*Burns v. Warden, USP Beaumont*,
482 F. App'x 414 (11th Cir. 2012) ....................42

**Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ....................12

*Chamber of Com. of U.S. v. SEC*,
412 F.3d 133 (D.C. Cir. 2005) ....................16

*City of Brookings Mun. Tel. Co. v. FCC*,
822 F.2d 1153 (D.C. Cir. 1987) ....................18

**City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ....................24, 30, 31

**Cressman v. Thompson*,
798 F.3d 938 (10th Cir. 2015) ....................36, 38

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*,
158 F.4th 732 (6th Cir. 2025) ....................37

*Detroit International Bridge Co. v. Government of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ....................14

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ....................20

*Doe 1 v. Marshall*,
367 F. Supp. 3d 1310 (M.D. Ala. 2019) ....................37, 38

*Doe 1 v. Trump*,
275 F. Supp. 3d 167 (D.D.C. 2017) ....................32

*Doe v. City of N.Y.*,
15 F.3d 264 (2d Cir. 1994) ....................42

*Doe v. Kerry*,
2016 WL 5339804 (N.D. Cal. Sept. 23, 2016) ....................39

*Drs. for Am. v. Off. of Pers. Mgmt.*,
793 F. Supp. 3d 112 (D.D.C. 2025) ....................13, 15

*E.Q. v. DHS*,
835 F. Supp. 3d 221 (D.D.C. 2026) ....................16

*Eastwood v. Dep't of Corr. of Okla.*,
846 F.2d 627 (10th Cir. 1988) ....................42

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ....................20

*Farrell v. Tillerson*,
315 F. Supp. 3d 47 (D.D.C. 2018) ....................16

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....................16

*Fowler v. Stitt*,
676 F. Supp. 3d 1094 (N.D. Okla. 2023)....................39

**Franklin v. Massachusetts*,
505 U.S. 788 (1992)....................11, 13, 15, 22

*Fraternal Ord. of Police, Lodge No. 5 v. Philadelphia*,
812 F.2d 105 (3d Cir. 1987)....................42

*Gomez v. Trump*,
485 F. Supp. 3d 145 (D.D.C. 2020), *amended in part*, 486 F. Supp. 3d 445
(D.D.C. 2020) ....................11, 14, 15

*Gore v. Lee*,
107 F.4th 548 (2024)....................44

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020)....................29, 32

*Griswold v. Connecticut*,
381 U.S. 479 (1965)....................42

*Haig v. Agee*,
453 U.S. 280 (1981)....................39

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024)....................42

*Hurd v. Dist. of Columbia*,
864 F.3d 671 (D.C. Cir. 2017)....................8

*Hurley v. Irish-Am. Gay, Lesbian, Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)....................37, 39

*In re U.S. OPM Data Sec. Breach Litig.*,
928 F.3d 42 (D.C. Cir. 2019)....................43, 44

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
626 F.3d 84 (D.C. Cir. 2010)....................19

*Johnson v. California*,
543 U.S. 499 (2005)....................45

*Khatibi v. Hawkins*,
145 F.4th 1139 (9th Cir. 2025) ....................36

*Kingdom v. Trump*,
2025 WL 1568238 (D.D.C. June 3, 2025) ........ 13, 15

*Lawrence v. Texas*,
539 U.S. 558 (2003) ........ 43

*Love v. Johnson*,
146 F. Supp. 3d 848 (E.D. Mich. 2015) ........ 44

*Lyng v. Castillo*,
477 U.S. 635 (1986) ........ 29

*Manin v. Nat'l Transp. Safety Bd.*,
627 F.3d 1239 (D.C. Cir. 2011) ........ 21

**Matal v. Tam*,
582 U.S. 218 (2017) ........ 41

*Milligan v. Pompeo*,
502 F. Supp. 3d 302 (D.D.C. 2020) ........ 14, 15

*Minn. Voters All. v. City of Saint Paul*,
442 F. Supp. 3d 1109 (D. Minn. 2020) ........ 34

*Moshea v. Nat'l Transp. Safety Bd.*,
570 F.3d 349 (D.D.C. 2009) ........ 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 16, 17, 21

*NASA v. Nelson*,
562 U.S. 134 (2011) ........ 42, 43, 44

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015) ........ 37, 39

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) ........ 11, 15

*Nelson v. Landry*,
714 F. Supp. 3d 790 (M.D. La. 2024) ........ 39

*Nixon v. Adm'r of Gen. Servs.*,
433 U.S. 425 (1977) ........ 42, 43

*Norgren v. Minn. Dep't of Hum. Servs.*,
96 F.4th 1048 (8th Cir. 2024) ........ 37

*O.A. v. Trump*,
404 F. Supp. 3d 109 (D.D.C. 2019) .......... 15

*Obergefell v. Hodges*,
576 U.S. 644 (2015) .......... 43

*Olmstead v. United States*,
277 U.S. 438 (1928) .......... 42

*Orr v. Trump*,
778 F. Supp. 3d 394 (D. Mass. 2025) .......... 8, 18

*Padula v. Webster*,
822 F.2d 97 (D.C. Cir. 1987) .......... 30

*Payne v. Taslimi*,
998 F.3d 648 (4th Cir. 2021) .......... 42

*Physicians for Soc. Resp. v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) .......... 19

*Pleasant Grove City, Utah v. Summum*,
555 U.S. 460 (2009) .......... 35

*Powell v. Schriver*,
175 F.3d 107 (2d Cir. 1999) .......... 43, 44

**Pub. Citizen v. U.S. Trade Representative*,
5 F.3d 549 (D.C. Cir. 1993) .......... 11, 12, 13, 15

*Ray v. McCloud*,
507 F. Supp. 3d 925 (S.D. Ohio 2020) .......... 44

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) .......... 37, 39

**Romer v. Evans*,
517 U.S. 620 (1996) .......... 23, 25, 26, 29

*Ruhumuriza v. Higgins*,
2026 WL 587636 (D.D.C. Mar. 3, 2026) .......... 15

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .......... 16

**Shurtleff v. City of Boston*,
596 U.S. 243 (2022) .......... *passim*

*Talbott v. United States*,
176 F.4th 720 (D.C. Cir. 2026)....23, 29, 32

*Talbott v. United States*,
775 F. Supp. 3d 283 (D.D.C. 2025)....32

*Tate v. Pompeo*,
513 F. Supp. 3d 132 (D.D.C. 2021)....14, 15

*Thorne v. City of El Segundo*,
726 F.2d 459 (9th Cir. 1983)....42

*Trump v. Boyle*,
145 S. Ct. 2653 (2025)....28

**Trump v. Orr*,
146 S. Ct. 44 (2025)....2, 22, 23, 28

*United States v. Skrmetti*,
605 U.S. 495 (2025)....26, 29, 32, 33

*Va. State Conf. NAACP v. Cnty. Sch. Bd. of Shenandoah Cnty.*,
799 F. Supp. 3d 515 (W.D. Va. 2025)....34, 36

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)....34

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015)....34, 35, 39

*Washington v. Glucksberg*,
521 U.S. 702 (1997)....42, 45

*Whalen v. Roe*,
429 U.S. 589 (1977)....42, 43

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
858 F.3d 1034 (7th Cir. 2017)....32

*Widakuswara v. Lake*,
779 F. Supp. 3d 10 (D.D.C. 2025)....21

*Windsor v. United States*,
699 F.3d 169 (2d Cir. 2012)....29

*Wolfe v. Schaefer*,
619 F.3d 782 (7th Cir. 2010)....42

*Woodland v. Houston*,
940 F.2d 134 (5th Cir. 1991) ....................................................................................42

**Wooley v. Maynard*,
430 U.S. 705 (1977)....................................................................................... *passim*

*Zaid v. Exec. Off. of President*,
815 F. Supp. 3d 113 (D.D.C. 2025)..........................................................................14

*Zukerman v. U.S. Postal Serv.*,
961 F.3d 431 (D.C. Cir. 2020).............................................................................10, 21

*Zzyym v. Pompeo*,
958 F.3d 1014 (10th Cir. 2020) ..............................................................................30

**Statutes**

5 U.S.C. § 551.....................................................................................................10

5 U.S.C. § 704.................................................................................................10, 11

5 U.S.C. § 706.................................................................................................10, 23

5 U.S.C. § 7301...................................................................................................14

8 U.S.C. § 1185.....................................................................................................4

18 U.S.C. § 1001...................................................................................................6

18 U.S.C. § 1542.........................................................................................4, 38, 41

22 U.S.C. § 211a..............................................................................................4, 15

22 U.S.C. § 213...........................................................................................4, 38, 41

**Regulations**

8 C.F.R. § 235.12...................................................................................................6

22 C.F.R. § 51.1 .....................................................................................................4

22 C.F.R. § 51.20.........................................................................................5, 38, 41

22 C.F.R. § 53.1 .....................................................................................................4

73 Fed. Reg. 19,861 (Apr. 11, 2008) .........................................................................6

73 Fed. Reg. at 19,861 ...........................................................................................40

Federal Rule of Civil Procedure 12(b)(6) ........................................................................2, 10

**Executive Orders**

Executive Order No. 11295, *Rules Governing the Granting, Issuing, and Verifying of United States Passports*, 31 Fed. Reg. 10,603 (Aug. 5, 1966) ........................4, 15

Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025)..........................................................................................6, 8, 12

**Other Authorities**

Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001).......................15

HHS, *Advancing Health Equity for Intersex Individuals* (Jan. 2025), https://perma.cc/CY85-68RM..........................................................................30, 31

HHS, *Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168* (Feb. 19, 2025), https://perma.cc/4J3A-TBU5 ..........................................................................7, 8, 19

HHS, *Sex-Based Definitions*, https://perma.cc/JPB9-TJT9 ..................................................19

MedlinePlus, *Cell Division* (last reviewed Aug. 18, 2025), https://perma.cc/PN6N-JE4L ..........................................................................18

Passport Bulletin 92-22, *Procedures for Handling Requests for a Change in Gender in Passports* (Oct. 1, 1992), https://perma.cc/NJN7-G4CU ........................................5

U.S. Dep't of State, *Application for a U.S. Passport* (Apr. 2025), https://perma.cc/K9TQ-QNQ6..........................................................................4

U.S. Dep't of State, *New Policy on Gender Change in Passports Announced* (Jun. 9, 2010), https://perma.cc/Z54T-BKYZ ..........................................................................5

U.S. Dep't of State, *Proposing Changes to the Department's Policies on Gender on U.S. Passports and Consular Reports of Birth Abroad* (Jun. 30, 2021), https://perma.cc/96V2-N9A9 ..........................................................................5

U.S. Dep't of State, *Sex Marker in Passports*, https://perma.cc/VC9E-BQ5T ...................8, 13, 17

U.S. Dep't of State, *U.S. Passport Renewal Application for Eligible Individuals* (Apr. 2025), https://perma.cc/4NHA-LQHX..........................................................................4

## INTRODUCTION

The government's motion compounds the same pervasive error from its briefing on the preliminary injunction: mischaracterizing Plaintiff Jana Jansen's claims as based on "gender identity," when all she seeks is recognition of her undisputed intersex biology. Ms. Jansen was born with sex chromosome mosaicism, an intersex condition meaning that each of her cells has a different combination of sex chromosomes: some are XX, some are XY, and some are XXXY (*i.e.*, an extra pair of chromosomes). As a direct result of her mosaicism, Ms. Jansen was born with atypical physiological characteristics that do not fit binary definitions of "male" and "female." Because of this, she was incorrectly identified as "male" at birth. That error was corrected on her birth certificate, driver's license, and passport—identification documents that have consistently and correctly identified Ms. Jansen as female for more than 30 years.

Under the government's new policies, however, that error will deprive Ms. Jansen of her constitutional rights, result in contradictory identification documents, and put her at serious risk of bodily and emotional harm. In particular, the challenged Executive Order and the agencies' implementing actions violate the Constitution by ignoring the existence of intersex people, and the agency actions further violate the APA by using arbitrary classifications that not only fail to consider an entire category of people but that also *affirmatively undermine* the purported rationales for including sex on passports and Global Entry cards, including the "identification" function of ensuring that the individual possessing the document is, in fact, the individual listed on the document.

The government contends that Ms. Jansen's APA claim is not justiciable because the agencies just ministerially applied the President's Executive Order. That is clearly wrong: the Executive Order defined "male" and "female" as one's sex "at conception." But at conception, the only sex determination that could be made is a sex determination based on chromosomal

configuration, and intersex people often defy those definitions because they do not consistently carry only XX or only XY chromosomes. The definitions *the agencies* used their discretion to adopt are based on completely different characteristics—apparent reproductive systems at birth. Those definitions arbitrarily elevate one physiological trait above all others, ignoring the full biological picture and, like the Executive Order, ignoring intersex people. An intersex person might, for example, have male-associated external genitalia but female-associated chromosomes, ovaries, and a uterus. For Ms. Jansen, as a direct result of her sex-chromosome mosaicism, she was born with biological traits typical of both men and women—including that her reproductive organs never fully differentiated between typical male and typical female anatomy, resulting in what at birth looked like underdeveloped male reproductive organs. The government's attempt to categorize her as male because she was born with *some* male biological characteristics, despite the fact that she was *also* born with female biological characteristics, is irrational and unreasonable. The government cannot ignore its constitutional and APA obligations by simply assuming away science and, with it, the existence of an entire class of Americans. Nor can the government wave away the reliance interests of a woman whose federal *and state* identification documents have consistently identified her as a woman nearly since the end of apartheid.

The government cannot escape these obligations by citing to an emergency-docket stay order issued in *Trump v. Orr*, 146 S. Ct. 44 (2025)—a different case brought by different plaintiffs asserting different claims on a different record in which the court focused on the equitable stay factors and did not undertake anything resembling a Rule 12(b)(6) analysis. This case is not about the desire to "self-select" a sex marker based on "gender identity." Mot. 18. The Supreme Court did not consider claims involving the biology of intersex people, so its stay order does not govern Ms. Jansen's distinct claims and arguments.

## BACKGROUND

### I. Ms. Jansen's Medical History and Identification Documents

Ms. Jansen is an intersex, post-operative transgender woman. Am. Compl. ¶ 2, ECF No. 53; Mem. Op. & Order 8, ECF No. 80 ("PI Order"). She is a mother of two minor children. Am. Compl. ¶ 72. She has lived as a woman for over thirty years, and her female identity is deeply ingrained in her personal, familial, and public life. *Id.*

Ms. Jansen's intersex condition is sex chromosome mosaicism, meaning her cells carry XX, XY, and XXXY sex chromosomes. *Id.* ¶ 73; PI Order 8–9. As a result of her mosaicism, and as is characteristic of intersex people, Ms. Jansen was born with and developed biological traits that do not fit the typical binary definitions of "male" and "female," including underdeveloped external reproductive organs. Am. Compl. ¶¶ 74–75. Despite this, and without any further testing, her birth certificate was marked "male" at birth. *Id.*

As a teenager in the 1990s, Ms. Jansen learned that she had high estrogen levels and low testosterone levels. Am. Compl. ¶ 75; PI Order 9. She sought treatment from an endocrinologist for these hormonal irregularities, and subsequent genetic testing revealed her mosaicism condition. Am. Compl. ¶ 75. Taken together, the medical findings that emerged from that evaluation were unambiguous: the assignment of male at birth had been a mistake. It had been the result of an incomplete picture of her biology at a time when her intersex condition had not yet been identified.

Ms. Jansen had always known that she was a woman, and since learning of her mosaicism, she has lived all aspects of her life as a woman. *Id.* ¶ 75; PI Order 9. She underwent surgery in the 1990s to align her physical anatomy with her correct, female sex. Am. Compl. ¶ 77. She also began female hormone therapy at that time, which she continues to this day. *Id.* These medical interventions were undertaken under the supervision of her physicians.

Ms. Jansen then sought to correct her legal documents to reflect what her medical record had established. Also in the 1990s, the State Department updated her passport from male to female after reviewing documentation of her surgery. Am. Compl. ¶ 80; PI Order 9. Her birth certificate, Social Security records, and state driver's license were also corrected. Am. Compl. ¶ 76; PI Order 9. These federal and state agencies all recognized, implicitly or explicitly, what had occurred: a child had been assigned the wrong sex at birth. Accordingly, Ms. Jansen has lived as a woman, and been recognized as such by all relevant government agencies, for over thirty years.

## II. The U.S. Government Has Long Permitted Changes to Sex Markers on U.S. Passports and Global Entry Cards

U.S. citizens have been able to change the sex marker on their passports and Global Entry cards for decades. A U.S. passport, which is necessary to travel out of or into the United States, *see* 8 U.S.C. § 1185; 22 C.F.R. § 53.1(a), is a travel document that "attest[s] to the identity and nationality of the bearer," 22 C.F.R. § 51.1. The Secretary of State has exclusive statutory authority to issue passports and has been delegated rulemaking authority by the President for the issuance of passports. 22 U.S.C. § 211a; Exec. Order No. 11295, *Rules Governing the Granting, Issuing, and Verifying of United States Passports*, 31 Fed. Reg. 10,603 (Aug. 5, 1966).

The process of applying for a renewed passport involves proving one's identity and likeness. Am. Compl. ¶¶ 46–47. The applicant must submit a written application providing "a true recital of each and every matter of fact," including sex, signed under penalty of perjury. 22 U.S.C. § 213.[1] It is a criminal offense to willfully and knowingly make false statements in a passport application with intent to induce or secure issuance of a passport. *See* 18 U.S.C. § 1542;

[1] The forms required for a new passport (DS-11) and for renewing an existing passport (DS-82) each contain a field for "Sex." *See* U.S. Dep't of State, *Application for a U.S. Passport* (Apr. 2025), https://perma.cc/K9TQ-QNQ6 (DS-11); U.S. Dep't of State, *U.S. Passport Renewal Application for Eligible Individuals* (Apr. 2025), https://perma.cc/4NHA-LQHX (DS-82).

22 C.F.R. § 51.20(b); *see also* PI Opp. 2.

The State Department has allowed people to change the sex marker on their passport for over three decades. *See* PI Opp. 2–3. The State Department first introduced sex as a required identity attribute on passport application forms in 1976. Am. Compl. ¶ 49. As Ms. Jansen explained in her preliminary injunction papers, the government began doing so as a way to physically identify people and to ensure the person holding the passport is who she purports to be. *See* Mot. for Prelim. Inj. at 6–7, ECF No. 66-1; Decl. of Michelle R. Kaufman ¶ 66, ECF No. 66-12. Beginning in at least 1992, the State Department allowed applicants to select a sex marker on their passport that differed from that assigned at birth by submitting medical documentation establishing that they had undergone or would soon undergo what the policy referred to as "sexual reassignment surgery." Am. Compl. ¶ 52.[2] In 2010, the State Department eliminated the requirement for surgical "reassignment" and instead allowed individuals to change the sex listed on their passport by submitting a certification from a physician that they were being treated for "sex transition." *Id.* ¶ 53.[3] Starting in 2021, the State Department permitted individuals to change the sex marker on their passports based on their own affirmation, without a physician's certification. *Id.* ¶ 54.[4]

The Global Entry program has similarly long allowed people to change their sex marker.

---

[2] *See* Passport Bulletin 92-22, *Procedures for Handling Requests for a Change in Gender in Passports* (Oct. 1, 1992), https://perma.cc/NJN7-G4CU (Attachment G of California Transgender Law 101 (Apr. 2006)).

[3] U.S. Dep't of State, 7 FAM 1300 Appendix M (June 10, 2010), https://perma.cc/4XTC-6GXG; U.S. Dep't of State, *New Policy on Gender Change in Passports Announced* (Jun. 9, 2010), https://perma.cc/Z54T-BKYZ.

[4] Press Release, U.S. Dep't of State, *Proposing Changes to the Department's Policies on Gender on U.S. Passports and Consular Reports of Birth Abroad* (Jun. 30, 2021), https://perma.cc/96V2-N9A9.

Global Entry is a CBP international trusted traveler program that facilitates the entry into the United States of pre-approved, low-risk air travelers by providing dedicated CBP processing at certain airports. *See* 8 C.F.R. § 235.12(a). The program is open to eligible U.S. citizens who have a valid U.S. passport. *See id.* § 235.12(b)(1), (f). Participants are issued a Global Entry card, which includes a sex marker. Am. Compl. ¶ 66.[5] To apply, an applicant must submit an online application, pay a fee, and attend an in-person interview. *See* 8 C.F.R. § 235.12(d)–(e). Providing "false or incomplete information on the application" is grounds for CBP to deny an application or remove a participant from the program, *see id.* §§ 235.12(b)(2)(i), (j)(2), and it is a criminal offense to knowingly and willfully provide false information, *see* 18 U.S.C. § 1001(a)(2)–(3).

CBP has long allowed people to choose their correct sex for their Global Entry participation. Am. Compl. ¶ 69; PI Opp. 4. Global Entry launched as a pilot program in 2008, *Announcement of Program Pilot: International Traveler (IRT) Registered*, 73 Fed. Reg. 19,861 (Apr. 11, 2008), and Ms. Jansen's sex marker has been "female" since her entry into the program in 2009. Am. Compl. ¶ 81.

## III. Executive Order 14168 Dramatically Changed the U.S. Government's Policies Regarding Federal Identification Documents

In early 2025, the federal government's policies regarding federal identification documents reversed 30 years of consistent practice.

**A.** On President Trump's first day of his second term of office, he issued Executive Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("Executive Order"), purportedly

---

[5] Global Entry cards can be used as identification for U.S. entry at land and sea ports of entry (although not at airports). Am. Compl. ¶ 67. Global Entry cards can also be used for a variety of other identification purposes, as they serve as lawful federal identification. *Id.* ¶ 68. For example, they can be used as lawful identification during Transportation Security Administration ("TSA") processing. *Id.*

to "defend women's rights and protect freedom of conscience by using clear and accurate language and policies." Exec. Order § 1; PI Opp. 4–6. The Executive Order states that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable." Exec. Order § 2. It provides a list of definitions to "govern all Executive interpretation of and application of Federal law and administration policy." *Id.*; *see also id.* § 3(b)–(c). Among the definitions are:

> "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.
>
> "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

*Id.* § 2(d)–(e). The Executive Order does not discuss its application to intersex people. Am. Compl. ¶ 43.

As relevant here, the Executive Order directs the Secretary of State and the Secretary of Homeland Security to "implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order." Exec. Order § 3(d). It also directs the Secretary of Health and Human Services ("HHS") to provide "clear guidance expanding on the sex-based definitions set forth in this order." *Id.* § 3(a). HHS did so on February 19, 2025, defining "[f]emale" as "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)," and defining "[m]ale" as "a person of the sex characterized by a reproductive system with the biological function of producing sperm." HHS, *Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168* at 2 (Feb. 19, 2025), https://perma.cc/4J3A-TBU5 (hereinafter HHS, *Defining Sex*); Am. Compl. ¶ 28. HHS's policy further states: "Rare disorders of sexual development do not constitute a third sex because these disorders do not lead to the production of a third gamete. That is, the reproductive system

of a person with such a disorder does not produce gametes other than eggs or sperm." HHS, *Defining Sex* at 1. That policy likewise does not suggest how to determine the sex of someone whose genetic makeup permits either or both gametes, especially those with mosaicism.

**B.** Almost immediately after Executive Order 14168 was issued and without undergoing any fact-finding, the State Department implemented a sudden and unexplained change to its longstanding policy related to passports (the "Passport Policy"). Am. Compl. ¶¶ 55–56; PI Opp. 7–8. Within days, the State Department issued an internal cable directing that "[t]he policy of the United States is that an individual's sex is not changeable." Am. Compl. ¶ 55 (citation omitted).

Shortly thereafter, the State Department finalized its policy to "only issue a passport with an M or F sex marker that matches the customer's biological sex at birth" and to "not honor attestations requesting a preferred sex marker." *Id.* ¶ 56 (quoting U.S. Dep't of State, *Sex Marker in Passports*, https://perma.cc/VC9E-BQ5T); ECF No. 66-9 at 2–3 (memorandum from senior official in Bureau of Consular Affairs to bureau leadership); ECF No. 66-10 at 2–3 (memorandum from senior official in Bureau of Consular Affairs to diplomatic and consular posts).[6] The State Department considers "biological sex at birth" on the basis of original birth certificates. Am. Compl. ¶ 57; ECF No. 66-9 at 2–3; ECF No. 66-10 at 2–3. As since clarified in related litigation, the State Department "relies on HHS's definitions of 'male' and 'female,' rather than the Executive Order's definitions of these terms" because it "does not have the capacity to adjudicate 'sex at conception.'" *Orr v. Trump*, 778 F. Supp. 3d 394, 404 (D. Mass. 2025) (citation omitted), *vacated and appeal dismissed*, 178 F.4th 34 (1st Cir. 2026); *see also* HHS, *Defining Sex*, *supra*.

[6] The Court may take judicial notice of the referenced government memoranda, which are attached as exhibits to Ms. Jansen's preliminary injunction motion, as they are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Hurd v. Dist. of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (quoting Fed. R. Evid. 201(b)).

**C.** DHS and CBP have also implemented the Executive Order as to Global Entry (the "Global Entry Policy"). Am. Compl. ¶¶ 70–71. The new Global Entry Policy now uses the same or similar definitions of "male" and "female" as provided in the Executive Order to determine the sex marker of Global Entry participants: defining "[f]emale" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and defining "[m]ale" as "a person belonging, at conception, to the sex that produces the small reproductive cell." Exec. Order § 2(d)–(e); Am. Compl. ¶ 71. Alternatively, CBP uses the same or similar definitions of "male" and "female" as does the Passport Policy: "the customer's biological sex at birth." Am. Compl. ¶ 71.

## IV. Procedural History

Ms. Jansen filed this lawsuit on September 2, 2025. Compl., ECF No. 1. Following appointment of pro bono counsel, Ms. Jansen filed an amended complaint on January 30, 2026. Am. Compl. Ms. Jansen's amended complaint brings claims challenging the Executive Order, the Passport Policy, and the Global Entry Policy under the Administrative Procedure Act; the Fifth Amendment's Due Process Clause for violation of her right to equal protection of the laws; the Fifth Amendment's Due Process Clause for violation of her fundamental right against the disclosure of intimate, private information about her body; and the First Amendment.

On August 24, 2026, the Court denied Ms. Jansen's renewed motion for a preliminary injunction to enjoin the government from enforcing the Executive Order and the Policies against her in advance of her deadline to renew her Global Entry participation. PI Order. The Court declined to reach the merits, instead holding that Ms. Jansen did not sufficiently show that she would be irreparably harmed in the absence of an injunction. *See id.* at 12.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege sufficient factual matter to state a facially plausible claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept well-pleaded factual allegations as true, construe the complaint liberally, and afford the plaintiff the benefit of all reasonable inferences from the alleged facts. *See Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 441 (D.C. Cir. 2020).

## ARGUMENT

### I. MS. JANSEN SUFFICIENTLY ALLEGES HER CLAIMS.

#### A. The Passport Policy and the Global Entry Policy violate the APA.

The APA instructs courts to "set aside" any agency action that is "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). The Passport Policy and the Global Entry Policy (collectively, the "Policies") are final agency actions subject to review under the APA. Contrary to the government's contention, the agencies cannot evade judicial review by invoking the narrow reviewability exception for presidential action. And the merits of Ms. Jansen's arbitrary-and-capricious claim cannot be resolved on a motion to dismiss without the benefit of the administrative record. Regardless, even a glancing review confirms that the agencies failed their basic obligations under the APA.

##### *i. The narrow reviewability exception for presidential action does not apply.*

The Policies are textbook examples of "final agency action[s]," 5 U.S.C. § 704, and the government cannot evade judicial review by mischaracterizing them as presidential actions.

The Policies are each "agency action" because they are agency "rule[s]," 5 U.S.C. § 551(13)—*i.e.*, "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4). And they are "final" agency action because they each (1) "mark the 'consummation' of the agency's

decisionmaking process" and (2) are actions "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). The Policies are the consummation of the State Department's and CBP's decisionmaking processes with respect to sex markers on passports and Global Entry.

The government nevertheless insists that the Policies are presidential action, not agency action, and they are therefore unreviewable under the narrow exception in *Franklin v. Massachusetts*, 505 U.S. 788 (1992). Mot. 9–13. But the mere fact that the Policies implement an executive order does not transform them into presidential action, insulated from review under the APA. The plain text of the APA authorizes review of all final "agency action," and there is no carveout for agency action pursuant to an executive order. 5 U.S.C. § 704. Consistent with that principle, courts have "never excepted a final rule from APA review because it carried out a presidential directive." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024).

Indeed, courts have "soundly rejected" the government's argument that a challenge to a regulation implementing an executive order is an unreviewable challenge to the executive order itself. *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020) (citation omitted), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and* 2021 WL 1037866 (D.D.C. Feb. 19, 2021) ("APA review of an Executive Branch official's actions is thus not precluded merely because the official is carrying out an executive order."); *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 468–69 & n.4 (D.D.C. 2020) ("[T]he D.C. Circuit … has held that agency regulations promulgated pursuant to executive orders are reviewable under the APA."). Instead, as the D.C. Circuit has explained, *Franklin* shields an action from review only when "the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action directly to affect the parties." *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (emphasis

added); *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question.").

That is not the case here. The State Department, DHS, and CBP, not the President, have authority over the "final step necessary for the agency action[s] directly to affect the parties." *Pub. Citizen*, 5 F.3d at 552. At the outset, the express terms of the Executive Order direct the agencies to "implement changes" consistent with its instructions. Exec. Order § 3(d) (directing "[t]he Secretaries of State and Homeland Security" to "implement changes to require that government-issued identification documents, including passports … and Global Entry cards, accurately reflect the holder's sex, as defined" by the Executive Order). The Executive Order also expressly directs the agencies to comply with existing law in implementing these changes. *Id.* § 8(a)(i), (b) (noting that the Executive Order "shall [not] be construed to impair or otherwise affect … the authority granted by law to an executive department or agency, or the head thereof," and it "shall be implemented consistent with applicable law and subject to the availability of appropriations"). This language necessarily implies discretionary authority by the agencies to determine how best to implement the Executive Order consistent with both the Order itself and existing law.

Consistent with the language of the Executive Order, the government has acknowledged that the State Department exercised "independent discretion" in implementing Executive Order 14168. *See* Defs.' Opp'n to Pl.'s Mot. for a Prelim. Inj. at 13, ECF No. 71 ("PI Opp.") ("[T]he Department of State did exercise limited independent discretion to procedurally meet the requirements of the Executive Order."). The State Department exercised its independent discretion by departing from the Executive Order's definitions of male and female, determining what sources

of evidence are relevant to assessing "sex at birth," and determining how to adjudicate "sex at birth" in light of "inconclusive" information. Am. Compl. ¶¶ 25, 56–57; U.S. Dep't of State, *Sex Marker in Passports*, https://perma.cc/VC9E-BQ5T; ECF No. 66-9 at 2–3; ECF No. 66-10 at 2–3. And the exercise of this independent discretion confirms that the State Department could have exercised independent discretion to make other choices. DHS and CBP had the same level of discretion in implementing the Global Entry Policy. That independent discretion forecloses any argument that the President took the relevant "final step" of the agency action. *Pub. Citizen*, 5 F.3d at 552. Ms. Jansen's APA claims are based on the *agencies'* "independent" and "discretion[ary]" choices, PI Opp. 13—as this District has twice held when reviewing the same Executive Order at issue here, *see Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 138 (D.D.C. 2025); *Kingdom v. Trump*, 2025 WL 1568238, at *1 (D.D.C. June 3, 2025). In other words, "the target stop[ped] moving" with the agencies, not the President. *Franklin*, 505 U.S. at 798.

The government's insistence (at 10) that the challenged definitions "come directly from the Executive Order itself" is simply wrong, as the agencies did not use the Executive Order's definitions of "male" and "female." Indeed, their choice to depart from the Executive Order's definitions is the only reason the government can now argue that Ms. Jansen falls within *either* definition of male or female—since she was born with both male and female sex chromosomes and therefore did not "belong[], at conception, to the sex that produces" either "the small reproductive cell" *or* "the large reproductive cell." Exec. Order § 2. The government cannot pretend that the State Department had no discretionary authority when its discretionary choices directly affected Ms. Jansen above and beyond the Executive Order.

In any event, Ms. Jansen's APA claim does not challenge the Policies' mere definitions

standing alone. *Cf.* Mot. 10–11. She challenges the agencies' utter failure to consider or account for the undisputed biology of intersex people in the process of implementing the Executive Order. That result was not dictated by the Executive Order. The Executive Order did not direct the agencies to ignore intersex people; in fact, it did not discuss its application to intersex people at all. So the government cannot hide behind the Executive Order to excuse compliance with its basic APA obligations. *See, e.g.*, *Zaid v. Exec. Off. of President*, 815 F. Supp. 3d 113, 138 (D.D.C. 2025) (presidential memorandum that "expressly directed agency heads to act 'consistent with existing law'" did not allow agency to circumvent preexisting regulations), *appeal docketed*, No. 26-5009 (D.C. Cir. Jan. 13, 2026).

The government's reliance on *Detroit International Bridge Co. v. Government of Canada*, 189 F. Supp. 3d 85, 102 (D.D.C. 2016), *aff'd on other grounds*, 875 F.3d 1132 (D.C. Cir. 2017), and its predecessor cases is misplaced.[7] As many district courts have since explained, these cases at most hold that purely "ministerial implementation of presidential action" is unreviewable. *Gomez*, 485 F. Supp. 3d at 178 (discussing *Detroit Int'l Bridge Co.*); *see also Milligan v. Pompeo*, 502 F. Supp. 3d 302, 314 (D.D.C. 2020) (same); *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143 (D.D.C. 2021) (same). Here, the Policies "are in no sense a ministerial implementation of presidential action." *Gomez*, 485 F. Supp. 3d at 178. The agencies had discretion and exercised that discretion.

That the President may have exercised discretionary authority under the Passport Act or Article II in issuing the Executive Order does not shield the agencies' subsequent actions from APA review. *See* Mot. 12.[8] That position would allow the President to "evade APA-mandated

[7] *Detroit* relied on and echoed the same reasoning in the government's two other cited cases. *See* Mot. 10–11 (citing *NRDC v. Dep't of State*, 658 F. Supp. 2d 105 (D.D.C. 2009), and *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18 (D.D.C. 2001), *aff'd on other grounds*, 306 F.3d 1138 (D.C. Cir. 2002)).

[8] Notably, the Executive Order does not mention the Passport Act or Article II; it explicitly invokes only 5 U.S.C. § 7301, which grants the President authority to "prescribe regulations for the conduct

accountability" over broad swaths of discretionary agency action "by simply issuing an executive order first." *Su*, 121 F.4th at 16. The proper question is not the source of the President's authority to direct the agency, but rather the scope of the *agency's* discretionary authority to take action. *See Bennett*, 520 U.S. at 178 (*Franklin* was "premised on the observation that the [challenged agency] report [to the President] carried 'no direct consequences' and served 'more like a tentative recommendation than a final and binding determination'" (citation omitted)). In other words, the question is whether (a) the President retains control over the "final step," *Pub. Citizen*, 5 F.3d at 552, or (b) the President's authority is "delegated to an agency head," even if still "directed by the President." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001). If the latter, then "the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern." *Id.*

Here, the President has indeed "stepped into the shoes" of the agencies by directing them to "implement changes" to government identification documents to "accurately reflect the holder's sex," as defined in the Executive Order. Exec. Order § 3(d). That left the agencies with some level of "independent discretion" in choosing *how* to implement—discretion that the government has acknowledged it in fact exercised. PI Opp. 13. Indeed, courts have regularly found agency action reviewable despite the fact that it implements a presidential directive—including presidential directives issued pursuant to *presidential* statutory and constitutional authority.[9]

---

of employees in the executive branch." Exec. Order. Regardless, the Secretary of State has exclusive statutory authority to issue passports and has been delegated rulemaking authority by the President for the issuance of passports. 22 U.S.C. § 211a; Exec. Order No. 11295, *Rules Governing the Granting, Issuing, and Verifying of United States Passports*, 31 Fed. Reg. 10,603 (Aug. 5, 1966).

[9] *See Tate*, 513 F. Supp. 3d at 143; *Milligan*, 502 F. Supp. 3d at 312–14; *Gomez*, 485 F. Supp. 3d at 177; *Ashtari*, 496 F. Supp. 3d at 468–69; *Ruhumuriza v. Higgins*, 2026 WL 587636, at *9 (D.D.C. Mar. 3, 2026); *O.A. v. Trump*, 404 F. Supp. 3d 109, 147 (D.D.C. 2019); *Kingdom*, 2025 WL 1568238, at *10; *Drs. for Am.*, 793 F. Supp. 3d at 138.

**ii. The Policies are arbitrary and capricious.**

The amended complaint plausibly alleges that the Policies are neither reasonable nor reasonably explained, and the government cannot use the Executive Order as a crutch to excuse that failure. At the outset, "the government has jumped the gun in moving to dismiss [Ms. Jansen's] arbitrary-and-capricious claim" on the merits because it has not yet produced the respective administrative records. *E.Q. v. DHS*, 835 F. Supp. 3d 221, 249 (D.D.C. 2026); *see also id.* at 250 (collecting cases); *Farrell v. Tillerson*, 315 F. Supp. 3d 47, 69 (D.D.C. 2018) ("Because the defendants have requested that the Court defer their obligation to produce an administrative record until after adjudication of their motion to dismiss, … the Court cannot properly evaluate the plaintiff's claims that the defendants acted arbitrarily and capriciously.") (collecting cases).

The Court can, however, determine that the amended complaint plausibly alleges that the Policies are neither "reasonable" nor "reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). In reviewing agency action under the arbitrary-and-capricious standard, courts must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation and internal quotation marks omitted); *accord Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005). In doing so, courts are limited to reviewing the reasonableness of the agency's own explanation. Thus, the court may not "substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, nor may it affirm on a ground not relied upon by the agency, *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). The amended complaint plausibly alleges that the agencies failed to meet these obligations here.

### *1. The Passport Policy is neither reasonable nor reasonably explained.*

Ms. Jansen plausibly alleges that the State Department's Passport Policy is unreasonable because the Department entirely ignored intersex people, failed to consider any less restrictive alternatives for intersex people, and provided no justification for departing from longstanding prior policy related to intersex people. Any one of these failures is fatal.

Most fundamentally, the Passport Policy "entirely failed to consider an important aspect of the problem": intersex people. *State Farm*, 463 U.S. at 43. The Policy's "sex at birth" standard, determined by looking to original birth certificates, *see* U.S. Dep't of State, *Sex Marker in Passports*, https://perma.cc/VC9E-BQ5T ("the sex marker at [one's] birth"); *see also* ECF No. 66-9 at 3 ("documentation issued closest to an individual's birth"), ignores that intersex people have atypical biological characteristics that can result in an inaccurate sex marker at birth, Am. Compl. ¶¶ 37–40. In implementing this policy, the State Department made no factual findings about intersex people, collected no information about intersex people, and offered no explanation for how its definitions ultimately apply to someone like Ms. Jansen, whose cells carry XX, XY, and XXXY chromosomes and who was incorrectly assigned male at birth as a direct result of her intersex condition. The sole indication that the State Department was even aware that intersex people exist itself indicates that the State Department seeks to ignore their biology: the Policy explains that "a designation of intersex" on an applicant's birth certificate or other documentation "will" result in "suspens[ion of] the application" while the State Department investigates "whether the applicant is male or female." ECF No. 66-9 at 2.

Nothing in the Executive Order precludes the State Department from recognizing intersex people, so the State Department could have easily accommodated them consistent with the Executive Order's directives. Indeed, the Order does not discuss its application to intersex people.

Its definitions of "male" and "female" do not conclusively categorize intersex people, who (like Ms. Jansen) are often neither "a person belonging … to the sex that produces the large reproductive cell" *nor* "the small reproductive cell" "at conception." Exec. Order § 2(d)–(e). The only sex determination that could even *theoretically* exist "at conception" is a sex determination based on chromosomal configuration, as a fertilized egg is a single cell with no reproductive systems. *See* MedlinePlus, *Cell Division* (last reviewed Aug. 18, 2025), https://perma.cc/PN6N-JE4L ("*Cell Division*"). And intersex people often defy chromosomal definitions because they do not consistently carry only XX or only XY chromosomes. Am. Compl. ¶¶ 38, 40, 73. Moreover, the Executive Order's assertion that the "sexes are not changeable" does not conclusively address circumstances (like Ms. Jansen's) where an intersex person does not seek to "change[]" her sex but was simply assigned the wrong sex on her birth certificate due to atypical biological traits. Exec. Order § 2. The government acknowledges that the State Department had some level of "independent discretion" in implementing the Executive Order—at the very least, discretion to ensure the policies were "procedurally" workable. PI Opp. 13; *Orr*, 778 F. Supp. 3d at 404 (noting that State Department changed the Executive Order's definitions). Thus, just as the State Department altered the Executive Order's definitions of "male" and "female," it could have provided—for example—a limited exception for intersex people whose atypical biology resulted in an inaccurate sex marker at birth. Or it could have accepted medical documentation regarding a person's complete biological picture at birth, rather than relying exclusively on birth certificates. The State Department's failure to even consider intersex people, much less provide an exception for intersex people whose sex assigned at birth was demonstrably incorrect, was arbitrary and capricious. Such a failure to consider obvious alternatives "has led uniformly to reversal." *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (citation omitted).

HHS's guidance does not bridge the gap. *Cf.* Mot. 16. That guidance summarily concludes that intersex people "do not constitute a third sex" because they "do[] not produce gametes other than eggs or sperm." HHS, *Defining Sex*, *supra*, at 1; *see also* HHS, *Sex-Based Definitions*, https://perma.cc/JPB9-TJT9. But the guidance has no justification for nevertheless barring intersex people from changing their sex marker in light of a demonstrably *inaccurate* sex assignment at birth. "Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of [APA] review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010) (citation omitted). Nor does the HHS guidance provide workable definitions for intersex people. It suggests that the key inquiry in defining sex is the "'biological function' of the reproductive system." Mot. 16 (citing HHS, *Sex-Based Definitions*, https://perma.cc/JPB9-TJT9). But the government does not explain what it means to have the "function" of producing sperm or eggs, except that it does *not* require the literal ability to produce sperm or eggs. *See id.* And if "function" is divorced from literal ability, then the operative criterion has shifted from "function" of reproductive organs to "generally outwardly resembles the reproductive structures associated with male." Of course, the outward appearance of reproductive systems at birth has no reasonable application to intersex people like Ms. Jansen. And it arbitrarily elevates one physiological trait—apparent reproductive systems at birth—above all others, ignoring the full biological picture.

The State Department's failure is particularly egregious given that the Passport Policy is a sudden departure from over three decades of prior practice. While agencies are allowed to change policies, they "must 'offer a reason to distinguish [the prior policy] or explain its apparent rejection of [the prior] approach.'" *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020)

(quoting *Southwest Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)). And they must "take[] into account" the "serious reliance interests" that the prior "polic[y] may have engendered." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (citation omitted).

The Passport Policy acknowledged the prior policy but, again, made no attempt to explain why the Executive Order precluded an exception for intersex people. *See*, *e.g.*, *Moshea v. Nat'l Transp. Safety Bd.*, 570 F.3d 349, 352 (D.D.C. 2009) ("The Board's analysis suffers from a separate flaw that also requires vacatur … [b]y departing from the [prior] precedent without explanation, the Board here acted in an arbitrary and capricious manner."). Nor did the State Department consider the "serious reliance interests" implicated by its sudden and extreme policy reversal. *Encino Motorcars*, 579 U.S. at 221–22. For over thirty years, Ms. Jansen has "legitimate[ly] reli[ed]" on the ability to obtain a passport with a sex marker consistent not only with her lived sex, but also with her other state and federal identification documents. Am. Compl. ¶ 167; *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). She was listed as the mother on her children's birth certificates in reliance on her ability to correctly and consistently identify herself as female. Am. Compl. ¶ 96. Suddenly forcing her to use a passport with an inconsistent male sex marker upends that reliance and risks serious harm to her. *Id.* ¶¶ 72–101. The State Department provided no consideration to those, like Ms. Jansen, who have for decades structured their lives and obtained identification documents on the assumption that their sex will be accurately represented in federal identification documents and they will not be "outed" by inaccurate sex markers on those documents. Contrary to the government's suggestion (at 16) that these are merely "[]conclusory," it is hard to fathom a case with stronger reliance interests on the government's *decades* of consistent policy and practice. *See Regents of the Univ. of Cal.*, 591 U.S. at 30.

The Court's inquiry ends here, as courts may not "affirm" agency action "on a ground other

than that relied upon by the agency," *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011), nor "supply a reasoned basis for [an] agency's action that the agency itself has not given," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (citation omitted). And an agency that fails to consider an entire category of people affected by its policy has failed the most basic requirement of reasoned decisionmaking. *See State Farm*, 463 U.S. at 43. That result is not only inexplicable, but dangerous. Forcing an intersex, post-operative person like Ms. Jansen to use a sex marker that does not reflect her lived sex risks her safety and well-being. Am. Compl. ¶¶ 6, 90–101. The Passport Policy did not even attempt to rationalize this irrational, dangerous result.

***2. The Global Entry Policy is neither reasonable nor reasonably explained.***

DHS and CBP fare even worse than the State Department, as they have failed to provide *any* public information regarding their implementation of the Executive Order. The amended complaint plausibly alleges that DHS and CBP implemented the Executive Order by adopting the same or similar definitions of "male" and "female" as the Executive Order itself, or the same or similar definitions as the State Department. Am. Compl. ¶¶ 70–71. This Court accepts those allegations as true for the purpose of the pleadings. *See Zukerman*, 961 F.3d at 441.

DHS and CBP's failure to provide any public explanation regarding their implementation of the Executive Order is facially insufficient. *See, e.g.*, *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 33 (D.D.C. 2025) ("Not only is there an absence of 'reasoned analysis' from the defendants; there is an absence of any analysis whatsoever."), *appeal docketed*, No. 25-5144 (D.C. Cir. Apr. 24, 2025). Additionally, DHS and CBP's failure to exercise their discretion in considering intersex people or providing an exemption for intersex people is also independently fatal to the Global Entry Policy—even if DHS and CBP implemented the Executive Order with no modification. Like

the State Department, DHS and CBP had at least some amount of discretion in implementing the Executive Order, regardless of whether or not they chose to exercise that discretion. Choosing not to provide an exemption for intersex people was therefore arbitrary and capricious. *See supra* pp. 17–21 (Passport Policy was arbitrary and capricious).

#### *3. The emergency stay order in* **Orr** *does not excuse the agencies from complying with the APA.*

The government argues (at 13–14) that, even if *Franklin* does not bar review, the mere existence of the Executive Order excuses the agencies from the APA's requirement of a reasoned explanation. But this extends the Supreme Court's emergency-docket order in *Orr*, 146 S. Ct. 44, far beyond what the order actually holds. That order did not hold that the State Department is *per se* excused from providing a reasoned explanation in implementing any aspect of the Executive Order's direction with respect to passports; it held only that the State Department need not explain its choice to "declin[e] to depart from" the Executive Order's direction with respect to passports. *Id.* at 46. And unlike the plaintiffs in *Orr*, Ms. Jansen's APA claim does not challenge the agencies' choice not to "depart from" the Executive Order. *Id.*

Rather, as explained, she challenges the independent, discretionary choices *related to intersex people* that the agencies made in implementing those rules. Nothing in the Executive Order dictated these choices. Again, the Order did not direct agencies to ignore or exclude intersex people; it did not instruct agencies to adjudicate "biological sex" based on original birth certificates; and it did not prohibit agencies from exempting intersex people. The agencies' own choices to ignore intersex people were thus neither "obvious" nor "mandatory" in light of the Executive Order. Mot. 14. Indeed, Ms. Jansen's challenges are distinct from the *Orr* plaintiffs' APA claims that the Supreme Court preliminarily rejected. Ms. Jansen's challenges relate to the biology of intersex people and the State Department's failure to even consider intersex people,

neither of which were arguments directly presented by the *Orr* plaintiffs. *See* Mot. for Prelim. Inj. at 12–14, *Orr*, No. 1:25-cv-10313 (D. Mass. Feb. 18, 2025), ECF No. 30.

**B. The Executive Order and the Policies violate Ms. Jansen's Fifth Amendment right to equal protection.**

The Fifth Amendment ensures that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."[10] U.S. Const. amend. V. It also imposes upon the federal government the "obligation to respect the personal right to equal protection of the laws." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 231–32 (1995). The Executive Order and the challenged agency Policies fail under the Fifth Amendment because they lack any rational relationship to the government's proffered legitimate state interests, and because they unconstitutionally discriminate based on intersex status.[11] Indeed, if (as has been the case for decades) the government's interest in using sex markers on passports is one of "identification," then the Executive Order and the Policies *affirmatively undermine* that interest by "identifying" a document holder like Ms. Jansen in a way that is inconsistent with all of her other forms of identification, not to mention her appearance and lived experience for the past three decades.

***i. The Executive Order and the Policies are fundamentally irrational.***

The Executive Order and the Policies "lack[] a rational relationship to legitimate state interests" as applied to intersex people because they subvert the government's claimed interests (at 15–16) in "identification" and "uniformity." *Romer v. Evans*, 517 U.S. 620, 632 (1996); *see also Talbott v. United States*, 176 F.4th 720, 737 (D.C. Cir. 2026). Defining sex based on

---

[10] In addition to direct claims under the Constitution, Ms. Jansen raises each of her constitutional claims under the APA. 5 U.S.C. § 706(2)(B).

[11] Because the complaint states a plausible claim for relief even under the lowest level of constitutional scrutiny, the Court need not decide whether heightened scrutiny applies for purposes of this motion.

chromosomes (as the Executive Order apparently does) or based on original birth certificates (as the Policies do) only *undermines* the government's ability to identify people or to maintain consistency in government records. A law that is otherwise valid[12] may still be unconstitutional in its application to a particular plaintiff where the government's proffered justifications, examined against the specific facts of that plaintiff's circumstances, provide no rational basis for the differential treatment. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448–50 (1985) (invalidating zoning ordinance as applied where the city's proffered justifications provided no rational basis for treating a group home for persons with intellectual disabilities differently).

To begin, the Executive Order does not rationally further an interest in allowing government officials to identify whether intersex people traveling internationally are who their passport says they are. The Executive Order defines sex as based on whether a person "belong[ed], at conception, to the sex that produces the large reproductive cell" or "the small reproductive cell." Exec. Order § 2(d)–(e). Because humans "at conception" are a single cell, there is only one biological trait that can be used to define sex "at conception": chromosomes. *See Cell Division*, supra. But intersex people present with a variety of atypical biological and chromosomal traits, including sex chromosomes typically associated as male but genitals associated as female; sex chromosomes typically associated as female, and a uterus and ovaries, but external genitals associated as male; sex chromosomes that are *both* male and female, along with *both* ovarian and testicular tissue; or, as in Ms. Jansen's case, sex chromosomes that are *both* male and female, along with *underdeveloped* male reproductive organs (*i.e.*, organs that never fully differentiated between male and female and thus have biological characteristics of both). Am. Compl. ¶¶ 38, 40, 73–75.

---

[12] Ms. Jansen seeks injunctive relief only for herself, but Ms. Jansen does not concede the validity of the Executive Order and the Policies as to others.

Her development after birth also proceeded atypically—she had high estrogen levels, low testosterone levels, could not produce sperm, and grew only to 5'1" as a result of premature bone plate closure. *Id.* ¶¶ 74–75. In other words, as the amended complaint plausibly alleges, forcing people to carry sex markers based on their chromosomal configuration does not help government officials determine whether a person presenting a passport is in fact the passport holder. Indeed, this rationale is "so discontinuous with the reasons offered" that it seems "inexplicable by anything but animus toward" intersex people. *Romer*, 517 U.S. at 631. If anything, the Executive Order serves only the function of identifying these individuals as intersex or transgender people—and the government has wisely *never* contended that the purpose of gender markers on passports or Global Entry cards is to identify the holders of those documents *as transgender or intersex*.

Nor does defining sex based on chromosomes further an interest in consistent identification documentation across government documents. Because intersex people present with a variety of atypical biological and chromosomal traits, intersex people with typical female (XX) sex chromosomes are often designated as male at birth, and vice versa. Am. Compl. ¶¶ 37–40, 42. Accordingly, as in Ms. Jansen's case, states generally permit corrections to birth certificates when the full biological picture of an individual demonstrates that the assignment made at birth was incorrect. And they similarly permit intersex people to change gender markers on other state-identifying documents (like drivers' licenses) to reflect their full biological picture. Thus, the Executive Order ensures only that an intersex person's government identification documents will be *inconsistent*. And that is true even when looking at *federal* identifying documentation, because Global Entry cards must be renewed every five years, whereas passports must be renewed only every ten years, and Social Security records need not be renewed at all. In Ms. Jansen's case, for example, if she renews her Global Entry card now (because it expires in November), her *federal*

identifying documents will be inconsistent for at least the next six years (when her passport must be renewed). That directly *undermines* any purported interest in consistency among federal records.

The challenged Policies are also "discontinuous with the reasons offered for [them]." *Romer*, 517 U.S. at 632. Defining sex as "sex at birth," *i.e.*, based on the sex marker on one's original birth certificate, does not further an interest in physical identification with respect to intersex people. Intersex people whose lived sex differs from their sex assigned at birth do not physically appear to be the sex they were assigned at birth. For example, Ms. Jansen lives as a woman, is perceived as female, and has anatomy reflecting her female sex. Am. Compl. ¶¶ 72, 75, 77–78. Designating intersex people based on the sex marker listed on their original birth certificates means that "sex" is based on whether their intersex condition was caught at birth and how medical professionals and parents reacted at that time. That is not "[b]iological [t]ruth" (Exec. Order); it is chance. The government cannot legitimately suggest—and indeed, hardly even tries to suggest—that identifying someone as "male" who by all physical markers appears female helps border officials confirm whether a person carrying a correct passport or Global Entry card is who she purports to be.[13]

Nor do the Policies further any interest in uniformity across federal documentation. To the contrary, the Policies again create the very discrepancies they purport to fix. Sex markers in federal documentation were already uniform prior to these Policies. Ms. Jansen's federal documents, for example, have consistently identified her as "female" for the last three decades—including her

[13] The government's suggestion that "[s]ome transgender individuals 'detransition' later in life" so as to "identify again with the gender that corresponds to their biological sex," Mot. 15 (quoting *United States v. Skrmetti*, 605 U.S. 495, 551 (2025) (Barrett, J., concurring)), merits little response, as this case is about intersex people whose "biological sex" definitionally does not conform to the government's narrow views.

passport and Social Security Administration records. Am. Compl. ¶¶ 76, 80–82. The Policies themselves will make her records inconsistent, given the government's insistence that Ms. Jansen may retain her current passport (which correctly identifies her as a woman) for the next six years, but must use a Global Entry card that would incorrectly identify her as a male. *See, e.g.*, PI Opp. 9, ECF No. 71. And even six years from now, Ms. Jansen's passport and Global Entry card will still be inconsistent with her Social Security records, which accurately reflect her female sex. Am. Compl. ¶¶ 76, 82.[14]

To the extent the government seeks to rely on HHS guidance to fill in gaps in the Executive Order or the Policies, that guidance similarly fails to further any interests in identification or uniformity. As explained above, *see supra* p. 19, HHS guidance defines sex by looking to the "'biological function' of the reproductive system." Mot. 16 (citing HHS, *Sex-Based Definitions*, https://perma.cc/JPB9-TJT9). But this criterion boils down to mere outward physical resemblance of genitalia at birth. Of course, designating people based on the general outward resemblance of their external genitalia at birth does not assist with physical identification, unless the government suggests it intends to demand people carry around photographic evidence from their birth, or that officials around the world are going to start asking individuals at border crossings what their genitalia looked like at birth. But that is not how border crossings work: officials use gender markers to identify whether the individual holding the passport is the person depicted in the passport rather than someone attempting to cross unlawfully using someone else's passport. Nor does HHS guidance assist with uniformity across federal documentation, for the same reasons explained above with respect to original birth certificates.

---

[14] Forcing Ms. Jansen to use a male sex marker on her passport and Global Entry card will also render them inconsistent with her state identification documents, which carry a female sex marker.

Finally, the Supreme Court's emergency docket order in *Orr*, 146 S. Ct. at 46, does not require dismissal of Ms. Jansen's equal protection claim. That order did not address Ms. Jansen's rational-basis arguments regarding intersex people, as it suggested only that (1) the Passport Policy does not discriminate on the basis of sex (the only class decided by the district court in that case), and (2) the plaintiffs had failed to establish that the Passport Policy was motivated solely by animus "on th[e] record" before the Court. *Id.* In any event, as the government recognizes (at 13), the Supreme Court's "interim orders are not conclusive as to the merits." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). That decision thus did not foreclose even the court in *Orr* from continuing to adjudicate the claims, much less foreclose this Court from doing so on different claims with a different plaintiff on a different record.

Indeed, the government fails to explain why the Supreme Court's statement that a sex marker at birth is a "historical fact," *Orr*, 146 S. Ct. at 46, has any bearing on Ms. Jansen's rational-basis argument. That a sex marker at birth is a "historical fact" does not help with physically identifying people: border officials do not ask about, and certainly cannot observe, a person's chromosomes or what their external genitalia looked like at birth—regardless of whether those "facts" are "historical." Nor does it help with uniformity across government records, again for all the same reasons explained above.

The Executive Order and the Policies therefore do not rationally further any purported interests in identification or uniformity as applied to intersex people. While the government need not "produce evidence" to support rationality, there must be *some* "conceivable basis" for the challenged laws. Mot. 22 (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993)). Because there is no other apparent, legitimate interest that could support these laws' application to intersex people like Ms. Jansen, the only remaining inference is that they were born of animosity. *See*

*Romer*, 517 U.S. at 632–35; *see* Am. Compl. ¶¶ 30–36 (alleging animus). And the Constitution does not tolerate a law premised solely on animosity. *See Talbott*, 176 F.4th at 745–47 (holding plaintiffs were likely to succeed in showing that this Administration's transgender military ban was "soaked in animus").

***ii. The Executive Order and the Policies unconstitutionally discriminate based on intersex status.***

The Executive Order and the Policies discriminate based on intersex status as applied to Ms. Jansen. Although the Policies fail any level of scrutiny, the amended complaint sufficiently alleges that intersex people are a quasi-suspect class and thus are entitled to heightened scrutiny. Contrary to the government's dramatic pronouncement (at 20), the Supreme Court has not discredited the test for quasi-suspect classes. *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (applying the test); *cf. Skrmetti*, 605 U.S. at 517 (declining to apply test solely because the case did "not raise that question"). And courts of appeals have recognized new suspect classes where appropriate—as is the case here.[15]

The Executive Order discriminates directly against intersex people like Ms. Jansen by classifying on the basis of chromosomes. As explained, the Order's definitions refer to sex "at conception," at which time the only knowable trait is chromosomal composition. *See Cell Division*, *supra*. That means intersex people like Ms. Jansen, who do not have typical sex chromosomes (*i.e.*, they do not have solely XX or solely XY sex chromosomes), do not fit into *either* of the Executive Order's categories. *See* Am. Compl. ¶ 73.

The Policies also discriminate against intersex people like Ms. Jansen. The Policies

---

[15] *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 613 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013).

classify on the basis of "sex at birth," which they define with reference to original birth certificates. These definitions bar many intersex people from obtaining a sex marker consistent with their lived sex, simply because their atypical physiological traits resulted in an incorrect designation at birth. Had Ms. Jansen not been born with mosaicism—had she been born with only typical female biological characteristics—she would be able to obtain federal identification documents reflecting her correct, lived sex. That is undisputed. Yet the government, once again, simply ignores that intersex people like Ms. Jansen have atypical biology. Instead, it accuses Ms. Jansen of seeking "preferential treatment" for her "gender identity." Mot. 19–20. But Ms. Jansen seeks only the same treatment she would be given if she had not been born with mosaicism. That is not "preferential treatment"—it is equal treatment.

The test for identifying a quasi-suspect class is well established. *See Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987). Quasi-suspect classes have historically been subject to discrimination, *Cleburne*, 473 U.S. at 440–41; they have a defining characteristic that bears no relation to their ability to contribute to society, *id.*; they comprise a discrete group characterized by obvious, immutable, or distinguishing characteristics, *Bowen*, 483 U.S. at 602; and they lack political power, *id.* The government can defend against that well-established test only by ignoring basic science and history.

First, the defining feature of intersex people is that they were born with immutable physiological characteristics—including chromosomes, reproductive glands, and/or reproductive anatomy—that do not fit the typical binary definitions of "male" and "female." Am. Compl. ¶ 116; *Zzyym v. Pompeo*, 958 F.3d 1014, 1028 & n.8 (10th Cir. 2020) (collecting academic literature defining intersexuality); HHS, *Advancing Health Equity for Intersex Individuals* 3 (Jan. 2025), https://perma.cc/CY85-68RM (hereinafter *HHS Report*). As HHS has recognized, intersex also

comprises "an identity and community." *HHS Report*, supra, at 3. Those immutable physiological characteristics bear no relation to their ability to contribute to society. Am. Compl. ¶ 116. Just as sex "generally provides no sensible ground for differential treatment," neither does being intersex. *Cleburne*, 473 U.S. at 440–41 (citing *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973)).

The mere fact that some intersex conditions are not always medically recognized at the moment of birth does not make them any less immutable. *Cf.* Mot. 20. Indeed, contrary to the government's suggestion, Ms. Jansen's mosaicism is a chromosomal condition that has defined her biology since the moment of her conception. Am. Compl. ¶¶ 73–75. The government cannot change her biology simply by parroting the phrase "gender identity." Similarly, variations in intersex conditions do not make the fundamental shared characteristics of intersex people any less distinct or consistent. *Cf.* Mot. 20–21.

Second, intersex people have historically suffered, and continue to suffer, discriminatory treatment. Am. Compl. ¶ 117. The government rightfully does not argue that intersex people have not suffered discrimination generally, and the government's suggestion (at 21) that intersex people have not suffered *de jure* discrimination ignores the lengthy allegations on that point. Am. Compl. ¶¶ 117, 125, 133. When intersex people are assigned the wrong sex at birth, as commonly happens, they often experience all the same harms that other transgender people experience. And for nearly two centuries of American history, transgender people have been disproportionate targets of policing, prosecution, and incarceration. *Id.* ¶¶ 125, 133 (citing Br. of Law and History Scholars as *Amici Curiae* in Supp. of Resp'ts, *Little v. Hecox*, Nos. 24-38, 24-43 (U.S. Nov. 17, 2025), https://perma.cc/3VYE-DG4Q). They have been prosecuted under cross-dressing laws, and for fraud. *Id*. And they have been disproportionately targeted for public indecency and vagrancy. *Id*. As multiple Courts of Appeals have recognized, "[t]here is no denying that transgender individuals

face discrimination, harassment, and violence because of their gender identity." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *see also Grimm*, 972 F.3d at 610–11 ("one would be hard-pressed to identify a class of people more discriminated against historically or … singled out for adverse treatment, than transgender people" (citation omitted)). In any event, courts in this District considering the existence of a quasi-suspect class do not limit the inquiry to *de jure* discrimination.[16] Even the Solicitor General conceded, during argument in *Skrmetti*, that this prong does "not turn on 'discrimination … reflected in the laws.'" 605 U.S. at 553–54 (Barrett, J., concurring) (citation omitted).

Third, intersex people lack the political power to protect themselves through the political process. Although there are as many as 5.6 million intersex people in the United States, just 0.05% to 1.7% of the population is intersex. Am. Compl. ¶ 117. Contrary to the government's contention (at 21), courts do not limit this inquiry to the historical ability to vote, and the government cites no binding law supporting its narrow view. *See, e.g.*, *Doe 1*, 275 F. Supp. 3d at 209; *Talbott*, 775 F. Supp. 3d at 321–22. In any event, the amended complaint sufficiently alleges that intersex people *have* historically been precluded from voting. Intersex people have historically often been overincarcerated and involuntarily institutionalized, Am. Compl. ¶¶ 125, 133, which would preclude them from voting. Even today, intersex people with mismatched identification documents can be turned away from or subject to additional scrutiny at voting booths. *Id.* ¶ 94 (mismatched identification documents risk accusations of using false or inaccurate identification).

The Executive Order and the Policies discriminate against this quasi-suspect class of

---

[16] *See, e.g.*, *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 208–09 (D.D.C. 2017), *vacated on other grounds*, 755 F. App'x 19 (D.C. Cir. 2019); *Talbott v. United States*, 775 F. Supp. 3d 283, 319–20 (D.D.C. 2025), *stayed on other grounds*, 2025 WL 3533344 (D.C. Cir. Dec. 9, 2025), *aff'd in part on other grounds, vacated in part on other grounds*, 176 F.4th 720 (2026).

intersex people. These laws stand in stark contrast to the challenged statutes in *Skrmetti*, which explicitly exempted intersex people. *See Skrmetti*, 605 U.S. at 507 (noting that "SB1 does not ban fully the administration of [gender-affirming care] to minors," including "to treat a minor's congenital defect [or] precocious (or early) puberty," where "[c]ongenital defect" is defined as an "abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex" (citation omitted)). Because the Executive Order and the Policies discriminate against intersex people like Ms. Jansen by barring her from obtaining a sex marker consistent with her lived sex, this Court should subject the Policies to heightened scrutiny. And for the same reasons they fail rational basis review, they fail heightened scrutiny. *See supra* pp. 23–29.

**C. The Executive Order and the Policies violate Ms. Jansen's First Amendment right to freedom of speech.**

The government cannot compel its private citizens to speak—regardless of whether the compelled speech also implicates government speech. Otherwise, language included on state-issued license plates would pose no compelled speech concerns, contrary to *Wooley v. Maynard*, 430 U.S. 705, 717 (1977). The government's reliance on the government-speech doctrine, including *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), thus fails to cure the First Amendment violation. Even if the government were correct that the Executive Order and the Policies implicate government speech, Ms. Jansen's First Amendment rights trump the government-speech doctrine. And in either event, the government completely ignores the *non-government* speech that the Order and the Policies compel: Ms. Jansen's speech when filling out passport and Global Entry forms.

***i. The government-speech doctrine does not supersede the compelled-speech doctrine.***

The First Amendment prohibits the government from compelling a private citizen to speak a message to which she objects. *See Wooley*, 430 U.S. at 717. This principle is as old as the Republic: "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism,

religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). And where this principle applies, it cannot be superseded by government speech. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015) ("[T]he Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech.").

The government's resort to the government-speech doctrine "misses the mark." *Cressman v. Thompson*, 798 F.3d 938, 949–50 (10th Cir. 2015). The Supreme Court "has never held that government speech is a defense to a compelled speech claim." *Va. State Conf. NAACP v. Cnty. Sch. Bd. of Shenandoah Cnty.*, 799 F. Supp. 3d 515, 533 (W.D. Va. 2025); *Minn. Voters All. v. City of Saint Paul*, 442 F. Supp. 3d 1109, 1116–17 (D. Minn. 2020) ("Federal courts … have concluded that 'the issue of whether a [message] is government speech is inapposite' when 'the central question presented is whether an individual has been compelled to speak.'" (citation omitted)). In fact, "the Supreme Court has expressly stated that compelled speech is a limit on government speech doctrine"—and in contrast, "no decision holds the reverse to be true." *Va. State Conf.*, 799 F. Supp. 3d at 536 (citing *Walker*, 576 U.S. at 207). This hierarchy makes good sense. While the compelled-speech doctrine is premised on the understanding that private citizens have First Amendment rights, the government-speech doctrine is "not based on the view … that governmental entities have First Amendment rights." *Shurtleff*, 596 U.S. at 268 (Alito, J., concurring in judgment). Instead, the government-speech doctrine simply follows from the premise that pure government speech—speech made by a government mouthpiece to express governmental views—does not implicate the First Amendment rights of citizens. *See id.* Thus, when the government *purports* to speak but does so in a way that implicates the First Amendment

rights of citizens, the government-speech doctrine is no refuge. *See Walker*, 576 U.S. at 208.

Contrary to the government's contention (at 22–23), the Supreme Court's decision in *Shurtleff*, 596 U.S. at 252, did not overrule decades of Supreme Court precedent, *see Wooley*, 430 U.S. at 717. That viewpoint-discrimination case does not apply to this compelled-speech context. *See Shurtleff*, 596 U.S. at 247, 250–51 (considering claim that city refused to include plaintiff's flag in flag-raising program at city hall). Rather, the Court in *Shurtleff* crafted a test for determining whether the government speaks on its own behalf or regulates private speech in the context of an alleged speech restriction (or, in the religious-freedom context, alleged viewpoint discrimination). *See, e.g.*, *id.* at 256–57; *see also id.* at 252 (providing a test for determining when "government-public engagement transmit[s] the government's own message" versus when "it instead create[s] a forum for the expression of private speakers' views"). Thus, for example, the *Shurtleff* test applies where the government "invites the people to participate in a program" that "encourages diverse expression," *id.* at 247, 252, or "creat[es] a forum for debate," *id.* at 247, 252, or allows citizens to use a public flagpole, *see id.* at 248, or erects donated monuments in a city park, *see Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 464 (2009), or allows citizens to design their own license plates, *see Walker*, 576 U.S. at 219. The majority opinion in *Shurtleff* never mentions compelled speech and relies on no compelled-speech cases.

Moreover, as Justice Alito's concurrence explains, extending the *Shurtleff* test to the compelled-speech context would be illogical and dangerous. As the Court has long recognized, "not all governmental activity that qualifies as 'government speech' … is exempt from First Amendment scrutiny," since "'the Free Speech Clause itself may constrain the government's speech' … when a 'government seeks to compel private persons to convey the government's speech.'" *Shurtleff*, 596 U.S. at 262–68 (Alito, J., concurring in judgment) (quoting *Walker*, 576

U.S. at 208). Applying the *Shurtleff* test to compelled speech would also open the door to "dangerous misuse." *Id.* at 262 (quoting *Matal v. Tam*, 582 U.S. 218, 235 (2017)). In particular, "it can be difficult to tell whether the government is using the doctrine 'as a subterfuge for favoring certain private speakers over others based on viewpoint.'" *Id.* (quoting *Summum*, 555 U.S. at 473). Or the government could compel an individual to carry any controversial message under the guise of government speech—for example, by adding partisanship designations to IDs, the government could brand its critics as "communists," "fascists," "lunatics," or the like, and there would be no recourse for holders under the First Amendment. But that is not the law. *See, e.g.*, *Va. State Conf.*, 799 F. Supp. 3d at 533 ("the fact that the government is the ultimate source of any speech at issue helps rather than hinders plaintiffs' [compelled speech] First Amendment claim").[17]

In any event, as explained below, the Executive Order and the Policies unconstitutionally compel speech regardless of whether they also implicate "government speech" under the *Shurtleff* test. *See infra* pp. 39–41.

***ii. The Executive Order and the Policies unconstitutionally compel Ms. Jansen's speech.***

Because the government-speech doctrine cannot supersede the First Amendment, the only relevant question in this compelled-speech claim is whether the Executive Order and the Policies compel Ms. Jansen's speech. They do. The elements of compelled speech are straightforward: the plaintiff must generally identify (1) speech; (2) to which she objects; (3) that is compelled; and (4)

[17] Some courts have neglected to heed these warnings, instead applying the *Shurtleff* test broadly to any cases where the government invokes the government-speech doctrine, including in the compelled-speech context. *See Khatibi v. Hawkins*, 145 F.4th 1139, 1141 (9th Cir. 2025); *Advance Colorado v. Griswold*, 99 F.4th 1234, 1240 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1168 (2025); *Brown v. Yost*, 133 F.4th 725, 734 (6th Cir. 2025). Notably, however, the parties in *Khatibi* and *Brown* did not dispute application of the *Shurtleff* test, and the plaintiff-appellant in *Advance Colorado* did not argue that its speech was "improperly compelled by the government speech." *Advance Colorado*, 99 F.4th at 1242 & n.6.

that is readily associated with her. *See, e.g.*, *Cressman*, 798 F.3d at 949–50; *Norgren v. Minn. Dep't of Hum. Servs.*, 96 F.4th 1048, 1057 (8th Cir. 2024). Ms. Jansen meets each of these factors. And she meets them twice over: the government compels speech not only by compelling Ms. Jansen to carry a passport and a Global Entry card indicating that she is "male," but also by compelling her to indicate in her passport and Global Entry applications that she is "male."

*First*, the sex markers on Ms. Jansen's identification documents and on her applications are speech because they communicate information about the bearer to anyone who views them. *See, e.g.*, *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 754–55 (6th Cir. 2025) (recognizing biological and preferred pronouns as speech). Just as elements of a license plate can be speech, so too can elements of passports, Global Entry cards, and applications. *See Wooley*, 430 U.S. at 707, 717; *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1326 (M.D. Ala. 2019) (finding statement on state ID card is speech). It is irrelevant whether the sex markers communicate ideological beliefs or are merely statements of fact. *See Hurley v. Irish-Am. Gay, Lesbian, Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (First Amendment protections apply "equally to statements of fact the speaker would rather avoid"); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 782 (1988) ("a distinction cannot be drawn between compelled statements of opinion and … of 'fact'"); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 554 (D.C. Cir. 2015) ("That a disclosure is factual, standing alone, does not immunize it from scrutiny[.]").

*Second*, as is evident from this lawsuit, Ms. Jansen objects to the government's message. The Executive Order and the Policies counterfactually require her to state that she is male, despite the fact that she has sex chromosomes typical of both sexes and has lived as a woman for over thirty years. Am. Compl. ¶¶ 72–73. As a matter of both dignity and safety, Ms. Jansen objects to conveying the message that she is male. *Id.* ¶ 150.

*Third*, the speech is compelled. Ms. Jansen is directly compelled to speak the government's message by designating herself as "male" on her passport and Global Entry applications—under penalty of perjury or other criminal liability. *See supra* p. 4 (citing 22 U.S.C. § 213; 18 U.S.C. § 1542; 22 C.F.R. § 51.20(b)); *supra* p. 6 (citing 18 U.S.C. § 1001(a)(2)–(3)). Separately, she is then compelled to carry and use identification indicating that she is male as a condition of using these benefits. *See Cressman*, 798 F.3d at 950 ("the affixation of objectionable speech on a standard license plate implicates compelled-speech concerns if it forces a vehicle owner to 'be an instrument for fostering public adherence to a ... point of view he finds unacceptable'").

*Fourth*, the sex markers on Ms. Jansen's passport and Global Entry applications, on her passport, and on her Global Entry card are readily associated with her, the passport and Global Entry card applicant and holder. The mere fact that a passport or Global Entry card is a "political document" issued and owned by the federal government, Mot. 23, does not mean it is not readily associated with its holder. The government's suggestion to the contrary reads out the Supreme Court's decision in *Wooley*, 430 U.S. at 707, 717, which held that a state motto on a license plate was readily associated with the car owner. And holding otherwise would be nonsensical. For example, no one would argue that a scarlet letter was not readily associated with its wearer, even if it were issued and owned by the federal government. To the contrary, identification documents like passports and Global Entry cards "are meant to be displayed" so as to "convey substantive personal information about their holders"—including sex markers. *Marshall*, 367 F. Supp. 3d at 1326. Notably, that personal information is compiled and provided *by the holder* through his or her application forms. And when the holder presents their identification card, the public understands the holder to be representing that the information is accurate. *See Cressman*, 798 F.3d at 949 (license plate is "closely linked" with holder (citation omitted)). Where there is a mismatch

between the identification and the holder, the public's suspicions are directed at the holder—not the government. Am. Compl. ¶ 96. Thus, when the government compels holders to self-identify a certain way on applications (under penalty of perjury), and to subsequently bear that compelled self-identification on identification cards, that speech is readily associated with the holder.

The government fails to identify any controlling precedent suggesting otherwise. Its cited cases from outside the compelled-speech context are inapposite. *See Walker*, 576 U.S. at 207; *Shurtleff*, 596 U.S. at 252; *Haig v. Agee*, 453 U.S. 280, 283 (1981). So too is *Fowler v. Stitt*, 676 F. Supp. 3d 1094, 1105–08 (N.D. Okla. 2023), *aff'd in part on other grounds, rev'd in part on other grounds*, 104 F.4th 770 (10th Cir. 2024), *vacated on other grounds*, 145 S. Ct. 2840 (2025), and dictum from *Doe v. Kerry*, 2016 WL 5339804 (N.D. Cal. Sept. 23, 2016) (dismissing for lack of standing and ripeness). The reasoning of both cases—that a statement of fact cannot be compelled speech—is contrary to the Supreme Court's and the D.C. Circuit's repeated instruction that compelled speech equally encompasses statements of fact and ideological statements. *See Hurley*, 515 U.S. at 573; *Riley*, 487 U.S. at 782; *Nat'l Ass'n of Mfrs.*, 800 F.3d at 554; *see also Nelson v. Landry*, 714 F. Supp. 3d 790, 803–04 (M.D. La. 2024) (rejecting *Doe*'s reasoning based on *Riley*). Accordingly, the sex markers on Ms. Jansen's passport and Global Entry card, and in her applications for a passport and for Global Entry, are compelled speech—regardless of whether they may also implicate government speech.

***iii.* Shurtleff *confirms that the Executive Order and the Policies violate Ms. Jansen's First Amendment rights.***

Alternatively, even if the government were correct that the *Shurtleff* test controls the outcome with respect to the sex markers on Ms. Jansen's passport and Global Entry card, that test confirms that the sex markers are compelled speech, not government speech. In *Shurtleff*, the Court laid out "a holistic inquiry" to determine "whether the government intends to speak for itself

or to regulate private expression." *Shurtleff*, 596 U.S. at 252. This inquiry "is not mechanical" and focuses on "a case's context rather than the rote application of rigid factors." *Id.* Courts consider "several types of evidence," including but not limited to (1) "the history of the expression at issue," (2) "the public's likely perception as to who (the government or a private person) is speaking," and (3) "the extent to which the government has actively shaped or controlled the expression." *Id.* at 252. Each of these factors weighs in favor of Ms. Jansen.

First, sex markers on passports and Global Entry cards do not historically convey any "governmental message" about sex. *Shurtleff*, 596 U.S. at 253–54. To the contrary, the State Department has historically allowed people to change the sex marker on their passport consistent with medical documentation. Indeed, the State Department only began requiring sex markers on passports 50 years ago, and it has allowed people to change the sex marker on their passport for the majority of that time. Am. Compl. ¶¶ 49, 51–54. Ms. Jansen herself successfully petitioned the State Department to change the sex marker on her passport in the 1990s. *Id.* ¶ 80. CBP, too, has long allowed people to choose their correct sex for their Global Entry participation. *Id.* ¶ 69. Global Entry only launched as a pilot program less than 20 years ago, in 2008, *see* 73 Fed. Reg. at 19,861, and Ms. Jansen's sex marker has been "female" since her entry into the program in 2009, Am. Compl. ¶ 81. The government has thus long respected private citizens' medically documented sex without using sex markers to convey any particular *governmental* message about its citizens' bodies. That is in stark contrast to *Shurtleff*, where the Court explained, in considering the history of flag-flying, that "the content of a flag" and "its presence and position" have "long conveyed important messages about government." 596 U.S. at 253–54.

Second, the public is likely to perceive the sex markers on Ms. Jansen's passport and Global Entry card as "associate[d]" with her—the holder of those documents—for the same reasons

explained above. *Shurtleff*, 596 U.S. at 255. The entire point of identification documents is to convey personal information about their holder, and the public understands that the information on an identification document is generally compiled *by the holder*. *See supra* pp. 38–39.

Finally, the government "control[s]" the speech only as a form of unconstitutional censorship. *Shurtleff*, 596 U.S. at 252. The speech starts and ends with the holder, with a pit stop in between for the government to ensure the holder is conveying the government's preferred ideological message. The holder first provides the sex designation to the government—under penalty of perjury or other criminal liability should it not reflect the government's preferred view. *See Matal*, 582 U.S. at 235 ("The Federal Government does not dream up these [trade]marks…."); *supra* p. 4 (citing 22 U.S.C. § 213; 18 U.S.C. § 1542; 22 C.F.R. § 51.20(b)); *supra* p. 6 (citing 18 U.S.C. § 1001(a)(2)–(3)). The holder is subsequently forced to become "a 'mobile billboard' for the [government's] ideological message" by carrying and using the resulting identification documents. *Wooley*, 430 U.S. at 715. This form of "control" is "an essential element of censorship." *Shurtleff*, 596 U.S. at 264 (Alito, J., concurring in judgment). By way of analogy, a requirement that any play be reviewed, edited, and approved by the government before performance would unquestionably give the government "extensive 'control over the nature and content' … of covered performances"—yet no one would "seriously maintain that those plays were thereby transmuted into the government's speech." *Id.* (discussing the British Licensing Act of 1737). Accordingly, even the inapt *Shurtleff* test confirms that the Executive Order and the Policies unconstitutionally compel Ms. Jansen's speech.

**D. The Executive Order and the Policies violate Ms. Jansen's Fifth Amendment right to substantive due process.**

The government does not dispute that, should this Court recognize a fundamental right to informational privacy, the Policies violate that right. Instead, the government attempts (at 24) to

sanitize the question down to whether there is a fundamental right to "self-select[] a sex marker." But that writes out the very information that Ms. Jansen seeks to keep private. Ms. Jansen's due process claim does not concern her sex marker in isolation; it concerns the intimate personal information about her body and sex that the sex marker necessarily discloses, given that it does not match her personal appearance or other forms of identification. For Ms. Jansen, the sex marker that the Executive Order and the Policies require discloses that she is intersex or transgender or both, thereby putting her at serious risk of physical and emotional abuse.

The Supreme Court has suggested that the Constitution protects some form of informational privacy "for nearly 100 years." *Aid for Women v. Foulston*, 441 F.3d 1101, 1116 (10th Cir. 2006); *see Whalen v. Roe*, 429 U.S. 589, 599 n.25 (1977) (collecting cases); *Griswold v. Connecticut*, 381 U.S. 479, 483 (1965) ("[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion."); *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting) ("the right to be let alone" is "the most comprehensive of rights and the right most valued by civilized men"). It has repeatedly assumed, without deciding, the existence of a fundamental right to informational privacy. *See Whalen*, 429 U.S. at 599–600; *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457 (1977); *NASA v. Nelson*, 562 U.S. 134, 138, 145–47 (2011). That right is fundamental for all the same reasons that nearly every other court of appeals has recognized it (often in decisions that long predated *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).[18]

---

[18] *Harper v. Werfel*, 118 F.4th 100, 113 (1st Cir. 2024) ("the substantive component of the Due Process Clause protects a limited liberty interest in the confidentiality of certain intimate information"), *cert. denied sub nom. Harper v. Faulkender*, 145 S. Ct. 2867 (2025); *Doe v. City of N.Y.*, 15 F.3d 264, 267 (2d Cir. 1994); *Fraternal Ord. of Police, Lodge No. 5 v. Philadelphia*, 812 F.2d 105, 110 (3d Cir. 1987); *Payne v. Taslimi*, 998 F.3d 648, 655 (4th Cir. 2021); *Woodland v. Houston*, 940 F.2d 134, 138 (5th Cir. 1991) (per curiam); *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998); *Wolfe v. Schaefer*, 619 F.3d 782, 785 (7th Cir. 2010); *Thorne v. City of El Segundo*, 726 F.2d 459, 468 (9th Cir. 1983); *Eastwood v. Dep't of Corr. of Okla.*, 846 F.2d 627, 631 (10th Cir. 1988); *Burns v. Warden, USP Beaumont*, 482 F. App'x 414, 417 (11th Cir. 2012).

Like the Supreme Court, the D.C. Circuit has only "assum[ed] (without deciding) the existence of a constitutional right to informational privacy," *In re U.S. OPM Data Sec. Breach Litig.*, 928 F.3d 42, 72, 74 (D.C. Cir. 2019) ("*In re OPM Litig.*"), and has not yet had occasion to accept an informational-privacy claim. But neither court has ever considered the kind of extraordinary privacy intrusion at issue here. At the outset, information about Ms. Jansen's sexual anatomy and sexual identification is as intimate as it gets. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 572 (2003) ("liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex"); *Obergefell v. Hodges*, 576 U.S. 644, 663 (2015) ("[The Due Process Clause] extend[s] to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs."). This case is about more than "birth dates, Social Security numbers, addresses, and … fingerprint records," *In re OPM Litig.*, 928 F.3d at 49, "private communications," *Nixon*, 433 U.S. at 459, drug prescriptions, *see Whalen*, 429 U.S. at 591, or even use of illicit drugs and other potentially "adverse information," *NASA*, 562 U.S. at 151–55; *Am. Fed'n of Gov't Emps., AFL-CIO v. Dep't of Hous. & Urb. Dev.*, 118 F.3d 786, 794 (D.C. Cir. 1997). This case is about deeply intimate information about Ms. Jansen's bodily and sexual autonomy that she is constitutionally entitled to share only when and with whom she chooses. *See Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) ("The excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate.").

Moreover, the government is not merely collecting and retaining Ms. Jansen's intimate information; it is *publicly disseminating* that information. Each of *Whalen*, *Nixon*, *NASA*, *AFL-CIO*, and *In re OPM Litigation* focused on the fact that the plaintiffs challenged "only the Government's *collection* of information." *NASA*, 562 U.S. at 156; *see also AFL-CIO*, 118 F.3d at

793 (any privacy interest "is significantly less important where the information is … not disseminated publicly"). Ms. Jansen, in contrast, does not have an "unsubstantiated fear of public disclosure." *AFL-CIO*, 118 F.3d at 793. There are no regulatory and statutory "protections against" dissemination of her information. *In re OPM Litig.*, 928 F.3d at 73; *accord NASA*, 562 U.S. at 155; *AFL-CIO*, 118 F.3d at 794. The Executive Order and the Policies will force her to disclose her intimate information *every time* she uses her passport or her Global Entry card because the sex marker required on these documents will clearly not match her physical appearance, how she has been perceived by the public for decades, or her state identification documents. Disclosure is a feature of the Executive Order and the Policies, not a bug.

Especially given the nature of the information at stake—information about Ms. Jansen's body and sex—the Policies violate Ms. Jansen's fundamental right to informational privacy. Indeed, multiple courts have specifically held that a government policy forcing the disclosure of transgender status violates that fundamental right.[19] The government's reliance (at 24) on the Sixth Circuit's decision in *Gore v. Lee* is misplaced, as *Gore* placed the Sixth Circuit in the significant minority of circuits in holding that "the Constitution does not create a general right of privacy." 107 F.4th 548, 563 (2024).

Because the Executive Order and the Policies violate Ms. Jansen's fundamental right to

---

[19] *See Powell*, 175 F.3d at 111 (recognizing a privacy right in maintaining the confidentiality of one's transgender identity in challenge to prison guard's disclosure of plaintiff's identity); *Ray v. McCloud*, 507 F. Supp. 3d 925, 932, 939–40 (S.D. Ohio 2020) ("forced disclosure of a transgender individual's status as transgender [on birth certificate] was highly personal sexual information that [i]s protected by the due process clause's informational right to privacy"); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) ("By permitting plaintiffs to change the name on their birth certificate, while prohibiting the change to their gender markers, the Commonwealth forces them to disclose their transgender status in violation of their constitutional right to informational privacy."); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015) (same regarding state-issued driver's licenses and state identification cards).

informational privacy, they must satisfy strict scrutiny review. *See Glucksberg*, 521 U.S. at 720. Under that standard, Defendants must demonstrate that the Executive Order and the Policies are narrowly tailored to achieve a compelling government interest and that they have attempted to use less intrusive alternatives to achieve that interest. *See Johnson v. California*, 543 U.S. 499, 505 (2005). Defendants cannot do so, for all the same reasons the laws fail rational basis review. *See supra* pp. 23–29.

## II. MS. JANSEN INTENDS TO SEEK EXPEDITED PRODUCTION OF THE ADMINISTRATIVE RECORD FOR THE GLOBAL ENTRY POLICY.

Ms. Jansen takes no position on the government's request for excusal from this District's requirement that the administrative record be served "simultaneously with the filing of a dispositive motion," D.D.C. LCvR 7(n)(1); Mot. 25, on the condition that the government otherwise provides expedited processing and production of the administrative records. Ms. Jansen agrees that the administrative records for the respective Policies are not required to confirm that she has plausibly alleged violations of the APA, equal protection under the Fifth Amendment, the First Amendment, and the Due Process Clause of the Fifth Amendment. Ms. Jansen notes that the government has already publicly filed the administrative record for the Passport Policy in *Orr v. Trump*, No. 1:25-cv-10313 (D. Mass. Aug. 27, 2025), ECF No. 140. To facilitate expedited summary judgment briefing, Ms. Jansen intends to seek expedited production of (1) any updates to the administrative record for the Passport Policy, if necessary, and (2) the administrative record for the Global Entry Policy.

## CONCLUSION

Ms. Jansen respectfully requests that the Court deny the government's motion to dismiss.

Dated: October 2, 2026

Respectfully submitted,

*/s/ Cassandra M. Snyder*
Andrew Kim (#1029348)
Cassandra M. Snyder (#1671667)
Kylie E. Burke (#90040140)
GOODWIN PROCTER, LLP
1900 N Street, N.W. Washington, DC 20036
Tel.: (202) 346-4000
Fax: (202) 246-4444
AndrewKim@goodwinlaw.com
CassandraSnyder@goodwinlaw.com
KylieBurke@goodwinlaw.com

Louis Lobel (admitted *pro hac vice*)
Andrea S. Goodman (admitted *pro hac vice*)
GOODWIN PROCTER, LLP
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
Fax: (617) 523-1231
LLobel@goodwinlaw.com
AndiGoodman@goodwinlaw.com

Timothy James Beavers (admitted *pro hac vice*)
GOODWIN PROCTER, LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 459-7208
Fax: (212) 355-3333
TBeavers@goodwinlaw.com

*Counsel for Plaintiff*